| | |
|---|---|
| PICATINNY FEDERAL CREDIT UNION,<br><br>　　　　　　Plaintiff,<br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>　　　　　　Defendant. | UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY<br><br>Hon. Garrett E. Brown<br><br>Consolidated Civil Action<br>No. 09-01295 (GEB) |
| SPERRY ASSOCIATES FEDERAL CREDIT UNION,<br><br>　　　　　　Plaintiff,<br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>　　　　　　Defendant. | PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE FOR TRIAL |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>　　　　　　Plaintiff,<br>v.<br><br>PROPONENT FEDERAL CREDIT UNION,<br><br>　　　　　　Defendant. | |
| SUFFOLK FEDERAL CREDIT UNION,<br><br>　　　　　　Plaintiff,<br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>　　　　　　Defendant. | |

Pursuant to Rule 56.1 of the Local Civil Rules, plaintiff Picatinny Federal Credit Union ("Picatinny") submits this statement of material facts as to which there is no genuine issue for trial on its motion for partial summary judgment as to liability on the First Count of the Amended Complaint for conversion of promissory notes underlying 52 first mortgage loans Picatinny made to its members, and on the Second Count of the Amended Complaint for a judgment declaring that Fannie Mae does not have any right to enforce the notes and related mortgages because they were transferred to Fannie Mae over Picatinny's unauthorized indorsement and requiring Fannie Mae to return these notes and mortgages to Picatinny.

1. Picatinny is a federally chartered credit union. (Affidavit of William Darling, ¶2) (hereinafter "Darling Aff.").

2. Picatinny's members consist of military and other personnel stationed and/or working at the Picatinny Arsenal, other residents of the Morris County area, and local businesses. (Darling Aff., ¶2).

3. As a federally chartered credit union, Picatinny is a not-for-profit, cooperative financial institution that is owned and run by its members. (Darling Aff., ¶3).

4. The members of Picatinny pool their funds together by purchasing Share Accounts, the proceeds of which are used to make loans to the members of Picatinny. (Darling Aff., ¶3). The interest income from these loans is used to pay Picatinny's expenses and cover its capital reserve requirements with the remaining income returned to the members as dividends on their Share Accounts and other services provided by Picatinny. (Id.).

5. Picatinny is governed by a Board of Directors solely consisting of its members. (Darling Aff., ¶4). Members of Picatinny's Board of Directors do not receive

payment for their services; rather, they are volunteers who are elected to the Board by other members of the credit union. (Id.).

6. In 1995, Picatinny began making first mortgage loans to its members. (Deposition of Stephen J. Lardiere, T. 23-11 to 23-17, attached as Exhibit C to the Affidavit of James H. Forte) (hereinafter "Forte Aff.").

7. At that time, Picatinny did not have employees with expertise in making or servicing first mortgage loans, and did not wish to incur the substantial cost of hiring employees to staff a first mortgage department and purchasing the requisite hardware and software. (Id., T. 26-3 to 27-7, attached as Exhibit C to the Forte Aff.).

8. As of April 7, 1995, Picatinny retained CUMAnet to originate, process, underwrite and close first mortgage loans for Picatinny's members and service those loans for Picatinny. (Forte Aff., Exhibit D; ¶¶1-5 and 9, and Exhibit A to Agreement; Lardiere Dep. T. 46-3 to 46-10).

9. CUMAnet maintained for Picatinny the mortgage loan files, including the original promissory notes. (Lardiere Dep. T. 31-18 to 31-21, 33-18 to 34-1, attached as Exhibit C to the Forte Aff.).

10. CUMAnet, at all relevant times, maintained the original notes not only on behalf of Picatinny but also on behalf of all other credit unions whose loans it serviced. (Deposition of Joan Mahon, T. 41-10 to 41-13, 69-19 to 70-4, 139-16 to 140-3, 141-19 to 142-20, attached as Exhibit D to the Forte Aff).

