| | |
|---|---|
| PICATINNY FEDERAL CREDIT UNION,<br><br>                    Plaintiff,<br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>                    Defendant. | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY<br><br>Hon. Garrett E. Brown<br><br>Consolidated Civil Action No. 09-01295 (GEB) |

SPERRY ASSOCIATES FEDERAL CREDIT UNION,

                    Plaintiff,
v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION,

                    Defendant.

---

FEDERAL NATIONAL MORTGAGE ASSOCIATION,

                    Plaintiff,
v.

PROPONENT FEDERAL CREDIT UNION,

                    Defendant.

---

SUFFOLK FEDERAL CREDIT UNION,

                    Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION,

                    Defendant.

{00642353.DOC}

BRIEF OF PLAINTIFF PICATINNY FEDERAL CREDIT UNION IN
SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932
(973) 622-3333
JF2248
Attorneys for Plaintiff
Picatinny Federal Credit Union

Motion Return Date:

    Monday, February 22, 2011

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ....................................................................1

STATEMENT OF FACTS ...........................................................................7

    A.    Picatinny's Status As A Credit Union ....................................7

    B.    Picatinny Begins To Make First Mortgage Loans ..................8

    C.    Picatinny Retains CU National To Originate And Service Its Mortgage Loans ...................................................................9

    D.    Picatinny's Sale Of Loans To The Secondary Market.............10

    E.    Picatinny Discovers Mr. McGrath's Fraud.............................11

    F.    Fannie Mae Refusal To Return The Stolen Loans.................12

ARGUMENT    13

    I.    FANNIE MAE HAS CONVERTED THE STOLEN LOANS ............................13

        A.    U.S. Mortgage Was A Person Not Entitled To Enforce The Promissory Notes.......................................14

        B.    Fannie Mae Did Not Take The Promissory Notes By Negotiation ..........15

        C.    The Same Result Applies If Picatinny's Promissory Notes Are Non-Negotiable..........................................16

    II.    FANNIE MAE IS NOT A HOLDER IN DUE COURSE...................................17

        A.    Fannie Mae Is Not A Holder Of Picatinny's Promissory Notes...............18

        B.    The Promissory Notes Are Not Negotiable Instruments ..........................21

    III.    FANNIE MAE'S ALLEGED STATUS AS A GOOD FAITH PURCHASER FOR VALUE IS NOT A DEFENSE TO PICATINNY'S CONVERSION CLAIM.......................................24

    IV.    FANNIE MAE'S ACTUAL AUTHORITY DEFENSE IS FRIVOLOUS ..........26

V.      US MORTGAGE DID NOT HAVE PICATINNY'S APPARENT
        AUTHORITY TO INDORSE THE PROMISSORY NOTES
        UNDERLYING THE STOLEN LOANS ................................................29

VI.     THE WAIVER AND ESTOPPEL DEFENSES LACK MERIT..........................33

VII.    FANNIE MAE'S UCC DEFENSES ARE NOT APPLICABLE TO THE
        PROMISSORY NOTES UNDERLYING THE STOLEN LOANS ....................35

VIII.   EVEN IF THE PROMISSORY NOTES UNDERLYING
        THE STOLEN LOANS ARE NEGOTIABLE INSTRUMENTS,
        FANNIE MAE'S UCC DEFENSES ARE UNAVAILING .................................36

        A.      N.J.S.A. 12A:3-405(b) Does Not Apply Because
                CU National Did Not Have Responsibility With Respect To
                The Notes And The Notes Did Not Contain A Fraudulent
                Indorsement As Defined In The UCC ......................................36

        B.      N.J.S.A. 12A:3-406 Does Not Apply Because The Notes
                Did Not Contain A Forged Indorsement....................................39

CONCLUSION.................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## FEDERAL CASES

<u>Adams v. Madison Realty & Development, Inc.</u>, 853 F.2d 163 (2d Cir. 1988) ...........................14

<u>Carton v. Choice Point</u>, 450 F.Supp.2d 489 (D.N.J. 2006) ...........................................17

<u>Cooperatieve Centrale Raifeeisen-Boerenleenbank B.A. v. Bailey</u>,
       710 F. Supp. 737 (C.D. Cal. 1989) ...............................................................22

<u>Corestar Inter, Pte. Ltd. v. LPB Communications, Inc.</u>,
       513 F.Supp.2d 107 (D.N.J. 2007) ...............................................................17

<u>McAdam v. Dean Witter Reynolds, Inc.</u>, 896 F.2d 750 (3d Cir. 1990)..................................16, 17

<u>Sylvan Learning Systems, Inc. v. Gordon</u>, 135 F.Supp.2d 529 (D.N.J. 2000).........................4, 29

<u>Webb Carter Construction Co., Inc. v. Louisiana Central Bank</u>,
       922 F.2d 1197 (5th Cir. 1991) ...............................................................38

## STATE CASES

<u>American Liberty Insurance Co. v. AmSouth Bank</u>, 825 So.2d 786 (Ala. 2002) .........................39

<u>Baurhenn v. Fidelity & Deposit Co. of Maryland</u>, 114 N.J.L. 99 (E.& A. 1935) .........................33

<u>Blaisdell Lumber Co. v. Horton</u>, 242 N.J. Super. 98 (App. Div. 1990) .......................................33

<u>Clarke v. Clarke ex. rel. Costine</u>, 359 N.J. Super. 562 (App. Div. 2003)......................................34

<u>County Chevrolet, Inc. v. Township of N. Brunswick Planning Board</u>,
       190 N.J. Super. 376 (App. Div. 1983) ...............................................................34

<u>Geiger Fin. Co. v. Graham</u>, 123 Ga.App. 771, 182 S.E.2d 521 (1971).......................................22

<u>Gotlib v. Gotlib</u>, 399 N.J. Super. 295 (App. Div. 2008).........................................................33-34

<u>J. Wiss & Sons Co. v. H.G. Vogel Co.</u>, 86 N.J.L. 618 (E. & A. 1914) .........................................30

<u>Jackson v. DeWitt</u>, 224 Wis.2d 877, 592 N.W.2d 262 (Ct. App. 1999)......................................22

<u>Kim v. Marina Dist. Development Co. LLC</u>,
       2010 WL 2877784 (D.N.J. July 7, 2010).........................................................30

Knorr v. Smeal, 178 N.J. 169 (2003) ...........................................................................5, 33, 34

Mercer v. Weyerhaeuser Co., 324 N.J. Super. 290 (App. Div. 1999) .......................................29

Mountain Ridge State Bank v. Investor Funding Corp.,
    1990 WL 261859, 13 UCC Rep.Serv.2d 184 (Law Div. 1990).........................................20

N. Rothenberg & Son, Inc. v. Nako, 49 N.J. Super. 372 (App. Div. 1958)..................................30

O'Malley v. Department of Energy, 109 N.J. 309 (1987).............................................................34

Owens v. Wood, 43 Ala. App. 366, 190 So.2d 734 (1966) ..........................................................33

P & K Marble v. La Paglia, 147 A.D.2d 804, 537 N.Y.S.2d 682, 682 (3d Dep't 1989)..............22

Salsman v. National Community Bank, 102 N.J. Super. 482 (Law Div. 1968),
    aff'd, 105 N.J. 164 (App. Div. 1969) ...............................................................15, 19, 20, 38

Santos v. First National State Bank of New Jersey,
    186 N.J. Super. 52 (App. Div. 1982) ...............................................................................20

Simpkins v. 7-Eleven, Inc., 2008 WL 918482 (App. Div. Apr. 7, 2008).....................................30

Thompson v. Lake Cty. Nat'l Bank,
    47 Ohio App.2d 249, 353 N.E.2d 895 (1975)...................................................................33

Touch of Class Leasing v. Mercedes-Benz Credit of Canada, Inc.,
    248 N.J. Super.426 (App. Div), certif. denied, 126 N.J. 390 (1991) ......................4, 25, 26

Wilzig v. Sisselman, 209 N.J.Super. 25 (App. Div.),
    certif. denied, 104 N.J. 417 (1986) .................................................................................30

## STATE STATUTES

N.J.S.A. 12A:1-201(20)...........................................................................................14, 18, 19, 20

N.J.S.A. 12A:1-201(43)......................................................................................................38, 39

N.J.S.A. 12A:2-102...................................................................................................................25

N.J.S.A. 12A:2-403..............................................................................................................25, 26

N.J.S.A. 12A:2-403(1) ......................................................................................................3, 4, 26

N.J.S.A. 12A:3-102(a) ..............................................................................................................16

N.J.S.A. 12A:3-104 ...........................................................................................21, 22

N.J.S.A. 12A:3-104(a)(3) .............................................................................3, 23, 35

N.J.S.A. 12A:3-104(b) ...............................................................................14, 21, 35

N.J.S.A. 12A:3-201(b) ...........................................................................................15

N.J.S.A. 12A:3-203(a) ...........................................................................................14

N.J.S.A 12A:3-301 .................................................................................................14

N.J.S.A. 12A:3-302 ...........................................................................................17, 18

N.J.S.A. 12:3-302(a) ..............................................................................................17

N.J.S.A. 12A:3-309 ...........................................................................................14, 15

N.J.S.A. 12A:3-405 .................................................................................................37

N.J.S.A. 12A:3-405(a)(1) .......................................................................................36

N.J.S.A. 12A:3-405(a)(2) ...................................................................................37, 39

N.J.S.A. 12A:3-405(a)(3) .....................................................................................6, 37

N.J.S.A. 12A:3-405(b) ..........................................................................6, 35, 36, 37

N.J.S.A. 12A:3-406 .................................................................................................39

N.J.S.A. 12A:3-418 ...........................................................................................14, 15

N.J.S.A. 12:A:3-418(d) ..........................................................................................15

N.J.S.A. 12A:3-420 ...........................................................................................13, 21

## MISCELLANEOUS

5A Anderson on the Uniform Commercial Code § 3-104:20 (3d ed. 2010) .................................24

Black's Law Dictionary (6th ed. 1990)....................................................................2

30 N.J. Prac., Law of Mortgages, §28.9 (2d ed.) (2d ed. 2000 & Supp. 2010) .............................23

1 Lary Lawrence, Payment Systems, §3:17 (2010) ......................................................24

Robert J. Mann, Searching for Negotiability in Payment and Credit Systems,
    44 U.C.L.A. Law. Rev. 951 (1998) ...............................................................23

4 William D. Hawkland, UCC Series §3-104:14 (2010) ............................................24

4 William D. Hawkland, UCC Series §3-202:4 (2010) .............................................18

2 White & Summers, Uniform Commercial Code §17-3 (5th ed. 2000)................................16, 18

2 White & Summers, Uniform Commercial Code § 19-3 (5th ed. 2000).....................................40

## PRELIMINARY STATEMENT

Picatinny Federal Credit Union ("Picatinny") submits this brief in support of its motion for partial summary judgment against defendant Federal National Mortgage Association ("Fannie Mae") as to liability on the First Count of the Amended Complaint for conversion of promissory notes underlying 52 first mortgage loans Picatinny made to its members, and on the Second Count of the Amended Complaint for a judgment declaring that Fannie Mae does not have any right to enforce the notes and related mortgages because they were transferred to Fannie Mae over Picatinny's unauthorized signature and requiring Fannie Mae to return these notes and mortgages to their rightful owner, Picatinny.

