| | |
|---|---|
| PICATINNY FEDERAL CREDIT UNION,<br><br>              Plaintiff,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION,<br><br>              Defendant. | UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY<br><br>Hon. Garrett E. Brown<br><br>Consolidated Civil Action<br>No. 09-01295 (GEB) |

| | |
|---|---|
| SPERRY ASSOCIATES FEDERAL CREDIT<br>UNION,<br><br>              Plaintiff,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION,<br><br>              Defendant. | AFFIDAVIT OF MICHAEL J.<br>McGRATH IN CONNECTION WITH<br>MOTION FOR PARTIAL SUMMARY<br>JUDGMENT BY PICATINNY<br><u>FEDERAL CREDIT UNION</u> |

PICATINNY FEDERAL CREDIT UNION,

            Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

            Defendant.

SPERRY ASSOCIATES FEDERAL CREDIT
UNION,

            Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

            Defendant.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

            Plaintiff,

v.

PROPONENT FEDERAL CREDIT UNION,

            Defendant.

SUFFOLK FEDERAL CREDIT UNION,

            Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

            Defendant.

{00644705.DOC}

STATE OF NEW JERSEY   :
                          : ss:
COUNTY OF ESSEX       :

       MICHAEL J. McGRATH, JR., being duly sworn according to law, upon his oath, deposes and says:

       1.     I was a principal and the President of U.S. Mortgage Corporation ("U.S. Mortgage"), which owned CU National Mortgage, LLC ("CU National").

       2.     On June 11, 2009, I pled guilty in United States District Court for the District of New Jersey, Civil Action No. 09-436, before the Honorable Katherine S. Hayden, to one count of mail and wire fraud conspiracy and one count of money laundering conspiracy.  A copy of the transcript of my plea allocution is attached as Exhibit A.

       3.     My guilty pleas arose from a fraudulent scheme by which I, through U.S. Mortgage, sold1 to Federal National Mortgage Association ("Fannie Mae") nearly 500 first mortgage loans totaling in excess of $136 million that CU National was servicing for approximately 26 different credit unions.  The vast majority of these sales occurred without the knowledge or consent of the credit unions, and without the credit unions receiving any of the proceeds of the sales, including fifty-two (52) mortgage loans funded by Picatinny Federal Credit Union ("Picatinny"), fifty-one (51) of which are identified on Exhibit C to its Amended Complaint (hereinafter "Stolen Loans") .

---

1     By reference to "sold" or "sale" in this Affidavit, I mean delivered for consideration.  I do not mean to suggest that these purported sales transferred to Fannie Mae any ownership rights in the loans.

**The Business of U.S. Mortgage and CU National**

4.      U.S. Mortgage was a mortgage banking company licensed in various states, including New Jersey.  The business of U.S. Mortgage was to originate, buy, sell and service residential mortgage loans.

5.      In or about1999, CU National was formed as a subsidiary of U.S. Mortgage. CU National's primary business was to originate and service first mortgage loans made by credit unions.  The need for CU National's services arose from the fact that members of credit unions wished to obtain first mortgage loans from their credit union but their credit union lacked sufficient expertise, manpower and technology to originate and service those loans.

6.      CU National performed origination and/or servicing of first mortgage loans for in excess of approximately 50 credit unions.  CU National's servicing of mortgage loans for credit unions included, among other things, generating monthly mortgage statements and sending them to the borrower, collecting the monthly payment of principal and interest from the borrower and remitting those monthly payments (less a fee) to the credit union, along with loan reports reflecting, among other things, the remittances received for the month and the loan's status.

