# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PICATINNY FEDERAL CREDIT UNION, <br><br> Plaintiff, <br><br> v. <br><br> FEDERAL NATIONAL MORTGAGE ASSOCIATION, <br><br> Defendant. | Civil Action No. 2:09-CV-01295 (GEB)(MCA) |

---

## DEFENDANT FEDERAL NATIONAL MORTGAGE ASSOCIATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

Alan E. Kraus
Rebecca K. Brown
LATHAM & WATKINS LLP
One Newark Center, 16th Floor
Newark, New Jersey 07101-3174
Telephone: (973) 639-1234
Facsimile: (973) 639-7298

*Attorneys for Defendant*
*Federal National Mortgage Association*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

PROCEDURAL HISTORY...................................................................................3

STATEMENT OF FACTS ...................................................................................4

    I.      THE PARTIES AND THEIR BUSINESS ...........................................4

    II.     MCGRATH'S FRAUDULENT SCHEME ...........................................6

    III.    PICATINNY'S FACILITATION OF MCGRATH'S FRAUD ............................7

    IV.    SALE OF THE LOANS AND CHARACTERISTICS OF THE ENDORSEMENTS...................................................................................10

    V.     FANNIE MAE'S LOAN ACCEPTANCE AND CERTIFICATION PROCEDURES...................................................................................12

ARGUMENT...................................................................................13

    I.      THE SUMMARY JUDGMENT STANDARD...................................................................................13

    II.     FANNIE MAE IS THE HOLDER IN DUE COURSE OF THE DISPUTED NOTES ...................................................................................13

           A.     Fannie Mae is a "Holder" of the Disputed Notes ...................................15

                1.     Fannie Mae Possesses the Original Notes. ...................................16

                2.     McGrath and U.S. Mortgage Had Apparent Authority to Sell the Disputed Notes to Fannie Mae...........................................16

                         (a)    There Were Multiple Manifestations By Picatinny That Led Fannie Mae To Reasonably Believe That McGrath And U.S. Mortgage Were Authorized To Sell The Picatinny Notes And Endorse Them On Picatinny's Behalf..........................................................20

           B.     Fannie Mae Took the Disputed Notes For Value in Good Faith and Without Notice of Any Defect...................................................22

                1.     Fannie Mae Is Not Required to Investigate Authority on Intervening Endorsements. ...................................26

2.    Picatinny's Alleged "Red Flags" Are Irrelevant As A Matter Of Law.............................................................................29

CONCLUSION....................................................................................................32

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Society of Mechanical Engineers v. Hydrolevel Corp.*,
   456 U.S. 556 (1982)............................................................................................17

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................13

*Azur v. Chase Bank, USA*,
   601 F.3d 212 (3d Cir. 2010)...............................................................................19

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)............................................................................................13

*Continental-Wirt Electronics Corp. v. Sprague Electric Co.*,
   329 F. Supp. 959 (E.D. Pa. 1971) ......................................................................20

*DBI Architects, P.C. v. American Express Travel-Related Services Co.*,
   388 F.3d 886 (D.C. Cir. 2004)............................................................................19

*Datasphere, Inc. v. Computer Horizons Corp.*,
   No. 05-2717, 2008 U.S. Dist. LEXIS 88178 (D.N.J. Oct. 9, 2008) ....................19

*Famous Knitwear Corp. v. Drug Fair, Inc.*,
   493 F.2d 251 (4th Cir. 1974) ..............................................................................18

*Great Northern Insurance Co. v. ADT Security Services, Inc.*,
   No. 06-90, 2009 U.S. Dist. LEXIS 91564 (W.D. Pa. Sep. 30, 2009)...................20

*In re Jersey Tractor Trailer Training Inc.*,
   580 F.3d 147 (3d Cir. 2009)...........................................................................23, 25

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)............................................................................................13

*Midfirst Bank v. C.W. Haynes & Co.*,
   893 F. Supp. 1304 (D.S.C. 1994), *aff'd*, Nos. 95-2515, 95-2516,
   1996 U.S. App. LEXIS 12567 (4th Cir. May 31, 1996)........................................30

*Minskoff v. American Express Travel-Related Services Co.*,
   98 F.3d 703 (2d Cir. 1996)..................................................................................20

*In re Mushroom Transport Co.*,
   382 F.3d 325 (3d Cir. 2004)................................................................................19

iii

*National Union Fire Insurance Co. v. Universal Fabricators, Inc.*,
   713 F. Supp. 2d 206 (S.D.N.Y. 2010)...............................................................20

*In re Pinnacle Mortgage Investment Corp.*,
   No. 98-0489, 1998 U.S. Dist. LEXIS 23289 (D.N.J. Dec. 9, 1998)...............................26, 28

*State Bank of the Lakes v. Kansas Bankers Surety Co.*,
   328 F.3d 906 (7th Cir. 2003) .......................................................................25

*In re Victory Corrugated Container Corp.*,
   183 B.R. 373 (Bankr. D.N.J. 1995) ...............................................................17, 18

## STATE CASES

*Ackerman v. Sobol Family Partnership, LLP*,
   298 Conn. 495 (2010) ...............................................................................18

*Basil v. Wolf*,
   193 N.J. 38 (2007) ...................................................................................17

*Breslin v. New Jersey Investors, Inc.*,
   70 N.J. 466 (1976) .......................................................................24, 26, 28, 31

*Cardarelli v. Scodek Construction Corp.*,
   758 N.Y.S.2d 188 (N.Y. App. Div. 2003) .............................................................29

*Carnegie Bank v. Shalleck*,
   256 N.J. Super. 23 (App. Div. 1992) ............................................................13, 14

*Estate of Cordero, ex rel. Cordero v. Christ Hospital*,
   403 N.J. Super. 306 (App. Div. 2008) ..........................................................17, 19

*Dubin v. Hudson County Probation Department*,
   267 N.J. Super. 202 (Law Div. 1993) ................................................................23

*Frankowski v. Lawrence Motor Car Co.*,
   114 N.J.L. 326 (E & A 1934)..........................................................................18

*Heckel v. Cranford Golf Club*,
   97 N.J.L. 538 (E & A 1922)...........................................................................18

*Jones v. HealthSouth Treasure Valley Hospital*,
   147 Idaho 109 (2009)................................................................................19

*Kuebler Foundries, Inc. v. H.J. Koehler Motors Corp.*,
    100 N.J.L. 163 (E & A 1924) ...................................................................18

*Licette Music Corp. v. Sills*,
    No. A-6595-06T2, 2009 N.J. Super. Unpub. LEXIS 1861 (App. Div. July 16, 2009) ..........19

*Lustrelon, Inc. v. Prutscher*,
    178 N.J. Super. 128 (App. Div. 1981) ....................................................24, 29

*Mann v. Interstate Fire & Casualty Co.*,
    307 N.J. Super. 587 (App. Div. 1998) ....................................................16, 19

*New Jersey Lawyers' Fund for Client Protection v. Stewart Title Guaranty Co.*,
    203 N.J. 208 (2010) ...........................................................................19

*Rodriguez v. Hudson County Collision Co.*,
    296 N.J. Super. 213 (App. Div. 1997) ........................................................16

*Triffin v. American International Group, Inc.*,
    372 N.J. Super. 517 (App. Div. 2004) ........................................................28

*Triffin v. American International Group, Inc.*,
    Nos. A-0513-06T5, A-0514-06T5,
    2008 N.J. Super. Unpub. LEXIS 1519 (App. Div. Apr. 16, 1998)................................23

*Triffin v. Somerset Valley Bank*,
    343 N.J. Super. 73 (App. Div. 2001) .........................................................23

## STATUTES

N.J.S.A. § 12A:1-201(20) ........................................................................16

N.J.S.A. § 12A:1-201(43) ........................................................................15

N.J.S.A. § 12A:3-103........................................................................24, 25, 26

N.J.S.A. § 12A:3-104(e) .........................................................................14

N.J.S.A. § 12A:3-105(a) .........................................................................15

N.J.S.A. § 12A:3-109(c) .........................................................................16

N.J.S.A. § 12A:3-201........................................................................15, 16

N.J.S.A. § 12A:3-202............................................................................14

N.J.S.A. § 12A:3-205(b) .................................................................................16

N.J.S.A. § 12A:3-301 .......................................................................................16

N.J.S.A. § 12A:3-302 ..................................................................................15, 27

N.J.S.A. § 12A:3-306 ..................................................................................14, 24

N.J.S.A. § 12A:9-102(a)(65) ...........................................................................14

N.J.S.A. § 12A:9-331 .......................................................................................27

## FEDERAL RULES

Fed. R. Civ. P. 56 ............................................................................................13

## MISCELLANEOUS

Patricia L. Heatherman, Comment, *Good Faith in Revised Article 3 of
     the Uniform Commercial Code: Any Change? Should There Be?*,
     29 Willamette L. Rev. 567 (1993) ..........................................................25

James J. White & Robert S. Summers,
     *Uniform Commercial Code* (5th ed. 2000) ......................................15, 25

Restatement (Second) of Agency § 49 (1957) ................................................17

Restatement (Third) of Agency § 1.03 (2006) ..................................17, 18, 21

Restatement (Third) of Agency § 2.03 (2006) ................................................17

Restatement (Third) of Agency § 3.03 (2006) ................................................18

## PRELIMINARY STATEMENT

Defendant Federal National Mortgage Association ("Fannie Mae") submits this memorandum in support of its motion for summary judgment seeking final judgment in Fannie Mae's favor on both Counts of Plaintiff's Complaint.

