## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PICATINNY FEDERAL CREDIT UNION,<br><br>       Plaintiff,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>       Defendant. | Civil Action No. 2:09-CV-01295 (GEB)(MCA) |

**DEFENDANT FEDERAL NATIONAL MORTGAGE ASSOCIATION'S RULE 56 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Alan E. Kraus
Rebecca K. Brown
LATHAM & WATKINS LLP
One Newark Center, 16th Floor
Newark, New Jersey 07101-3174
Telephone: (973) 639-1234
Facsimile: (973) 639-7298

*Attorneys for Defendant*
*Federal National Mortgage Association*

Pursuant to *Loc. Civ. R.* 56.1, Defendant Federal National Mortgage Association ("Fannie Mae") states that, for purposes of its motion for summary judgment, there does not exist a genuine issue with respect to the following material facts:

1.  During the period November 2007 to December 2008, Picatinny Federal Credit Union's ("Picatinny") agent, U.S. Mortgage Corporation ("U.S. Mortgage") and its subsidiary, CU National Mortgage LLC ("CU National") (collectively, "USM"), sold 51 mortgage loans to Fannie Mae without Picatinny's knowledge or permission and then kept the proceeds for itself (the "Disputed Notes"). (*See* 12/13/10 Declaration of Debra Thompson ("D. Thompson Decl.") ¶¶ 9, 11, Ex. A).

2.  Between 2002 and December 2008, USM sold Fannie Mae a total of 231 Picatinny mortgage loans on behalf of Picatinny. (D. Thompson Decl. ¶ 5). Only 52 of those sales are claimed by Picatinny to have been fraudulent, all occurring between November 2007 and December 2008. (*Id*. ¶ 11). Of those 52 notes, Fannie Mae has been unable to locate the original of one of those notes (namely, the Bonte loan) and has offered to pay Picatinny the unpaid principal balance and escrowed interest for that loan rather than moving for summary judgment with respect to that loan. (Affidavit of Alan E. Kraus, Esq. sworn to December 14, 2010 ("Kraus Aff.,") ¶ 26). Thus, 179 Picatinny notes were legitimately sold by USM to Fannie Mae. (D. Thompson Decl. ¶ 10, Ex. B).

3.  Fannie Mae is a federally chartered entity that purchases mortgage loans originated by lenders in the primary mortgage market in order to provide liquidity and stability to the mortgage markets. (D. Thompson Decl. ¶ 2). Each year, Fannie Mae buys millions of mortgage loans on the secondary market from its approved lender partners. (*Id.*) Specifically,

Fannie Mae purchased an average of 3.9 million loans annually for the period 2003 to 2008. (*Id.*)

4. Until February 2009, one of Fannie Mae's approximately 1,800 active approved Sellers/Servicers was U.S. Mortgage, which became an approved Fannie Mae Seller/Servicer in 1996.  (*Id.* ¶ 3).

5. As a Seller/Servicer, U.S. Mortgage could both sell mortgage loans to Fannie Mae and continue to service those loans post-sale by collecting monthly principal and interest payments from the borrowers and remitting those payments to Fannie Mae.  (*Id.*)

6. In or about 1999, U.S. Mortgage formed a wholly-owned subsidiary, CU National, to act as an agent for credit unions with mortgage lending operations. (Kraus Aff., Ex. 3, FNMA-USM-SAPA 000017113-21).

7. CU National served as a *de facto* mortgage department for its credit union clients, providing mortgage-related services including mortgage origination, loan servicing, and the marketing and sale of loans to the secondary market, namely, Fannie Mae.  (*Id.* at FNMA-USM-SAPA000017114-15).

8. This allowed the credit unions, who had not traditionally been involved in the mortgage industry, to offer mortgage loans to their members without having to establish a separate mortgage department.  (*Id.*)

9. CU National acted as a mortgage department in the name of the credit unions, so that it would appear to a credit union member that he or she was dealing directly with the credit union.  (*Id.* at FNMA-USM-SAPA000017114-15, 17-18).

10. From 2001 through January 2009, USM sold Fannie Mae 2,544 mortgage loans from 91 credit unions.  (D. Thompson Decl. ¶ 4).

11. For most of these loans – 2,002 of the 2,544 – the credit unions authorized the sales to Fannie Mae; they received the proceeds from their agent, USM; and there has been no dispute regarding Fannie Mae's ownership. (*Id.*)

12. Picatinny entered into a Mortgage Services Agreement ("Agreement") with CU National on July 1, 1999. (*See* Kraus Aff., Ex. 4, Agreement, PICA0001170-1192).