11. Picatinny permitted CUMAnet to maintain Picatinny's loan files and original promissory notes because CUMAnet had the facilities to maintain those documents in a secure manner. (Lardiere Dep. T. 32-7 to 32-19, attached as Exhibit C to the Forte Aff.).

12. CUMAnet stored Picatinny's promissory notes in locked file cabinets with a fireproof rating in a secure area. (Lardiere Dep. T. 34-12 to 35-9, attached as Exhibit C to the Forte Aff.). Picatinny did not own such cabinets. (Id., T. 34-20 to 34-23, 36-8 to 36-15).

13. In the late 1990s, Dennis Fitzpatrick, the then Chief Executive Officer of CUMAnet, advised Picatinny he was leaving CUMAnet and forming CU National, which would operate exactly like CUMAnet. (Lardiere Dep. T. 70-14 to 70-25, attached as Exhibit C to the Forte Aff.).

14. Because Picatinny was satisfied with the services CUMAnet had provided while Mr. Fitzpatrick was its Chief Executive Officer, and CU National offered reduced pricing for the same services, Picatinny selected CU National as its new mortgage loan originator and servicer. (Lardiere Dep. T. 71-10 to 71-19).

15. As of July 1, 1999, Picatinny and CU National entered into the Credit Union Support Services and Correspondent Lending Agreement (the "Agreement") under which CU National agreed to provide Picatinny with loan services that were integral to Picatinny's residential mortgage lending program, including the performance of all duties necessary or incidental to the servicing of all first mortgage loans on behalf of Picatinny. (Darling Aff., ¶5, Exhibit A, at 13). These services included the collection of payments from Picatinny loan customers and the remittance of those payments to Picatinny. (Id.).

16. U.S. Mortgage was not a party to the Credit Union Support Services and Correspondent Mortgage Lending Agreement between CU National and Picatinny. (Darling Aff., Exhibit A).

17. The Agreement provided that CU National, "shall keep full and complete records pertaining to each Mortgage Loan." (Darling Aff., Exhibit A, at 14).

18. Picatinny permitted CU National to maintain its loan files, including the original promissory notes. (Lardiere Dep. T. 75-6 to 75-18, 82-5 to 82-18, 83-10 to 86-9, attached as Exhibit C to the Forte Aff.).

19. Auditors of the National Credit Union Administration, which has federal oversight over federal credit unions, were aware that CU National was holding Picatinny's original notes and did not object to this practice. (Lardiere Dep. T. 87-10 to 88-15, attached as Exhibit C to the Forte Aff.; Darling Aff., ¶7).

20. Picatinny was not the only credit union whose loan files and original promissory notes CU National maintained. (Affidavit of Michael J. McGrath, ¶7) (hereinafter "McGrath Aff."). For many of the credit unions whose loans CU National serviced, CU National maintained physical custody of the loan files, including the original promissory notes underlying the loans. (Id.).

21. At some time during the period from July 1999 through early February 2009, CU National maintained original promissory notes for the following credit unions: (a) 1st Liberty Federal Credit Union; (b) 102 Federal Credit Union; (c) ADP Federal Credit Union; (d) Avon Federal Credit Union; (e) Bard Employees Federal Credit Union; (f) British Airways Employees Federal Credit Union; (g) County Educators Federal Credit Union; (h) Cross Valley Federal Credit Union; (i) CWA Long Island Federal Credit Union; (j) Delta Employees Federal Credit Union; (k) Dow Jones Employees Federal Credit Union; (l) Duval Federal Credit Union; (m) "E" Federal Credit Union; (n) Educational Systems Federal Credit Union; (o) Essex County Teachers Federal Credit Union; (p) First Florida Federal Credit Union; (q) Florida Aircraft Federal Credit Union; (r) Frontier Federal Credit Union; (s) GTE Federal Credit Union; (t) H.E. Telephone Federal Credit Union; (u) Holston Methodist Federal Credit Union; (v) Jersey Trades