There is nothing unduly complex about this action.  Fannie Mae claims that it purchased from U.S. Mortgage Corp. ("U.S. Mortgage") promissory notes and mortgages underlying 52 first mortgage loans Picatinny made to its members.[1]  U.S. Mortgage did not have Picatinny's authority to possess, indorse or sell the promissory notes at issue; rather, they were maintained by CU National Mortgage, LLC ("CU National"), which was servicing the loans for Picatinny.  CU National was a subsidiary of U.S. Mortgage.

Michael J. McGrath was one of several owners of U.S. Mortgage.  In connection with U.S. Mortgage's purported sale[2] of these loans to Fannie Mae, Mr. McGrath obtained from

---

[1]      One of the Picatinny notes and first mortgages Fannie Mae claims to have purchased relates to a $244,000 loan that Picatinny made to a borrower named Bonte (hereinafter "Bonte Loan").  Fannie Mae, however, does not have any of the documents relating to the Bonte Loan, including, but not limited to, the promissory note, an allonge or other indorsement of that note to the order of Fannie Mae, the mortgage securing the note and an assignment of that mortgage.  Fannie Mae's willful and wanton refusal to relinquish its claimed ownership of the Bonte loan, when it has none of those documents in its possession, is one of the reasons why Picatinny also seeks in the First Count of its Amended Complaint an award of punitive damages.

[2]      By reference to "sale" or "purchase," Picatinny does not intend to imply that title to its promissory notes was transferred to Fannie Mae.  Rather, Picatinny's reference to the sale of the notes to, or purchase of the notes by, Fannie Mae means U.S. Mortgage's delivery of the

CU National the promissory notes underlying Picatinny's mortgage loans and delivered to Fannie Mae the notes as well as allonges[3] and assignments of mortgage, both of which he executed as an alleged "AVP" of Picatinny.  It is undisputed that Mr. McGrath was not an "AVP" of Picatinny, and did not have Picatinny's authority to sell these loans.  As a result of his execution of allonges and assignments of mortgage in connection with U.S. Mortgage's unauthorized sale of Picatinny's 52 first mortgage loans (hereinafter "Stolen Loans") and more than 400 additional mortgage loans owned by 25 other federal credit unions, Mr. McGrath has pleaded guilty to the federal crimes of conspiracy to commit mail and wire fraud and money laundering, and is awaiting sentencing.

Although Fannie Mae knew in June 2009 that Mr. McGrath pleaded guilty to fraud in connection with the Picatinny loans, it has refused to return Picatinny's property.  The proffered bases for Fannie Mae's refusal to return the Stolen Loans are the purported affirmative defenses in its Answer to the Amended Complaint.[4]  As demonstrated infra, the undisputed facts on this motion establish that none of these defenses possess merit.

In its First Affirmative Defense, Fannie Mae alleges that Picatinny's claims are barred because Fannie Mae is a "holder in due course" of Picatinny promissory notes.  Before Fannie Mae can be a "holder in due course," it must establish that it is a "holder" of the promissory notes under the Stolen Loans, which means the notes were issued or negotiated to Fannie Mae's order.  The notes, however, were issued to the order of Picatinny, not Fannie Mae.

---

promissory notes underlying the Stolen Loans to Fannie Mae over an indorsement made without actual, implied or apparent authority and Fannie Mae's alleged payment for those notes.

[3]      An "allonge" is defined as "[a] piece of paper annexed to a negotiable instrument or promissory note, on which to write endorsements for which there is no room on the instrument itself."  Black's Law Dictionary (6th ed. 1990).

[4]      A copy of Fannie Mae's Answer to Picatinny's Amended Complaint is attached as Exhibit B to the Affidavit of James H. Forte (hereinafter "Forte Aff.").

The notes were not negotiated to Fannie Mae because they were delivered to Fannie Mae over Mr. McGrath's unauthorized indorsement.  Therefore, Fannie Mae is not a holder, and cannot be a holder in due course.  See Points I(A) and II(A)(1) infra.

In addition, to be a holder in due course, Fannie Mae must be a holder of a negotiable instrument.  Under N.J.S.A. 12A:3-104(a)(3), a "negotiable instrument" is an unconditional promise to pay a fixed amount of money if it "does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money. . . ."  Each of the promissory notes underlying Picatinny's mortgage loans imposed an additional obligation on the borrower, namely, when making a prepayment, to "tell the Note Holder in writing that I am doing so."  Because the promissory notes required the borrowers to undertake an action in addition to the payment of money, they are not "negotiable instruments" under the Uniform Commercial Code ("UCC").  See Point II(A)(2) infra.

Fannie Mae's Second Affirmative Defense contends that Picatinny cannot recover because Fannie Mae was a "good faith purchaser for value of the mortgage loans at issue, without notice that the mortgage notes contained unauthorized signatures or had been altered, and without notice of any claims to the mortgage notes by Picatinny or anyone else."  The concept of a "good faith purchaser for value" arises under Article 2 of the UCC, which relates to transactions in goods.  Even if Picatinny were to assume, solely for purposes of its motion, that Fannie Mae was a "good faith purchaser for value" of the notes at issue and that the sales of the notes to Fannie Mae were transactions in goods, Fannie Mae still has no viable defense to Picatinny's claims.

Pursuant to N.S.J.A. 12A:2-403(1), "[a] purchaser of goods acquires all title which the transferor had or had power to transfer . . . ."  Here, U.S. Mortgage did not have title to Picatinny's promissory notes, and therefore had no title to transfer to Fannie Mae.  Although

N.J.S.A. 12A:2-403(1) provides that a transferor with voidable title may transfer good title to a good faith purchaser for value, New Jersey courts have held that where, as here, the transferor did not obtain possession "under a transaction of purchase," the transferor did not obtain voidable title to the goods.  See Touch of Class Leasing v. Mercedes-Benz Credit of Canada, Inc., 248 N.J. Super. 426, 438 (App. Div.), certif. denied, 126 N.J. 390 (1991).  Because U.S. Mortgage did not obtain possession of the notes from Picatinny "under a transaction of purchase," U.S. Mortgage did not have voidable title and could not have transferred good title to Fannie Mae.  See Point III infra.

Next, Fannie Mae's contends that Mr. McGrath and his companies, U.S. Mortgage and its subsidiary, CU National, had Picatinny's "actual authority" to indorse and sell the promissory notes that are the subject of Picatinny's claims.  (Fannie Mae Answer, Third Affirmative Defense).  There is not a shred of evidence to support this purported defense.  The affidavits of Bill Darling, Chief Executive Officer of Picatinny, and Mr. McGrath conclusively establish that U.S. Mortgage and CU National did not have any authority to indorse the promissory notes that are the subject of Picatinny's Amended Complaint.  See Point IV infra.

Fannie Mae's Fourth Affirmative Defense alleges that "McGrath and U.S. Mortgage had the apparent authority" to sell the mortgage loans that are the subject of Picatinny's claims.  Under New Jersey law, apparent authority imposes liability on the principal when "the principal's actions have misled a third-party into believing that a relationship of authority in fact exists."  Sylvan Learning Systems, Inc. v. Gordon, 135 F. Supp.2d 529, 545 (D.N.J. 2000).  Here, however, Fannie Mae's representatives have uniformly testified at deposition that they were unaware of any actions by Picatinny that led Fannie Mae to believe Mr. McGrath had authority to indorse promissory notes on Picatinny's behalf.  See Point V infra.

Nonetheless, Fannie Mae has argued that the mere fact that Mr. McGrath was in possession of Picatinny's original promissory notes evidenced his apparent authority to indorse the notes on Picatinny's behalf.  There is no New Jersey authority supporting that result.  To the contrary, New Jersey courts have recognized that possession of personal property does not convey the apparent authority to sell that property.  See Point V infra.

Fannie Mae's Fifth Affirmative Defense is nothing more than boilerplate.  It contends without any specificity that "Picatinny's claims are barred by the doctrines of waiver and estoppel."  Under New Jersey law, "[w]aiver is the voluntary and intentional relinquishment of a known right."  Knorr v. Smeal, 178 N.J. 169, 177 (2003).  The affidavits of Mr. McGrath and Mr. Darling demonstrate that Picatinny did not know, or have any reason to know, that Mr. McGrath was indorsing Picatinny's name on any promissory notes without Picatinny's knowledge or authorization.  Just the opposite, U.S. Mortgage went to great lengths to conceal that information from Picatinny (and other credit unions whose loans U.S. Mortgage sold without authorization).  As such, Picatinny did not knowingly and intentionally relinquish its right to sue Fannie Mae for accepting Picatinny's notes over Mr. McGrath's unauthorized indorsement.  See Point VI infra.

Fannie Mae's purported estoppel defense fares no better.  "Estoppel, unlike waiver, requires the reliance of one party on another.  In short, to establish equitable estoppel, [Fannie Mae] must show that [Picatinny] engaged in conduct, either intentionally or under circumstances that induced reliance, and that [Fannie Mae] acted or changed their position to [its] detriment."  Knorr v. Smeal, 178 N.J. at 178.  As discussed supra, Picatinny did not engage in any conduct that induced Fannie Mae to accept notes over Mr. McGrath's indorsement.  Indeed, according to Fannie Mae's expert witness, Fannie Mae could have cared less who indorsed Picatinny's promissory notes as long as someone did so.  See Point VI infra.

Fannie Mae's last two Affirmative Defenses purport to rely upon UCC §§3-405 and 3-406.  Both provisions, however, apply to negotiable instruments.  As addressed supra, the promissory notes underlying the Stolen Loans are not negotiable instruments because they impose an obligation on the borrower in addition to the payment of money.  Therefore, neither of these statutes has any application to the facts before this Court.  See Point VII infra.

Even if this Court found that the promissory notes underlying the Stolen Loans are negotiable instruments, Fannie Mae's Sixth and Seventh Affirmative Defenses should be stricken. In its Sixth Affirmative Defense, Fannie Mae contends that N.J.S.A. 2A:3-405(b) bars Picatinny's claims "because Picatinny entrusted McGrath and U.S. Mortgage with certain responsibility with respect to the mortgage notes and, therefore, the signatures of McGrath and other U.S. Mortgage personnel on the mortgage notes are effective as the signatures of Picatinny."  This alleged defense fails for at least three additional reasons.  First, Picatinny did not entrust U.S. Mortgage or Mr. McGrath with any responsibility with respect to the notes at issue.  Second, CU National's responsibility for Picatinny notes was limited to maintaining possession of them, which does not fall within the definition of "responsibility" in  N.J.S.A. 12A:3-405(a)(3).  Third, N.J.S.A. 12A:3-405(b) applies only to a "fraudulent indorsement" which, by definition, does not include indorsements made without actual, implied or apparent authority such as Mr. McGrath signing the notes as an AVP of Picatinny.  See Point VIII(A) infra.