**CU National's Maintenance of Original Loan Files Including Promissory Notes**

7.      For many of the credit unions whose loans CU National serviced, CU National maintained physical custody of the loan files, including the original promissory note underlying the loan.  While I cannot remember all of the credit unions for which CU National maintained the original promissory notes, at some time during the period from July 1999 through early February 2009, CU National maintained original promissory notes for a number of credit unions, including the following:  (a) 1st Liberty Federal Credit Union; (b) 102 Federal Credit Union; (c) ADP Federal Credit Union; (d) Avon Federal Credit Union; (e) Bard Employees Federal Credit Union; (f) British Airways Employees Federal Credit Union; (g) County Educators Federal Credit Union; (h) Cross

Valley Federal Credit Union; (i) CWA Long Island Federal Credit Union; (j) Delta Employees Federal Credit Union; (k) Dow Jones Employees Federal Credit Union; (l) Duval Federal Credit Union; (m) "E" Federal Credit Union; (n) Educational Systems Federal Credit Union; (o) Essex County Teachers Federal Credit Union; (p) First Florida Federal Credit Union; (q) Florida Aircraft Federal Credit Union; (r) Frontier Federal Credit Union; (s) GTE Federal Credit Union; (t) H.E. Telephone Federal Credit Union; (u) Holston Methodist Federal Credit Union; (v) Jersey Trades Federal Credit Union; (w) J.M. Associates Federal Credit Union; (x) Liberty Savings Federal Credit Union; (y) League of Municipal Taxi Owners Federal Credit Union; (z) Lone Star Credit Union; (aa) Lower Eastside People Federal Credit Union; (bb) Manville Area Credit Union; (cc) Miami Firefighters Federal Credit Union; (dd) Miami Police Federal Credit Union; (ee) Middlesex Federal Credit Union; (ff) MidSouth Federal Credit Union; (gg) Moapa Valley Federal Credit Union; (hh) N.E.T. Federal Credit Union; (ii) Newark Board of Education Employees Federal Credit Union; (jj) North Jersey Federal Credit Union; (kk) Novartis Federal Credit Union; (ll) Oregon Community Federal Credit Union; (mm) Penn East Federal Credit Union; (nn) Peoples First Choice Federal Credit Union; (oo) Picatinny Federal Credit Union; (pp) Pine Bluff Cotton Belt Federal Credit Union; (qq) Pinnacle Federal Credit Union; (rr) Potter's House Federal Credit Union; (ss) Rutgers Federal Credit Union; (tt) San Antonio Citizens Federal Credit Union; (uu) Skyline Federal Credit Union; (vv) Sperry Federal Credit Union; (ww) Suffolk Federal Credit Union; (xx) TCT Federal Credit Union; (yy) Toledo Urban Federal Credit Union; (zz) Treasury Department Federal Credit Union; (aaa) Tri-Linc Federal Credit Union; (bbb) Tucson Federal Credit Union; (ccc) Tuscaloosa VA Federal Credit Union; (ddd) United Financial Services Community Federal Credit Union; (eee) Velocity Federal Credit Union; (fff) Wakefern Federal Credit Union; and (ggg) Wauna Federal Credit Union.

{00644705.DOC}                                              4

8.   CU National maintained the original promissory notes for these and other credit unions in fireproof file cabinets and locked the original notes in those cabinets. These fireproof locked cabinets were maintained in a restricted access area that required a security code to enter.

9.   Other than its storage of the original promissory notes for the credit unions, CU National did not have any other responsibility with respect to the credit unions' original promissory notes. Specifically, CU National never had the authority to sign or indorse the promissory notes on behalf of any credit union.

10.   From time to time, a credit union would request that CU National arrange for the sale of one or more of its loans on the secondary mortgage market.2 CU National, however, was not an authorized seller of loans to the secondary market. When a credit union requested CU National to sell a loan, the general practice was that CU National would arrange for its parent, U.S. Mortgage, to prepare an allonge reflecting the credit union's indorsement of the loan to the order of U.S. Mortgage and assignment of mortgage from the credit union to U.S. Mortgage, and deliver to the credit union that allonge and assignment of mortgage. The credit union would execute the allonge and assignment and return them to CU National, which would provide them to U.S. Mortgage. I believe that there were a few occasions when a credit union asked CU National or U.S. Mortgage to execute these documents. In other words, there were a few occasions to my recollection the execution was done with a credit union's explicit approval, such as the time described in Paragraph 16 below. However, for the vast majority —all those related to the improper scheme – CU National did not have the credit unions' approval and did not have Picatinny's approval to execute an allonge and assignment of the mortgage on Picatinny's behalf.

---

2   By "secondary mortgage market," I am referring to those entities such as Fannie Mae that purchased mortgage loans and grouped them together for purposes of sale as a mortgage backed security.