By this action, Picatinny Federal Credit Union ("Picatinny") seeks to force Fannie Mae to make Picatinny whole for the value of 51 mortgage loans[1] that Picatinny's agent, U.S. Mortgage Corporation ("U.S. Mortgage") and its subsidiary, CU National Mortgage LLC ("CU National") (collectively, "USM"), sold to Fannie Mae without Picatinny's knowledge or permission and then kept the proceeds for itself (the "Disputed Notes").  But Picatinny's complaint rightfully lies against its agent, USM, and USM's President and owner, Michael J. McGrath, Jr., ("McGrath") who orchestrated and perpetrated the fraud.  Fannie Mae bought the 51 Picatinny Disputed Notes for value, in good faith, without notice that USM was engaged in a fraud.  Accordingly, under black letter negotiable instruments law, Fannie Mae took title to those 51 Disputed Notes as a holder in due course, without regard to any claims by prior owners such as Picatinny.

Picatinny cannot credibly claim that Fannie Mae did not reasonably believe that USM, as Picatinny's agent, had at least the apparent authority to sell the 51 Disputed Notes.  As Fannie Mae well knew, USM's business was to originate, service and, often, sell mortgage loans on behalf of USM's credit union customers, such as Picatinny.  One of USM's principal selling points to its credit union customers was that USM was an authorized Seller/Servicer for Fannie Mae.  Selling mortgage loans to Fannie Mae on behalf of credit unions was a legitimate business

---

[1] Picatinny originally sued to recover the value of 58 mortgage loans.  Picatinny then realized there actually were only 52 loans in dispute.  Fannie Mae has been unable to locate the original note for one of those 52 mortgage loans and has offered to pay Picatinny the unpaid principal balance and escrowed interest for that loan, rather than moving for summary judgment with respect to that loan.  Accordingly, for the purposes of this summary judgment motion, there are 51 mortgage loans in dispute.

for USM, separate and apart from its fraudulent sideline of selling loans without authorization and keeping the proceeds:  between 2001 and January 2009, USM sold Fannie Mae 2,544 mortgage loans originated on behalf of credit unions; for the overwhelming majority of those loans - - 2,002 of the 2,544 - - the sale was unquestionably legitimate.  No one claims to the contrary.

Indeed, on behalf of Picatinny, between 2002 and December 2008, USM sold Fannie Mae 231 Picatinny mortgage loans.  Only 52 of those sales are claimed by Picatinny to have been fraudulent, all occurring between November 2007 and December 2008.  That means that 179 Picatinny notes were legitimately sold by USM to Fannie Mae.  Indeed, 6 Picatinny notes were legitimately sold by USM to Fannie Mae during the November 2007 to December 2008 period when the Disputed Notes were sold.  That Fannie Mae reasonably believed that USM had authority to sell the 51 disputed Picatinny notes - - just like it had the authority to sell 179 other Picatinny notes and, in total, 2,002 credit union notes - - is beyond dispute.

Picatinny contends, however, that Fannie Mae should not have accepted the 51 Disputed Notes because they were endorsed on behalf of Picatinny by McGrath, signing as an "AVP" of Picatinny and Fannie Mae knew or should have known that McGrath was the President of USM.  But that entirely misses the point.  *First*, the issue is whether McGrath and USM had the apparent authority to *sell* Picatinny notes and they clearly did.  Anyone can be authorized to endorse a note.  That is why, among other reasons, negotiable instruments law does not require a purchaser of a note to investigate the authority of endorsers.  There is no impediment in law or fact to Picatinny authorizing McGrath to endorse Picatinny notes as an "AVP" of Picatinny.

And *second*, in any event, Picatinny is in no position to challenge the reasonableness of Fannie Mae's acceptance of notes endorsed by McGrath as an "AVP" of Picatinny.  In 2003,

2

McGrath endorsed 46 Picatinny notes on behalf of Picatinny for sale to Fannie Mae in exactly the same way. Those were all indisputably legitimate sales: McGrath was authorized to endorse those notes for Picatinny by a formal resolution of Picatinny's Board of Directors. Those 46 notes are indistinguishable from the 51 Disputed Notes.

And, *finally*, Picatinny's assertion that Fannie Mae should have terminated USM as a Seller/Servicer because of alleged "evidence" that USM was engaged in breaches of its Seller/Servicer Agreement with Fannie Mae and alleged frauds unrelated to the unauthorized sale of notes is also beside the point. Only evidence of irregularities on the face of the notes themselves that should have called into question USM's ability to sell those notes would qualify as a "red flag" that might defeat Fannie Mae's holder in due course status. There is no such evidence here. And, as a matter of law, Picatinny's claim that Fannie Mae was negligent in its audit of USM's performance as a servicer for Fannie Mae is immaterial because negotiable instruments law does not require such due diligence and negligence is not the standard.

In short, Fannie Mae is a holder in due course of the 51 disputed Picatinny notes. It is not subject to competing claims of ownership by Picatinny - - or anyone else. Picatinny's claim lies against its former agents, USM and Michael McGrath, not Fannie Mae.

## PROCEDURAL HISTORY

On March 3, 2009, Picatinny filed a two-count Complaint in conversion against Fannie Mae, seeking to recover the value of certain loans that its agent, U.S. Mortgage, sold to Fannie Mae between 2006 and 2009,[2] allegedly without Picatinny's knowledge or authorization and without turning over the sale proceeds to Picatinny. (*See* 12/14/10 Affidavit of Alan E. Kraus

---

[2] Picatinny's date range for the unauthorized sales was overbroad. In truth, they occurred between November 2007 and December 2008. (*See* 12/13/10 Declaration of Debra Thompson ("D. Thompson Decl.") ¶ 9).

3

("Kraus Aff."), Ex. 1, Complaint, dated February 27, 2009).  Fannie Mae filed an Answer to the

Complaint on April 7, 2009, denying liability because it is a holder in due course of the Disputed

Notes.  (Kraus Aff., Ex. 2, Answer to Complaint, dated April 6, 2009).

The parties have engaged in extensive discovery.  Fannie Mae has produced

approximately 1,180,000 pages of documents and responded to multiple sets of interrogatories

and document demands and numerous informal requests for documents.  In addition, Picatinny

took 14 depositions.  Fact discovery concluded in October 2010.

## STATEMENT OF FACTS

## I.    THE PARTIES AND THEIR BUSINESS

Fannie Mae is a federally chartered entity that purchases mortgage loans originated by

lenders in the primary mortgage market in order to provide liquidity and stability to the mortgage

markets.  (D. Thompson Decl., ¶ 2).  Each year, Fannie Mae buys millions of mortgage loans on

the secondary market from its approved lender partners.  (*Id.*)

Until February 2009, one of Fannie Mae's approximately 1,800 active approved

Sellers/Servicers was U.S. Mortgage, which became an approved Fannie Mae Seller/Servicer in

1996.  (*Id.* ¶ 3).  As a Seller/Servicer, U.S. Mortgage could both sell mortgage loans to Fannie

Mae and continue to service those loans post-sale by collecting monthly principal and interest

payments from the borrowers.  (*Id.*)

In or about 1999, U.S. Mortgage formed a wholly-owned subsidiary, CU National, to act

as an agent for credit unions with mortgage lending operations.  (Kraus Aff., Ex. 3, FNMA-

USM-SAPA000017113-21).  CU National served as a *de facto* mortgage department for its

credit union clients, providing mortgage-related services including mortgage origination, loan

servicing, and the marketing and sale of loans to the secondary market, namely, Fannie Mae.

(*Id.* at FNMA-USM-SAPA000017114-15).  This allowed the credit unions, which had not

4

traditionally been involved in the mortgage industry, to offer mortgage loans to their members without having to establish a separate mortgage department. (*Id.*) CU National acted as a mortgage department in the name of the credit unions, so that it would appear to a credit union member that she was dealing directly with the credit union. (*Id.* at FNMA-USM-SAPA 000017114-15, 17-18). From 2001 through January 2009, USM sold Fannie Mae 2,544 mortgage loans from 91 credit unions. (D. Thompson Decl., ¶ 4). For most of these loans - - 2,002 of the 2,544 - - the credit unions authorized the sales to Fannie Mae; they received the proceeds from their agent, USM; and there has been no dispute regarding Fannie Mae's ownership. (*Id.*)

Picatinny entered into a Mortgage Services Agreement ("Agreement") with CU National on July 1, 1999. (*See* Kraus Aff., Ex. 4, Agreement, PICA0001170-1192). The Agreement identified the various mortgage-related services that CU National was to provide to Picatinny. (*Id.*) Those included loan production services, marketing services, and loan servicing, namely, the collection of monthly principal and interest payments by borrowers, and reporting of those payments to Picatinny. (*Id.*) The Agreement also provided that CU National "shall act as the Credit Union's agent" in fulfilling its responsibilities to Picatinny. (*Id.* at PICA0001173). In addition, the Agreement provided that CU National would assist Picatinny in selling its loans to the secondary market. (*Id.* at PICA0001184-85).