13. The Agreement identified the various mortgage-related services that CU National was to provide to Picatinny. (*Id.*) Those included loan production services, marketing services, and loan servicing, namely, the collection of monthly principal and interest payments by borrowers and reporting of those payments to Picatinny. (*Id.*)

14. The Agreement stated that "[i]n fulfilling CU NATIONAL's responsibilities to the Credit Union as set forth in this Agreement, CU NATIONAL shall act as the Credit Union's agent and shall be authorized to receive, transmit, and otherwise process the member's confidential financial information provided through the loan application process." (*Id.* at PICA0001173).

15. The Agreement also provided that CU National would assist Picatinny in selling its loans to the secondary market. (*Id.* at PICA0001184-1185).

16. Picatinny referred to CU National as its "First Mortgage Department" and the Agreement required CU National to act in a manner that would make third parties believe that it was, in fact, Picatinny. (*Id.* at PICA0001187; Kraus Aff., Ex. 5, W. Darling Dep., Tr. 16; Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 80-81).

17. The Agreement provided that it was "critical that CU National provide its services to the Credit Union members in such a manner that highlights the Credit Union's

involvement and reduces CU National's involvement in the eyes of the member." (*See* Kraus Aff., Ex. 4, Agreement, at PICA0001187).

18. All of the loan origination, marketing, and servicing functions performed by CU National were required to be "transparent" services and, accordingly, were provided "in the Credit Union's name." (*Id.*)

19. When CU National employees answered calls to a Picatinny dedicated toll-free number, they identified themselves as "Picatinny Federal Credit Union." (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 27; Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 81).

20. Fannie Mae was aware that USM's business model was to provide "transparent" services. (Kraus Aff., Ex. 7, A. Saphos Dep., Tr. 92-93).

21. More specifically, Fannie Mae knew that USM had contracted to sell loans on behalf of credit unions that it had originated through its CU National subsidiary and that CU National routinely operated in the name of the credit unions, including Picatinny. (Kraus Aff., Ex. 7, A. Saphos Dep., Tr. 85-86, 93, 111).

22. Picatinny never communicated to Fannie Mae any limits on USM's authority to sell Picatinny loans. (Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 174-75).

23. In August-September 2003, USM sold 46 Picatinny notes to Fannie Mae in an authorized bulk sale. By written resolution, Picatinny's Board authorized USM to sign all documents necessary to sell certain loans to Fannie Mae. For each of the 46 notes sold pursuant to that resolution, USM's Michael McGrath signed an allonge on behalf of Picatinny as an "AVP" of Picatinny. (Kraus Aff., Ex. 8, Board Resolution; Kraus Aff., Ex. 9, copies of notes authorized to be sold in 2003). Each of those notes is identical in form to the 51 Disputed Notes.

(*Compare* Kraus Aff., Ex. 9, copies of notes authorized to be sold in 2003, *with* Kraus Aff., Ex. 10, copies of 51 disputed notes).

24. In 2005, another Picatinny note was sold to Fannie Mae over the endorsement Ron Carti, as an AVP of Picatinny. (Kraus Aff., Ex. 11, note endorsed by R. Carti). Ron Carti was a USM executive. That sale has never been challenged by Picatinny. (Kraus Aff., Ex. 1, Complaint, Exhibit C (identifying 58 alleged Disputed Notes none of which include the note endorsed by Ron Carti in 2005)).

25. In addition to Ron Carti and Michael McGrath, Picatinny had at least three authorized endorsers – William Darling, Dan Mathews and Stephen Lardiere. (*See* Kraus Aff., Ex. 5, W. Darling Dep. Tr. 180-81; Kraus Aff., Ex. 24 Mathews Dep., Tr. 84-85).

26. Someone at USM signed Picatinny CEO William Darling's name to the endorsement of six other notes sold to Fannie Mae from November 29, 2007 through March 25, 2008. (*See* Kraus Aff., Ex. 5, W. Darling Dep., Tr. 267-68; Kraus Aff., Ex. 22, notes endorsed on behalf of W. Darling). Picatinny was paid the sale proceeds on those six loans and has never disputed the legitimacy of their sale. (Kraus Aff., Ex. 1, Complaint, Exhibit C (identifying 58 alleged Disputed Notes and not including any notes allegedly endorsed by forging Darling's name)).

27. In or around 2004, U.S. Mortgage experienced financial troubles and began making authorized sales of credit union loans to Fannie Mae but then delaying remittance of the proceeds to the credit unions. (Kraus Aff., Ex. 12, McGrath Plea Hearing Tr. 31).