Federal Credit Union; (w) J.M. Associates Federal Credit Union; (x) Liberty Savings Federal Credit Union; (y) League of Municipal Taxi Owners Federal Credit Union; (z) Lone Star Credit Union; (aa) Lower Eastside People Federal Credit Union; (bb) Manville Area Credit Union; (cc) Miami Firefighters Federal Credit Union; (dd) Miami Police Federal Credit Union; (ee) Middlesex Federal Credit Union; (ff) MidSouth Federal Credit Union; (gg) Moapa Valley Federal Credit Union; (hh) N.E.T. Federal Credit Union; (ii) Newark Board of Education Employees Federal Credit Union; (jj) North Jersey Federal Credit Union; (kk) Novartis Federal Credit Union; (ll) Oregon Community Federal Credit Union; (mm) Penn East Federal Credit Union; (nn) Peoples First Choice Federal Credit Union; (oo) Picatinny Federal Credit Union; (pp) Pine Bluff Cotton Belt Federal Credit Union; (qq) Pinnacle Federal Credit Union; (rr) Potter's House Federal Credit Union; (ss) Rutgers Federal Credit Union; (tt) San Antonio Citizens Federal Credit Union; (uu) Skyline Federal Credit Union; (vv) Sperry Federal Credit Union; (ww) Suffolk Federal Credit Union; (xx) TCT Federal Credit Union; (yy) Toledo Urban Federal Credit Union; (zz) Treasury Department Federal Credit Union; (aaa) Tri-Linc Federal Credit Union; (bbb) Tucson Federal Credit Union; (ccc) Tuscaloosa VA Federal Credit Union; (ddd) United Financial Services Community Federal Credit Union; (eee) Velocity Federal Credit Union; (fff) Wakefern Federal Credit Union; and (ggg) Wauna Federal Credit Union. (McGrath Aff., ¶7).

22. Under the Agreement, CU National agreed to assist Picatinny if it desired to sell its first mortgage loans to the secondary market. (Darling Aff., ¶6, Exhibit A, at 15). The Agreement, however, did not authorize CU National or its parent company, U.S. Mortgage, to indorse the promissory notes underlying Picatinny's mortgage loans or to execute assignments of mortgage, or to sell any loans. (Darling Aff., ¶¶7; McGrath Aff., ¶¶9, 10 and 23).

{00645099.DOC}                                6

23. In January 2009, Picatinny learned from sources other than CU National that CU National had sold certain Picatinny loans to Fannie Mae without Picatinny's knowledge or authorization, and did not remit the loan proceeds to Picatinny. (Darling Aff., ¶8).

24. In a February 12, 2009 letter, U.S. Mortgage confirmed that it had sold at least forty Picatinny loans without Picatinny's authorization and diverted the sales proceeds. (Darling Aff., Exhibit D).

25. In February 2009, Picatinny undertook its own investigation to determine the number of loans U.S. Mortgage had sold without Picatinny's knowledge or authorization, and discovered U.S. Mortgage may have unlawfully sold as many as 58 Picatinny mortgage loans. (Darling Aff., ¶11).

26. On February 18, 2009, Picatinny's counsel provided Fannie Mae with a spreadsheet of the 58 Picatinny loans and asked Fannie Mae to "advise whether Fannie Mae's books and records reflect that these loans were sold to it." (Forte Aff., Exhibit F).

27. The 58 loans identified in Picatinny's spreadsheet include the 52 loans on which Picatinny seeks to recover from Fannie Mae in its Amended Complaint (hereinafter "Stolen Loans") and six other loans Picatinny was unable to track through its records. (Darling Aff., ¶11).

28. On February 23, 2010, Picatinny's counsel sent Fannie Mae's counsel a second e-mail stating that "I have not heard back from you concerning these loans. Can you please advise whether Fannie Mae's records reflect that the attached loans are in its portfolio?" (Forte Aff., Exhibit G).