Finally, relying upon N.J.S.A. 12A:3-406, Fannie Mae contends that Picatinny's alleged failure to exercise ordinary care substantially contributed to the making of Mr. McGrath's unauthorized indorsement on the notes.  (Fannie Mae Answer, Seventh Affirmative Defense). N.J.S.A. 12A:3-406, however, applies only to an "alteration" and a "forged signature."  Mr. McGrath did not make any alterations on the promissory notes at issue and did not forge the

signature of a representative of Picatinny.  Instead, he misrepresented that he was an AVP of

Picatinny and was authorized to indorse notes on Picatinny's behalf.  Because Mr. McGrath's

indorsement of his own name as an "AVP" of Picatinny was a misrepresentation of his authority,

his indorsement is not a "forged signature" under N.J.S.A. 12A:3-406.  See Point VIII(B) infra.

   In sum, the evidence Picatinny has presented amply demonstrates that, for nearly

two years, Fannie Mae has wrongfully exercised dominion and control over the Stolen Loans,

which constitutes conversion and entitles Picatinny to the declaratory relief requested.

**STATEMENT OF FACTS**

**A.**  **Picatinny's Status As A Credit Union**

   Picatinny is a federally chartered credit union with total current assets of

approximately $250 million.  (See Affidavit of Bill Darling, ¶2).  It was established in 1939 at

Picatinny Arsenal in Morris County, New Jersey.  (Id.).  Picatinny is now headquartered in Dover,

New Jersey and has branches located in Dover, Mount Olive and at the Picatinny Arsenal.  (Id.).

Its members consist of military and other personnel stationed and/or working at the Picatinny

Arsenal, other residents of the Morris County area, and local businesses.  (Id.).

   As a federally chartered credit union, Picatinny is a not-for-profit, cooperative

financial institution that is owned and run by its members.  (Id., ¶3).  The members pool their

funds together by purchasing Share Accounts, the proceeds of which are used to make loans to the

members of Picatinny.  (Id.).  The interest income from these loans is used to pay Picatinny's

expenses and cover its capital reserve requirements with the remaining income returned to the

members as dividends on their Share Accounts and other services provided by Picatinny.  (Id.).

   Unlike banks and other financial institutions, Picatinny is governed by a Board of

Directors solely consisting of its members.  (Id., ¶4).  Members of Picatinny's Board of Directors

do not receive payment for their services; rather, they are volunteers who are elected to the Board by other members of the credit union.  (Id.).

**B.      Picatinny Begins To Make First Mortgage Loans**

In 1995, Picatinny began making first mortgage loans.  (Deposition of Stephen J. Lardiere, T. 23-11 to 23-17) (hereinafter "Lardiere Dep. T.").[5]  Picatinny entered into the first mortgage loan business at that time because the interest deduction on personal loans was being phased out and, as a result, homeowners were using their real property as collateral for loans to continue to obtain the benefit of an interest deduction.  (Id., T. 24-25 to 25-22).

Picatinny did not, however, have employees with expertise in making or servicing first mortgage loans, and did not wish to incur the substantial cost of hiring employees to staff a first mortgage department and purchasing the requisite hardware and software.  (Id., T. 26-3 to 27-7).  Consequently, Picatinny selected CUMAnet, Inc., later known as CUMAnet, LLC ("CUMAnet"), to perform that function for Picatinny.  (Id., T. 27-8 to 30-4, 46-3 to 46-10).

As of April 7, 1995, Picatinny retained CUMAnet to originate, process, underwrite and close first mortgage loans for Picatinny's members and service those loans for Picatinny. (Forte Aff., Exhibit D; ¶¶1-5 and 9, and Exhibit A to Agreement; Lardiere Dep. T. 46-3 to 46-10). Consistent with its contractual obligation to keep full and complete records for Picatinny relating to each mortgage loan, CUMAnet maintained for Picatinny the mortgage loan files, including the original promissory notes.  (Lardiere Dep. T. 31-18 to 31-21, 33-18 to 34-1).  As a servicer of mortgage loans, CUMAnet, at all relevant times, maintained the original notes not only on behalf

---

[5]      A copy of cited pages from the deposition transcript of Stephen J. Lardiere, who was the former General Manager of Picatinny, is attached collectively as Exhibit C to the Forte Aff.

of Picatinny but also on behalf of all other credit unions whose loans it serviced.  (Deposition of

Joan Mahon, T. 41-10 to 41-13, 69-19 to 70-4, 139-16 to 140-3, 141-19 to 142-20).[6]

Picatinny permitted CUMAnet to maintain Picatinny's loan files and original

promissory notes because CUMAnet had the facilities to maintain those documents in a secure

manner.  (Lardiere Dep. T. 32-7 to 32-19).  Specifically, CUMAnet stored Picatinny's promissory

notes in locked file cabinets with a fireproof rating in a secure area.  (Id., T. 34-12 to 35-9).

Picatinny did not own such cabinets and did not believe it had sufficient secure storage space to

maintain the original notes.  (Id., T. 34-20 to 34-23, 36-8 to 36-15).  Before permitting CUMAnet

to maintain its original notes, Picatinny contacted other credit unions and determined they too

allowed their servicer to maintain their original notes.  (Id., T. 37-5 to 37-15).

## C.   Picatinny Retains CU National To Originate And Service Its Mortgage Loans

In the late 1990s, Picatinny decided to replace CUMAnet with CU National as its

loan originator and servicer.  (Id., T. 69-16 to 70-4).  At that time, Dennis Fitzpatrick, the then

Chief Executive Officer of CUMAnet, advised Picatinny he was leaving CUMAnet and forming

CU National, which would operate exactly like CUMAnet.  (Id., T. 70-14 to 70-25).  Because

Picatinny was satisfied with the services CUMAnet had provided while Mr. Fitzpatrick was its

Chief Executive Officer, and CU National offered reduced pricing for the same services, Picatinny

selected CU National as its new mortgage loan originator and servicer.  (Id., T. 71-10 to 71-19).

As of July 1, 1999, Picatinny and CU National entered into the Credit Union

Support Services and Correspondent Lending Agreement (the "Agreement") under which CU

National agreed to provide Picatinny with loan services that were integral to Picatinny's

residential mortgage lending program, including the performance of all duties necessary or

---

[6]      A copy of cited pages from the deposition transcript of Joan Mahon, Vice President of
Special Projects for CUMAnet, is attached collectively as Exhibit E to the Forte Aff.

incidental to the servicing of all first mortgage loans on behalf of Picatinny. (Darling Aff., ¶5, Exhibit A, at 13). These services included the collection of payments from Picatinny loan customers and the remittance of those payments to Picatinny minus a fee to CU National. (Id.).

Like the Credit Union Mortgage Financing Assistance Agreement with CUMAnet, the Agreement provided that Picatinny's loan servicer, now CU National, "shall keep full and complete records pertaining to each Mortgage Loan." (Id., Exhibit A, at 14). Consistent with this provision, and its prior experience with CUMAnet, Picatinny permitted CU National to maintain its loan files, including the original promissory notes. (Lardiere Dep. T. 75-6 to 75-18, 82-5 to 82-18, 83-10 to 86-9). Auditors of the National Credit Union Administration, which has federal oversight over federal credit unions, were aware that CU National was holding Picatinny's original notes and did not object to this practice. (Id., T. 87-10 to 88-15).

Picatinny was not the only credit union whose loan files and original notes CU National maintained. For many of the credit unions whose loans CU National serviced, CU National maintained physical custody of the loan files, including the original promissory note underlying the loan. (Affidavit of Michael J. McGrath, ¶7) (hereinafter "McGrath Aff.").

Other than storing original notes for credit unions, CU National did not have any other responsibilities relating to the original notes. (Id., ¶9). CU National was not authorized to indorse the credit unions' notes. (Id., ¶¶9, 15).

**D.      Picatinny's Sale Of Loans To The Secondary Market**

Under the Agreement, CU National agreed to assist Picatinny if it desired to sell its first mortgage loans to the secondary mortgage market. (McGrath Aff., Exhibit B, at 15). The Agreement, however, did not authorize CU National or its parent company, U.S. Mortgage, to indorse the promissory notes underlying Picatinny's mortgage loans or to execute assignments of mortgage. (Darling Aff., ¶7; McGrath Aff., ¶¶15, 22-23).

To assist Picatinny in its sale of loans on the secondary market, CU National would arrange for its parent corporation, U.S. Mortgage, to prepare an allonge reflecting the credit union's indorsement of the loan to the order of U.S. Mortgage, and deliver to the credit union the allonge and an assignment of mortgage from the credit union to U.S. Mortgage.  (McGrath Aff. ¶10).  The credit union would execute the allonge and assignment of mortgage, and return those documents to CU National, which would provide them to U.S. Mortgage.  (Id.).  Then, U.S. Mortgage would prepare a second allonge and assignment of mortgage from U.S. Mortgage to the secondary market purchaser.  (Id., ¶11).  U.S. Mortgage would execute the allonge in blank and a second assignment of mortgage in favor of the secondary market purchaser, and deliver the allonge in blank and the second assignment of mortgage to the secondary market purchaser which, with respect to credit union mortgage loans, was primarily Fannie Mae.  (Id.).

In 2003, Picatinny did authorize Mr. McGrath to sign allonges and execute assignments of mortgage in connection with a block sale of mortgage loans.  (Id., ¶16).  To eliminate the need to deliver allonges and assignments back and forth in connection with one large sale, Picatinny delivered to U.S. Mortgage a corporate resolution authorizing U.S. Mortgage to sign document necessary to sell these loans to Fannie Mae.  (Id.; Exhibit C).  Attached to the corporate resolution was a list of the specific loans that Picatinny had authorized to be sold.  (Id.).

U.S. Mortgage maintained this resolution in the event that Fannie Mae inquired as to the extent of Mr. McGrath's authority to indorse allonges and execute assignments of mortgage on behalf of Picatinny.  (Id.).  Fannie Mae, however, never made that inquiry.  (Id.).

**E.**     **Picatinny Discovers Mr. McGrath's Fraud**

In January 2009, Picatinny learned from sources other than CU National that CU National had sold certain Picatinny loans to Fannie Mae without Picatinny's knowledge or authorization, and did not remit the loan proceeds to Picatinny.  (Darling Aff., ¶8).  By letter dated

January 30, 2009, Picatinny's counsel advised CU National that Picatinny had learned about the unauthorized sale of Picatinny loans to Fannie Mae, and demanded that CU National identify the specific Picatinny loans CU National had attempted to sell to Fannie Mae and make its books and records relating to such loans available for inspection.  (Id., ¶9; Exhibit B).

In an e-mail response dated February 9, 2009, CU National advised Picatinny that CU National could no longer effectively process loan applications for Picatinny and requested that Picatinny find an alternate service provider.  (Id., ¶10; Exhibit C).  Subsequently, in a February 12, 2009 letter, U.S. Mortgage confirmed that it had sold at least forty Picatinny loans without Picatinny's authorization and diverted the sales proceeds.  (Id., ¶10; Exhibit D).