11.    U.S. Mortgage needed to prepare and deliver an allonge and assignment of mortgage for the credit union's execution in connection with the sale of credit union mortgage loans because U.S. Mortgage, like CU National, did not have the authority to sign or indorse any credit union's original promissory notes or execute on behalf of the credit union an assignment of mortgage.  On occasion, a credit union would prepare and provide U.S. Mortgage with a corporate resolution identifying specific loans with respect to which I, on behalf of the credit union, was authorized to sign or indorse a promissory note and other necessary documents to effectuate a sale of the mortgage loan.  When it received such a corporation resolution from a credit union, U.S. Mortgage maintained that resolution in its files so that it could be provided to the secondary market purchaser in the event the purchaser inquired as to my authority to make the indorsement on behalf of the credit union.  I never provided Fannie Mae with any of these corporate resolutions because Fannie Mae never inquired as to my authority to indorse promissory notes, execute assignments of mortgage or sell loans on behalf of any credit union.

12.    To effectuate the sale of the credit union loan on the secondary market, U.S. Mortgage would prepare a second allonge and assignment of mortgage from U.S. Mortgage to the secondary market purchaser which, with respect to credit unions loans, was primarily Fannie Mae. U.S. Mortgage would execute the allonge in blank and a second assignment of mortgage in favor of the secondary market purchaser, and deliver the allonge in blank and the second assignment of mortgage to the secondary market purchaser.

**CU National's Relationship With Picatinny**

13.    As of July 1, 1999, Picatinny and CU National entered into the Credit Union Support Services and Correspondent Mortgage Lending Agreement ("Agreement").  Under this Agreement, from on or about July 1, 1999 until early February 2009, CU National originated first

mortgage loans for Picatinny and serviced those loans. A copy of this Agreement is attached as Exhibit B.

14.     Article I of this Agreement sets forth the "Loan Production Support Services" that CU National was to provide Picatinny. Section I(d) is entitled "Loan Processing," which addresses the manner in which CU National would process a Picatinny member's loan application. Under this section, the Agreement provides that "[i]n fulfilling CU NATIONAL's responsibilities to the Credit Union as set forth in this Agreement, CU NATIONAL shall act as the Credit Union's agent and shall be authorized to receive, transmit, and otherwise process the member's confidential financial information provided through the loan application process."

15.     The reason for this language was to ensure that Picatinny's disclosure of its member's personal financial information to CU National would not violate any state or federal privacy laws. By referring to CU National as an "agent" for purposes of the loan application, Picatinny would not be permitting the disclosure of this information to a third-party. This section did not, and was not intended to, grant CU National the right to indorse promissory notes on behalf of Picatinny, execute assignments of mortgage on behalf of Picatinny or sell Picatinny mortgage loans. To the best of my knowledge, this Agreement was not provided to Fannie Mae or any other secondary market purchaser.

16.     On one occasion, Picatinny did authorize U.S. Mortgage to sign allonges and execute assignments of mortgages and sell loans on its behalf. In or around 2003, Picatinny wished to sell a block of loans. To avoid the exchange of several allonges and assignments back and forth over a short period of time, Picatinny issued and delivered to U.S. Mortgage a corporate resolution authorizing U.S. Mortgage to sign the documents necessary to sell these loans to Fannie Mae. Attached to the resolution was a list of the specific loans for which U.S. Mortgage was authorized to sign documents on Picatinny's behalf to sell the loans to Fannie Mae. To accomplish the sale, I

{00644705.DOC}                                7

ended up signing the notes as "AVP" (for Assistant Vice President) of Picatinny. Although U.S. Mortgage was permitted to execute all necessary documents, I was not given explicit permission or instruction by Picatinny to sign as AVP on behalf of Picatinny. Although I would have provided Fannie Mae with the corporate resolution if it requested evidence of U.S. Mortgage's authority to act on Picatinny's behalf, I did not do so because Fannie Mae never inquired as to U.S. Mortgage's authority. A copy of that corporate resolution is attached as Exhibit C.

17.    I do not recall any other occasion on which Picatinny authorized U.S. Mortgage to execute loan documents on its behalf.