Picatinny referred to CU National as its "First Mortgage Department" and the Agreement required CU National to act in a manner that would make third parties believe that it was, in fact, Picatinny. (*Id.* at PICA0001187; Kraus Aff., Ex. 5, W. Darling Dep., Tr. 16; Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 80-81). Specifically, the Agreement provided that it was "critical that CU National provide its services to the Credit Union members in such a manner that highlights the

Credit Union's involvement and reduces CU National's involvement in the eyes of the member."
(*See* Kraus Aff., Ex. 4, Agreement at PICA0001187). In short, all of the loan origination,
marketing, and servicing functions performed by CU National were required to be "transparent"
services and, accordingly, were provided "in the Credit Union's name." (*Id.*) When CU
National employees answered calls to a Picatinny dedicated toll-free number, they identified
themselves as "Picatinny Federal Credit Union." (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 27;
Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 81). Fannie Mae was aware that USM's business model
was to provide "transparent" services. (Kraus Aff., Ex. 7, A. Saphos Dep., Tr. 92-93).

     In August-September 2003, USM sold 46 Picatinny notes to Fannie Mae in an authorized
bulk sale. Specifically, Picatinny's Board authorized McGrath to sign any and all necessary
documents on Picatinny's behalf to sell certain notes to Fannie Mae. (Kraus Aff., Ex. 8, Board
Resolution). For each of those 46 notes, McGrath, with the express authorization of that
Picatinny Board Resolution, signed an allonge on behalf of Picatinny as an "AVP" of Picatinny.
(Kraus Aff., Ex. 9, copies of notes authorized to be sold in 2003; Kraus Aff., Ex. 8, Board
Resolution). Each of those notes is identical in form to the 51 Disputed Notes. (*Compare* Kraus
Aff., Ex. 9, copies of notes authorized to be sold in 2003, *with* Kraus Aff., Ex. 10, copies of 51
Disputed Notes). Subsequently, in 2005, yet another Picatinny note was sold to Fannie Mae over
the endorsement Ron Carti, as an AVP of Picatinny. (Kraus Aff., Ex. 11, note endorsed by R.
Carti). Ron Carti was a USM executive. That sale has never been challenged by Picatinny.
(Kraus Aff., Ex. 1, Complaint, Exhibit C (identifying 58 alleged Disputed Notes, none of which
include the note endorsed by Carti in 2005)).

## II.     MCGRATH'S FRAUDULENT SCHEME

     In or around 2004, U.S. Mortgage experienced financial troubles and began making
authorized sales of credit union loans to Fannie Mae but then delaying remittance of the proceeds

to the credit unions.  (Kraus Aff., Ex. 12, McGrath Plea Hearing, Tr. 31).  For example, in at least four (4) instances, CU National delayed remittance of the proceeds to Picatinny for over one year on loans that Picatinny had authorized to be sold.  (Kraus Aff., Ex. 13, K. McCarthy Dep., Tr. 74, 76, 87-88).  Picatinny never complained about those payment delays.  (Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 189-90; Kraus Aff., Ex. 13, K. McCarthy Dep., Tr. 95).   And none of those loans is among the 51 Disputed Notes.

Subsequently, McGrath began making unauthorized sales of credit union loans to Fannie Mae without the knowledge of the credit unions, and without remitting the proceeds.  (Kraus Aff., Ex. 12, McGrath Plea Hearing, Tr. 31).  Generally, McGrath endorsed notes to U.S. Mortgage as an "AVP" of the originating credit union; another U.S. Mortgage employee then endorsed the notes in blank on behalf of U.S. Mortgage and delivered them to Fannie Mae. McGrath also created fraudulent assignments of mortgages transferring the mortgages from the originating credit union to U.S. Mortgage and then from U.S. Mortgage to Fannie Mae. Following the sale, McGrath forwarded the borrowers' principal and interest payments to Fannie Mae, but, to hide his scheme, he sent duplicate monthly principal and interest payments and false financial reports to the credit unions, which led the credit unions to believe the loans were being maintained in the credit unions' portfolio.  (Kraus Aff., Ex. 12, McGrath Plea Hearing, Tr. 32). All of Picatinny's Disputed Notes followed that pattern.  They were sold to Fannie Mae during 2007 and 2008.  (D. Thompson Decl., ¶ 11).  Notably, during that same time period, USM sold six Picatinny loans to Fannie Mae that are *not* disputed.  (*Id.*)

## III.   PICATINNY'S FACILITATION OF MCGRATH'S FRAUD

Like other credit unions that fell victim to McGrath's fraud, Picatinny permitted CU National to retain the original notes after closing, instead of requiring delivery of all original notes to Picatinny or a Picatinny-designated third-party document custodian or maintaining them

in a separate contractual custodial arrangement.  (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 101, 185; Kraus Aff., Ex. 14, Expert Report of Susan E. Tittl "Tittl Report" at 2-3).  Typically, the owner of the commercial paper retains the notes in its own fireproof, secure vault, or it contracts a third-party document custodian to perform the custodial services.  (Kraus Aff., Ex. 14, Tittl Report at 2-3; Kraus Aff., Ex. 15, *See* D. Thompson Dep., Tr. 381; Kraus Aff., Ex. 5, W. Darling Dep., Tr. 122).  The written custodial agreements with such third parties contain stringent requirements for the safekeeping of original notes and further require that the custodian maintain a fidelity bond sufficient to cover the value of the notes in the third party's custody.  (Kraus Aff., Ex. 14, Tittl Report at 2-3).  Picatinny did not enter into any formal custodial agreement with CU National.  (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 185).  CU National was the servicer for Picatinny on its loans, but a servicer typically maintains a *copy* of the note in the loan file and does not retain the original note.  (Kraus Aff., Ex. 14, Tittl Report at 2-3).  Picatinny's Servicing Agreement with CU National provided that with respect to loans owned by Picatinny, "in the performance of its servicing duties, CU NATIONAL shall comply with all provisions of the secondary market standards, rules, regulations as promulgated from time to time by [Fannie Mae]".  (*See* Kraus Aff., Ex. 4, Agreement, at PICA0001182).  Fannie Mae's loan servicing standards for loans owned by Fannie Mae, which are consistent with industry standards, do not permit the servicer to keep the original note in the serviced loan file.  (D. Thompson Decl., ¶ 8; *see also* Kraus Aff., Ex. 14, Tittl Report at 3).

In the event that a servicer also provides formal document custody services, those services are segregated from the servicing function, and the original notes are maintained separately from the loan files, under the control of different personnel.  (Kraus Aff., Ex. 14, Tittl Report at 3).

Here, Picatinny required no protections for the original notes in U.S. Mortgage's possession (such as a fidelity bond, which presumably would have covered the losses that Picatinny has sustained as a result of McGrath's conduct).  (*Id.* at 2; Kraus Aff., Ex. 5, W. Darling Dep., Tr. 185-86).   If Picatinny or a separate custodian had the originals, USM would have needed to ask for the original before selling the note to Fannie Mae, which would have alerted Picatinny or the custodian to the sale. (Kraus Aff., Ex. 14, Tittl Report at 3). Alternatively, if McGrath had delivered a copy of a note to Fannie Mae, it would have been rejected because Fannie Mae requires delivery of an original note, which Fannie Mae relies on as evidence of the originator's authorization of the sale.  (Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 161, 322, 380-83).  And if Fannie Mae mistakenly accepted a copy, Fannie Mae would not qualify as a holder, thus protecting Picatinny's ownership of the note.  (*See* pp. 15-16 *infra*.) McGrath's unfettered access to the original notes provided him with the means to sell those notes on the secondary market without Picatinny's knowledge and thus made the fraud possible. (Kraus Aff., Ex. 14, Tittl Report at 3; Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 58-59).