28. For example, in at least four (4) instances, CU National delayed remittance of the proceeds to Picatinny for over one year on loans that Picatinny had authorized to be sold. (Kraus Aff., Ex. 13, K. McCarthy Dep., Tr. 74, 76, 87-88). Picatinny never

complained about those payment delays.  (Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 189-90; Kraus Aff., Ex. 13, K. McCarthy Dep., Tr. 95).   None of those delayed payment loans is among the 51 Disputed Notes.  (D. Thompson Decl. ¶ 9, Ex. A).

29. Subsequently, McGrath began making unauthorized sales of credit union loans to Fannie Mae without the knowledge of the credit unions, and without remitting the proceeds.  (Kraus Aff., Ex. 12, McGrath Plea Hearing Tr. 31).  Generally, McGrath endorsed notes to U.S. Mortgage as an "AVP" of the originating credit union; another U.S. Mortgage employee then endorsed the notes in blank on behalf of U.S. Mortgage and delivered them to Fannie Mae.  McGrath also created fraudulent assignments of mortgages transferring the mortgages from the originating credit union to U.S. Mortgage and then from U.S. Mortgage to Fannie Mae.  Following the sale, McGrath forwarded the borrowers' principal and interest payments to Fannie Mae, but, to hide his scheme, he sent duplicate monthly principal and interest payments and false financial reports to the credit unions, which led the credit unions to believe the loans were being maintained in the credit unions' portfolio.  (Kraus Aff., Ex. 12, McGrath Plea Hearing, Tr. 32).  All of Picatinny's Disputed Notes followed that pattern.

30. Picatinny's disputed notes were sold to Fannie Mae during 2007 and 2008. (D. Thompson Decl. ¶ 11, Ex. A).  During that same time period, USM sold six Picatinny loans to Fannie Mae that are *not* disputed.  (*Id.*, Ex. B)

31. Picatinny permitted CU National to retain the original notes after closing, instead of requiring delivery of all original notes to Picatinny or a Picatinny-designated third-party document custodian or maintaining them in a separate contractual custodial arrangement. (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 101, 185).

32. Typically, the owner of the commercial paper retains the notes in its own fireproof, secure vault, or it contracts a third-party document custodian to perform the custodial services. (*See* Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 380-382; Kraus Aff., Ex. 5, W. Darling Dep., Tr. 122).

33. Picatinny did not enter into any formal custodial agreement with CU National. (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 185).

34. Picatinny's Servicing Agreement with CU National provided that with respect to loans owned by Picatinny, "in the performance of its servicing duties, CU NATIONAL shall comply with all provisions of the secondary market standards, rules, regulations as promulgated from time to time by [Fannie Mae]". (*See* Kraus Aff., Ex. 4, Agreement, at PICA0001182).

35. Fannie Mae's loan servicing standards for loans owned by Fannie Mae do not permit the servicer to keep the original note in the serviced loan file. (D. Thompson Decl. ¶ 8).

36. Here, Picatinny required no protections for the original notes, including the Disputed Notes, in U.S. Mortgage's possession (such as a fidelity bond). (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 185-86).

37. If Picatinny or a separate custodian had the originals, USM would have needed to ask for the original before selling the note to Fannie Mae, which would have alerted Picatinny or the custodian to the sale. (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 58-59).

38. If McGrath had delivered a copy of a note to Fannie Mae, it would have been rejected because Fannie Mae requires delivery of an original note, which Fannie Mae relies on as evidence of the originator's authorization of the sale. (D. Thompson Decl. ¶ 12; Kraus Aff.,

Ex. 21, J. Gang Dep., Tr. 202; Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 105, 161, 322, 380-83).

39. McGrath's access to the original notes provided him with the means to sell those notes on the secondary market without Picatinny's knowledge. (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 58-59).

40. At his deposition, Picatinny CEO William Darling admitted that there is no evidence demonstrating that Picatinny audited CU National to ensure that CU National was in possession of Picatinny's original notes. (Kraus Aff., Ex. 5, W. Darling Dep. Tr. 223-31).

41. Picatinny's internal auditors performed audits of CU National in 2003 and 2008. (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 26-27; Kraus Aff., Ex. 17, R. Baumann Dep., Tr. 52-53).

42. Neither the 2003 audit nor the 2008 audit included any verification that CU National still possessed Picatinny's original notes. (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 28, 32-33, 39-41, 85-89; Kraus Aff., Ex. 17, R. Baumann Dep., Tr. 75).

43. There is no evidence that Picatinny took any steps to ensure that CU National retained Picatinny's original notes and had not sold them. (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 226; Kraus Aff., Ex. 6, S. Lardiere Dep., Tr. 77-78; Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 28, 32-33, 39-41).