29. On February 24, 2009, Picatinny's counsel sent Fannie Mae a letter demanding that Fannie Mae immediately return the Stolen Loans and six additional loans, and

account for and return all payments received in connection therewith. (Forte Aff., Exhibit I). In his letter, Picatinny's counsel explained why Fannie Mae did not have any right to retain Picatinny's property and advised that "if Fannie Mae does not deliver to my office the requested allonges and assignments and remit all payments collected on or before noon on Friday, February 27, Picatinny shall file suit against Fannie Mae without further notice." (Id.).

30. Fannie Mae did not honor Picatinny's demand, either in whole or in any part. (Forte Aff., Exhibit I).

31. On June 11, 2009, Mr. McGrath pled guilty to one count of mail and wire fraud conspiracy and one count of money laundering conspiracy arising from his fraudulent sale, though U.S. Mortgage, of nearly 500 first mortgage loans totaling in excess of $136 million that CU National was servicing for credit unions. (McGrath Aff., ¶¶2, 3; Exhibit A). The vast majority of these sales occurred without the knowledge or consent of the credit unions, and without the credit unions receiving the sales proceeds. (Id.).

32. All of the Stolen Loans were unauthorized sales. (McGrath Aff., ¶¶2, 3, 22 and 23; Exhibit A).

33. In connection with 51 out of 52 of Stolen Loans (other than the Bonte loan), Mr. McGrath signed an allonge to the underlying promissory note and an assignment of mortgage purportedly as an "AVP" (Assistant Vice President) of Picatinny for the purpose of selling the loan to Fannie Mae. (McGrath Aff., ¶22).

34. Mr. McGrath never was an "AVP" or other officer of Picatinny. (McGrath Aff., ¶22).

35. Mr. McGrath signed his own name to each of these allonges and assignments of mortgage but misrepresented that he was an "AVP" of Picatinny and that he had authority to act on its behalf. (McGrath Aff., ¶23).

36. Fannie Mae required its loan sellers, including U.S. Mortgage, to deliver documents to be purchased to Fannie Mae's Document Delivery Facility (hereinafter "DDF"). (Deposition of John Gang, T. 93-18 to 94-2, 94-9 to 97-21, attached as Exhibit L to the Forte Aff.).

37. After delivery of the loan documents to the DDF, Fannie Mae would review the promissory notes, indorsements or allonges to ensure that they were in proper form, a process Fannie Mae referred to as certification. (Gang Dep. T. 22-7 to 22-14, attached as Exhibit L to the Forte Aff.).

38. If DDF did not certify the loan, Fannie Mae would not purchase it. (Deposition of Barbara Cushman, T. 134-13 to 134-18, attached as Exhibit M to the Forte Aff.).

39. In discovery, Fannie Mae produced a spreadsheet that identifies who at Fannie Mae reviewed the documents underlying the Stolen Loans and all other loans stolen from other credit unions by Mr. McGrath. (Forte Aff., ¶4; Exhibit N).

40. The spreadsheet does not identify anyone who reviewed the indorsements, allonges and mortgage assignments relating to 29 Stolen Loans. (Forte Aff., ¶4; Exhibit N).

41. Barbara Cushman certified for Fannie Mae documents underlying the Stolen Loans without relying upon any actions of Picatinny. (Cushman Dep. T. 134-13 to 134-18, attached as Exhibit M to the Forte Aff.).

42. Fannie Mae does not keep a record of who was authorized to sign notes on behalf of the payee. (Gang Dep. T. 118-3 to 119-2, attached as Exhibit L to the Forte Aff.).

43. Fannie Mae never reviewed prior allonges and indorsements on notes to determine whether the persons signing notes presented for purchase were authorized. (Gang Dep. T. 119-6 to 119-13, attached as Exhibit L to the Forte Aff.).

44. The Fannie Mae Customer Account Manager assigned to U.S. Mortgage did not believe that Mr. McGrath was an Assistant Vice President of Picatinny or any other credit union. (Deposition of Alexander Saphos, T. 133-5 to 135-5).

SAIBER LLC
Attorneys for Plaintiff
Picatinny Federal Credit Union

By: _____
JAMES H. FORTE
A Member of the Firm

Dated: December 15, 2010