**F.    Fannie Mae Refusal To Return The Stolen Loans**

Picatinny then undertook its own investigation to determine the number of loans U.S. Mortgage had sold without Picatinny's knowledge or authorization, and discovered U.S. Mortgage may have unlawfully sold as many as 58 Picatinny mortgage loans.  (Id., ¶11).  Because Picatinny's investigation was undertaken without cooperation from U.S. Mortgage and CU National, Picatinny's counsel provided Fannie Mae with a spreadsheet of those loans and asked Fannie Mae to "advise whether Fannie Mae's books and records reflect that these loans were sold to it." (Forte Aff., Exhibit F).  The loans identified in Picatinny's spreadsheet include the Stolen Loans and six other loans Picatinny was unable to track through its records.  (Darling Aff., ¶11).

When Fannie Mae did not respond, on February 23, 2010, Picatinny's counsel sent Fannie Mae's counsel a second e-mail stating that "I have not heard back from you concerning these loans.  Can you please advise whether Fannie Mae's records reflect that the attached loans are in its portfolio?" (Forte Aff., Exhibit G).  Instead of answering Picatinny's question, Fannie Mae responded that it planned "to send out a letter shortly with the loans we believe originated with Picatinny that should answer your question." (Forte Aff., Exhibit H).

Unable to wait any longer to recover its loans, on February 24, 2009, Picatinny's counsel sent Fannie Mae a letter demanding that Fannie Mae immediately return the Stolen Loans and six additional loans, and account for and return all payments received in connection therewith. (Forte Aff., Exhibit I).  In his letter, Picatinny's counsel explained why Fannie Mae did not have any right to retain Picatinny's property and advised that "if Fannie Mae does not deliver to my office the requested allonges and assignments and remit all payments collected on or before noon on Friday, February 27, Picatinny shall file suit against Fannie Mae without further notice."  (Id.).

Fannie Mae did not respond to Picatinny's counsel's demand letter and did not ask for more time to do so.  (Forte Aff., ¶3).  Nor did it return Picatinny's property.  (Id.).  This lawsuit followed.

On June 11, 2009, Mr. McGrath pled guilty to one count of mail and wire fraud conspiracy and one count of money laundering conspiracy arising from his fraudulent sale, though U.S. Mortgage, of nearly 500 first mortgage loans totaling in excess of $136 million that CU National was servicing for credit unions.  (McGrath Aff., ¶¶2, 3; Exhibit A).  The vast majority of these sales occurred without the knowledge or consent of the credit unions, and without the credit unions receiving the sales proceeds.  (Id.).  All of the Stolen Loans were unauthorized sales. (Id.).

## ARGUMENT

### I.

### FANNIE MAE HAS CONVERTED THE STOLEN LOANS

N.J.S.A. 12A:3-420 provides in relevant part:

> The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment.

The UCC defines "instrument" to mean a negotiable instrument.  See N.J.S.A. 12A:3-104(b).  If the promissory notes underlying the Stolen Loans are negotiable instruments,[7] then Fannie Mae's retention of them constitutes conversion if Fannie Mae received them from "a person not entitled to enforce the instrument" and by a transfer "other than a negotiation."

**A.    U.S. Mortgage Was A Person Not Entitled To Enforce The Promissory Notes**

N.J.S.A 12A:3-301 defines a "person entitled to enforce" an instrument as "the holder of the instrument, a nonholder in possession of the instrument who has the rights of a holder, or a person not in possession of the instrument who is entitled to enforce the instrument pursuant to 12A:3-309 or subsection d. of 12A:3-418."

U.S. Mortgage was not a "holder" of the promissory notes underlying the Stolen Loans.  "Mere ownership or possession of a note is insufficient to qualify an individual as a 'holder.'"  Adams v. Madison Realty & Dev., Inc., 853 F.2d 163, 166 (3d Cir. 1988) (applying New Jersey law).  Rather, under N.J.S.A. 12A:1-201(20), a "holder" of a negotiable instrument is "the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession."  Because the promissory notes were not payable to bearer or to U.S. Mortgage's order, U.S. Mortgage was not a holder of the promissory notes underlying the Stolen Loans.

Nor was U.S. Mortgage "a nonholder in possession of the instrument who has the rights of a holder."  The Official Comment to UCC §3-301 defines a nonholder in possession with the rights of a holder as "a person that acquired rights of a holder by subrogation or under Section 3-203(a)."  U.S. Mortgage did not acquire any rights to Picatinny's promissory notes by subrogation.  U.S. Mortgage also did not acquire any such rights under N.J.S.A. 12A:3-203(a),

---

[7]    As explained in Point II(B) infra, the promissory notes underlying the Stolen Loans are not negotiable instruments.

which provides that an instrument is transferred "when it is delivered by a person other than an issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." Picatinny did not deliver[8] the promissory notes to U.S. Mortgage; it delivered them to CU National. Moreover, it did not do so for the purpose of giving CU National (or U.S. Mortgage) the right to enforce the notes; it did so for the purpose of CU National maintaining custody of them. (Lardiere Dep. T. 75-6 to 75-18, 82-5 to 82-21, 83-10 to 86-9).

Further, U.S. Mortgage was not entitled to enforce the instruments "pursuant to 12A:3-309 or subsection d. of 12A:3-418." N.J.S.A. 12A:3-309 address the rights of a person not in possession of an instrument because the instrument was lost, destroyed or stolen, which obviously would not apply to U.S. Mortgage because it stole the instruments from Picatinny and CU National. N.J.S.A. 12A:3-418(d) addresses the rights of a person whose instrument is paid or accepted by mistake and the payor or acceptor recovers payment or revokes acceptance, which would not apply to U.S. Mortgage or Picatinny's promissory notes.

**B.      Fannie Mae Did Not Take The Promissory Notes By Negotiation**

N.J.S.A. 12A:3-201(b) provides that "if an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder." While U.S. Mortgage transferred to Fannie Mae possession of the notes under the Stolen Loans, U.S. Mortgage was not, as explained supra, a holder of the notes. Because U.S. Mortgage was not a holder, its transfer of possession of the notes to Fannie Mae and indorsement thereon was not a negotiation of the notes. See Salsman v. National Community Bank, 102 N.J. Super. 482, 490-91 (Law Div. 1968) (holding that check indorsed by payee to order of the Estate of Arthur J. Odgers "could not be negotiated without an authorized indorsement of the special indorsee, the estate of Arthur J. Odgers"), aff'd, 105 N.J. Super. 164 (App. Div. 1969)

---

[8]      "Deliver" requires only the "voluntary transfer of possession." N.J.S.A 12A:1-201(14).

The leading UCC commentator, Professors White and Summers, agree:

> In order to negotiate a stolen instrument, a thief must forge the indorsement of the party to whose order it is drawn.  The thief himself is not a holder under 1-201(b)(21) [N.J.S.A. 12A:1-201(20)] because the instrument is not payable to his order or to bearer; by hypothesis it is payable to the order of another, the true owner.  Under section 3-201 quoted above, this instrument may be "negotiated" (i.e., passed to a person who thereby becomes its "holder") only if it is indorsed "by the holder." Since the thief is not a holder, any writing he puts on the back is not an indorsement "by the holder;" therefore, the transaction – however voluntary with a third party who is fooled by the thief – does not constitute a negotiation under 3-201 and does not therefore render the third party himself a holder.

2 White & Summers, Uniform Commercial Code § 17-3 (5th ed. 2000).

Application of Professor White's and Summers's analysis to the facts before this Court results in Mr. McGrath being the "thief," Picatinny being the party "to whose order [the notes were] drawn" and the "true owner" of the notes, and Fannie Mae being the "third party who is fooled by the thief."  It is undisputed that Mr. McGrath's indorsement purportedly on behalf of Picatinny on allonges accompanying the notes underlying the Stolen Loans was undertaken without the knowledge or consent of Picatinny.  (McGrath Aff., ¶¶22, 23; Darling Aff., ¶13). Because Mr. McGrath did not have Picatinny's knowledge or consent to indorse promissory notes on Picatinny's behalf, Mr. McGrath was not a holder, and thus U.S. Mortgage's indorsement of the notes in blank could not have resulted in a negotiation of the notes to Fannie Mae.

**C.     The Same Result Applies If Picatinny's Promissory Notes Are Non-Negotiable**

Article 3 of the UCC applies only to negotiable instruments.  See N.J.S.A. 12A:3-102(a).  If the promissory notes underlying the Stolen Loans are not negotiable instruments, then the common law of conversion governs Picatinny's conversion claim.  See McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 771 (3d Cir. 1990) (applying New Jersey law) (recognizing that conversion under the UCC is merely a codification of certain acts that are already tortious under the common law).

Under New Jersey common law, "[c]onversion is essentially the wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that property." McAdam, 896 F.2d at 771. "The elements of common law conversion under New Jersey law are (1) the existence of property; (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant." Corestar Int'l Pte. Ltd. v. LPB Communications, Inc., 513 F.Supp.2d 107, 127 (D.N.J. 2007) (citing Carton v. Choice Point, 450 F.Supp.2d 489, 501 (D.N.J. 2006)).

Each of these elements is easily satisfied. The promissory notes underlying the Stolen Loans constitute Picatinny's property because they were issued to its order. Picatinny has the right to immediate possession of its promissory notes because it is and was, at all times, the owner of the notes. Fannie Mae has refused to return the promissory notes, notwithstanding Picatinny's demand for their return. Accordingly, Picatinny has demonstrated that Fannie Mae's refusal to honor Picatinny's demand constitutes conversion under New Jersey common law.

## II.

### FANNIE MAE IS NOT A HOLDER IN DUE COURSE

Fannie Mae's First Affirmative Defense is that it is a holder in due course of Picatinny's promissory notes under N.J.S.A. 12A:3-302 and, as a result, its alleged rights are superior to Picatinny's claim of ownership of the notes. N.J.S.A. 12A:3-302(a) reads as follows:

a.     Subject to subsection c. of this section and subsection d. of 12A:3-106, "holder in due course" means the holder of the instrument if:

(1)     the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2)     the holder took the instrument for value, in good faith, without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, without notice that the instrument contains an

unauthorized signature or has been altered, without notice of any claim to the instrument described in 12A:3-306, and without notice that any party has a defense or claim to recoupment described in subsection a. of 12A:3-305.

Although Picatinny can demonstrate at trial, if necessary, that Fannie Mae does not meet the requirements of subsections (1) and (2) of N.J.S.A. 12A:3-302, Picatinny does not seek summary judgment on those issues in this motion.  Rather, Picatinny contends, and the undisputed evidence in the record establishes, that Fannie Mae is not a "holder of an instrument," and, consequently, cannot be a holder in due course.