**U.S. Mortgage's Unauthorized Sales of Picatinny and Other Credit Unions' Loans**

18.    In or around 2004, I and others within U.S. Mortgage at my direction began to sell first mortgage loans held by CU National on behalf of credit unions in the secondary market without the authorization of the credit unions that owned the loans. Between 2004 and early 2009, I caused credit union mortgage loans totaling in excess of $100 million in principal to be sold to Fannie Mae without the credit unions' knowledge or authorization.

19.    I accomplished these unlawful sales by signing an allonge to the credit union's promissory note and executing an assignment of mortgage, purportedly on behalf of the credit union, to the order of U.S. Mortgage. I then caused a representative of U.S. Mortgage to sign an allonge in blank and execute an assignment of mortgage in favor of Fannie Mae, and deliver the original promissory note, allonges and assignments of mortgage to Fannie Mae, which then would issue payment to U.S. Mortgage for the loan.

20.    I believed I could accomplish this fraud because Fannie Mae, during the many years that U.S. Mortgage sold to Fannie Mae mortgage loans funded by credit unions, never inquired about the authority of the person indorsing the promissory note and executing the assignment of mortgage from the credit union to U.S. Mortgage. As a result, I did not believe that

{00644705.DOC}                                          8

Fannie Mae would raise a concern about the fact that I was executing allonges and assignments of mortgage, purportedly as an officer of 26 different credit unions. I understood that this was a risk that I took, i.e., that Fannie Mae may ask about the authority of the person indorsing the note. However, to my knowledge, Fannie Mae never raised that concern.

21.    Beginning in November 2007 and continuing through December 2008, I sold each of the Stolen Loans to Fannie Mae without Picatinny's knowledge or authorization.

22.    Attached as Exhibit D are the promissory notes, allonges and assignments of mortgage relating to 51 of the Stolen Loans (the documents underlying the Bonte loan have not been provided). In connection with each of the Stolen Loans, I signed an allonge and an assignment of mortgage purportedly as an "AVP" (Assistant Vice President) of Picatinny. I was not then, and never was, an "AVP" or any other officer of Picatinny. Nor did I know whether Picatinny even had the title "AVP" within its organization.

23.    I signed my own name to each of these allonges and assignments of mortgage but misrepresented that I was an "AVP" of Picatinny and that I had authority to act on its behalf. I had no authority from Picatinny to sign these allonges and assignments of mortgage, and no right to attempt to transfer them to Fannie Mae. When Fannie Mae paid U.S. Mortgage for each of these unauthorized loan sales, U.S. Mortgage kept the proceeds of the sales without remitting them to Picatinny or advising Picatinny that these purported sales had been made.

24.    CU National was able to conceal my unauthorized sale of the credit union loans (including the Stolen Loans) by making it appear to the credit unions that the loans sold remained in their loan portfolio and by paying the credit unions the monthly remittances to which they were entitled. Each month, CU National provided to each credit union various written reports, including, among others, a loan trial balance report. The loan trial balance report contained the loan number and borrower name of each loan that CU National was servicing for that credit union and

reflected, for each of the loans that was sold without the credit union's knowledge and authorization, that the principal and interest balance on the loan had been reduced by the amount of the monthly payment received. Because the credits unions were receiving the monthly remittances to which they were entitled, and receiving monthly reports from CU National reflecting the loans remained in their portfolio, they would have no reason to believe that I had attempted to transfer their loans to Fannie Mae.

   25. I am unaware of any actions or inactions of Picatinny that gave Fannie Mae reason to believe that I was an "AVP" of Picatinny or otherwise had the authority to sign allonges and assignments of mortgage on Picatinny's behalf. Nor, to my knowledge, did Fannie Mae ever communicate with Picatinny (or any other credit union) about my authority to indorse allonges and execute assignments of mortgage on their behalf before my fraudulent acts were discovered.

                  MICHAEL J. McGRATH, JR.

Sworn to and subscribed before me
this ___/3__ day of December, 2010.

    NOTARY PUBLIC

MICHELLE CUNNINGHAM
A Notary Public of New Jersey
My Commission Expires 4/29/2013

{00644705.DOC}       10