Not only did Picatinny allow CU National to retain its original notes without any protections in place, but it also did nothing to ensure that its original notes remained in CU National's possession.  (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 226; Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 77-78).[3]  Specifically, Picatinny's internal auditors performed audits of CU National in 2003 and 2008.  (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 26-27; Kraus Aff., Ex. 17, R. Baumann Dep., Tr. 52-53).  Neither of those audits included any verification that CU National

---

[3] In response to Fannie Mae interrogatories, Picatinny asserted that it did audit CU National to ensure it still had Picatinny's original notes. (Kraus Aff., Ex. 19, 6/18/09 Picatinny Responses to Fannie Mae's First Set of Interrogatories, Nos. 4, 14).  However, at the Rule 30(b)(6) deposition of Picatinny's CEO, William Darling, he was forced to admit that there is no evidence of any such audit.  (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 223-31).

still possessed Picatinny's original notes.  (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 28, 32-33, 39-41, 85-89; Kraus Aff., Ex. 17, R. Baumann Dep., Tr. 75).  In short, there is absolutely no evidence that Picatinny took any steps to ensure that CU National retained its original notes and had not sold them.  (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 28, 32-33, 39-41; Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 77-78).  In fact, to prevent a fraud like this one from occurring again, Picatinny's internal auditor, Bertram Cohen, recommended in September 2009 to Picatinny's CEO William Darling and the Supervisory Committee of the Board of Directors that Picatinny's original notes be kept in a fire-proof secured safe at Picatinny.  (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 56-60; Kraus Aff., Ex. 18, PICA000025894-25896, at 25896).  As Mr. Cohen explained, if Picatinny's original notes had "been on [Picatinny's] premises then McGrath would have not had access to them without the knowledge of someone at Picatinny."  (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 59).  Had that been the case, the fraud could not have occurred.  (*Id.*)  In recognition of this fact - - and consistent with industry standard custom and practice - - Picatinny's current mortgage loan servicer, CUMAnet, LLC, Picatinny's insurer, CUMIS, and the National Credit Union Association now require that Picatinny hold its original notes.  (Kraus Aff., Ex. 20, 9/10/10 Ltr. from D. Johnson to D. Mathews).

McGrath's fraud was possible only because Picatinny and other credit unions allowed USM to hold original notes.  (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 101; B. Cohen Dep., Tr. 58-59).  Delivery of the original note by USM was critical because Fannie Mae relies on receipt of the original note as evidence of the agent's authority to sell the loan.  (Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 161, 322, 380-83).

## IV.    SALE OF THE LOANS AND CHARACTERISTICS OF THE ENDORSEMENTS

Fannie Mae requires all mortgage notes to have a chain of endorsements:  (1) an endorsement on behalf of the payee on the notes (Picatinny, in this case) to U.S. Mortgage (as

U.S. Mortgage was Fannie Mae's approved seller); and (2) an endorsement from U.S. Mortgage

"in blank" (in favor of no specific party, pursuant to Fannie Mae's guidelines).  (Kraus Aff., Ex.

21, J. Gang Dep., Tr. 95-98; Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 105-06, 138-39).  The

endorsements could be written directly on the original note itself or could be made on an allonge

appended to the note.  (Kraus Aff., Ex. 21, J. Gang Dep., Tr. 95).  An allonge is simply an

additional document that contains endorsements.  (Kraus Aff., Ex. 21, J. Gang Dep., Tr. 95-96;

Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 139-40).  Fannie Mae also required a final

assignment of mortgage conveying the interest in the mortgage to Fannie Mae.[4]  (D. Thompson

Decl., ¶ 13).

In 2003, and again for a single note in 2005, Picatinny authorized U.S. Mortgage to

endorse notes on its behalf on authorized sales to Fannie Mae; McGrath endorsed the notes on all

but one of those 47 undisputed sales (1 was endorsed in Ron Carti's name in 2005).  (Kraus Aff.,

Ex. 8, Board Resolution; Kraus Aff., Ex. 9, copies of notes authorized to be sold in 2003; Kraus

Aff., Ex. 11, note endorsed by R. Carti).  Each of these 47 undisputed loans was endorsed by

Carti or McGrath as "AVP" of Picatinny Federal Credit Union.  (Kraus Aff. ¶¶ 11-12; Ex. 9

(copies of notes authorized to be sold in 2003); Ex. 11 (note endorsed by R. Carti)).

In addition, someone at USM signed Picatinny CEO William Darling's name to the

endorsement of six other notes sold to Fannie Mae from November 29, 2007 through March 25,

2008.  (*See* Kraus Aff., Ex. 5, W. Darling Dep., Tr. 267-68; Kraus Aff., Ex. 22, notes endorsed

by W. Darling).  Picatinny was paid the sale proceeds on those six loans and has never disputed

the legitimacy of their sale.  (Kraus Aff., Ex. 1, Complaint, Exhibit C (identifying 58 alleged

Disputed Notes and not including any notes allegedly endorsed by forging Darling's name)).

---

[4] Fannie Mae did not require delivery of intervening assignments, such as an assignment of the
mortgage from the original mortgagee to U.S. Mortgage.  (D. Thompson Decl., ¶ 13).

## V.    FANNIE MAE'S LOAN ACCEPTANCE AND CERTIFICATION PROCEDURES

Upon receipt of a sale package from U.S. Mortgage (or any other seller/servicer), Fannie Mae's loan review and certification team reviewed the documents pursuant to established guidelines.  Among other things, the certifiers reviewed the packets to ensure that (1) the note was an original (*i.e.*, it bore an original, ink signature that matched the borrower's name), and (2) the endorsements on the note and/or allonge, including any intervening endorsements, reflected an unbroken chain of ownership.  (Kraus Aff., Ex. 21, J. Gang Dep., Tr. 112, 202, 258-59; Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 140).  The certifiers also ensured that the loan packets contained an assignment of mortgage conveying the interest in the mortgage to Fannie Mae.  The Picatinny Disputed Notes met those certification requirements.  (D. Thompson Decl., ¶ 12; Kraus Aff., Ex. 14, Tittl Report at 6).[5]

Upon certifying the notes, Fannie Mae paid U.S. Mortgage the agreed upon price for the loans.  (D. Thompson Decl., ¶ 5).  Fannie Mae paid a total of $13,059,775.64 for the 51 Disputed Notes.  (*Id.* ¶ 7).  Although U.S. Mortgage serviced the loans for Fannie Mae post-sale, Fannie Mae retained the original notes in its custodial department in a secure vault in Herndon, Virginia. (*Id.* ¶ 5; Kraus Aff., Ex. 21, J. Gang Dep., Tr. 199).

---

[5] After McGrath's fraud was uncovered, Fannie Mae retained the services of Gerald M. LaPorte, a forensic ink chemist and document specialist and former Chief Research Forensic Chemist for the U.S. Secret Service, to examine notes in Fannie Mae's possession.  Mr. LaPorte determined that each of the Disputed Notes bore an original ink signature.  (*See* Kraus Aff., Ex. 23, Expert Report of Gerald M. LaPorte at 4).  In addition, each note had an unbroken chain of ownership: they had all been endorsed on behalf of Picatinny to U.S. Mortgage and then by U.S. Mortgage in blank.  (D. Thompson Decl., ¶ 6).

<u>**ARGUMENT**</u>

**I.     THE SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where, as here, "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party requesting summary judgment bears the burden of proving that no genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co., v. Zenith Radio Corp*., 475 U.S. 574, 586 n.10 (1986).  Once the movant has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts."  *Id.* at 586.  The party opposing summary judgment "must come forward with specific facts showing that there is a *genuine issue for trial*."  *Id.* at 587 (emphasis in original) (internal quotations omitted).  The mere existence of some evidence in support of the non-moving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a finder of fact reasonably to find for the non-moving party on that issue.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

Here, Fannie Mae is entitled to summary judgment as a matter of law dismissing Plaintiff's Complaint with prejudice because, with respect to every Disputed Note, Fannie Mae paid full value and acquired the original note in good faith, without notice of any defect or impairment in the note's chain of title, and with endorsements that were complete and proper on their face.  As a matter of law, therefore, Fannie Mae is a holder in due course and the rightful owner of those loans.

**II.     FANNIE MAE IS THE HOLDER IN DUE COURSE OF THE DISPUTED NOTES**

Under New Jersey law, promissory notes relating to mortgaged properties are "negotiable instruments."  *Carnegie Bank v. Shalleck*, 256 N.J. Super. 23, 45 (App. Div. 1992); *see also*

N.J.S.A. § 12A:3-104(e) (2004) ("An instrument is a 'note' if it is a promise."); N.J.S.A. §

12A:9-102(a)(65) (2004) (defining "promissory note" as a "[negotiable] instrument that

evidences a promise to pay a monetary obligation, does not evidence an order to pay, and does

not contain an acknowledgment by a bank that the bank has received for deposit a sum of money

or funds").  The validity, construction and effect of negotiable instruments are governed by the

Uniform Commercial Code ("U.C.C.").  Picatinny's Complaint hinges upon whether Fannie Mae

is a "holder in due course" of the disputed mortgage notes.[6]  If Fannie Mae is a holder in due

course, it is the rightful owner of the Disputed Notes without regard to Picatinny's competing

claim to ownership and summary judgment in Fannie Mae's favor should be granted.  *See*

N.J.S.A. 12A:3-306 (2004).

Fannie Mae acquired the Disputed Notes by negotiation, for value, from USM.