44. To prevent a fraud like USM's from occurring again, Picatinny's internal auditor, Bertrand Cohen, recommended in September 2009 to Picatinny's CEO William Darling and the Supervisory Committee of the Board of Directors that Picatinny's original notes be kept in a fire-proof secured safe at Picatinny. (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 56-60; Kraus Aff., Ex. 18, PICA000025894-25896, at 25896).

45. Mr. Cohen testified that if Picatinny's original notes had "been on [Picatinny's] premises then McGrath would have not had access to them without the knowledge of someone at Picatinny". (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 59).

46. If Picatinny's original notes had been on Picatinny's premises, rather than in USM's possession, USM's fraud could not have occurred. (Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 59).

47. Picatinny's current mortgage loan servicer, CUMAnet, LLC, Picatinny's insurer, CUMIS, and the National Credit Union Association now require that Picatinny hold its original notes. (Kraus Aff., Ex. 20, 9/10/10 Ltr. from D. Johnson to D. Mathews).

48. McGrath's fraud was possible because Picatinny allowed U.S. Mortgage to hold original notes. (Kraus Aff., Ex. 5, W. Darling Dep., Tr. 101; Kraus Aff., Ex. 16, B. Cohen Dep., Tr. 58-59).

49. Fannie Mae relies on receipt of the original note as evidence of the agent's authority to sell the loan. (Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 161, 322, 380-83).

50. Fannie Mae requires all mortgage notes to have a chain of endorsements: (1) an endorsement on behalf of the payee on the notes (Picatinny, in this case) to U.S. Mortgage (as U.S. Mortgage was Fannie Mae's approved seller); and (2) an endorsement from U.S. Mortgage "in blank" (in favor of no specific party, pursuant to Fannie Mae's guidelines). (Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 105-06, 138-40; Kraus Aff., Ex. 21, J. Gang Dep., Tr. 95-98, 112).

51. The endorsements could be written directly on the original note itself or could be made on an allonge appended to the note. (Kraus Aff., Ex. 21, J. Gang Dep., Tr. 95-97).

52. An allonge is an additional document appended to the note that contains endorsements. (*Id*.; Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 139-40).

53. Fannie Mae also required a final assignment of mortgage conveying the interest in the mortgage to Fannie Mae. (D. Thompson Decl. ¶ 13).

54. Fannie Mae does not require delivery of an intervening assignment of mortgage such as an assignment of the mortgage from the original mortgagee to U.S. Mortgage. (*Id*.).

55. Upon receipt of a sale package from U.S. Mortgage (or any other seller/servicer), the Fannie Mae certifiers reviewed the packets to ensure that (1) the note was an original (*i.e*., it bore an original, ink signature that matched the borrower's name), and (2) the endorsements on the note and/or allonge, including any intervening endorsements, reflected an unbroken chain of ownership. (Kraus Aff., Ex. 15, D. Thompson Dep., Tr. 140; Kraus Aff., Ex. 21, J. Gang Dep., Tr. 112, 202, 258-59).

56. Fannie Mae's certifiers also ensured that the loan packets contained an assignment of mortgage conveying the interest in the mortgage to Fannie Mae. (D. Thompson Decl. ¶ 13). The Picatinny Disputed Notes met those certification requirements. (*Id*. ¶ 12).

57. Each of the Disputed Notes bore an original ink signature. (*See* Kraus Aff., Ex. 23, Expert Report of Gerald M. LaPorte at 4).

58. Each Disputed Note had an unbroken chain of ownership: they had all been endorsed on behalf of Picatinny to U.S. Mortgage and then by U.S. Mortgage in blank. (D. Thompson Decl. ¶ 6).

59. Fannie Mae received fully executed, notarized mortgage assignments for each of the 51 Disputed Notes, each of which was signed on behalf of Picatinny by Michael McGrath as an AVP of Picatinnny.  (*Id*. ¶ 13).

60. Fannie Mae paid U.S. Mortgage a total of $13,059,775.64 for the 51 Disputed Notes.  (*Id*. ¶ 7).

61. Although U.S. Mortgage serviced the loans for Fannie Mae post-sale, Fannie Mae retained the original notes in its custodial department in a secure vault in Herndon, Virginia.  (*Id*. ¶ 5; Kraus Aff., Ex. 21, J. Gang Dep., Tr. 199).


Dated:  December 15, 2010

            Respectfully submitted,

            LATHAM & WATKINS LLP


            By    s/ Alan E. Kraus
                Alan E. Kraus, Esq.
                Rebecca K. Brown, Esq.
                Attorneys for Federal National Mortgage Association