**A.     Fannie Mae Is Not A Holder Of Picatinny's Promissory Notes**

As discussed in Point I(A) supra, U.S. Mortgage was not a "holder" of the promissory notes underlying the Stolen Loans under N.J.S.A. 12A:1-201(20) because the notes were not issued or negotiated to U.S. Mortgage's order.  Because U.S. Mortgage was not a holder of the notes, any subsequent transferees of the notes such as Fannie Mae also cannot be a holder.  Professors White and Summers explain:

> The upshot of these rules states in 1-201(b)(21) [N.J.S.A. 1:201(20)] and 3-201 is that none of the transferees downstream from the thief – however much value they have given and however good their faith – can be a holder or a holder in due course.  Each will have taken by a process that is not "negotiation" and each will in turn not be a holder and accordingly lack the power to make a negotiation under 3-201.  Absent preclusion of the owner to deny the forgery a la 3-404 through 3-406, no party can ever be a holder of an order instrument stolen prior to indorsement by the owner of the instrument.

2 White & Summers, Uniform Commercial Code § 17-3 (5th ed. 2000); see 4 William D. Hawkland, UCC Series § 3-202:4 (2010) ("if any indorsement in the chain of title has been forged or is unauthorized, none of the transferees subsequent to the unauthorized or forged indorsement qualify as holders").

Salsman is outcome determinative on this issue.  There, plaintiff received a check payable to her late husband, Arthur J. Odgers.  102 N.J. Super. at 486.  Plaintiff was advised by

Harold Breslow, the attorney representing her husband's estate, that the check must be deposited into a separate account for the payment of taxes and other purposes.  Id. at 487.  Mr. Breslow indorsed the check "pay to the order of Estate of Arthur J. Odgers" and asked plaintiff to indorse the check.  Id.  After plaintiff indorsed the check, Mr. Breslow, without plaintiff's knowledge or consent, wrote on the back of the check "Estate of Arthur J. Odgers – for deposit Harold Breslow, Trustee."  Id.  Mr. Breslow then deposited the check into an account in his name with defendant bank and misappropriated its proceeds.  Id.

Defendant bank contended, among other things, that it was a holder in due course of the check because it had given value for the check and took the check in good faith and without knowledge of any claims or defenses to the check.  Id. at 488.  Making short work of that contention, the court held that defendant bank could not be a holder in due course because the defendant bank was not a "holder" of the check under N.J.S.A. 12A:1-201(20):

> In the absence of defenses such as negligence, estoppel or ratification, the payee of a check is entitled to recover against a bank making collection from the drawee based upon a forged or unauthorized indorsement of a check. This has been the established law throughout the country and continues to be the rule in states which have adopted the Uniform Commercial Code. . . .
>
> The check in question was indorsed by the payee, Mrs. Odgers to the order of the Estate of Arthur J. Ordgers.  There was no valid indorsement thereafter by the estate of Arthur J. Odgers . . . .
>
> Receiving the funds without a proper indorsement and crediting the funds to one not entitled thereto constitutes a conversion of the funds.  A holder is one who receives an instrument which is indorsed to his order or in blank.  N.J.S.A. 12A:1-210(20) N.J.S.A.  The bank cannot be a holder or a holder in due course (N.J.S. 12A:3-302 N.J.S.A.) without a valid indorsement of this check by the estate of Arthur J. Odgers.

Id. at 489, 490, 492 (citations omitted); see Santos v. First Nat'l State Bank of New Jersey, 186 N.J. Super. 52, 72 (App. Div. 1982) (holding that "[t]he first and simplest conclusion is reached on the assumption that plaintiff, the payee of the cashier's check, did not indorse the check before

mailing it to Puerto Rico and did not authorize its indorsement by his father or anyone else.

Without an indorsement of the check no one can be a holder, much less a holder in due course")

(citations omitted).

Similarly, in Mountain Ridge State Bank v. Investor Funding Corp., 1990 WL

261859, 13 UCC Rep.Serv.2d 184 (Law Div. 1990),[9] defendant sold, assigned and transferred 22

promissory notes to plaintiff, but neglected to indorse the notes to plaintiff.  Id. at *1.  The

borrowers on each of the notes alleged that they were fraudulently induced to execute them.  Id.

Asserting that it was a holder in due course that took the notes free of the borrowers' fraud

defense, plaintiff moved for summary judgment.  Id.

The court properly recognized that, before plaintiff could be a holder in due course,

it had to demonstrate that it was a "holder" of the promissory notes under N.J.S.A. 12A:1-201(20).

Id.  Because "mere ownership or possession of a note is insufficient to qualify an individual as a

holder" and the notes lacked an indorsement from defendant, the court ruled that "the Bank is not

a holder because the notes were not properly endorsed and therefore not negotiated."  Id.

Like the purchasers of the check in Salsman and the promissory notes in Mountain

Ridge State Bank, Fannie Mae is not a holder and thus cannot be a holder in due course.  Both

U.S. Mortgage and Fannie Mae took the promissory notes underlying the Stolen Loans over the

prior unauthorized indorsement of Mr. McGrath as a purported Assistant Vice President of

Picatinny.  Because Mr. McGrath was not an Assistant Vice President of Picatinny, and was not

otherwise authorized to indorse the promissory notes underlying the Stolen Loans, Fannie Mae's

taking of the promissory notes constitutes conversion under N.J.S.A. 12A:3-420.

---

[9]      A copy of the Mountain Ridge State Bank decision is attached as Exhibit A.

**B.      The Promissory Notes Are Not Negotiable Instruments**

Fannie Mae is not a holder in due course for a second reason, namely that Picatinny's promissory notes are not "instruments" under the UCC.  <u>N.J.S.A.</u> 12A:3-104(b) provides that an instrument "means a negotiable instrument."  <u>N.J.S.A.</u> 12A:3-104(a) defines a negotiable instrument as follows:

> a.      Except as provided in subsections c. and d. of this section, "negotiable instrument" means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
>
> (1)      is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
>
> (2)      is payable on demand or at a definite time;
>
> (3)      does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain an undertaking or power to give, maintain, or protect collateral to secure payment, an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or a waiver of the benefit of any law intended for the advantage or protection of an obligor.

Picatinny's promissory notes contain an "undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money," which prevents them from being negotiable.  Under the heading "**BORROWERS RIGHT TO PREPAY,**" Section 4 of the notes imposes the additional obligation on the borrower to notify the note holder in writing whenever a borrower makes a prepayment.[10]  (McGrath Aff., Exhibit D).

---

[10]      The specific language reads as follows:  "When I make a Prepayment, I will tell the Note Holder in writing that I am doing so."

Because this obligation is clearly an undertaking by the borrower to perform an act in addition to the payment of money, the notes are not negotiable instruments under N.J.S.A. 12A:3-104.[11]

      While our research did not uncover any case law addressing N.J.S.A. 12A:3-104(a)(3), courts from other jurisdictions have found instruments non negotiable based upon obligations imposed on the borrower in the instrument outside of those obligations set forth in UCC § 3-104.  See, e.g., Geiger Fin. Co. v. Graham, 123 Ga.App. 771, 774, 182 S.E.2d 521, 524 (1971) (holding that, because "intent [underlying UCC] is that a negotiable instrument carries nothing but a simple promise to pay," contract that contained promises in addition to promise to pay was not a negotiable instrument); P & K Marble v. La Paglia, 147 A.D.2d 804, 805, 537 N.Y.S.2d 682, 682 (3d Dep't 1989) (promissory note found to be non-negotiable because it contained promises not authorized by Article 3, including promise to keep underlying property insured); Jackson v. DeWitt, 224 Wis.2d 877, 885-86, 592 N.W.2d 262, 267 (Ct. App. 1999) (agreement under which homeowner financed purchase of pool held non-negotiable because it contained promises other than an unconditional promise to pay).

      Moreover, Professor Ronald J. Mann, a renowned scholar on the negotiability of instruments, has addressed whether Fannie Mae form promissory notes, which are virtually identical to the notes at issue, are negotiable and concluded that they are not:

> The most basic of these forms is the FNMA/FHLMC Multistate Fixed Rate Note—Single Family. Section 4 of that Note provides as follows:
>
> 4. Borrower's Right to Prepay
> I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, *I will tell the Note Holder in writing that I am doing so.*

---

[11]     "Whether an instrument is negotiable is a question of law to be determined solely from the face of the instrument, without reference to the intent of the parties."  Cooperatieve Centrale Raiffeeisen-Boerenleenbank B.A. v. Bailey, 710 F. Supp. 737, 738 (C.D. Cal. 1989).

The italicized sentence of that provision appears to constitute an "undertaking . . . to do a[n] act in addition to the payment of money." For historical reasons codified in section 3-104(a)(3) of the U.C.C., a promissory note cannot be an instrument if it contains such an undertaking: the rules of negotiability apply only to promises to pay money, not to other, nonmonetary undertakings. Sending a notice certainly is an act "in addition to the payment of money," and the note's language seems to constitute an "undertaking" to perform that act (albeit only on certain conditions). Accordingly, it seems unlikely that the Fannie Mae/Freddie Mac form qualifies as negotiable.  Thus, the rules of Article 3 (including its holder-in-due-course protections) do not apply.

Robert J. Mann, Searching for Negotiability in Payment and Credit Systems, 44 U.C.L.A. Law.

Rev. 951, 971-72 (1998) (italics in original).

Myron C. Weinstein, the author of the leading treatise on New Jersey foreclosure

law and the former Chief of the New Jersey Office of Foreclosure, agrees:

One expert, Professor  Ronald J. Mann, has concluded that the "FNMA/FHLMC Multistate Fixed Rate Note – Single Family" – Form 3200 – is nonnegotiable because "Section 4.  Borrower's Right to Prepay" says:  "I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a 'prepayment.'  When I make a prepayment, *I will tell the Note Holder in writing that I am doing so.* (Emphasis supplied).  The italicized language, the "written notice" requirement, so Professor Mann contends, constitutes an undertaking – an act "in additional to the payment of money" – thus disqualifying the FNMA/FHLMC Multistate Fixed rate Note from being an instrument.  The author finds this argument to be extremely compelling, with the result that the Single Family Fixed Rate Note may well be nonnegotiable.  If that is true, it means that the Fixed Rate Note may be transferred by assignment without delivery of possession, making it easier for a foreclosing plaintiff to establish standing.

30 N.J. Prac., Law of Mortgages, §28.9 (2d ed. 2000 & Supp. 2010).

Picatinny anticipates that Fannie Mae will argue that not all promises in a

promissory note other than the payment of money (and the other promises in N.J.S.A. 12A:3-

104(a)(3)) impair negotiability.  The leading UCC scholars have rejected this argument, and

concluded that any additional promise in the instrument renders the instrument non-negotiable:

The language of the Code provision under consideration declaring that "no other promise . . ." may be included appears so categorical that it is

concluded that it must be given its literal effect.  This conclusion has the further advantage of practical expediency in that it avoids any question of construction as to whether an additional promise is or is not a promise of such a character as to impair negotiability.  The above conclusion provides a standard which the ordinary man in business can apply for it merely requires the ability to read the words of the instrument and see if there is an additional promise.  Otherwise stated, it avoids the complicated interpretation of additional words in an instrument and avoids the hazard that a court at a later date might not agree with the conclusion reached by the businessman reading the instrument.