Negotiation of an instrument is effective even if obtained by fraud, in breach of duty, or as part

of an illegal transaction.  N.J.S.A. § 12A:3-202(a) (2004).  That is, even if the prior negotiation

was "fraudulent or illegal in its essence and entirely void," there can be "no rescission of that

negotiation as against a holder in due course."  *Id.* at cmt. 3.  "The principle finds its most

extreme application in the well-settled rule that a holder in due course may take the instrument

even from a thief and be protected against the claim of the rightful owner."  *Id.* at cmt. 2.

---

[6] Ownership of the mortgage travels with ownership of the note.  *See Carnegie Bank*, 256 N.J.
Super. at 45 ("When a mortgage secures a negotiable instrument, the great weight of authority in
other jurisdictions is that a transfer of the negotiable instrument to a holder in due course to
whom the mortgage is also assigned will enable the assignee to enforce the mortgage (as well as
the negotiable instrument) according to its terms, free and clear of any personal defenses the
mortgagor may have against the assignor.  This results from the view that the mortgage is a mere
'incident' or 'accessory' to the debt and when the debt is embodied in a negotiable instrument
the quality of negotiability is necessarily imparted to the accompanying mortgage.").  Here,
Fannie Mae also received fully executed, notarized mortgage assignments for each of the 51
Disputed Notes.  Each of those assignments was signed on behalf of Picatinny by McGrath as an
AVP of Picatinny.  (D. Thompson Decl., ¶ 13).

Indeed, the holder in due course "is one of the few purchasers in Anglo-Saxon jurisprudence who may derive a good title from a chain of title that includes a thief in its links."  James J. White & Robert S. Summers, *Uniform Commercial Code* § 14-3, at 510 (5th ed. 2000).

Because the mortgage notes at issue in this matter are "order" instruments - - *i.e*., payable to the order of Picatinny - - an endorsement in the payee's name was required to negotiate these notes.  *See* N.J.S.A. § 12A:3-201(b) (2004).  That endorsement could have been made either by Picatinny or by anyone acting with Picatinny's actual or apparent authority.  N.J.S.A. § 12A:1-201(43) (2004).  An endorsement in the name of the payee is effective if the "thief" signed on behalf of the payee with its apparent authority, even if lacking actual authority.  *See*, *e.g*., White & Summers, *supra*, § 14-3, at 510 (a holder in due course "is one of the few purchasers in Anglo-Saxon jurisprudence who may derive a good title from a chain of title that includes a thief in its links").  Because Fannie Mae acquired the Disputed Notes from a seller - - USM - - who had apparent authority, for value and in good faith, Fannie Mae is a holder in due course of those notes and any claim to the contrary by Picatinny is unavailing.

### A.      Fannie Mae is a "Holder" of the Disputed Notes

To become a "holder in due course" of a negotiable instrument, one must first qualify as a "holder" of that instrument.  N.J.S.A. § 12A:3-302 (2004).  The status of "holder" arises in one of two ways:  (1) a person becomes a holder when the instrument is issued to that person;[7] or (2) as the result of negotiation.  N.J.S.A. § 12A:3-201 cmt. 1 (2004).  Here, the mortgage notes were not "issued" to Fannie Mae.  Fannie Mae, instead, became a holder as a result of negotiation.

---

[7] "Issue" is defined as the "first delivery of an instrument by the maker or drawer, whether to a holder or nonholder, for the purpose of giving rights on the instrument to any person."  N.J.S.A. § 12A:3-105(a) (2004).

## 1. Fannie Mae Possesses the Original Notes.

"Negotiation" is defined by N.J.S.A. § 12A:3-201(a) as a "transfer of possession . . . of an instrument by a person other than the issuer to a person who thereby becomes its holder." To qualify as a "holder," a person must be "in possession if the instrument is payable to the bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession."[8] N.J.S.A. § 12A:1-201(20) (2004). No one can be a "holder" without possessing the original instrument, either directly or through an agent. N.J.S.A. § 12A:3-201 cmt. 1 (2004). All holders are entitled to enforce the instruments they hold. N.J.S.A. § 12A:3-301 (2004).

For each of the Disputed Notes, Fannie Mae possesses the original, signed note. At no time has Picatinny contended that it retained original notes; to the contrary, Picatinny has conceded that it permitted USM to retain the original notes and that USM transferred those originals to Fannie Mae. (*See* Kraus Aff., Ex. 5, W. Darling Dep., Tr. 101).

## 2. McGrath and U.S. Mortgage Had Apparent Authority to Sell the Disputed Notes to Fannie Mae.

"[A]pparent authority arises when a principal 'acts in such a manner as to convey the impression to a third party that the agent has certain power which he may or may not possess.'" *Mann v. Interstate Fire & Cas. Co.*, 307 N.J. Super. 587, 596 (App. Div. 1998) (quoting *Rodriguez v. Hudson County Collision Co.*, 296 N.J. Super. 213 (App. Div. 1997) (internal quotations and alterations omitted)). "The rule is that the principal is bound by the acts of his agent within the apparent authority . . . which he holds the agent out to the public as possessing." *Mann*, 307 N.J. Super. at 595 (internal quotations omitted). The rationale is that to permit the principal to dispute an apparent agent's authority after cloaking the agent with the trappings of

---

[8] An endorsement by the payee or holder that does not designate a payee is known as an endorsement "in blank" and makes the instrument payable to the bearer. N.J.S.A. § 12A:3-109(c) (2004); N.J.S.A. § 12A:3-205(b) (2004).

authority would be to enable the agent to commit a fraud upon innocent persons. *In re Victory Corrugated Container Corp.*, 183 B.R. 373, 377 (Bankr. D.N.J. 1995); *see also* Restatement (Third) of Agency § 2.03 cmt. c (2006).

At bottom, in determining whether apparent authority exists, the inquiry is "whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question." *Basil v. Wolf*, 193 N.J. 38, 67 (2007). Under apparent authority principles, "[liability] is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him."[9] *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) (internal quotations omitted). In short, an endorsement by an individual with apparent authority to act for the principal constitutes an effective endorsement and valid negotiation of an instrument, even if the agent was engaged in a fraud on his principal.

To establish the existence of apparent authority, a party must show a reasonable belief that is traceable to a voluntary act or omission, otherwise known as a "manifestation," by the principal. *See Estate of Cordero, ex rel. Cordero v. Christ Hosp.*, 403 N.J. Super. 306, 314 (App. Div. 2008) (citing Restatement (Third) of Agency § 2.03). That manifestation need not be written or spoken but, instead, can occur by conduct, including by placing an agent in a specific position or by placing an agent in charge of certain transactions. *See* Restatement (Third) of

---

[9] Said another way, "[i]f a principal puts an agent into, or knowingly permits him to occupy, a position which according to the ordinary habits of persons in the locality, trade or profession, it is usual for such an agent to have a particular kind of authority, anyone dealing with him is justified in inferring that he has such authority, in the absence of a reason to know otherwise." *In re Victory Corrugated Container Corp.,* 183 B.R. at 377 n.2 (quoting Restatement (Second) of Agency § 49 cmt. c (1957)).

Agency §§ 1.03 cmt. b, 3.03 cmt. b (2006). "If a principal has given an agent general authority to engage in a class of transactions, subject to limits known only to the agent and the principal, third parties may reasonably believe the agent to be authorized to conduct such transactions and need not inquire into the existence of undisclosed limits on the agent's authority." *Id.* § 3.03 cmt. b; *see also Ackerman v. Sobol Family P'ship, LLP*, 298 Conn. 495, 512 (2010) (quoting same).

Likewise, agents can be placed in positions in an industry or setting in which holders of the position customarily have authority of a specific scope. Custom supports the presence of apparent authority when an agent's act is within the limit of authority that is standard for agents in similar positions and endeavors. *See In re Victory Corrugated Container Corp.*, 183 B.R. at 377. "Absent notice to third parties to the contrary, placing the agent in such a position constitutes a manifestation that the principal assents to be bound by actions by the agent that fall within that scope." Restatement (Third) of Agency § 1.03 cmt. b (2006).[10]

---

[10] *See also Frankowski v. Lawrence Motor Car Co.*, 114 N.J.L. 326, 331 (E & A 1934) ("This court may well take judicial knowledge that salesmen, employed by corporations to show and to sell automobiles to potential buyers at their show rooms, are customarily authorized to represent to the public the model, age and other attributes of the automobile, which the ordinary buyer cannot be expected to know upon a casual inspection of the car, and that buyers are entitled to rely upon representations made by such salesmen . . . ."); *Kuebler Foundries, Inc. v. H.J. Koehler Motors Corp.*, 100 N.J.L. 163, 167 (E & A 1924) (holding that a purchasing agent was vested with apparent authority to procure necessary materials for use in the principal's manufacture of automobiles, as such procurement was part of the principal's "usual course of business"); *Heckel v. Cranford Golf Club*, 97 N.J.L. 538, 542 (E & A 1922) (holding that an agent's employment as a steward at a golf club apparently authorized him with powers usually appertaining to the position of steward, including the purchase of supplies for the club, since it was "a matter of common knowledge that one of the duties of steward of a country club is to obtain the supplies necessary to serve the members of the club with meals and refreshments"); *Famous Knitwear Corp. v. Drug Fair, Inc.*, 493 F.2d 251, 252 (4th Cir. 1974) (holding that an agent was cloaked with apparent authority when: (a) he was appointed to a position in which his predecessor had apparent authority to enter binding contracts; (b) trade custom dictated, generally, that buyers were authorized to make binding commitments on behalf of their

Fannie Mae's reasonable belief is enough to prove USM's apparent authority.  The

Restatement (Third) of Agency, which superseded the Second Restatement in 2006 and has been

adopted by New Jersey courts,[11] expressly provides that "reliance" is an element of apparent

authority "only to the extent that it is subsumed in the requirement that the person accepting an

agent's services do so in the 'reasonable belief' that the service is rendered in behalf of the

principal."  *Estate of Cordero*, 403 N.J. Super. at 315 n.3 (App. Div. 2008); *see also Jones v.*

*HealthSouth Treasure Valley Hosp.*, 147 Idaho 109, 117 (2009) ("[U]nder the Restatement

(Third) of Agency, a plaintiff is only required to prove reasonable belief, rather than justifiable

reliance, to satisfy a claim of apparent authority.").