5A Anderson on the Uniform Commercial Code § 3-104:20 (3d ed. 2010); see  4 William D. Hawkland, UCC Series, § 3-104:14 (2010) ("An instrument to be negotiable can contain no other promise, order, obligation or power given by the maker or drawer except as authorized by Article 3"); 1 Lary Lawrence, Payment Systems, § 3:17 (2010) ("Inclusion in an instrument of a promise, obligation, order, or power not authorized by Article 3 defeats the instrument's negotiability.").

In sum, Fannie Mae's taking of Picatinny's promissory notes from U.S. Mortgage over the unauthorized indorsement of Mr. McGrath prevents it from being a "holder," and the borrower's promise in the notes to provide written notice of any prepayment renders the notes non-negotiable.  Accordingly, Fannie Mae is not a holder in due course of Picatinny's notes.

## III.

## FANNIE MAE'S ALLEGED STATUS AS A GOOD FAITH PURCHASER FOR VALUE IS NOT A DEFENSE TO PICATINNY'S CONVERSION CLAIM

Fannie Mae's Second Affirmative Defense states that "Picatinny's claims are barred because Fannie Mae was a good faith purchaser for value of the mortgage loans at issue, without notice that the mortgage notes contained unauthorized signatures or had been altered, and without notice of any claims to the mortgage notes by Picatinny or anyone else."  (Forte Aff., Exhibit B).  The phrase "good faith purchaser for value" does not appear in Article 3 of the UCC. The rights of a "good faith purchaser for value" are addressed only in Article 2, which governs transactions in goods.  See N.J.S.A. 12A:2-102.  For this reason alone, this defense is unavailing.

Assuming, arguendo, that U.S. Mortgage's sales of Picatinny's promissory notes to Fannie Mae constitute transactions in goods within Article 2 and that Fannie Mae was a good faith purchaser for value of the promissory notes, Fannie Mae still had, and has, no basis to retain possession of, and exert dominion and control over, Picatinny's notes.  N.S.J.A. 12A:2-403 provides that "[a] purchaser of goods acquires all title which the transferor had or had power to transfer . . . ."  In other words, Fannie Mae, as a purported purchaser of the notes, acquired all title to the notes which U.S. Mortgage had or had the power to transfer.  But U.S. Mortgage did not have title to the notes.  A reading of the notes establishes that they were not issued to U.S. Mortgage's order.  As addressed supra, they were not negotiated to U.S. Mortgage's order because Mr. McGrath "had no authority from Picatinny to sign these alonges and assignments of mortgage, and no right to attempt to transfer them to Fannie Mae."  (McGrath Aff., ¶23).

Nor did U.S. Mortgage have the power to transfer title to Picatinny's promissory notes.  N.J.S.A. 12A:2-403 provides that a transferor with voidable title may transfer good title to a good faith purchaser for value provided that the "goods have been delivered under a transaction of purchase. . . ."  Here, however, Picatinny did not deliver the notes underlying the Stolen Loans to U.S. Mortgage at all, but delivered the notes to CU National for custodial purposes, and not under a transaction of purchase.  Accordingly, U.S. Mortgage did not have voidable title and, consequently, did not have the power to transfer good title to a good faith purchaser for value.

Illustrative of this priniciple is Touch of Class Leasing v. Mercedes-Benz Credit of Canada, Inc., 248 N.J. Super. 426 (App. Div.), certif. denied, 126 N.J. 390 (1991).  There, defendant entered into a lease with Barnabe for a Mercedes 560 SEL.  248 N.J. Super. at 429.  Barnabe caused a Certificate of Registration to be obtained for the vehicle in the name of Rallye

Motors.  Id. at 430.  The vehicle was then sold to Gran Prix, which sold the vehicle to Ray Catena, which transferred title to the vehicle to Touch of Class.  248 N.J. Super. at 430-32.

Relying upon N.J.S.A. 12A:2-403, the Appellate Division held that Barnabe did not have voidable title to the Mercedes and thus could not convey good title to Gran Prix:

> Mercedes-Benz correctly argues that Barnabe's theft of the 560 SEL vested him with only void title and therefore, prevented any subsequent purchaser from obtaining lawful title to the 560 SEL.
>
> For the seller to acquire even voidable title, he must obtain delivery of the goods through "a transaction of purchase." . . .
> However, if a party merely converts the goods to his own use after obtaining possession through some manner other than a transaction of purchase, he does not possess even voidable title.  Rather, he possesses void title and therefore, cannot pass good title even to a good faith purchaser for value.
>
> Even assuming Gran Prix is a good faith purchaser for value, it cannot benefit from this portion of N.J.S.A. 12A:2-403(1).  No evidence shows that Barnabe obtained possession of the 560 SEL by a "transaction of purchase" with Mercedes-Benz.  Consequently, Barnabe did not even possess voidable title at the time of the sale to Gran Prix, and N.J.S.A. 12A:2-403(1) cannot cure the defects in any title that Gran Prix obtained from Barnabe.

Id. at 438.

Here, too, the thief, Mr. McGrath, acting through U.S. Mortgage, obtained possession of the note through a manner other than a transaction of purchase.  Under those circumstances, U.S. Mortgage possessed void title without the ability to transfer good title to an alleged good faith purchaser for value.  Accordingly, Fannie Mae's reliance on this defense fails.

## IV.

## FANNIE MAE'S ACTUAL AUTHORITY DEFENSE IS FRIVOLOUS

In its Third Affirmative Defense, Fannie Mae contends that "McGrath and his companies, U.S. Mortgage and its subsidiary CU National, were given the actual authority and responsibility by Picatinny to indorse Picatinny mortgage notes and sell Picatinny mortgage loans

on the secondary market to good faith purchasers like Fannie Mae." (Forte Aff., Exhibit B).

Discovery has confirmed that Fannie Mae does not have any facts to support this defense.

Picatinny served upon Fannie Mae an interrogatory asking Fannie Mae to set forth the factual basis for its claim that Mr. McGrath had actual authority to indorse the subject notes to which Fannie Mae responded as follows:

> Picatinny gave U.S. Mortgage actual authority to indorse the notes underlying each of the Assigned Loans and to sell the Assigned Loans by the clear terms of the contract between Picatinny and U.S. Mortgage entitled "Credit Union Support Services And Correspondent Mortgage Lending Agreement." Additionally, Picatinny allowed U.S. Mortgage to hold its original notes for loans originated by U.S. Mortgage on behalf of Picatinny.

(Fannie Mae's Second Amended Responses to Picatinny's First Set of Interrogatories, No. 14, attached as Exhibit J to the Forte Aff) (objections omitted).

Fannie Mae's reliance upon the Agreement to support its alleged "actual authority" defense makes no sense for several reasons. First, U.S. Mortgage was not a party to, or even mentioned in, the Agreement. Therefore, the Agreement could not have granted U.S. Mortgage the authority to indorse the notes underlying the Stolen Loans and sell them.

Second, the words "indorse" or "sign" do not appear in the Agreement. While the Agreement does address in three places Picatinny's sale of loans in the secondary market, none of these references authorized CU National to sell any loans without Picatinny's authority. (See Darling Aff., Exhibit A at 5, 15 and 18). In short, there is nothing in the Agreement that permitted Mr. McGrath to indorse Picatinny promissory notes in the possession of CU National.

Third, Mr. Darling has sworn that U.S. Mortgage did not have Picatinny's authorization to indorse its name on the promissory notes underlying and sell the Stolen Loans.

(Darling Aff., ¶¶7, 13).  Mr. McGrath also has testified that U.S. Mortgage did not have such authority, whether under the Agreement or otherwise.  (McGrath Aff., ¶¶3, 15, 22-23).

Unable to produce any witnesses whose testimony will contradict Mr. Darling's and Mr. McGrath's sworn statements on this issue, Fannie Mae purports to support its "actual authority" defense by relying upon the section of the Agreement which addresses CU National's responsibility to process loan documents received from Picatinny members.  Under the heading "Loan Production Support Service" and subheading "Loan Processing," the Agreement provides that "CU NATIONAL shall act as the Credit Union's agent and shall be authorized to receive, transmit, and otherwise process the member's confidential financial information provided through the loan application process."  (See Darling Aff., Exhibit A at 4).

How this language grants U.S. Mortgage, let alone CU National, the "actual authority to indorse the notes underlying each of the [Stolen] Loans and to sell the [Stolen] Loans" as Fannie Mae has contended in its Answer is a question Fannie Mae has not answered.  As Mr. McGrath explains, this language "was to ensure that Picatinny's disclosure of its member's personal financial information to CU National would not violate any state or federal privacy laws. By referring to CU National as an 'agent' for purposes of the loan application, Picatinny would not be permitting the disclosure of this information to a third-party.  This section did not, and was not intended to, grant CU National the right to indorse promissory notes on behalf of Picatinny, execute assignments of mortgage on behalf of Picatinny or sell Picatinny mortgage loans." (McGrath Aff., ¶15).  Fannie Mae will offer no evidence contradicting Mr. McGrath's testimony.

Finally, Fannie Mae's contention that U.S. Mortgage's alleged possession of the original notes reflects its "actual authority' to indorse and sell them is factually inaccurate and legally unsupportable.  It is undisputed that Picatinny did not authorize U.S. Mortgage to obtain

possession of its original promissory notes; only CU National had that authority.  In addition,

there is no legal support for the argument that possession of a negotiable instrument demonstrates

"actual authority" to indorse and sell it.  If that were the law, then no negotiable instrument would

ever be safe in the hands of a document custodian; a result that Fannie Mae would certainly regret

given that 89% of all of promissory notes purchased by Fannie Mae are maintained by third-party

custodians.  (Deposition of Debra Thompson, T. 300-19 to 301-10, 322-16 to 322-21).[12]

**V.**

**US MORTGAGE DID NOT HAVE PICATINNY'S APPARENT AUTHORITY
TO INDORSE THE PROMISSORY NOTES UNDERLYING THE STOLEN LOANS**

Lacking any evidence that U.S. Mortgage (or CU National) had any actual

authority to indorse the promissory notes underlying the Stolen Loan, Fannie Mae contends that

Mr. McGrath and U.S. Mortgage had the "apparent authority" to indorse Picatinny's signature on

alonges to the promissory notes underlying the Stolen Loan and to execute corresponding

Assignments of Mortgage.  (Forte Aff., Exhibit B, Fourth Affirmative Defense).

Apparent authority imposes liability on the principal when "the principal's actions

have misled a third-party into believing that a relationship of authority in fact exists."  Sylvan

Learning Sys., Inc. v. Gordon, 135 F. Supp.2d 529, 545 (D.N.J. 2000) (quoting Mercer v.

Weyerhaeuser Co., 324 N.J. Super. 290, 317 (App. Div. 1999)).  Explaining the rationale

underlying the doctrine of apparent authority, the Appellate Division has held:

> The principal is bound by the acts of the agent within the apparent authority
> which he knowingly permits the agent to assume, or which he holds the
> agent out to the public as possessing.  And the reason is that to permit the
> principal to dispute the authority of the agent in such cases would be to
> enable him to commit a fraud upon innocent persons.

---

[12]     A copy of cited pages from the deposition transcript of Debra Thompson, Director of
Operations Processing of Fannie Mae, is attached collectively as Exhibit K to the Forte Aff.