The relevant question, therefore, is whether the "totality of the circumstances created by

the [principal's] action or inaction" would lead a reasonable third party to believe that the agent

was authorized to act on behalf of the principal.  *Estate of Cordero*, 403 N.J. Super. at 310; *see*

*also Mann*, 307 N.J. Super. at 595-96.  Where, as here, the undisputed facts establish the

existence of the agent's apparent authority, numerous courts have held that summary judgment is

appropriate and that the issue may be decided as a matter of law.  *See, e.g.*, *Azur v. Chase Bank,*

*USA*, 601 F.3d 212, 222 (3d Cir. 2010) (affirming district court's grant of summary judgment

and holding that apparent authority existed as a matter of law); *In re Mushroom Transp. Co*., 382

F.3d 325, 345 (3d Cir. 2004) (holding that apparent authority existed as a matter of law); *DBI*

*Architects, P.C. v. Am. Express Travel-Related Servs. Co*., 388 F.3d 886, 893-94 (D.C. Cir.

---

principals, and (c) the size of the transaction at issue was not, of itself, so unusual as to lead a
reasonable man to question the scope of that apparent authority).

[11] *See, e.g.*, *N.J. Lawyers' Fund for Client Prot. v. Stewart Title Guar. Co*., 203 N.J. 208, 220
(2010) (citing to the Third Restatement for apparent authority principles); *Licette Music Corp. v.*
*Sills*, No. A-6595-06T2, 2009 N.J. Super. Unpub. LEXIS 1861, at *20, *24 (App. Div. July 16,
2009) (same); *Datasphere, Inc. v. Computer Horizons Corp.,* No. 05-2717, 2008 U.S. Dist.
LEXIS 88178, at *12 (D.N.J. Oct. 9, 2008) (same).

2004) (same); *Minskoff v. Am. Express Travel-Related Servs. Co.*, 98 F.3d 703, 710 (2d Cir. 1996) (same); *Nat'l Union Fire Ins. Co. v. Universal Fabricators, Inc.*, 713 F. Supp. 2d 206, 213 (S.D.N.Y. 2010) (same); *Great N. Ins. Co. v. ADT Sec. Servs., Inc.*, No. 06-90, 2009 U.S. Dist. LEXIS 91564, at *29-30, *54-55 (W.D. Pa. Sept. 30, 2009) (same); *Cont'l-Wirt Elec. Corp. v. Sprague Electric Co.*, 329 F. Supp. 959, 964 (E.D. Pa. 1971) (same).  This is just such a case.

> **(a)   There Were Multiple Manifestations By Picatinny That Led Fannie Mae To Reasonably Believe That McGrath And U.S. Mortgage Were Authorized To Sell The Picatinny Notes And Endorse Them On Picatinny's Behalf.**

There were multiple manifestations by Picatinny that, viewed individually or cumulatively, reasonably led Fannie Mae to believe that McGrath and U.S. Mortgage were authorized to sell the Picatinny notes and endorse them on Picatinny's behalf.  *First*, there can be no legitimate dispute that McGrath and U.S. Mortgage acted as Picatinny's agent.  (Kraus Aff., Ex. 4, Agreement at PICA0001173 (providing that CU National "shall act as the Credit Union's agent")).  Over a period of several years, USM originated loans on Picatinny's behalf; represented to Picatinny members that USM employees were, in fact, Picatinny employees; serviced loans on Picatinny's behalf and in Picatinny's name; and legitimately sold 179 loans to Fannie Mae on Picatinny's behalf in authorized transactions.  (Kraus Aff., Ex. 4, Agreement, PICA0001170-1192;  Kraus Aff., Ex. 5, W. Darling Dep., Tr. 27; Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 80-81; D. Thompson Decl., ¶ 12).  As Fannie Mae was well aware, one of CU National's major selling points to its credit union customers was the ability of CU National's parent company, U.S. Mortgage, to sell mortgage loans to Fannie Mae.  (Kraus Aff., Ex. 7, A. Saphos Dep., Tr. 85, 111; Kraus Aff., Ex. 5, W. Darling Dep., Tr. 128-29; Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 97).

*Second*, Picatinny placed McGrath and USM in a position in which it sold loans to Fannie Mae and thus would, customarily, have authority to sell loans on Picatinny's behalf.[12]  Picatinny only sold loans to Fannie Mae through USM.  Picatinny (and all of USM's other credit union customers) knew that one of USM's main sources of income was the sale of credit union loans to Fannie Mae.  Picatinny (and all of USM's other credit union customers) knew that Fannie Mae relied on USM's apparent authority in purchasing millions of dollars in credit union loans from USM.  Picatinny never communicated to Fannie Mae any limits on USM's authority to sell Picatinny loans.  (*See* Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 174-75).  And Picatinny knew from its own experience in 2003 and 2005 that USM successfully endorsed notes in Picatinny's name for sale to Fannie Mae.  (*See* p. 11, *supra*.)  In fact, USM sold undisputed loans to Fannie Mae on behalf of Picatinny on no less than 179 occasions.  (D. Thompson Decl., ¶ 10).  For Picatinny to claim now that it never held USM out as its agent empowered to sell Picatinny notes to Fannie Mae strains credulity past its breaking point.

*Third*, USM sold to Fannie Mae the original notes, not copies.  In the mortgage industry, there are only three reasons for the owner of an original note to provide the original note to a third party: (1) to deliver the notes to the loan servicer on a loan that has been paid off, so that the servicer can complete the satisfaction process, (2) to give the notes to a formal custodian of documents for storage and safekeeping, or (3) to deliver the original notes to the buyer in connection with a sale.  (Kraus Aff., Ex. 14, Tittl Report at 3).  From Fannie Mae's perspective, the only reason why USM would have possession of Picatinny's original notes - - at least as

---

[12] As noted in the Restatement (Third) of Agency, "an agent is sometimes placed in a position in an industry or setting in which holders of the position customarily have authority of a specific scope.  Absent notice to third parties to the contrary, placing the agent in such a position constitutes a manifestation that the principal assents to be bound by actions by the agent that fall within that scope."  Restatement § 1.03 cmt. b.

would be apparent to a purchaser such as Fannie Mae - - is because Picatinny intended to sell

those loans.  Fannie Mae relied on U.S. Mortgage's delivery of Picatinny's original notes as

compelling evidence that Picatinny had authorized the sales.  (Kraus Aff., Ex. 15, D. Thompson

Dep., Tr. 161, 322, 380-83).  If Picatinny had retained the original notes itself or hired a third

party custodian, USM would not have been able to sell Picatinny notes without authorization.

(Kraus Aff., Ex. 14, Tittl Report at 2-4).

   In short, Fannie Mae reasonably relied on Picatinny's conduct in placing its agent, USM,

in a position where it would be expected to have the authority and responsibility to sell Picatinny

loans.  Fannie Mae relied on the fact that U.S. Mortgage delivered original Picatinny notes to

Fannie Mae; without that act, there would have been no disputed sales because Fannie Mae

would have rejected copies.  (D. Thompson Decl., ¶ 12; Kraus Aff., Ex. 21, J. Gang Dep., Tr.

202; Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 105, 161, 322, 380-83).  Fannie Mae also knew

that USM had contracted to sell loans on behalf of credit unions that it had originated through its

CU National subsidiary and that CU National routinely operated in the name of the credit unions,

including Picatinny.  (Kraus Aff., Ex. 7, A. Saphos Dep., Tr. 85-86, 93, 111).  And finally,

Picatinny's prior course of dealing - - expressly authorizing USM to sell 179 loans on

Picatinny's behalf to Fannie Mae, 47 of which were signed by McGrath or Carti as an AVP of

Picatinny - - further demonstrates the reasonableness of Fannie Mae's belief that USM had

authority to sell the Picatinny Disputed Notes.