N. Rothenberg & Son, Inc. v. Nako, 49 N.J. Super. 372, 380 (App. Div. 1958) (quoting J. Wiss & Sons Co. v. H.G. Vogel Co., 86 N.J.L. 618, 621 (E. & A. 1914)).

> The Appellate Division has explained that apparent authority "looks to the actions of the principal, and not of the alleged agent.  The alleged agent cannot create apparent authority on his own accord, but must be held out as having such authority by the principal."  Simpkins v. 7-Eleven, Inc., 2008 WL 918482 at *8 (App. Div. Apr. 7, 2008) (citations omitted).[13]  "[T]he essential element of reliance [upon the principal's acts] must be present before apparent authority can be found."  Wilzig v. Sisselman, 209 N.J. Super. 25, 36 (App. Div.), certif. denied, 104 N.J. 417 (1986).  Moreover, "[a]pparent authority will bind the purported principal only with respect to a third person to whom a manifestation of the defendant's consent to the holding out has been made known."  N. Rothenberg & Son, 49 N.J. Super. at 381.[14]

> Fannie Mae required its loan sellers, including U.S. Mortgage, to deliver documents to be purchased to Fannie Mae's Document Delivery Facility (hereinafter "DDF"). (Deposition of John Gang, T. 93-18 to 94-2, 94-9 to 97-21) (hereinafter "Gang Dep. T.").[15]  After delivery of the loan documents to the DDF, Fannie Mae would review the promissory notes, indorsements or alonges to ensure that they were in proper form, a process Fannie Mae referred to as certification.  (Id., T. 22-7 to 22-14).  If DDF did not certify the loan, Fannie Mae would not

---

[13]     A copy of the Simpkins decision is attached as Exhibit B.

[14]     Although the issue of apparent authority is often an issue of fact, this Court has held that "as a matter of law, apparent authority does not exist when there is no evidence that a [party] relied upon [another party's] apparent authority."  Kim v. Marina Dist. Dev. Co. LLC, 2010 WL 2877784 at *7 (D.N.J. Jul, 7, 2010) (applying New Jersey law).  A copy of this decision is attached as Exhibit C.

[15]     A copy of cited pages from the deposition transcript of John Gang, former Director of Operations Processing of Fannie Mae, is attached collectively as Exhibit L to the Forte Aff.

purchase it.  (Deposition of Barbara Cushman, T. 134-13 to 134-18) (hereinafter "Cushman Dep. T.").[16]

Fannie Mae has produced a spreadsheet that identifies who, if anyone, at Fannie Mae reviewed the documents underlying the Stolen Loans and all other loans stolen from other credit unions by Mr. McGrath.[17]  The spreadsheet does not identify anyone who reviewed the indorsements, alonges and assignments of mortgage relating to twenty-nine (29) of the Stolen Loans.[18]  The spreadsheet reflects that the indorsements, alonges and assignments of mortgage underlying the remaining Stolen Loans were reviewed by various loan certifiers.  Fannie Mae, however, has not identified in discovery any loan certifier who relied upon any actions or inactions of Picatinny in certifying the Stolen Loans.  To the contrary, Barbara Cushman, a Fannie Mae loan certifier, made clear that she certified documents underlying the Stolen Loans without relying upon any actions of Picatinny.  (Cushman Dep. T. 134-13 to 134-18).

Although the analysis could end there, Picatinny will address Fannie Mae's other anticipated arguments in putative support of its apparent authority defense.  First, Fannie Mae may contend that Picatinny's issuance of corporate resolution in 2003 authorizing U.S. Mortgage to indorse Picatinny's name on promissory notes with respect to specifically identified loans is a Picatinny act upon which Fannie Mae relied to evidence U.S. Mortgage's apparent authority to act

---

[16]    A copy of the cited pages from the deposition transcript of Barbara Cushman, a Fannie Mae loan certifier, is attached collectively as Exhibit M to the Forte Aff.

[17]    A copy of the spreadsheet identifying information concerning Fannie Mae's alleged review of the documents underlying the Stolen Loans and loans stolen from other credit unions is attached as Exhibit N to the Forte Aff.

[18]    Comparing the Fannie loan numbers on each of the Stolen Loans identified as Exhibit D to the McGrath Aff. with the Fannie Mae loan numbers on the spreadsheet reveals that the Stolen Loans are identified on three of the last four loans on page 2 (Fannie Mae Loan Nos. 40056448157, 4005648151 and 4005648153), all of the loans on page 3 of the spreadsheet, and the top two loans on page 4 of the spreadsheet.  (Forte Aff., ¶4).

on Picatinny's behalf.  This argument fails because Fannie Mae does not have any loan certifier or

other witness who will testify that Fannie Mae certified the documents underlying the Stolen

Loans in 2007 and 2008 because it relied upon the 2003 corporate resolution authorizing Mr.

McGrath to sign documents relating to specific loans on behalf of Picatinny.  Nor could Fannie

Mae honestly offer such testimony because its Account Manager assigned to U.S. Mortgage has

testified that he did not believe Mr. McGrath was an Assistant Vice President of any credit union.

(Deposition of Alexander Saphos, T. 133-5 to 135-5, attached as Exhibit O to the Forte Aff.).

Moreover, Fannie Mae has admitted that it does not keep a record of who was

authorized to sign notes on behalf of a payee.  (Gang Dep. T. 118-3 to 119-2).  Fannie Mae never

reviewed prior allonges and indorsements on notes to determine whether the persons signing notes

presented for purchase were authorized.  (Id., T. 119-6 to 119-13).  Fannie Mae's own expert has

admitted that Fannie Mae did not rely upon any actions of Picatinny in accepting the notes over

Mr. McGrath's indorsement; rather, Fannie Mae only "confirm[ed] that the signature(s) appearing

on the note and any endorsements are present and are original."  (Forte Aff., Exhibit P, at 5).

Second, Fannie Mae will argue that, because Picatinny permitted U.S. Mortgage to

maintain possession of the original promissory notes, it assumed that U.S. Mortgage had the

authority to indorse Picatinny's name on an allonge to the promissory notes underlying the Stolen

Loans.  This argument lacks any factual or legal support.  As a factual matter, Picatinny did not

permit U.S. Mortgage to maintain possession of its original promissory notes; it permitted CU

National to do so.  In addition, U.S. Mortgage did not indorse its name as an agent of Picatinny;

Mr. McGrath did as an alleged AVP of Picatinny.

Legally, Fannie Mae is simply wrong.  New Jersey courts have recognized that

mere possession of personal property does not confer upon an agent the apparent authority to

exercise rights relating to the property.  See Baurhenn v. Fidelity & Deposit Co. of Maryland, 114 N.J.L. 99, 105 (E. & A. 1935); see also Blaisdell Lumber Co. v. Horton, 242 N.J. Super. 98, 104 (App. Div. 1990) (mere possession of credit card does not create apparent authority to use card).  Courts from other jurisdictions have reached the same result and held that mere possession of a negotiable instrument not payable to bearer does not convey apparent authority to negotiate the instrument.  See, e.g., Owens v. Wood, 43 Ala. App. 366, 374, 190 So.2d 734, 733 (1966); Thompson v. Lake Cty. Nat'l Bank, 47 Ohio App.2d 249, 252, 353 N.E.2d 895, 897 (1975).

Finally, Picatinny anticipates that Fannie Mae will argue that, because Picatinny permitted CU National to answer telephone lines as if they were employees of Picatinny and to indorse checks received from Picatinny's borrowers, Mr. McGrath had the apparent authority to indorse the promissory notes and to execute assignments of mortgage underlying the Stolen Loans.  This argument is a red herring.  Picatinny permitted CU National to undertake such actions, not U.S. Mortgage or Mr. McGrath individually.  Furthermore, while CU National's actions arguably could have caused a member of Picatinny to believe that CU National had authority to act on behalf of Picatinny in certain circumstances, Fannie Mae will offer no evidence that its loan certifiers certified the Stolen Loans based upon that authority.  Just the opposite, Fannie Mae certified the Stolen Loans without relying upon any actions of Picatinny.  (Cushman Dep. T. 134-13 to 134-18).  Thus, Fannie Mae's apparent authority defense also lacks merit.

## VI.

## THE WAIVER AND ESTOPPEL DEFENSES LACK MERIT

In its Fifth Affirmative Defense, Fannie Mae argues that "Picatinny's claims are barred by the doctrines of waiver and estoppel."  The New Jersey Supreme Court defines waiver as "the voluntary and intentional relinquishment of a known right."  Knorr v. Smeal, 178 N.J. 169, 177 (2003).  "It 'implies an election by the party to dispense with something of value, or to forego

some advantage which [that party] might have demanded and insisted on.'" Gotlib v. Gotlib, 399

N.J. Super. 295, 304 (App. Div. 2008) (quoting Clarke v. Clarke ex. rel. Costine, 359 N.J. Super.

562, 571 (App. Div. 2003)).  "The party waiving a known right must do so clearly, unequivocally,

and decisively."  Knorr, 177 N.J. at 177; see County Chevrolet, Inc. v. Township of N. Brunswick

Planning Bd., 190 N.J. Super. 376, 380 (App. Div. 1983) (same).

      The New Jersey Supreme Court has held that "[t]he essential elements of equitable

estoppel are a knowing and intentional misrepresentation by the party sought to be estopped under

circumstances in which the misrepresentation would probably induce reliance, and reliance by the

party seeking estoppel to his or her detriment."  O'Malley v. Dep't of Energy, 109 N.J. 309, 317

(1987).  The doctrine "is designed to prevent injustice by not permitting a party to repudiate a

course of action on which another party has relied to his detriment."  Knorr, 178 N.J. at 178.

      When asked in discovery to set forth each fact upon which Fannie Mae bases its

waiver and estoppel defenses, Fannie Mae responded:

> Picatinny provided U.S. Mortgage with the original notes for loans
> originated by U.S. Mortgage on behalf of Picatinny.  Picatinny failed to
> execute any sort of agreement by and between U.S. Mortgage as the
> lender/servicer, U.S. Mortgage as the Custodian and Picatinny.  Picatinny
> failed to require that U.S. Mortgage have safeguards in place to protect
> itself, including for example, written procedures that addressed the review
> and control of original notes, sufficient capabilities to track the receipt and
> release of original notes, and a Financial Institution Bond (or equivalent)
> insurance to protect against losses resulting from dishonesty and fraud or
> Errors and Omissions insurance policies.  Picatinny failed to require that
> U.S. Mortgage's custodial facilities and operation be separate and apart
> from its departments performing mortgage origination, selling and/or
> servicing functions for Picatinny.  Picatinny's negligence in allowing U.S.
> Mortgage to hold original notes without any safeguards substantially
> contributed to and enabled the fraud committed by U.S. Mortgage and
> Michael McGrath.

(Fannie Mae's Second Amended Responses to Picatinny's First Set of Interrogatories, No. 19,

attached as Exhibit J to the Forte Aff.) (objections omitted).