   **B.**  **Fannie Mae Took the Disputed Notes For Value in Good Faith and
Without Notice of Any Defect.**

   Having established that it is the "holder" of the Disputed Notes, Fannie Mae next must

demonstrate that it is a holder "in due course."  Under New Jersey's version of the U.C.C., a

holder in due course is a holder who takes an instrument for value, in good faith without notice

of any defect or impairment in the note's chain of title and without notice that the instrument

contains an unauthorized signature.  N.J.S.A. § 12A:3-302(a) (2004); *see In re Jersey Tractor

Trailer Training, Inc.,* 580 F.3d 147, 155 (3d Cir. 2009) (a holder in due course is a holder "who

takes an instrument for value, in good faith, and without notice of dishonor or any defense

against or claim to it on the part of any person").  Thus, if an individual took an instrument for

value (which is undisputed here), the "due course" inquiry is essentially two-fold: (1) did the

party take the instrument without notice of defect; and (2) did the party act in good faith.  *Id.*

As to the "notice of defect" analysis, "[i]n order to preclude liability from a holder in due

course under section 3-302, it must be apparent on the face of the instrument that it is

fraudulent."  *Triffin v. Somerset Valley Bank*, 343 N.J. Super. 73, 85 (App. Div. 2001).  Only if

there exists evidence upon presentation of an instrument that it is not authentic or suffers from

some other defect is the receiving party required to make an inquiry, into the validity of the

instrument.  *Triffin v. Am. Int'l Group, Inc.*, Nos. A-0513-06T5, A-0514-06T5, 2008 N.J. Super.

Unpub. LEXIS 1519, at *10-11 (App. Div. Apr. 16, 1998).[13]

---

[13] Picatinny may claim that there was a defect apparent on the face of the 51 Disputed Notes
because McGrath endorsed those notes as an AVP of Picatinny and Fannie Mae should have
known that he was really the President of U.S. Mortgage.  That argument is a non-starter:  *first*,
that McGrath was the President of U.S. Mortgage does not preclude Picatinny (or any other
credit union) from authorizing him to endorse notes as an AVP of the credit union; *second*, that
is undeniably true because Picatinny authorized McGrath and another USM executive Ron Carti
to endorse notes on Picatinny's behalf at least 47 times in 2003 and 2005, years before the first
sale of a Picatinny Disputed Note; and *third,* Fannie Mae's belief that McGrath could have
authority to endorse notes as an AVP of a credit union, was, most certainly reasonable, as proven
by the fact that, for at least 47 notes, he and Ron Carti did have such authority.  In any event, as
discussed above, the law does not require or expect any due diligence into the authority of
endorsers.  *See, e.g.*, *Dubin v. Hudson County Prob. Dep't.* 267 N.J. Super. 202, 208-09 (Law
Div. 1993) (holding that only major irregularities on the face of a negotiable instrument are
grounds for a court to find that the holder had notice of a prior claim/defense or needed to inquire
further into the validity of the instrument before taking it, noting that where the transferee of the
instrument is a commercial entity (such as Fannie Mae), and deals with thousands of similar
instruments in the course of its business each month, even subtle differences or slight

With respect to the "good faith" analysis of the "due course" inquiry, "good faith" is defined in the U.C.C. as "honesty in fact and the observance of reasonable commercial standards of fair dealing." N.J.S.A. § 12A:3-103(a)(4) (2004). The first prong, honesty in fact, is a subjective standard, determined "by looking to the mind of the particular holder." *Breslin v. N.J. Investors, Inc.*, 70 N.J. 466, 471 (1976) (internal quotations omitted). This standard essentially amounts to a requirement that the opposing party demonstrate bad faith, which "requires a showing of some indicia of dishonest conduct or a showing of acts and circumstances so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." *Lustrelon, Inc. v. Prutscher*, 178 N.J. Super. 128, 144 (App. Div. 1981) (internal quotations omitted). The second prong, utilizing an objective standard, assesses whether the holder's conduct met reasonable commercial standards of fair dealing. N.J.S.A. § 12A:3-103(a)(4) (2004). If a holder meets these requirements and establishes holder in due course status, the holder in due course takes the instrument free and clear of any claims that a competing party may have to its ownership. N.J.S.A. § 12A:3-306 (2004).

Fannie Mae purchased the Disputed Notes "for value." Accordingly, the "due course" analysis here focuses on whether Fannie Mae (1) was aware that the notes were defective or fraudulent, and (2) acted in good faith. There is absolutely no evidence that Fannie Mae was aware that the notes were defective or fraudulent, nor that there was anything on the face of the notes that would have called into question their authenticity. Indeed, the endorsements were identical in form to those on 46 Picatinny notes sold to Fannie Mae by U.S. Mortgage in 2003 with Picatinny's express authorization. (*Compare* Kraus Aff., Ex. 9, copies of notes authorized

---

irregularities from the face of one instrument to the next will not jeopardize the transferee's holder in due course status).

to be sold in 2003, *with* Kraus Aff., Ex. 10, copies of 51 Disputed Notes).  Thus, to defeat Fannie

Mae's motion for summary judgment, Picatinny must demonstrate that Fannie Mae did not act in

good faith because it failed to follow commercially reasonable standards of fair dealing.  That is

a requirement Picatinny cannot approach meeting.

As a plain reading of the U.C.C. makes clear,  "commercial reasonableness" is not the

standard for good faith under the U.C.C.; rather, the purchaser or taker of a negotiable instrument

need only have: (1) observed; (2) reasonable commercial standards; (3) *of fair dealing*.  N.J.S.A.

§ 12A:3-103(a)(4) (2004) (emphasis added); *see also* White & Summers, *supra*, § 14-6, 523

("[G]ood faith [under Article 3] does not require general conformity to 'reasonable commercial

standards,' but only to 'reasonable commercial standards of fair dealing.'").  The factfinder must

first determine whether the holder comported with industry or "commercial" standards

applicable to the transaction and, next, determine whether those standards were reasonably

intended to result in "fair dealing."  *In re Jersey Tractor Trailer Training Inc.*, 580 F.3d at 157.

"Fair dealing," while not defined in the U.C.C., ordinarily refers to "playing by the rules."

Patricia L. Heatherman, Comment, *Good Faith in Revised Article 3 of the Uniform Commercial

Code: Any Change? Should There Be?*, 29 Willamette L. Rev. 567, 585 (1993).

Article 3's good faith standard is thus directed toward the avoidance of unfair advantage-

taking.  *See State Bank of the Lakes v. Kan. Bankers Surety Co.*, 328 F.3d 906, 909 (7th Cir.

2003) ("Avoidance of advantage-taking, which [U.C.C. § 3-103(a)(4)] is getting at, differs from

due care."); White & Summers, *supra*, § 14-6, 523 (describing issue of good faith under Article 3

as "one of 'unfairness,' not of 'negligence'").

Stated differently, the standard is not one of negligence or ordinary care, as evidenced by

the Official Comment to the U.C.C. definition of "good faith":

> Although fair dealing is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the *care* with which an act is performed.  Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly conducting the transaction.  Both fair dealing and ordinary care, which is defined in § 3-103(a)(7), are to be judged in light of reasonable commercial standards, but those standards in each case are directed to different aspects of commercial conduct.

N.J.S.A. § 12A:3-103 cmt. 4 (2004).  There is no evidence here that Fannie Mae acted "unfairly" towards Picatinny when Fannie Mae purchased the Disputed Notes.  There is no suggestion in the record that Fannie Mae purchased those Notes because it wanted to harm Picatinny.  There is, in short, no basis to find that Fannie Mae failed to comply with commercially reasonable standards of fair dealing.

### 1.    Fannie Mae Is Not Required to Investigate Authority on Intervening Endorsements.

Picatinny contends that Fannie Mae failed to observe reasonable commercial standards of fair dealing because Fannie Mae did not investigate whether Michael McGrath was authorized to sign intervening endorsements on behalf of Picatinny.  Picatinny is wrong:  the law does not require purchasers of negotiable instruments to perform due diligence on the authority of endorsers.  *See, e.g.*, *Breslin*, 70 N.J. at 472 ("The basic philosophy of the holder in due course status is to encourage free negotiability of commercial paper by removing certain anxieties of one who takes the paper as an innocent purchaser knowing no reason why the paper is not as sound as its face would indicate. . . .  Ordinarily, where the note appears to be negotiable in form and regular on its face, the holder is under no duty to inquire as to possible defenses . . . ." (internal quotations omitted)); *In re Pinnacle Mortgage Inv. Corp.*, No. 98-0489, 1998 U.S. Dist. LEXIS 23289, at *35-36 (D.N.J. Dec. 9, 1998) ("Usually, one who takes a negotiable instrument for value has only the underlying circumstances of that transaction by which to determine if there

is reason to give pause as to the veracity of that instrument . . . [barring circumstances so suspicious that they cannot be ignored] there is no general duty for [the transferee] to inquire. . . ."); *see also* N.J.S.A. § 12A:9-331 cmt. 5 (2004) ("Good faith [under N.J.S.A. § 12A:3-302] does not impose a general duty of inquiry.").