Putting aside that Fannie Mae again has misstated that U.S. Mortgage acted as a custodian of Picatinny's original notes, Fannie's Mae's discovery response does not contain any facts that support these defenses.  The answer does not set forth any act by Picatinny that reflects its "voluntary and intentional relinquishment of [its] known right" to assert conversion claims against Fannie Mae.  The answer also does not identify any "knowing or intentional misrepresentation" made by Picatinny to Fannie Mae intended to induce reliance by Fannie Mae. In the absence of such facts, Fannie Mae does not have viable waiver and estoppel defenses.

<h2 style="text-align:center">VII.</h2>

<h3 style="text-align:center">FANNIE MAE'S UCC DEFENSES ARE NOT APPLICABLE<br>TO THE PROMISSORY NOTES UNDERLYING THE STOLEN LOANS</h3>

In its Sixth and Seventh Affirmative Defenses, Fannie Mae purports to rely upon N.J.S.A. 12A:3-405(b) and 12A:3-406, respectively.  N.J.S.A. 12A:3-405(b) permits a person who takes an instrument for value and in good faith to defend against a claim of conversion by an employer if the employer entrusted a person with responsibility with respect to the instrument and an employee or person acting in concert with the employee makes a fraudulent indorsement of the instrument.  N.J.S.A. 12A:3-406 permits a person who takes an instrument for value and in good faith to defend against a claim of conversion of an instrument if the party seeking to recover failed to exercise ordinary care that substantially contributed to the forged signature on the instrument.

Both defenses, however, hinge upon Fannie Mae having taken an "instrument," which, as defined in N.J.S.A. 12A:3-104(b), means a "negotiable instrument."  As discussed in Point III(B) supra, the promissory notes underlying the Stolen Loans are not negotiable instruments because they contain an undertaking by the person promising payment to perform acts in addition to the payment of money and the other permissible promises in N.J.S.A. 12A:3-104(a)(3).  Therefore, these statutes have no application to the facts before this Court.

## VIII.

### EVEN IF THE PROMISSORY NOTES UNDERLYING THE STOLEN LOANS ARE NEGOTIABLE INSTRUMENTS, FANNIE MAE'S UCC DEFENSES ARE UNAVAILING

**A.   N.J.S.A. 12A:3-405(b) Does Not Apply Because CU National Did Not Have Responsibility With Respect To The Notes And The Notes Did Not Contain A Fraudulent Indorsement As Defined In The UCC**

In its Sixth Affirmative Defense, Fannie Mae contends that Picatinny's claims are barred under N.J.S.A. 12A:3-405(b) because "Picatinny entrusted McGrath and U.S. Mortgage with certain responsibility with respect to the mortgage notes and, therefore, the signatures of McGrath and other U.S. Mortgage personnel on the mortgage notes are effective as the signatures of Picatinny."  (Forte Aff., Exhibit B).

N.J.S.A. 12A:3-405(b) reads as follows:

> For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the employee or a person acting in concert with the employee makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of the person.  If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

Assuming, for purposes of its summary judgment motion only, that Fannie Mae took the instrument for value and in good faith, Fannie Mae must establish under N.J.S.A. 12A:3-405(b) that Picatinny entrusted "an employee with responsibility with respect to the instrument" and that "the employee makes a fraudulent indorsement of the instrument."  It cannot do so.

First, Picatinny entered into the Agreement for loan servicing with CU National, not U.S. Mortgage.  Although N.J.S.A. 12A:3-405(a)(1) defines an "employee" to include an independent contractor and an employee of an independent contractor retained by the employer,

U.S. Mortgage was neither an independent contractor retained by Picatinny to perform any services relating to the Stolen Loans nor an employee of CU National.

Second, even if CU National (as opposed to U.S. Mortgage) were deemed an "employee" of Picatinny under N.J.S.A. 12A:3-405, and Mr. McGrath were deemed an "employee of an independent contractor," CU National was not entrusted with "responsibility" for the promissory notes. N.J.S.A. 12A:3-405(a)(3) defines "responsibility" to mean:

> "Responsibility" with respect to instruments means authority to:  sign or indorse instruments on behalf of the employer; process instruments received by the employer for bookkeeping purposes, for deposit to an account, or for other disposition; prepare or process instruments for issue in the name of the employer; supply information determining the names and addresses of payees of instruments to be issued in the name of the employer; control the disposition of instruments to be issued in the name of the employer; or act otherwise with respect to instruments in a responsible manner.  "Responsibility" does not include authority that merely allows an employee to have access to instruments or blank or incomplete instrument forms that are being stored or transported or are part of incoming or outgoing mail, or similar access.

A review of each of the acts that constitute "responsibility" for purposes of N.J.S.A. 12A:3-405 reveals that CU National did not have such responsibility with respect to Picatinny's promissory notes.  CU National did not have authority to "sign or indorse" notes on behalf of Picatinny.  (McGrath Aff., ¶¶3, 9, 22-23; Darling Aff., ¶7).  Its responsibility with respect to Picatinny original promissory notes was limited to storing them in a secure facility.  (McGrath Aff., ¶9).  Because the definition of "responsibility" expressly excludes "authority that merely allows an employee to have access to [promissory notes]," and such access was the limit of CU National's authority with respect to the notes, Fannie Mae will be unable to establish that CU National was entrusted with "responsibility" for the notes to invoke N.J.S.A. 12A:3-405(b).

Third, this statute applies only to a "fraudulent indorsement."  N.J.S.A. 12A:3-405(a)(2) defines a fraudulent indorsement to mean "in the case of an instrument payable to the

employer, a forged indorsement purporting to be that of the employer . . . ."  Although the UCC does not define the phrase "forged indorsement," it defines an "unauthorized indorsement" to mean "one made without actual, implied or apparent authority and includes a forgery."  N.J.S.A. 12A:1-201(43).  This definition makes clear that every indorsement made without actual, implied or apparent authority is not a "forged indorsement."

Here, there was no forged indorsement.  When indorsing the notes purportedly on behalf of Picatinny, Mr. McGrath signed his own name and did not purport to be a different "Michael McGrath."  (McGrath Aff., ¶23).  Instead, he misrepresented his authority to act on behalf of Picatinny by falsely referring to himself as an AVP of Picatinny.  (Id., ¶¶22, 23).  In such circumstances, courts have recognized that the indorsement is not a forgery.  See Salsman, 102 N.J. Super. at 492 (indorsement of Harold Breslow as "Harold Breslow, Trustee" when he was not Trustee held to be an "unauthorized signature" under N.J.S.A. 12A:1-201(43) because it was made without authority but did "not constitute a forgery in the strict sense"); see also Webb Carter Const. Co. v. Louisiana Cent. Bank, 922 F.2d 1197, 1199-1200 (5th Cir. 1991).

Webb Carter is instructive.  There, Phyllis Paul, a secretary of plaintiff, diverted checks from plaintiff and cashed them at the defendant bank indorsing the checks under her own name as a person apparently authorized to cash checks for plaintiff.  922 F.2d at 1198-99.  On the parties' motions for summary judgment, the Fifth Circuit recognized that Ms. Paul's indorsement was not a forgery but an indorsement made without actual, implied or apparent authority:

> One difficulty we confront is that both parties rely heavily on negotiable-instrument cases involving forgeries.  The record before us contains no evidence of forgery.  Paul's actions were illegal, and, if proven, subject her to civil and criminal liability, but her actions were not acts of forgery.  She signed her own name for each of the checks cashed and never claimed to be anyone other than Phyllis Paul.  As such her offense, and the relevant term involved for purposes of the Uniform Commercial Code, is unauthorized indorsement and not forgery.

Id. at 1199.[19]

Like Ms. Paul's indorsements on checks issued to plaintiff, Mr. McGrath's indorsements on the notes were made in his own name without actual, implied or apparent authority.  Because such indorsements are not forgeries under the UCC, they are not a "forged indorsement" under N.J.S.A. 12A:3-405(a)(2), which renders this statute inapplicable.

**B.**     **N.J.S.A. 12A:3-406 Does Not Apply Because**
        **The Notes Did Not Contain A Forged Indorsement**

Fannie Mae's Seventh Affirmative Defense states that Picatinny's claims are barred under N.J.S.A. 12A:3-406(a) because "Picatinny's failure to exercise ordinary care substantially contributed to the making of the signatures by McGrath and other U.S. Mortgage personnel on the mortgage notes, and, therefore, Picatinny is precluded from asserting that the signatures are ineffective."  (Forte Aff., Exhibit B).

N.J.S.A. 12A:3-406(a) provides:

> A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

By its terms, this statute applies only "to an alteration of an instrument or to the making of a forged signature on an instrument."  As discussed in Point VI supra, the promissory notes underlying the Stolen Loans are not negotiable instruments, and consequently this statute does not apply.  Even if this Court were to find that the notes are negotiable instruments, N.J.S.A 12A:3-406 has no application to Mr. McGrath's indorsement to Picatinny's promissory notes

---

[19]     In reaching that decision, the Fifth Circuit recognized, under the UCC definition of unauthorized signature, "[t]hat an unauthorized indorsement encompasses a forgery does not mean that the reverse is true, as is evident in this case."  922 F.2d at 1200 n.2; see American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d 786, 793 (Ala. 2002) (holding that UCC §1-201(43) "clearly characterizes 'a forgery' as an included, but narrower, subset of 'unauthorized' indorsements; it does not equate the two terms").

because his indorsement is neither an "alteration" nor a "forged signature."  Rather, as addressed

in Point VIII(A) infra, it is an indorsement made without actual, implied or apparent authority.

Recognizing that the drafters' use of the phrase "forged signature" in UCC §3-406

was intended to exclude cases involving indorsements made without actual, implied or apparent

authority that are not forgeries, Official Comment 2 to UCC §3-406 provides:

> Section 3-406 refers to "forged signature" rather than "unauthorized signature"
> that appeared in former Section 3-406 because it more accurately describes the
> scope of the provision.  Unauthorized signature is a broader concept that
> includes not only forgery but also the signature of an agent which does not bind
> the principal under the law of agency.  The agency cases are resolved
> independently under agency law.  Section 3-406 is not necessary in those cases.

As Comment 2 instructs, the effectiveness or, more appropriately, lack of

effectiveness of Mr. McGrath's indorsement on behalf of Picatinny on the notes is to be

determined by agency law, i.e., whether he had Picatinny's actual, implied or apparent authority to

sign the allonges.  See 2 White & Summers, Uniform Commercial Code § 19-3 (5th ed. 2000)

(recognizing that UCC Comments "state the drafters intention to limit [UCC §§ 3-405 and 3-406]

to forgeries and to exclude unauthorized indorsements that are not forgeries").  In such cases, as

set forth in the Official Comment 2, "Section 3-406 is not necessary."

## CONCLUSION

For the foregoing reasons, Picatinny respectfully requests that this Court grant

Picatinny's motion for partial summary judgment against Fannie Mae.

SAIBER LLC
Attorneys for Plaintiff
Picatinny Federal Credit Union


By:_____*/s/ James H. Forte*_____
JAMES H. FORTE
A Member of the Firm

Dated:  December 15, 2010