Thus, any claim by Picatinny that Fannie Mae's purchase of the Disputed Notes was not in good faith because Fannie Mae did not investigate whether McGrath had the authority to endorse notes on Picatinny's or other credit unions' behalf fails as a matter of law.  Secondary market purchasers are not required to investigate an intervening endorser's authority to execute an instrument. (Kraus Aff., Ex. 14, Tittl Report at 5).  Accordingly, Fannie Mae's loan certification team does not, and was not required to scrutinize the name or signature on "intervening endorsements," such as the endorsement from Picatinny to U.S. Mortgage.  Fannie Mae's certification procedures, which are consistent with industry custom and practice, require only that the final endorsement, in blank, is by Fannie Mae's authorized seller, and that there is no break in the chain of endorsements from the originator/lender to the final seller to Fannie Mae.  (Kraus Aff., Ex. 14, Tittl Report at 3-5).  Given the extraordinarily large volume of loans Fannie Mae purchases - - an average of 3.9 million loans annually for the period 2003 to 2008 (D. Thompson Decl., ¶ 2) - - it defies credulity to suggest that Fannie Mae's document certifiers could or should have noticed that McGrath endorsed notes as an AVP of multiple credit unions, much less have known that he was the Chief Executive Officer of U.S. Mortgage.  And even if they had, there is no reason why they would have been concerned by those facts:  as Picatinny's course of dealing shows, it was commonplace for credit unions to authorize U.S. Mortgage employees to endorse notes in the credit union's name.

Moreover, the notion that Fannie Mae should have called Picatinny to verify McGrath's authority to sign on its behalf is unrealistic at best.  It would be impracticable for Fannie Mae to investigate the authority of each of the endorsers on the thousands of notes it receives each day.  There can be multiple authorized endorsers for any institution.[14]  There can be numerous intervening endorsements, as mortgage loans are freely tradable instruments, and requiring verification of all intervening endorsers would require calls to all intervening holders.  What number would the certifier call?  How would the certifier verify the authority of the person who answered the call?  Given the volume of loans Fannie Mae negotiates on a daily basis, it would be commercially unreasonable and unduly burdensome to require Fannie Mae and other secondary purchasers to verify each and every signature that appears on every chain of endorsements present on any given mortgage note prior to its purchase, based on the remote possibility that the notes were forged or in any other respect were not what they purported to be on their face.  *Cf. Triffin v. Am. Int'l Group, Inc.*, 372 N.J. Super. 517, 523 (App. Div. 2004).  Simply put, such a requirement would cause Fannie Mae's business - - and the entire secondary mortgage market - - to grind to a halt.  The very nature of negotiable instrument law is designed to avoid this sort of detailed inquiry and to permit the routine transmittal of instruments so long as they appear on their face to be in order.  *Breslin*, 70 N.J. at 472; *Pinnacle Mortgage Inv. Corp.,* 1998 U.S. Dist. LEXIS 23289, at *35-36.

The reasonableness of Fannie Mae's loan certification policies and procedures is supported by the fact that the other principal players in the secondary market - - namely, Freddie Mac and Ginnie Mae - - follow the same general procedures.  The certification procedures of

---

[14] Picatinny, by its own admission, had at least three authorized endorsers - - not counting McGrath or Carti of USM.  (*See* Kraus Aff., Ex. 5, Darling Dep., Tr. 180-81; Kraus Aff., Ex. 24, Mathews Dep., Tr. 84-85).

each of these entities mirror Fannie Mae's procedures: neither entity requires investigation or verification of intervening endorsements.  (*See* Kraus Aff., Ex. 14, Tittl Report at 3-5).  The certifiers for both Freddie Mac and Ginnie Mae would have certified the Picatinny loans just as Fannie Mae's certifiers did.  (*Id.* at 6).  In sum, there can be no dispute that Fannie Mae observed reasonable commercial standards of fair dealing and purchased the Disputed Notes in good faith.

### 2.    Picatinny's Alleged "Red Flags" Are Irrelevant As A Matter Of Law.

Picatinny has also argued that Fannie Mae should have terminated U.S. Mortgage as an approved Seller/Servicer before USM sold the first Picatinny Disputed Note because of audits and reviews of U.S. Mortgage's operations that supposedly should have put Fannie Mae on notice that USM was not trustworthy.

As an initial matter, Picatinny's so-called "red flags" arguments all fail as a matter of law because none of them involves a defect on the face of any of the Disputed Notes or on the chain of title to the instrument.  As discussed above, a holder has a duty of inquiry only if the circumstances reveal "actual knowledge or a deliberate attempt [by the holder] to evade knowledge" of a claim or defense to the instrument, or if there are defects on the face of the instrument "so cogent and obvious" that to remain passive would amount to bad faith.  *In re Pinnacle Mort. Inv. Corp.*, 1998 U.S. Dist. LEXIS 23289, at *32; *Lustrelon,* 178 N.J. Super. at 144; *see also Cardarelli v. Scodek Constr. Corp.*, 758 N.Y.S.2d 188, 189-90 (N.Y. App. Div. 2003).  A so-called "red flag" that U.S. Mortgage supposedly breached its servicing obligations under its contract with Fannie Mae or delayed payments to a credit union simply does not qualify as a defect on the face of the Disputed Notes or evidence that Fannie Mae willfully ignored evidence that USM was selling notes without authorization.

*Midfirst Bank v. C.W. Haynes & Co., Inc*., 893 F. Supp. 1304 (D.S.C. 1994), *aff'd*, Nos.

95-2515, 95-2516, 1996 U.S. App. LEXIS 12567 (4th Cir. May 31, 1996), is particularly

instructive.  There, Midfirst Bank was a servicer for the Government National Mortgage

Association ("GNMA").  *Id.* at 1310.  Midfirst filed a declaratory judgment action against a loan

originator to determine whether GNMA was a holder in due course of seventeen mortgage notes.

*Id.*  The originator claimed it was the rightful owner because an intervening endorser never paid

for the notes and, allegedly, GNMA was negligent in not discovering the intervening endorser's

fraud.  *Id.* at 1309-10.  More specifically, the originator argued that another federal agency knew

that the intervening endorser had engaged in a different fraud and that GNMA should have done

due diligence before buying the notes and violated certain of its internal guidelines in purchasing

the notes.  *Id.*

The *Midfirst* Court quickly disposed of the originator's arguments and granted summary

judgment in Midfirst's favor, holding that (1) negligence is not relevant to the "good faith"

requirement of holder in due course status; (2) whether GNMA complied with its own

procedures is irrelevant; (3) knowledge even by one department of a bank is not imputable to

another department, absent evidence of a regular practice of communication between the

departments; (4) knowledge of one type of fraud is not notice of a different type of fraud; and (5)

a purchaser of negotiable instruments has no duty of inquiry about unknown facts.  *Id.* at 1316-

17.

By a parity of reasoning, Picatinny's claim of breaches of U.S. Mortgage's servicing

obligations and alleged frauds unrelated to the negotiation of the Disputed Notes, as a matter of

law, do not preclude Fannie Mae from holder in due course status.

At bottom, Picatinny's theory of liability rests on the untenable argument that Fannie Mae should have conducted better investigations into U.S. Mortgage's activities as a servicer of notes sold to Fannie Mae and terminated its Seller/Servicer Agreement with U.S. Mortgage when questions were raised regarding U.S. Mortgage's compliance with that Agreement as a servicer. But that is not the law.  In order to defeat Fannie Mae's status as a holder in due course, Picatinny must prove that the so-called red flags upon which it relies should have called into question USM's ability to sell the Picatinny Disputed Notes.  *Breslin*, 70 N.J. at 472-73.  That Picatinny contends, with twenty/twenty hindsight, that Fannie Mae should have terminated its Seller/Servicer Agreement with U.S. Mortgage earlier or that, if Fannie Mae had done better audits of USM's servicing performance, Fannie Mae would have uncovered that USM was a fraudster, is all beside the point, as a matter of law.  None of those contentions, even if proven (and they are baseless), would approach Picatinny's burden under negotiable instruments law. Picatinny's supposed red flags are, in short, nothing more than red herrings.

## **CONCLUSION**

The undisputed facts demonstrate that Fannie Mae is a holder in due course of the

Disputed Notes and owns those loans without regard to Picatinny's claims as a prior owner.

Accordingly, for the reasons set forth above, the Court should grant Fannie Mae's motion for

summary judgment and render judgment in Fannie Mae's favor on both counts of Picatinny's

Complaint.

Dated:  December 15, 2010

                                    Respectfully submitted,

                                    LATHAM & WATKINS LLP


                                    By____/s Alan E. Kraus_____
                                        Alan E. Kraus, Esq.
                                        Rebecca K. Brown, Esq.
                                        Attorneys for Federal National Mortgage
                                        Association