# EXHIBIT 5

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF NEW JERSEY

3        HONORABLE JOSEPH A. GREENAWAY

4        CIVIL ACTION NO. 09-01295 (JAG)

5

6     PICATINNY FEDERAL CREDIT UNION,    :

7             Plaintiff,            :

8        vs.                    :

9     FEDERAL NATIONAL MORTGAGE         :

10    CORPORATION,                 :

11            Defendant.          :

12    - - - - - - - - - - - - - - - - - -

13

14

15        DEPOSITION OF:  WILLIAM DARLING

16           FRIDAY, FEBRUARY 12, 2010

17

18

19

20        ROSENBERG & ASSOCIATES, INC.

21      Certified Court Reporters & Videographers

22    425 Eagle Rock Ave., Suite 201     575 Madison Ave.

23    Roseland, NJ 07068          New York, NY 10022

24    (973) 228-9100    1-800-662-6878    (212) 868-1936

25        www.rosenbergandassociates.com

1      Q.    What was the operation to whom it

2    was out-sourced?

3      A.    CU National, Pine Brook, New

4    Jersey.

5      Q.    So, although you, and I guess

6    others at Picatinny, referred to it as your

7    first mortgage department, it actually was an

8    independent contractor; is that fair to say?

9         MR. FORTE:  Note my objection to

10   the form.  I think that requires a legal

11   analysis, but you can answer.

12     A.    Can you ask the question again,

13   please.

14     Q.    Sure.  Even if you and others

15   referred to CU National as your first

16   mortgage department, it actually was an

17   independent contractor; is that correct?

18        MR. FORTE:  Same objection.

19     A.    Yes.

20     Q.    The employees of CU National who

21   were involved in first mortgage services for

22   Picatinny were not also employees of

23   Picatinny; is that fair to say?

24     A.    They were not.

25     Q.    They were not on your payroll?

1    training guides for Picatinny employees

2    telling them that that is what they should

3    tell the members?

4        A.    Not that I recall.

5        Q.    To the best of your knowledge,

6    when the CU National employees dealt with

7    your members, did they refer to themselves as

8    Picatinny?

9        A.    Yes.

10          MR. FORTE:  Note my belated

11   objection to the form.  Just make sure I get

12   my objection in.

13          THE WITNESS:  Okay.

14       Q.    To the best of your knowledge,

15   did they have dedicated telephone lines at CU

16   National to receive inquiries from Picatinny

17   members?

18       A.    Yes.

19       Q.    To your knowledge, how were those

20   telephone lines answered?

21          MR. FORTE:  Same objection.

22   Object to the form.

23       A.    Thank you for calling Picatinny

24   Federal Credit Union.

25       Q.    At any point in time during that

1    going with CU National.

2        Q.    Is there anything else you know?

3        A.    I know that the program that CU

4    National had for production and for servicing

5    the mortgages was identical to what CUMANET

6    was offering.  CUMANET was maintaining

7    original promissory notes.  That was part of

8    the arrangement with CU National, that they

9    retain original promissory notes.

10           They held original promissory

11   notes because it made it easy for them to

12   facilitate servicing of the mortgages when

13   the loans were paid off, whether they were

14   paid off in normal monthly installments or if

15   they were paid off because they were

16   refinanced outside.

17       Q.    Is there anything else you know

18   on that subject?

19       A.    I know that when we had to leave

20   CU National drastically because of when they

21   stole from us, we had to find another

22   servicer and we went back to CUMANET and with

23   the exact same format that originally had

24   been in place prior to 1999 and the same

25   process that CU National had in maintaining

1    their fireproof cabinets in building 30 the

2    entire loans that Picatinny ever did.  That

3    is the way they maintained.  That is the way

4    they archived their loans at Picatinny.

5        Q.    They archived their loans at CU

6    National?

7        A.    No, no, no, no.

8        Q.    I am misunderstanding you.

9        A.    Picatinny Federal Credit Union

10   offers home equity loans also.  We offer auto

11   loans, personal loans, shares through secured

12   loans.  Files the size of that notebook to

13   prepare for a home equity loan, for example,

14   would be kept in a fireproof safe.  We have

15   over 16,000 members, so any one of those

16   members that borrowed, we would maintain a

17   file.  That file was kept in the fireproof

18   safe.  So, I am saying -- I am saying we

19   didn't have the room for it.

20       Q.    You never had the room to keep

21   500 pages of original promissory notes?  Is

22   that really your testimony?

23          MR. FORTE:  Stop.  We don't want

24   to be argumentative.  The witness has already

25   answered.

1        A.    I don't know that that was an

2    important fact to enter into the agreement

3    with CU National.

4        Q.    Do you know -- do you know after

5    the agreement was entered into whether it was

6    important to Picatinny that US Mortgage, CU

7    National's affiliate, had the ability to sell

8    loans to Fannie Mae?

9        A.    I know that now.

10        Q.    And it was important, correct?

11        A.    I don't know that it was

12    important in negotiating a contract, but I

13    know that now.

14            MR. FORTE:  He is only saying he

15    has the knowledge of that today.

16            MR. KRAUS:  I understand that,

17    but that is not my question.

18        Q.    Let me try my question again.

19    Today, do you know that it was at some point

20    in time important to Picatinny that CU

21    National's affiliate, US Mortgage, had

22    ability to sell loans to Fannie Mae?

23        A.    Yes.

24        Q.    And would you agree that it was

25    important?

1      A.    Yes.

2      Q.    And would you agree that at least

3   as far back as 2003 it was important?

4      A.    Yes.

5            MR. FORTE:  I think that's been

6   established.

7      Q.    Do you know who prepared the

8   first draft of this agreement?

9      A.    I do not.

10           MR. FORTE:  Just note my

11   objection.  It lacks foundation.

12           MR. KRAUS:  Somebody prepared a

13   first draft.

14           MR. FORTE:  No, it could have

15   been a final version.  There could have been

16   no drafts.

17           MR. KRAUS:  Then the first draft

18   and the final would be the same thing, Jim.

19      Q.    Do you know if there was any

20   negotiation and any changes made to any of

21   the terms of this agreement?

22      A.    Since?

23      Q.    No, before it was entered into.

24      A.    I do not.

25      Q.    Do you know if there have been

1        Q.    There is no writing that provides

2    any kind of authorization to Mr. Lardiere,

3    Mr. Mathews or yourself to endorse notes on

4    behalf of Picatinny for eventual sale to

5    Fannie Mae, correct?

6            MR. FORTE:  Object to the form.

7    Do you mean from the board?

8            MR. KRAUS:  No, from anyone.

9    That is the point of the question.  We have

10   already established that there is no board

11   resolution.

12       Q.    There is no written directive

13   from anyone within Picatinny authorizing you,

14   Mr. Mathews or Mr. Lardiere to endorse notes

15   on behalf of Picatinny for eventual sale; is

16   that correct?

17       A.    Not that I am aware of.

18       Q.    There is, in fact, no writing

19   that says that only you, Mr. Lardiere or

20   Mr. Mathews could endorse notes for eventual

21   sale, correct?

22       A.    Not that I am aware of.

23       Q.    In fact, any officer of Picatinny

24   could have endorsed the notes?

25           MR. FORTE:  Object to the form.

1    The witness can answer.

2        A.    Yes.

3        Q.    Could you turn to page 18 of the

4    agreement.  By the way, in subparagraph E,

5    captioned Transparency of Services, would it

6    be fair to say that that paragraph of the

7    agreement reflects the parties' intent that

8    to the full extent possible CU National was

9    to deal with members in the name of

10   Picatinny?

11       A.    Yes, to the Picatinny Federal

12   Credit Union members.

13       Q.    Paragraph F talks about secondary

14   market sales, and it says -- well, you can

15   read it yourself.  What I -- what I would

16   like to get you to explain to me is how was

17   CU National or US Mortgage paid for selling

18   loans to the secondary market?

19       A.    I don't know how they were paid

20   for selling mortgages to the secondary

21   market.

22       Q.    Do you know what subparagraph F

23   means?

24       A.    It says that it won't be charged

25   a fee for loans that are sold to the

1    A.    Yes.

2         MR. FORTE:  Note my objection to

3    the phrase tangible asset.

4    Q.    And they -- the mortgage loan

5    portfolio of Picatinny was a material asset

6    throughout this period on its balance sheet;

7    would you agree with that?

8    A.    Yes.

9    Q.    Do you know if you had any kind

10   of -- you meaning Picatinny -- had any kind

11   of separate custodial agreement with CU

12   National that set forth requirements for the

13   way in which they handled and maintained the

14   original mortgage notes?

15   A.    Not that I am aware of.

16   Q.    Do you know if there was any

17   agreement between Picatinny and CU National

18   or US Mortgage that required that the people

19   who dealt with the original notes had to be

20   separated from -- that is, different from --

21   the people who handled the origination and

22   servicing of the loans?

23   A.    I have no knowledge of that.

24   Q.    Do you know of any agreement that

25   required CU National or US Mortgage to keep

1    any amount of insurance to cover the original

2    mortgage loans that it was maintaining

3    custody of?

4        A.    Not that I am aware of.

5        Q.    With respect to CUMANET and their

6    current servicing relationship with you, I

7    think you told me previously that they are

8    holding the original notes as well?

9        A.    That is correct.

10       Q.    Did anybody on behalf of

11   Picatinny object to that?

12       A.    No.

13       Q.    Were you concerned that perhaps

14   you were putting yourself at risk of the same

15   time of malfeasance that you had experienced

16   with CU National and US Mortgage?

17       A.    I didn't think so.

18       Q.    Why not?

19       A.    CUMANET was good to the credit

20   union prior to leaving and going over to CU

21   National.  And CUMANET is owned -- a majority

22   ownership is owned by Affinity Federal Credit

23   Union, which is a billion dollar credit

24   union, and I felt comfortable knowing those

25   facts in the credit union industry.  I felt

1        A.    There was an audit by David

2    Goldsmith in 2001, I think.  I think it was

3    2001.

4        Q.    Any others?

5        A.    No.  Well, yes.  By outside

6    auditors or internal auditors?

7        Q.    Let's start with anybody.

8        A.    Yes.

9        Q.    What other audits are you aware

10   of?

11       A.    We have a compliance consultant

12   by the name of RSM McGladrey that does our

13   compliance audits for us.  They come out to

14   us on a quarterly basis.

15       Q.    Okay.  Let's talk about

16   Mr. Goldsmith first.  What was his job in

17   2001?

18       A.    He was the internal auditor at

19   the time for Picatinny.

20       Q.    He was the predecessor of

21   Mr. Baumann and Mr. Cohen?

22       A.    Yes, that is correct.

23       Q.    Do you know whether in his audit

24   of CU National's operations on behalf of

25   Picatinny he did anything to check on the

1    original mortgage notes that were supposedly

2    in the safe at CU National?

3        A.    I know -- I read his review.  I

4    know he -- he -- he did an audit review on

5    the first mortgages.  I didn't see any -- I

6    didn't see him specifically say original

7    notes, but he said everything was operating

8    consistently and fairly over there.

9        Q.    Did you pick up the phone and

10    call Mr. Goldsmith in the course of preparing

11    for today's deposition?

12        A.    No, I did not.

13        Q.    So, it would be fair to say that

14    you don't know whether Mr. Goldsmith saw a

15    single original note being held at CU

16    National?

17        A.    Correct.

18        Q.    With respect to Mr. Baumann, you

19    don't know whether he saw a single original

20    note?

21        A.    I asked him the question.  He

22    didn't recall.  He said he would have to

23    review his working papers.

24        Q.    So, it would be fair to say that

25    as you sit here today you cannot testify that

1    he reviewed any original mortgage notes being

2    held at CU National, correct?

3           MR. FORTE:  Object to the form of

4    the question.

5       A.    Yes.

6       Q.    With respect to Mr. Cohen, he was

7    not able to tell you that he had a clear

8    recollection of having reviewed original

9    mortgage notes at CU National in either of

10   the occasions he audited their operations on

11   behalf of Picatinny, correct?

12      A.    Correct.

13      Q.    With respect to your outside

14   auditors, you are not aware of any instance

15   where they went to the physical location of

16   CU National and looked at original mortgage

17   notes, correct?

18      A.    Correct.

19      Q.    With respect to R.S. McGladrey,

20   they did compliance audits, correct?

21      A.    Correct.

22      Q.    And a compliance audit is one

23   that looks at whether or not the operations

24   are being conducted in accordance with the

25   requirements of various laws and regulations.

1    Fair to say?

2        A.    Correct.

3        Q.    McGladrey wasn't even asked to

4    look at whether or not there were original

5    notes being held at CU National, correct?

6        A.    Correct.

7        Q.    And as far as you know, McGladrey

8    never did look to see whether there were

9    original notes being held at CU National,

10   correct?

11       A.    Correct.

12       Q.    So, as you sit here today, you

13   are not aware of anyone working for or on

14   behalf of Picatinny, whether employed by

15   Picatinny directly or as an outside auditor,

16   who saw whether there were original notes

17   being held at CU National, correct?

18       A.    Correct.

19       Q.    Could you look at the

20   Interrogatory Answers that you verified.

21           MR. KRAUS:  What Exhibit number

22   are they?

23           MR. FORTE:  Nine.

24           MR. KRAUS:  Thank you.

25       Q.    Let me direct your attention to

1    the answer to Interrogatory four, which

2    starts on page six and continues to page

3    seven.  Could you read that entire answer to

4    yourself.

5        A.    Okay.

6        Q.    Let me direct your attention to

7    the last sentence of the answer to

8    Interrogatory four, which reads,

9    "Periodically audits of random mortgage files

10   were performed to insure, among other things,

11   that CU National, LLC, had in its possession

12   Picatinny's promissory notes underlying first

13   mortgage loans.  That statement is incorrect,

14   right?

15       A.    I don't believe so.

16       Q.    What was done to insure that they

17   had original promissory notes?

18           MR. FORTE:  That is not what it

19   says and that is a misrepresentation.

20           MR. KRAUS:  Oh, I misunderstood.

21       Q.    So, your testimony is that --

22   well, let me back up.  What did you do to

23   insure that they had in their possession

24   Picatinny's promissory notes, as opposed to

25   copies of the promissory notes?

1          MR. FORTE:  Note my objection.  I

2    don't know whether that means copies or not.

3          MR. KRAUS:  He wrote it.

4      Q.    Did you mean to say that -- that

5    all you were doing was insuring that they had

6    copies of the promissory notes or did you

7    mean to say that they were -- that you did

8    periodic audits to insure that they had the

9    actual promissory notes?

10          MR. FORTE:  Just note my

11    objection.  Witnesses don't write, and nor do

12    clients, write Interrogatory Answers, nor did

13    your clients write Interrogatory answers.

14          MR. KRAUS:  He verified it under

15    oath.

16          MR. FORTE:  That is different

17    than writing it.

18      Q.    When you verified it under oath,

19    did you understand this to mean original

20    promissory notes or copies of promissory

21    notes?

22      A.    When I -- when I read this, I was

23    -- I was agreeing with that there were random

24    audits that were performed at CU National,

25    and no where did I read in those audits that

1    CU National was not in possession of

2    promissory notes.  There was nothing in those

3    audits that told me that they were not in

4    possession of those promissory notes.  And I

5    was getting paid every month, so there was

6    nothing to lead me to believe that they

7    didn't have the promissory notes.  So, that

8    is why I signed it.

9        Q.    But, in fact, there was nothing

10   in any of the reports that you read that

11   indicated that anybody had done anything to

12   insure that they actually had possession of

13   the promissory notes themselves, correct?

14       A.    There was nothing in the reports

15   that told me that they weren't there either.

16       Q.    That isn't what I asked you, sir.

17   We can be done much more quickly if you

18   answer the question I ask.

19       A.    I am sorry.

20       Q.    The question I asked is the

21   following.  There wasn't anything you read in

22   any of the audit reports that indicated that

23   the report had determined that CU National,

24   in fact, had possession of the original

25   promissory notes for Picatinny borrowers;

1    fair to say?

2        A.    There was verbiage in those audit

3    reports that did not specifically say

4    original promissory notes, but there was

5    other language in there that led me to

6    believe that everything was under control

7    over there, in terms of collateral,

8    documentation and everything associated with

9    CU National and the servicing of those loans.

10       Q.    Can you recall any audit report

11   that you read that said in words or

12   substance, we are satisfied that CU National

13   has the original promissory notes in its

14   file?

15           MR. FORTE:  Just note my

16   objection.  I think the witness answered that

17   in the last question.  But you can answer it.

18       A.    No.

19       Q.    So, when this Interrogatory --

20   when this Interrogatory says -- let me start

21   over.

22           When this Interrogatory said,

23   "Periodically audits of random mortgage files

24   were performed to insure, among other things,

25   that CU National, LLC, National Mortgage,

1    LLC, had in its possession Picatinny's

2    promissory notes underlying first mortgage

3    loans," what you really meant to say was that

4    the audits did not say that they didn't have

5    them?

6         MR. FORTE:  Note my objection to

7    the form of the question.  You can answer.

8        A.    Yes.

9        Q.    Do you know if NCUA did any

10   inspections at CU National?

11       A.    They did not.

12       Q.    Do you know if NCUA issued any

13   reports about CU National's operations on

14   behalf of Picatinny?

15       A.    No, I do not.

16       Q.    You said earlier that Picatinny

17   conducted a number of audits of US Mortgage

18   in 2008, the end of 2008, beginning of 2009.

19   Do you remember that testimony?

20       A.    Yes.

21       Q.    By that did you mean -- how many

22   audits were done?

23       A.    In 2008/2009?

24       Q.    Right.

25       A.    Four.

1      Q.    I have handed you what's been

2   marked as collective Exhibit 19, Mr. Darling.

3   And if you take a look through it, you will

4   see that near the back of each note package

5   there is an alonge which appears to have been

6   signed by you on behalf of Picatinny.  And

7   what I would like you to do is as you look

8   through them is to let me know whether, in

9   fact, those are your signatures each time.

10      MR. KRAUS:  Jim, I think, but I

11   am not sure, that the reason that many of the

12   pages don't have Bates numbers is that we

13   printed it off our internal system where we

14   have all the notes, rather than off of the

15   production that we made to Picatinny, but I

16   will check on that.

17      MR. FORTE:  Just so we are clear,

18   I am not saying that I have not received some

19   of these notes.  I have seen the Ron Carti

20   document before.  You did produce a number of

21   non-disputed loans early on, and apparently

22   without Bates number.  But I don't -- it is

23   hard for me to verify that I have all of

24   them, given that they don't have numbers.

25      MR. KRAUS:  I understand.

1      Q.    Mr. Darling, is that your

2    signature on each and every one of them?

3      A.    No, it is not.

4      Q.    Which ones are not your

5    signature?

6      A.    All of them.

7      Q.    Did you ever authorize anyone to

8    sign your name?

9      A.    No.

10     Q.    Is this the first you are

11   learning that there are notes that were

12   endorsed over your name that you didn't

13   personally sign?

14     A.    No.

15     Q.    When and how did you learn that?

16         MR. FORTE:  Note my objection.

17   If that information came from counsel, you

18   are not to tell Mr. Kraus.  Otherwise,

19   outside of that, you can advise him.

20     A.    Counsel.

21     Q.    Okay.  Do you know whether or not

22   the proceeds from the sale of these loans

23   were delivered to Picatinny?

24     A.    Not without checking I do not

25   know.

# EXHIBIT 6

Lardiere, Stephen J.  4/7/2010  10:15:00 AM

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF NEW JERSEY

3          CIVIL ACTION NO. 09-01295 (JAG)

4

5     PICATINNY FEDERAL CREDIT UNION,     :

6          Plaintiff,                 :

7          vs.                        :

8     FEDERAL NATIONAL MORTGAGE          :

9     ASSOCIATION,                      :

10         Defendant.                 :

11

12

13     VIDEOTAPE DEPOSITION OF:  STEPHEN J. LARDIERE

14          WEDNESDAY, APRIL 7, 2010

15

16

17

18

19

20          ROSENBERG & ASSOCIATES, INC.

21        Certified Court Reporters & Videographers

22     425 Eagle Rock Ave., Suite 201     575 Madison Ave.

23     Roseland, NJ 07068          New York, NY 10022

24     (973) 228-9100    1-800-662-6878    (212) 868-1936

25          www.rosenbergandassociates.com

1  that within that agreement was a provision that

2  said that CUMAnet would hold those original

3  valuable, negotiable instruments?

4     A.    No, I did not make a specific point

5  to mention that.

6     Q.    While CUMAnet was your third party

7  vendor, did anyone from Picatinny ever go out to

8  CUMAnet's offices to verify that the original

9  notes were physically there?

10         MR. LORELL:  Can I hear the question

11  back?

12         (Record read.)

13     A.    No employee of Picatinny ever, to my

14  knowledge, went to CUMAnet to verify that the

15  original documents were there.

16     Q.    Did any outside auditor for

17  Picatinny, to your knowledge, ever go to CUMAnet's

18  offices to verify that the original notes were

19  physically there?

20     A.    I do not recall that any auditor or

21  examiner went there to specifically verify that

22  the original notes were there.

23     Q.    Did anyone on behalf of Picatinny

24  ever go to the offices of CUMAnet to verify that

25  the original notes were still there?

```
 1       A.      I don't recall anybody that went

 2    there specifically to verify if the notes were

 3    there.

 4       Q.      While you were the general manager of

 5    Picatinny and CU National was its outside vendor

 6    for first mortgage loans, did any employee of

 7    Picatinny ever go to the offices of CU National to

 8    verify that the original notes were still there?

 9       A.      I don't recall that anybody that was

10    employed by Picatinny went to CU National to

11    verify that the original notes were there.

12       Q.      Did any outside auditor for Picatinny

13    ever go to the offices of CU National to verify

14    that the original notes were still there?

15       A.      I don't know that that happened.

16       Q.      Did anyone on behalf of Picatinny

17    ever go to the offices of CU National to verify

18    that the original notes were still there?

19       A.      I don't know -- I'm unaware that

20    anybody did that.

21       Q.      Who negotiated the original contract

22    with CU National?

23       A.      With CU National?  That was myself,

24    with the ALCO Committee.

25       Q.      And who was on the ALCO Committee at
```

1    to grave services for your mortgage lending

2    operation?

3        A.    I don't understand what you mean by

4    that.  If you could explain cradle to grave?

5        Q.    That was a phrase that they used in

6    some of their marketing materials.

7            Do you recall that?

8        A.    I don't recall that phrase.

9        Q.    Did you recall that they would be

10   offering services from the first contact with your

11   credit union member, through the servicing of the

12   loan, until it was ultimately paid off?

13       A.    When you say provide services, you

14   mean performing what we asked them to do within

15   the agreement?

16       Q.    Yes.

17       A.    Originate, underwrite, service?

18       Q.    All of that.

19       A.    Yes, I understood that that was part

20   of the agreement.

21       Q.    And did you understand that, like

22   CUMAnet, they were going to do it in a transparent

23   way in the name of Picatinny?

24       A.    Correct.

25       Q.    Did you also understand that when

Lardiere, Stephen J.  4/7/2010  10:15:00 AM

| 1 | they dealt with your members, that their goal was |
| 2 | to make sure that the members believed that they |
| 3 | were dealing directly with Picatinny? |
| 4 | A.     That was the goal. |
| 5 | Q.     Did you understand that they |
| 6 | accomplished that by having dedicated phone lines |
| 7 | that would be answered, Picatinny Federal Credit |
| 8 | Union? |
| 9 | A.     Yes. |
| 10 | Q.     Did you also understand that in |
| 11 | dealing with your members in writing, that they |
| 12 | would be dealing with them - they, meaning CU |
| 13 | National - in the name of Picatinny Federal Credit |
| 14 | Union? |
| 15 | A.     Yes. |
| 16 | MR. KRAUS:  Jeff, this was previously |
| 17 | marked at Mr. Darling's deposition as Exhibit 6. |
| 18 | MR. LORELL:  Let's leave it like |
| 19 | that. |
| 20 | D-6? |
| 21 | MR. KRAUS:  Yes. |
| 22 | Q.     Do you recognize that document? |
| 23 | A.     Yes.  It looks -- well, from the |
| 24 | first paragraph, it appears to be the one -- the |
| 25 | agreement that was entered into between Picatinny |

1    payable and the like?

2         MR. LORELL:  Objection to form; lack

3    of foundation.

4         MR. KRAUS:  Well, no, the question is

5    asking if he knows.  I'm trying to find out if

6    there is a foundation.

7         MR. LORELL:  Well, okay, all right,

8    he can answer.

9    Q.    Do you recall?

10   A.    I do not, no.

11   Q.    Okay.  So whatever testimony you

12   would give in that regard, you would be

13   speculating, correct?

14   A.    Those are your words.  I don't know.

15   Q.    With respect to the CU National

16   agreement, CU National's ability to assist

17   Picatinny in selling loans to the secondary market

18   was important, correct?

19   A.    Yes.

20   Q.    And it is specifically addressed at

21   page 15 and 16 of the agreement, correct?

22   A.    It looks like it.  I haven't read the

23   whole thing, but that sounds like -- yes, that

24   looks like it, actually.

25   Q.    Okay.  And you knew over time that CU

1    U.S. Mortgage to execute documents, and that's

2    what I'm referring to, your general awareness that

3    there was a resolution authorizing U.S. Mortgage.

4         MR. LORELL:  Objection.  I think that

5    misstates the record.

6         MR. KRAUS:  That's my clear

7    recollection, but I'll ask the question again just

8    to be clear.

9    Q.    Do you have a recollection, even if

10   you don't remember the particular document, that

11   there was a board resolution that authorized U.S.

12   Mortgage to execute documents to effectuate the

13   sale in 2003?

14   A.    No, I'm not aware that there was a

15   specific document to do that.

16   Q.    Okay.  Are you aware of anybody at

17   Picatinny or U.S. Mortgage communicating to Fannie

18   Mae that U.S. Mortgage's authority to endorse

19   notes on behalf of Picatinny was limited in any

20   way?

21        MR. LORELL:  Objection to the form of

22   the question; compound.

23        MR. KRAUS:  I'll split it up.

24   Q.    Are you aware of anyone at Picatinny

25   ever communicating to Fannie Mae in any way that

1    U.S. Mortgage's authority to endorse notes on

2    behalf of Picatinny was limited in any sense?

3        A.    I don't recall any communications

4    with Fannie Mae in that regard.

5        Q.    Are you aware of any communications

6    by U.S. Mortgage or CU National to Fannie Mae

7    telling Fannie Mae that U.S. Mortgage's authority

8    to endorse notes on behalf of Picatinny was

9    limited in any sense?

10       A.    I don't recall any conversation or

11   correspondence about that.

12       Q.    Do you know how the August 2003 sale

13   was -- well, let me rephrase that.

14           For the notes that Mr. Ratner

15   selected for sale, how were those notes processed

16   for sale to Fannie Mae?

17       A.    I don't recall what the process was.

18       Q.    Okay.  Did you ever ask anyone how

19   they were processed?

20       A.    No, I didn't.

21       Q.    Did you ever ask anyone who signed

22   them on behalf of Picatinny?

23       A.    No, I did not.

24       Q.    Did you ever ask to see those notes

25   to determine how they were endorsed on behalf of

1      Q.     Well, here's my -- let me rephrase

2    the question.

3      A.     Yeah, please.

4      Q.     Did anybody ever bring to your

5    attention that Picatinny -- that there were

6    instances where Picatinny instructed U.S. Mortgage

7    to sell a loan to Fannie Mae and then it took many

8    months for the proceeds from that sale to be

9    delivered by CU National to Picatinny?

10     A.     Yes.

11     Q.     Who told you about that?

12     A.     It was my accounting manager, but I

13    don't know who was the accounting manager at the

14    time, whether it was Steve Ratner or whether it

15    was Charles Sette.

16     Q.     What do you recall being told?

17     A.     That we -- it's taking a long time,

18    over two months, to get the proceeds from the sale

19    back into the credit union.

20     Q.     And what did you say in response?

21     A.     I said, what's the interest rate?

22    And they told me the interest rate.  And I said,

23    fine, no problem, let it go, if you don't get

24    it -- you know, stay on top of it, if you don't

25    get it next month, let me know.  Because at that

1    time we were getting more -- the interest accrues

2    during the time and we get that interest all the

3    way from the day it's sold until the day we

4    finally get the funds, and that was higher than

5    our rate of return on any investment that we could

6    get.

7       Q.    Was there any written agreement

8    between Picatinny and CU National that specified

9    that CU National owed you interest on any delayed

10   payments like that?

11      A.    Delayed payments?  I don't recall

12   that there's a written agreement on delayed

13   payments.

14      Q.    Do you recall that there's a written

15   agreement that requires -- that required CU

16   National to pay Picatinny interest on sale

17   proceeds?

18      A.    I believe that's in the agreement.

19      Q.    Okay.  Can you look at the agreement

20   and show me where that is?

21      A.    Sure.  Do I have it?

22      Q.    You do.

23          MR. LORELL:  Just so we're clear, the

24   question is interest on the sale proceeds or

25   accrued interest on the note?

# EXHIBIT 7

1      UNITED STATES DISTRICT COURT

2      DISTRICT OF NEW JERSEY

3      CASE NO.: 2:09-CV-01295-JAG-MCA

4      -----------------------------------x

5   PICATINNY FEDERAL CREDIT UNION,

6          Plaintiff,

7        vs.

8   FEDERAL NATIONAL MORTGAGE ASSOCIATION,

9          Defendant.

10     -----------------------------------x

11     Per Protective Order, Section 9, this transcript has a

12    temporary "Confidential" designation for a period of 15

13      days after the depostition is received

14      DEPOSITION OF ALEXANDER N. SAPHOS

15        Thursday, February 25, 2010

16         Newark, New Jersey

17

18

19

20

21

22   ATKINSON- BAKER, INC.

22   COURT REPORTERS

23   (800) 288-3376

23   www.depo.com

24

25   FILE NO.: A401C39

1    would consider to be a third-party origination.

2    What was unique about it from other wholesale

3    corresponding channels was that it was

4    dedicated solely and specifically to the credit

5    union industry.

6         Q.   And what did they do for the credit

7    union industry?

8         A.   They offered a complete back-office

9    operation on behalf of the -- on behalf of

10   their credit union clientele with services that

11   went from actually taking the application

12   throughout the entire mortgage process,

13   including the sale of mortgage loans in the

14   secondary market.

15        Q.   Was it your understanding that they

16   offered an outsourced first mortgage department

17   for credit unions?

18        A.   That they were the outsource?

19        Q.   Yes.

20        A.   Yes.

21        Q.   And by performing that function, was

22   it your understanding that they -- they

23   eliminated the need for credit unions to have

24   personnel involved in first mortgage -- in

25   first mortgages?

1      A.   Yes.

2      Q.   For example, you're familiar with in

3   your years of experience when a loan is paid,

4   the note gets stamped "paid" and returned to

5   the borrower?  Are you familiar with that

6   process?

7      A.   I'm aware of it, yes.

8      Q.   And was it your understanding

9   CU National was doing that for the credit

10  unions?

11     A.   I don't know what the process was for

12  returning the note -- a satisfied note to the

13  credit union.

14     Q.   Well, you just told me that

15  CU National provides a first mortgage

16  department for credit unions and such that they

17  don't have to have any involvement or any

18  members or employees involved in the first

19  mortgage process.

20     A.   To the extent that I misunderstood

21  your question, the service that they were

22  providing was a complete outsource, complete

23  back office, but the credit union would still

24  have to have somebody in place making mortgage

25  decisions.

```
 1      Q.   Let me show you what I've marked as

 2   P-91 for Identification.  It bears Bates stamp

 3   numbers SAPA 17092 through -17099.

 4           And I ask whether you have seen

 5   these documents before.

 6      A.   Yes.

 7      Q.   Okay.  SAPA, according to what Fannie

 8   Mae's counsel has represented to me, means that

 9   these documents were in your possession.  You

10   were the custodian of these documents.

11           So can you tell me what this

12   document is?

13      A.   This is a promotional document that

14   CU National used in conjunction with their

15   solicitation of -- of credit union clientele

16   for their CU National production channel.

17      Q.   Did you read this document?

18      A.   I read it when I first got it, which

19   was some years ago, yes.

20      Q.   And on the very first page of the

21   document it says, "Give them credit turnkey

22   services."

23           Do you see where I am?

24      A.   Uh-huh.

25      Q.   You have to answer verbally.
```

1      A.   Yes.

2      Q.   What is your understanding of the

3   phrase "turnkey services"?

4      A.   That they were providing a complete

5   back-office facility to the credit unions and

6   doing it in the name of the credit unions.

7      Q.   And as part of back-office

8   processing, would that be also maintenance of

9   final documents?

10      MR. KRAUS:  Objection to the form of

11      the question.

12      A.   I'm not -- my focus was more on

13   front-end activities.  I'm not familiar with

14   everything that's involved on the servicing

15   side, but I know that they were providing

16   servicing facilities as well, so ...

17      Q.   Okay.  My question is, though -- I

18   wasn't specifically referring to CU National at

19   this point.  But when you talk about complete

20   back-end office operations, back-end office

21   operations includes maintenance of loan

22   documents.  Correct?

23      MR. KRAUS:  Objection to the form of

24      the question.  What do you mean by "loan

25      documents"?

1    with this credit union production channel.

2        Q.   Where did you get it from?  That's

3    what I'm trying to understand.  Where did that

4    understanding come from?

5        A.   From speaking to them about the

6    nature of their different business models.

7        Q.   So during one or more of your

8    discussions with them, and I assume that means

9    US Mortgage --

10       A.   Yes.

11       Q.   -- you believed that Michael McGrath

12   had the authority to sell credit union loans to

13   Fannie Mae?  Is that your testimony?

14       A.   Yes.

15       Q.   Did you ever hear from any --

16       A.   May I go back on that?  My

17   understanding was -- my understanding was that

18   somewhere within the US Mortgage arrangement,

19   being the CU National production channel with

20   the credit union clientele, existed their

21   ability to sell loans into the secondary

22   market, in our case, specifically Fannie Mae,

23   on which they had been given that authority to

24   do that.  I do never recall any specific

25   language or conversation regarding the manner

# EXHIBIT 8

## RESOLUTION

BE IT RESOLVED that the transaction herein referred to, being herewith approved, the president and secretary of this corporation hereby direct, authorize and empower US Mortgage Corporation with offices located at 19 D Chaplin Road Pine Brook, New Jersey to execute, acknowledge and deliver such documents, instruments and papers including but not limited to assignments of mortgage and Note allonges and perform such acts as may be legally, properly and reasonably required or necessary for the purpose of the sale by Picatinny Federal Credit Union to Federal National Mortgage Association of the mortgages set forth on the attached schedule.

I, Marion Schuttler, Secretary of Picatinny Federal Credit Union CERTIFY that the foregoing is a true copy of a resolution as it appears in the records of the corporation and as was duly and legally adopted at a meeting of the Board of Directors of the corporation called for that purpose and held on August 20, 2003, pursuant to and in accordance with the Certificate of Incorporation and By-Laws thereof; that it has not been modified, amended or rescinded, and is in full force and effect as of the date hereof.

Dated: August 26, 2003

_Marion E. Schuttler_
Marion Schuttler, SECRETARY



FM 0041

## Picatinny Federal Credit Union
## Mortgages Approved for Sale
### August 20, 2003

| Loan Num | Name | Term |
|---|---|---|
| 215001146 | SNYDER, K | 180 |
| 215001491 | TERHUNE, K | 180 |
| 9000293 | TROAST, DOUGLAS | 180 |
| 150397 | HULSMAN, FRANK G. | 180 |
| 215000965 | WRIGHT, E | 180 |
| 215001088 | VAN NESS, M | 180 |
| 215000973 | ALLEN, J | 180 |
| 215001084 | LABELL, S | 180 |
| 215001151 | HANZL, F | 180 |
| 215001141 | GILLIOZ, A | 180 |
| 215001149 | KAPOOR, D | 180 |
| 215001136 | COSTEA, J | 180 |
| 215001097 | SZOLLOSY, L | 180 |
| 215001128 | ROGERS, R | 180 |
| 215000654 | BARRETT, E | 180 |
| 215001081 | OAKLEY, S | 180 |
| 215001262 | KENT, R | 180 |
| 215001064 | MIRZA, M | 180 |
| 215001213 | MCBRIDE, H | 180 |
| 215001377 | REGELSKI, P | 180 |
| 215001163 | ASTROLOGO, A | 180 |
| 215001224 | HAUPTMAN, Y | 180 |
| 215000544 | HERON, A | 180 |
| 215001272 | ENNIS, M | 180 |
| 215001362 | VOGLER, J | 180 |
| 215001337 | HOLMES, C | 180 |
| 215001240 | VANSCHAICK, G | 180 |
| 215001292 | DIXON, D | 180 |
| 215001379 | HEATH, K | 180 |
| 215001234 | PAWLIKOWSKI, G | 180 |
| 215001238 | SCHULTZ, R | 180 |
| 215001408 | DEMAREST, D | 180 |
| 215001444 | DELL'ELBA, M | 180 |
| 215001241 | BARRIERS, STEVEN | 180 |
| 215001397 | BAILEY, M | 180 |
| 215001390 | BOSTROM, L | 180 |
| 215001237 | SEARCH, C | 180 |
| 215001454 | CARROLL, C | 180 |
| 215001507 | GELATO, L | 180 |
| 215001253 | ALBINSON, G | 180 |
| 215001360 | YEE, D | 180 |
| 215001207 | SULOVSKI, W | 180 |
| 215001221 | HRYNYK, A | 180 |

FM 0042

✳ Not eligible for Fannie

### Picatinny Federal Credit Union
### Mortgages Approved for Sale
### August 20, 2003

| Loan Num | Name | Term | Note Rate | 08/18/2003 Sell Price | Balance | Cum Balance |
|---|---|---|---|---|---|---|
| 215001146 | SNYDER, K | 180 | 5.375 | 99.750 | 202,974.62 | 202,974.62 |
| 215001491 | TERHUNE, K | 180 | 5.375 | 99.750 | 99,127.05 | 302,101.67 |
| 9000293 | TROAST, DOUGLAS | 180 | 5.750 | 101.100 | 68,431.29 | 370,532.96 |
| 150397 | HULSMAN, FRANK G. | 180 | 5.875 | 101.550 | 90,917.45 | 461,450.41 |
| 215000965 | WRIGHT, E | 180 | 5.875 | 101.550 | 159,137.62 | 620,588.03 |
| 215001088 | VAN NESS, M | 180 | 5.875 | 101.550 | 100,282.88 | 720,870.91 |
| 215000973 | ALLEN, J | 180 | 5.875 | 101.550 | 133,094.77 | 853,965.68 |
| 215001084 | LABELL, S | 180 | 5.875 | 101.550 | 183,939.39 | 1,037,905.07 |
| 215001151 | HANZL, F | 180 | 5.875 | 101.550 | 111,697.80 | 1,149,602.87 |
| 215001141 | GILLIOZ, A | 180 | 5.875 | 101.550 | 96,407.02 | 1,246,009.89 |
| 215001149 | KAPOOR, D | 180 | 5.875 | 101.550 | 71,130.34 | 1,317,140.23 |
| 215001136 | COSTEA, J | 180 | 5.875 | 101.550 | 96,447.06 | 1,413,587.29 |
| 215001097 | SZOLLOSY, L | 180 | 5.875 | 101.550 | 96,273.03 | 1,509,860.32 |
| 215001128 | ROGERS, R | 180 | 5.875 | 101.550 | 287,929.41 | 1,797,789.73 |
| 215000654 | BARRETT, E | 180 | 5.875 | 101.550 | 176,498.12 | 1,974,287.85 |
| 215001081 | OAKLEY, S | 180 | 5.875 | 101.550 | 110,914.10 | 2,085,201.95 |
| 215001262 | KENT, R | 180 | 5.875 | 101.550 | 87,322.76 | 2,172,524.71 |
| 215001064 | MIRZA, M | 180 | 5.875 | 101.550 | 629,266.47 | 2,801,791.18 |
| 215001213 | MCBRIDE, H | 180 | 5.875 | 101.550 | 41,628.41 | 2,843,419.59 |
| 215001377 | REGELSKI, P | 180 | 5.875 | 101.550 | 103,894.54 | 2,947,314.13 |
| 215001163 | ASTROLOGO, A | 180 | 5.875 | 101.550 | 185,660.64 | 3,132,974.77 |
| 215001224 | HAUPTMAN, Y | 180 | 5.875 | 101.550 | 226,020.72 | 3,358,995.49 |
| 215000544 | HERON, A | 180 | 5.875 | 101.550 | 130,693.80 | 3,489,689.29 |
| 215001272 | ENNIS, M | 180 | 5.875 | 101.550 | 87,129.16 | 3,576,818.45 |
| 215001362 | VOGLER, J | 180 | 5.875 | 101.550 | 213,934.96 | 3,790,753.41 |
| 215001337 | HOLMES, C | 180 | 5.875 | 101.550 | 147,151.55 | 3,937,904.96 |
| 215001240 | VANSCHAICK, G | 180 | 5.875 | 101.550 | 199,068.05 | 4,136,973.01 |
| 215001292 | DIXON, D | 180 | 5.875 | 101.550 | 106,163.01 | 4,243,136.02 |
| 215001379 | HEATH, K | 180 | 5.875 | 101.550 | 105,523.13 | 4,348,659.15 |
| 215001234 | PAWLIKOWSKI, G | 180 | 5.875 | 101.550 | 145,215.31 | 4,493,874.46 |
| 215001238 | SCHULTZ, R | 180 | 5.875 | 101.550 | 96,810.21 | 4,590,684.67 |
| 215001408 | DEMAREST, D | 180 | 5.875 | 101.550 | 106,643.81 | 4,697,328.48 |
| 215001444 | DELL'ELBA, M | 180 | 5.875 | 101.550 | 114,336.63 | 4,811,665.11 |
| 215001241 | BARRIERS, STEVEN | 180 | 5.875 | 101.550 | 118,592.54 | 4,930,257.65 |
| 215001397 | BAILEY, M | 180 | 5.875 | 101.550 | 71,906.97 | 5,002,164.62 |
| 215001390 | BOSTROM, L | 180 | 5.875 | 101.550 | 136,986.49 | 5,139,151.11 |
| 215001237 | SEARCH, C | 180 | 5.875 | 101.550 | 174,908.93 | 5,314,060.04 |
| 215001454 | CARROLL, C | 180 | 5.875 | 101.550 | 125,853.34 | 5,439,913.38 |
| 215001507 | GELATO, L | 180 | 5.875 | 101.550 | 72,606.75 | 5,512,520.13 |
| 215001253 | ALBINSON, G | 180 | 5.875 | 101.550 | 129,725.69 | 5,642,245.82 |
| 215001360 | YEE, D | 180 | 5.875 | 101.550 | 193,620.41 | 5,835,866.23 |

8/15

✳

FM 0039

| | | | | | |
|---|---|---|---|---|---|
| 215001207 SULOVSKI, W | 180 | 5.875 | 101.550 | 49,122.47 | 5,884,988.70 |
| 215001221 HRYNYK, A | 180 | 5.875 | 101.550 | 91,748.92 | 5,976,737.62 |
| 215001275 FRANCO, J | 180 | 5.875 | 101.550 | 169,901.98 | 6,146,639.60 |
| 215001401 COFFMAN, J | 180 | 5.875 | 101.550 | 91,650.82 | 6,238,290.42 |
| 215001468 GOULD, K | 180 | 5.875 | 101.550 | 114,654.11 | 6,352,944.53 |
| 215001232 DAVIS, W | 180 | 5.875 | 101.550 | 72,141.82 | 6,425,086.35 |
| 215001412 HOUTSMA, T | 180 | 5.875 | 101.550 | 58,302.98 | 6,483,389.33 |
| 215001327 RICCIARDI, A | 180 | 5.875 | 101.550 | 242,025.52 | 6,725,414.85 |
| 215001657 CORREALE, L | 180 | 5.875 | 101.550 | 97,531.21 | 6,822,946.06 |
| 215001365 DUNADO, R | 180 | 5.875 | 101.550 | 125,853.34 | 6,948,799.40 |
| 215001164 TARTARILLA, A | 180 | 5.875 | 101.550 | 122,948.99 | 7,071,748.39 |
| 215001476 REINER, F | 180 | 5.875 | 101.550 | 60,926.62 | 7,132,675.01 |
| 215001486 HEGARTY, R | 180 | 5.875 | 101.550 | 194,343.18 | 7,327,018.19 |
| 215001416 BASCONE, J | 180 | 5.875 | 101.550 | 131,583.25 | 7,458,601.44 |
| 215001385 COLLINS, A | 180 | 5.875 | 101.550 | 132,153.40 | 7,590,754.84 |
| 215001256 KERWIN, S | 180 | 5.875 | 101.550 | 100,819.75 | 7,691,574.59 |
| 215001503 SIMPSON, J | 180 | 5.875 | 101.550 | 81,785.51 | 7,773,360.10 |
| 215001336 JACKSON, S | 180 | 5.875 | 101.550 | 107,284.35 | 7,880,644.45 |
| 215001215 RISBERG, J | 180 | 5.875 | 101.550 | 68,271.88 | 7,948,916.33 |
| 215001464 ZLOTNICK, S | 180 | 5.875 | 101.550 | 144,930.36 | 8,093,846.69 |
| 215001410 ZULAUF, S | 180 | 5.875 | 101.550 | 170,050.29 | 8,263,896.98 |
| 215001420 NAUJOKAS, V | 180 | 5.875 | 101.550 | 170,679.63 | 8,434,576.61 |
| 215001347 HANNA, P | 180 | 5.875 | 101.550 | 116,605.95 | 8,551,182.56 |
| 215001280 SPIEGEL, K | 180 | 5.875 | 101.550 | 194,343.18 | 8,745,525.74 |
| 215001254 DUKES, G | 180 | 5.875 | 101.550 | 33,648.25 | 8,779,173.99 |
| 315001984 MORAN, R | 180 | 5.875 | 101.550 | 171,305.90 | 8,950,479.89 |
| 315001226 AUGUSTIN, Y | 180 | 5.875 | 101.550 | 94,952.47 | 9,045,432.36 |
| 315002027 DOLLBERG, R | 180 | 5.875 | 101.550 | 127,718.82 | 9,173,151.18 |
| 315002196 RHODES, J | 180 | 5.875 | 101.550 | 80,269.04 | 9,253,420.22 |
| 315002326 SOLORZA, B | 180 | 5.875 | 101.550 | 160,717.39 | 9,414,137.61 |
| | | | | | |
| 315002911 SCHANTZ, J | 240 | 5.500 | 97.750 | 147,325.20 | 9,561,462.81 |
| 315001508 SPERONI, S | 240 | 5.500 | 97.750 | 114,467.75 | 9,675,930.56 |
| 315002994 MANSER, M | 240 | 5.500 | 97.750 | 199,609.45 | 9,875,540.01 |
| 215001154 VARGA, F | 240 | 5.750 | 0.000 | 145,828.69 | 10,021,368.70 |
| | | | | | |
| 315200043 CORJESCU, A | 360 | 5.500 | 0.000 | 117,795.69 | 10,139,164.39 |
| 315002171 VERGA, M | 360 | 5.625 | 97.250 | 114,152.66 | 10,253,317.05 |
| 315002870 MCCAFFERTY, R | 360 | 5.625 | 97.250 | 348,311.24 | 10,601,628.29 |
| 315002868 FRIEDMAN, M | 360 | 5.625 | 97.250 | 189,387.77 | 10,791,016.06 |
| 315200139 NOONAN, L | 360 | 5.625 | 97.250 | 89,710.00 | 10,880,726.06 |
| 215001954 PETERS, T | 360 | 5.750 | 98.000 | 359,316.03 | 11,240,042.09 |
| 315002860 ELIAS, V | 360 | 5.750 | 98.000 | 214,095.64 | 11,454,137.73 |
| 315002890 MEYER-PFLUG, A | 360 | 5.750 | 98.000 | 209,116.67 | 11,663,254.40 |
| 315002807 PERCE, J | 360 | 5.750 | 98.000 | 134,410.21 | 11,797,664.61 |
| 315003028 CASED, R | 360 | 5.750 | 98.000 | 177,439.80 | 11,975,104.41 |
| 315200234 DEMASSI, G | 360 | 5.750 | 98.000 | 175,446.08 | 12,150,550.49 |
| 315002055 Loreng, D | 360 | 5.750 | 98.000 | 114,638.07 | 12,265,188.56 |
| 315003058 BALL, G | 360 | 5.750 | 98.000 | 84,732.48 | 12,349,921.04 |
| 315002650 DESMOND,B | 360 | 5.750 | 98.000 | 249,476.73 | 12,599,397.77 |

FM 0040

| | |
|---|---|
| 215001275 FRANCO, J | 180 |
| 215001401 COFFMAN, J | 180 |
| 215001468 GOULD, K | 180 |
| 215001232 DAVIS, W | 180 |
| 215001412 HOUTSMA, T | 180 |
| 215001327 RICCIARDI, A | 180 |
| 215001657 CORREALE, L | 180 |
| 215001365 DUNADO, R | 180 |
| 215001164 TARTARILLA, A | 180 |
| 215001476 REINER, F | 180 |
| 215001486 HEGARTY, R | 180 |
| 215001416 BASCONE, J | 180 |
| 215001385 COLLINS, A | 180 |
| 215001256 KERWIN, S | 180 |
| 215001503 SIMPSON, J | 180 |
| 215001336 JACKSON, S | 180 |
| 215001215 RISBERG, J | 180 |
| 215001464 ZLOTNICK, S | 180 |
| 215001410 ZULAUF, S | 180 |
| 215001420 NAUJOKAS, V | 180 |
| 215001347 HANNA, P | 180 |
| 215001280 SPIEGEL, K | 180 |
| 215001254 DUKES, G | 180 |
| 315001984 MORAN, R | 180 |
| 315001226 AUGUSTIN, Y | 180 |
| 315002027 DOLLBERG, R | 180 |
| 315002196 RHODES, J | 180 |
| 315002326 SOLORZA, B | 180 |

| | |
|---|---|
| 315002911 SCHANTZ, J | 240 |
| 315001508 SPERONI, S | 240 |
| 315002994 MANSER, M | 240 |
| 215001154 VARGA, F | 240 |

| | |
|---|---|
| 315200043 CORJESCU, A | 360 |
| 315002171 VERGA, M | 360 |
| 315002870 MCCAFFERTY, R | 360 |
| 315002868 FRIEDMAN, M | 360 |
| 315200139 NOONAN, L | 360 |
| 215001954 PETERS, T | 360 |
| 315002860 ELIAS, V | 360 |
| 315002890 MEYER-PFLUG, A | 360 |
| 315002807 PERCE, J | 360 |
| 315003028 CASED, R | 360 |
| 315200234 DEMASSI, G | 360 |
| 315002055 Loreng, D | 360 |
| 315003058 BALL, G | 360 |
| 315002650 DESMOND, B | 360 |

FM 0043

**Steve Rattner**

| | |
|---|---|
| From: | Steve Rattner |
| Sent: | Monday, August 25, 2003 10:56 AM |
| To: | 'Michael McGrath' |
| Subject: | RE: FNMA Pricing Levels |



ALC0 082003
CUNM.xls

Michael,

The attached worksheet lists the mortgages we are authorized to sell at the prices listed in your August 20 e-mail.

Regards,

Steve

-----Original Message-----
From: Michael McGrath [mailto:Michael@usmtg.com]
Sent: Wednesday, August 20, 2003 1:22 PM
To: Steve Rattner
Subject: FNMA Pricing Levels


15 Year          101.50
20 Year          98.40
30 Year          98.00

1

FM 0038



# EXHIBIT 9

ORIGINAL

# NOTE

September 19, 2002      [City]      New Jersey
[Date]      [State]

## REDACTED

[Property Address]

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$ 123,000.00**      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      **5.8750%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.  PAYMENTS**

**(A)  Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the      **1st**      day of each month beginning on      **November 01, 2002**

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **October 01, 2017**      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **Picatinny Federal Credit Union, P.O. Box 682, Pine Brook, NJ  07058**

or at a different place if required by the Note Holder.

**(B)  Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$1,029.66**

**4.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3200 1/01

ITEM 1848L1 (0011)      *(Page 1 of 3 pages)*      GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

FNMA-USM000014617

Picatinny Federal Credit Union

**ALLONGE TO PROMISSORY NOTE**

**LOAN INFORMATION**

Loan Number: CUNL01151
Borrower(s):

# REDACTED

Address:

Note Amount: 123,000.00
Note Date: 9/19/2002

Pay to the order of:

U.S. MORTGAGE CORPORATION

Without Recourse

Name _Michael A Grant_

Title _AVP_
Picatinny Federal Credit Union

100 Mineral Springs Road, Dover, NJ, 07801

 

# NOTE

October 18, 2002                          New Jersey
[Date]                    [City]           [State]

[Property Address]          **REDACTED**

**1.  BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $ **112,000.00**                (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**
I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      **5.8750%**.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.  PAYMENTS**
    **(A)  Time and Place of Payments**
    I will pay principal and interest by making a payment every month.
    I will make my monthly payment on the     **1st**    day of each month beginning on     **December 01, 2002**
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **November 01, 2017**              , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at **Picatinny Federal Credit Union, P.O. Box 682, Pine Brook, NJ  07058**

                                        or at a different place if required by the Note Holder.

    **(B)  Amount of Monthly Payments**
    My monthly payment will be in the amount of U.S. $ **937.57**

**4.  BORROWER'S RIGHT TO PREPAY**
    I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
    I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 1/01
                                                                      GREATLAND ■
ITEM 1646L1 (0011)                *(Page 1 of 3 pages)*          To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131

FNMA-USM000014732

Picatinny Federal Credit Union

**ALLONGE TO PROMISSORY NOTE**

<u>LOAN INFORMATION</u>

Loan Number: CUNL01408
Borrower(s):

# REDACTED

Address:

Note Amount: 112,000.00
Note Date: 10/18/2002

Pay to the order of:

U.S. MORTGAGE CORPORATION

Without Recourse

Name  *Michael McGrady*

Title  *AVP*
Picatinny Federal Credit Union

100 Mineral Springs Road, Dover, NJ, 07801

FNMA-USM000014735

ORIGINAL ●

# NOTE

September 26, 2002
[Date]                              [City]                              **New Jersey**
                                                                        [State]

[Property Address]        **REDACTED**

**1.  BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. **$ 183,000.00**                    (this amount is called
"Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit
Union**
I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of      **5.8750%.**
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section
6(B) of this Note.

**3.  PAYMENTS**
    **(A)  Time and Place of Payments**
    I will pay principal and interest by making a payment every month.
    I will make my monthly payment on the      **1st**    day of each month beginning on      **November 01, 2002**
I will make these payments every month until I have paid all of the principal and interest and any other charges described
below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied
to interest before Principal. If, on **October 01, 2017**              , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at **Picatinny Federal Credit Union, P.O. Box 682, Pine Brook, NJ  07058**


                                        or at a different place if required by the Note Holder.
    **(B)  Amount of Monthly Payments**
    My monthly payment will be in the amount of U.S. **$1,531.93**

**4.  BORROWER'S RIGHT TO PREPAY**
    I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as
a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.
    I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 1/01
                                                                                              GREATLAND ■
ITEM 1846L1 (0011)                          *(Page 1 of 3 pages)*                To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

FNMA-USM000014540

Picatinny Federal Credit Union

**ALLONGE TO PROMISSORY NOTE**

LOAN INFORMATION

Loan Number: CUNL00654
Borrower(s):

Address:

Note Amount: 183,000.00
Note Date: 9/26/2002

**REDACTED**

Pay to the order of:

U.S. MORTGAGE CORPORATION

Without Recourse

Name *Michael M'Geary*

Title *AVP*
Picatinny Federal Credit Union

100 Mineral Springs Road, Dover, NJ, 07801



# NOTE

| August 28, 2002 | [City] | New Jersey |
|---|---|---|
| [Date] | | [State] |

[Property Address]        **REDACTED**

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 165,000.00              (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      **5.8750%.**

· The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. · PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     **1st**     day of each month beginning on      **November 01, 2002**
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **October 01, 2017**                , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **Picatinny Federal Credit Union, P.O. Box 682, Pine Brook, NJ  07058**


                                                or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **$1,381.25**

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 1/01

ITEM 1646L1 (0011)                              *(Page 1 of 3 pages)*          GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

FNMA-USM000014714

Picatinny Federal Credit Union

**ALLONGE TO PROMISSORY NOTE**

<u>LOAN INFORMATION</u>

Loan Number: CUNL00965
Borrower(s):

# REDACTED

Address:

Note Amount: 165,000.00
Note Date: 8/28/2002

Pay to the order of:

U.S. MORTGAGE CORPORATION

Without Recourse

Name  *Michael M'Gurn*

Title  *AVP*
Picatinny Federal Credit Union

00 Mineral Springs Road, Dover, NJ, 07801

FNMA-USM000014717

ORIGINAL

# NOTE

October 22, 2002
[Date]

[City]

New Jersey
[State]

[Property Address]

**REDACTED**

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 200,000.00                     (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of           5.8750%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

**(A)  Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the       1st       day of each month beginning on       **December 01, 2002**
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **November 01, 2017**          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **Picatinny Federal Credit Union, P.O. Box 682, Pine Brook, NJ  07058**

or at a different place if required by the Note Holder.

**(B)  Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$1,674.24**

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                     Form 3200 1/01

ITEM 1646L1 (0011)                     *(Page 1 of 3 pages)*                     GREATLAND ■
                                              To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

FNMA-USM000014726

Picatinny Federal Credit Union

**ALLONGE TO PROMISSORY NOTE**

LOAN INFORMATION

Loan Number: CUNL01360
Borrower(s):

# REDACTED

Address:

Note Amount: 200,000.00
Note Date: 10/22/2002

Pay to the order of:

U.S. MORTGAGE CORPORATION

Without Recourse

*[signature]*
Name *Michael McGuire*

Title *VP*
Picatinny Federal Credit Union

100 Mineral Springs Road, Dover, NJ, 07801

# EXHIBIT 10

# ORIGINAL

## NOTE

June 29, 2006                              New Jersey
[Date]                    [City]           [State]

[Property Address]

### REDACTED

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$365,000.00**                    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     **6.7500%.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.  PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     **1st**     day of each month beginning on     **August 01, 2006**
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **July 01, 2036**     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **PO Box 682, Pine Brook, NJ 07058**

or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **$2,367.39**

**4.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3200 1/01

                                                                              GREATLAND ■
ITEM 1846L1 (0312)                 *(Page 1 of 3 pages)*        To Order Call: 1-800-530-9393 □ Fax 616-791-1131
**MFCD3002**                                                          3330000992

FNMA-USM000000882

ALLONGE TO PROMISSORY NOTE

<u>LOAN INFORMATION</u>

Loan Number: 3330000992

Borrower(s)

## REDACTED

Property Address:

Note Amount: 365,000.00

Note Date:    June 29, 2006

Pay to the order of:
U.S. MORTGAGE CORPORATION

_____

Without Recourse

Picatinny Federal Credit Union

Name

Title     MICHAEL J. MCGRATH, JR.

          AVP

US4057

FNMA-USM000000878



# NOTE

# *ORIGINAL*

October 30, 2006
[Date]

[City]

New Jersey
[State]

## REDACTED

[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$338,530.00**          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          **7.1250%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     **1st**     day of each month beginning on     **December 01, 2006**
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **November 01, 2036**          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **PO Box 682, Pine Brook, NJ  07058**

                                        or at a different place if required by the Note Holder.

**(B)  Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$2,280.74**

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3200 1/01

ITEM 1646L1 (0312)                              *(Page 1 of 3 pages)*                GREATLAND ■
                                                                        To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
**MFCD3002**                                                                                3330001700

FNMA-USM000000871

**ALLONGE TO PROMISSORY NOTE**

<u>LOAN INFORMATION</u>

Loan Number: 3330001700

Borrower(s)                                    :

# REDACTED

Property Address:

Note Amount: 338,530.00

Note Date:    October 30, 2006

Pay to the order of:
U.S. MORTGAGE CORPORATION

_____

Without Recourse

Picatinny Federal Credit Union

_____
Name
                MICHAEL J. MCGRATH, JR.

Title        AVP

US4057

ORIGINAL

# NOTE

**May 11, 2007**
[Date]

[City]

**Pennnsylvania**
[State]

[Property Address]

## REDACTED

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$195,000.00**            (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        **6.2500%.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A)  Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     **1st**     day of each month beginning on        **July 01, 2007**
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **June 01, 2037**        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **PO Box 682, Pine Brook, NJ  07058**

or at a different place if required by the Note Holder.

**(B)  Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$1,200.65**

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1646L1 (0609)

**Form 3200 1/01**
GreatDocs™
(Page 1 of 3)

**MFCD3002**

3330002748

FNMA-USM000000864

**ALLONGE TO PROMISSORY NOTE**

**LOAN INFORMATION**

Loan Number: 3330002748

Borrower(s)

# REDACTED

Property Address:

Note Amount: 195,000.00

Note Date:     May 11, 2007

Pay to the order of:
U.S. MORTGAGE CORPORATION

_____

Without Recourse

Picatinny Federal Credit Union

_____
Name

           MICHAEL J. MCGRATH, JR.

Title           AVP

US4057

# NOTE



ORIGINAL

November 28, 2007
[Date]

[City]

New Jersery
[State]

[Property Address]

## REDACTED

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$367,900.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.2500%.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **January 01, 2008** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **December 01, 2037** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **PO Box 682, Pine Brook, NJ 07058**

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **S2,265.23**

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1646L1 (0509)

Form 3200 1/01
GreatDocs™
(Page 1 of 3)

MFCD3002

3330003754

FNMA-USM000000857

**ALLONGE TO PROMISSORY NOTE**

<u>**LOAN INFORMATION**</u>

Loan Number: 3330003754

Borrower(s)                                        :

# REDACTED

Property Address:

Note Amount: 367,900.00

Note Date:     November 28, 2007

Pay to the order of:
U.S. MORTGAGE CORPORATION

_____
Without Recourse

Picatinny Federal Credit Union

Name
          MICHAEL J. MCGRATH, JR.

Title          AVP

US4057

FNMA-USM000000860

**ORIGINAL**

# NOTE

November 17, 2006
[Date]

[City]

New Jersey
[State]

**REDACTED**

[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$128,800.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.1250%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

#### (A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **January 01, 2007** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **December 01, 2036** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **PO Box 682, Pine Brook, NJ  07058**

or at a different place if required by the Note Holder.

#### (B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **$782.61**

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 1/01

ITEM 1646L1 (0312)                               (Page 1 of 3 pages)          GREATLAND ■
                                                                  To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

MFCD3002                                                                      3330001896

FNMA-USM000000849

**ALLONGE TO PROMISSORY NOTE**

<u>LOAN INFORMATION</u>

Loan Number:  3330001896

Borrower(s)

# REDACTED

Property Address:

Note Amount:  128,800.00

Note Date:    November 17, 2006

Pay to the order of:
U.S. MORTGAGE CORPORATION

_____
Without Recourse

Picatinny Federal Credit Union

_____
Name

                MICHAEL J. MCGRATH, JR.
Title
                AVP

US4057

FNMA-USM000000852

# EXHIBIT 11

ORIGINAL

100059700002096256   **NOTE**

November 09, 2005                    New Jersey
[Date]                [City]              [State]

**REDACTED**

[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ **163,000.00**           (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     **6.0000%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     **1st**     day of each month beginning on     **January 01, 2006**

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **December 01, 2035**          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **Picatinny Federal Credit Union, P.O. Box 682, Pine Brook, NJ 07058**

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ **977.27**

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3200 1/01
                                                                                         GREATLAND ■
ITEM 1846L1 (0011)                    *(Page 1 of 3 pages)*                To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

CONFIDENTIAL                                                          FNMA-USM000017720

# ALLONGE

**LOAN NUMBER:** 301310156

**BORROWER (S):**    **REDACTED**

**PROPERTY ADDRESS:**

**NOTE/LOAN AMOUNT:** $ 163,000.00

**NOTE/LOAN DATE:** 11/9/2005

*PAY TO THE ORDER OF:*

U.S. Mortgage Corporation

## WITHOUT RECOURSE

**COMPANY NAME:** Picatinny Federal Credit Union

**AUTHORIZED SIGNATURE:** *Ron Curti*

**PRINTED NAME AND TITLE OF AUTHORIZED SIGNER: Ron Carti**
**AVP**

CONFIDENTIAL                                                      FNMA-USM000017723

# EXHIBIT 12

1               IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
2                     CRIMINAL NO. 09-436
    UNITED STATES OF AMERICA          :
3                 Plaintiff,  :
    -vs-                      :
4                             :
    MICHAEL J. MCGRATH, JR.,          :
5                             :
                             : PLEA HEARING
6               Defendant  :
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
7                   Newark, New Jersey
                  June 11, 2009 3:30 p.m.
8   B E F O R E:
9       THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.
10  A p p e a r a n c e s:
11  UNITED STATES ATTORNEY-NEWARK
    CHRISTOPHER J. CHRISTIE
12  Attorneys for Plaintiff-USA
    970 Broad Street
13  Newark, New Jersey 07102
    BY: MARK E. COYNE, AUSA
14
15  CRITCHLEY, KINUM & VAZQUEZ, LLC
    Attorneys for Defendant-Michael J. McGrath, Jr.
16  75 Livingston Avenue
    Roseland, New Jersey 07068
17  BY: MICHAEL CRITCHLEY, ESQ.
       JOHN MICHAEL VAZQUEZ, ESQ.
18
    ALSO PRESENT
19  DAMIAN SALVATI
    HUD
20  MICHELLE ROMAN
    PRETRIAL SERVICES
21
    _____
22      Pursuant to Section 753 Title 28 United States Code,
    the following transcript is certified to be an accurate
23  record as taken stenographically in the above-entitled
    proceedings.
24
                    \s\ RALPH F. FLORIO
25                  Official Court Reporter

1     LLC?

2          THE DEFENDANT:  Yes, it did.

3          THE COURT:  During that period did you conspire

4     with subordinates at U.S. Mortgage and CU National to

5     fraudulently sell loans belonging to various credit unions

6     and use the proceeds to fund U.S. Mortgage's operations and

7     your personal investments and investments that you made on

8     U.S. Mortgage's behalf?

9          THE DEFENDANT:  Yes, I did.

10          THE COURT:  Starting in 2004, did you divert or

11     cause to be diverted U.S. Mortgage's own use funds that

12     should have been paid to various credit unions for mortgage

13     loans that they had made and authorized CU National to sell?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Did you begin withholding these funds

16     from the credit unions to help U.S. Mortgage address cash

17     flow problems caused by losing investment in mortgage-backed

18     securities that you had made on the company's behalf?

19          THE DEFENDANT:  Yes.

20          THE COURT:  When U.S. Mortgage's financial

21     condition continued deteriorating, did you sell hundreds of

22     mortgage loans without the knowledge and consent of the

23     credit unions that owned the loans?

24          THE DEFENDANT:  Yes.

25          THE COURT:  To accomplish these fraudulent loan

1    sales, did you execute documents assigning the loans from the

2    credit union to U.S. Mortgage in which you pretend to be an

3    officer of the credit unions in question?

4        THE DEFENDANT:  Yes.

5        THE COURT:  Did you also cause subordinates at U.S.

6    Mortgage to execute documents purporting to assign the loans

7    from U.S. Mortgage to Fannie Mae?

8        THE DEFENDANT:  Yes.

9        THE COURT:  To conceal your scheme, did you also

10   direct U.S. Mortgage's servicing manager to generate reports

11   for the credit unions falsely stating that loans you had sold

12   to Fannie Mae were still in their portfolios?

13       THE DEFENDANT:  Yes.

14       THE COURT:  To conceal your scheme, did you also

15   direct the servicing manager to add loans to U.S. Mortgage's

16   servicing system that you fraudulently sold to Fannie Mae and

17   that weren't being serviced by U.S. Mortgage?

18       THE DEFENDANT:  Yes.

19       THE COURT:  To conceal your scheme did you direct

20   your subordinates, including U.S. Mortgage's chief financial

21   officer, to pay off or make servicing payments to the credit

22   unions for the fraudulently sold loans?

23       THE DEFENDANT:  Yes.

24       THE COURT:  Did you sell some of those loans a

25   second time to another institution based in New Jersey?

# EXHIBIT 13

McCarthy, Keith - Vol. I 3/26/2010 10:00:00 AM

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW JERSEY

3          HONORABLE JOSEPH A. GREENAWAY

4          CIVIL ACTION NO. 09-01295 (JAG)

5

6     PICATINNY FEDERAL CREDIT UNION,   :

7             Plaintiff,           :

8       vs.                    :

9     FEDERAL NATIONAL MORTGAGE        :

10    CORPORATION,                :

11            Defendant.         :

12    - - - - - - - - - - - - - - - - - -

13

14

15          DEPOSITION OF:  KEITH McCARTHY

16            FRIDAY, MARCH 26, 2010

17

18

19

20          ROSENBERG & ASSOCIATES, INC.

21      Certified Court Reporters & Videographers

22    425 Eagle Rock Ave., Suite 201      575 Madison Ave.

23    Roseland, NJ 07068          New York, NY 10022

24     (973) 228-9100    1-800-662-6878    (212) 868-1936

25          www.rosenbergandassociates.com

1     two points, yes.

2         Q.    From November, 2005, until June,

3     2006, Picatinny was not receiving any monthly

4     principal and interest on this loan, correct?

5         A.    Yes.

6             (Whereupon, Exhibit D-52 was

7     marked for identification.)

8         Q.    What has been marked as D-52 is a

9     similar document.  This one is dated

10    11/17/2005.  It is a member for the Espinosa

11    loan.  The funding date is August 6, 2004.

12    Interest rate, 6.125 percent.  Per diem,

13    17.6119.  Interest days, 467 days.

14            Was there a 467-day delay from

15    the time that Picatinny funded this loan

16    until it received payment on this loan?

17        A.    I wasn't working at the credit

18    union at this time.

19        Q.    Based on this document, do you

20    have any reason to doubt that it wasn't

21    467 days?

22        A.    No, I do not.

23            MR. FORTE:  That last document,

24    is it 57 or 67?

25            MS. BROWN:  I think it is 67.

1    page, because we just reviewed the Espinosa

2    loan, this is the Grieg loan or Grieg loan.

3    The date is 11/17/2005.  Funding date is

4    December 7, 2004.  The interest rate is 5.125

5    percent.  Interest days, 344.  For the Grieg

6    loan, was there a 344-day delay between the

7    time Picatinny funded this loan and received

8    payment for this loan?

9        A.    I wasn't working at the credit

10   union at the time.

11       Q.    Do you have any reason to doubt

12   that this document is incorrect?

13       A.    No.

14       Q.    And the next page is for the

15   Petronella loan dated 11/17/2005 as well.

16   Funding date, 7/19/2004.  Interest rate, 5.75

17   percent.  Interest days, 485.

18           Based on your knowledge of the

19   documents when you were at the credit union

20   at this time -- or when you were working at

21   the credit union, it would appear that there

22   was a 485 delay from the time that Picatinny

23   funded this loan and received payment on this

24   loan, correct?

25       A.    Yes, it would appear.

1    that correct?

2       A.   That is correct.

3       Q.   This is for the Domalski loan.

4    Picatinny funded this loan on 9/28/2006.

5    Interest rate, 6.625 percent.  The interest

6    days, 397.  Correct?

7       A.   Yes.

8       Q.   So, there was a 397 delay between

9    the time that Picatinny funded this loan and

10   received payment on this loan, correct?

11      A.   Yes.

12         MR. FORTE:  I think you missed

13   the word "day."  You just said 397 delay.

14      Q.   397-day delay between the time

15   that Picatinny funded this loan and received

16   payment on this loan?

17      A.   Yes.

18         MR. FORTE:  Slow down and let me

19   get my objections on the record.

20      Q.   How many days are there in a

21   year?

22         MR. FORTE:  I don't think we need

23   to do that.

24         MS. BROWN:  I didn't need an

25   objection for lack of foundation.

```
 1       Q.     So, you would agree that this was

 2   a time that you were working at Picatinny and

 3   an example of a situation where there was a

 4   loan that there was a delay in payment for

 5   longer than a year, correct?

 6       A.     Yes.

 7       Q.     The next loan, the last page, is

 8   for W. Rude.  Date, 10/31/2007.  Funding

 9   date, October 30th, 2006.  Interest rate

10   6.625 percent.  Interest days, 365.

11          For the Rude loan, there was a

12   365 delay between the time that Picatinny

13   funded the loan and received payment for the

14   loan, correct?

15          MR. FORTE:  Once again you left

16   out the word day, but we understand what you

17   mean.

18       Q.     Day delay.

19       A.     Yes.

20       Q.     I want to go back to D-49.  I

21   would like to focus now on the top of the

22   e-mail, which is from you on Tuesday,

23   February 20th, 2007, to Dan Mathews, Phil

24   Scialabba, Ron Carti; copies, Steve Lardiere,

25   Karen Morano, Bill Darling; subject, re first
```

1    the policy because Picatinny decided that

2    whether it be a day or a year, it no longer

3    wanted loans with its portfolio that it

4    authorized to be sold, correct?

5        A.    That is correct.

6        Q.    I guess what I am asking, did it

7    matter to Picatinny that, in fact, in many

8    cases it was as long as a year?  Did the fact

9    that it was taking so long to receive payment

10   for loans it had funded play into Picatinny's

11   decision to change this policy?

12       A.    Are we talking about the time I

13   joined or prior to when I joined the credit

14   union?

15       Q.    If you can answer both, I would

16   like to know both.

17       A.    I can't answer for both, because

18   the credit union obviously was comfortable

19   with the relationship with CU National as far

20   as when they got paid and were -- were happy

21   to get their interest income and accrue their

22   interest income during the time, having that

23   as an earning asset on the books until such

24   time as it was sold.

25            From the time I was there, my

# EXHIBIT 14

**Report of Susan E. Tittl**

*Picatinny Federal Credit Union v. Federal National Mortgage Association*,
**Civil Action No.  09-1295**

## I. Background and Experience

I, Susan E. Tittl, am a Supervisor/Vice President at Branch Banking & Trust Company ("BB&T") and the head of BB&T's Document Custody Department which is located in Charlotte North Carolina. I have worked in the field of document custody for eighteen years and have been the head of BB&T's Document Custody Department since 1998. For the purposes of this report, all references to BB&T refer to BB&T's Document Custody Department, unless otherwise indicated.

The Document Custody Department of BB&T is responsible for certifying loans for purchase by clients including the Federal Home Loan Mortgage Corporation ("Freddie Mac"), the Federal National Mortgage Association ("Fannie Mae"), and the Government National Association ("Ginnie Mae"). Freddie Mac, Fannie Mae, and Ginnie Mae are collectively referred to as the "Agencies." My specific responsibilities have included, among other things, initial and/or final certification of loan files, review of trailing documentation, release and reinstatement of loan files, writing and updating department review procedures, and serving as the contact person for agency and client audits.

I have been a member of Freddie Mac's Custodian Advisory Committee since March 2006. The committee, which meets via conference call on a quarterly basis, includes document custodians from a variety of seller/servicers including ReconTrust Company, MetLife Home Loans, Ally Bank, PNC Bank, CitiMortgage, US Bank, Flagstar Bank, Fifth Third Bank, and Wells Fargo. The purpose of the committee is to discuss Freddie Mac's document custody practices. In the course of its work the committee has also discussed developments, practices and policies pertaining to the document custodian industry generally. I also stay apprised of industry policies and procedures through BB&T's subscription to AllRegs, which provides e-mail alerts whenever one of the Agencies updates or changes its policies or procedures.

Freddie Mac, Fannie Mae and Ginnie Mae each audit BB&T's Document Custody Department on an annual basis to assess BB&T's compliance with the respective agency's document certification policies and procedures. BB&T has never failed an agency audit, further confirming my familiarity and expertise with the standard customs, practices and policies applicable in the document custodian industry.

A copy of my Curriculum Vitae is attached as Exhibit A

## II. Opinions

I have been asked by Latham & Watkins, LLP, counsel for Federal National Mortgage Association ("Fannie Mae"), to analyze whether Picatinny Federal Credit Union's ("Picatinny") document custody practices with respect to original notes that it owned were consistent with industry customs and standards. I have also been asked to analyze whether Fannie Mae's mortgage note certification polices and procedures adhere to the industry customs and standards. I am being compensated at an hourly rate of $200.00.

1

In conducting my analysis, the following documents informed my opinions in this matter: Fannie Mae's, Freddie Mac's, and Ginnie Mae's Document Custody and Certification Policy and Procedures; the transcript of the February 12, 2010 deposition of William Darling; and the following examples of Picatinny disputed notes: FNMA-USM000000948, FNMA-USM000000605, FNMA-USM000000612, FNMA-USM000000619, FNMA-USM000000626, FNMA-USM000000633, FNMA-USM000000640, FNMA-USM000000647, FNMA-USM000000654, and FNMA-USM000000662.

Based on my analysis, I conclude that Picatinny's document custody practices fell far below the industry standards. I further conclude that Fannie Mae's mortgage note certification policies and procedures are consistent with, and adhere to, the industry custom and standard.

### A. Opinions Relating to Picatinny Document Custody Practices

Because original mortgage notes are negotiable instruments, it is standard custom and practice in the industry for note owners to require document custodians to adhere to certain minimum standards, or safeguards, including the following:

1.      Original Loan Documents (the note, any allonges and modifications) are maintained by the owner of those notes or by a third-party document custodian;

2.      If maintained by a document custodian, the maintenance of original loan documents is governed by a written contract (separate and apart from any contract relating to the servicing of the mortgage, if the company providing document custodian services also provides mortgage servicing functions);

3.      Loan documents are housed in fire resistant safes, filing cabinets, or vaults;

4.      Access to the loan documents is restricted, often with dual access controls (i.e., key card access and only a limited number of authorized personnel are permitted access to the loan documents); and

5.      Document custodians are required to purchase annually and maintain insurance such as an errors and omissions policy and a financial institution bond.

It is my understanding that Picatinny permitted its mortgage loan servicer, CU National, to hold Picatinny's original mortgage notes but failed to require CU National to adhere to any of the above safeguards that are common practice in the industry. It is my understanding, for example, that Picatinny allowed CU National to retain the original mortgage notes after closing, rather then returning the original mortgage notes to Picatinny or sending them to a designated third-party document custodian. Nor did Picatinny require CU National to maintain the original mortgage note under a separate contractual custodial agreement (or compensate CU National for providing document custodian services). To the contrary, Picatinny did not enter into, and did not require, any written custodial agreement with CU National as a condition of allowing CU National to hold Picatinny's original mortgage notes. Further, is my understanding that Picatinny

did not require CU National to maintain a financial institution bond or other similar insurance to protect Picatinny's original notes. It is also my understanding that there was no separation between the storage of original notes at CU National and the servicing division of CU National that serviced Picatinny's loans. *See* (W. Darling dep. tr. at 185-186). Finally, it is my understanding that CU National also did not limit access to Picatinny's original notes by keeping the original notes in a locked vault or in a similar safekeeping device.

In my opinion, Picatinny's failure to require CU National to adhere to or implement the above-mentioned safeguards as a prerequisite to holding Picatinny's original mortgage notes fell far below industry standards. The safeguards serve to protect against losses that may occur due to physical theft, loss, or destruction of the mortgage notes, including to prevent against a fraudulent scheme such as the one perpetrated by CU National against Picatinny. If Picatinny or a separate document custodian had maintained Picatinny's original mortgage notes in accordance with industry standards, CU National would have been required to ask for the original note before selling it to Fannie Mae, which would have alerted Picatinny or the custodian to the sale. (Alternatively, if unable to obtain the original note, the entity tasked with certifying the loan in order to complete the sale – whether BB&T, Fannie Mae, Freddie Mac, or another purchaser or certifier – would not certify it and would fail the loan due to the lack of original documentation.)

It is standard custom and practice in the industry for mortgage note owners to maintain original loan documents (the note, allonges, and modifications) themselves or have them maintained by a third-party custodian (pursuant to a written document custodial contract setting forth specific criteria the document custodian must adhere to) such as BB&T's Document Custody Department. Furthermore, pursuant to standard custom practice in the industry, in the event that a servicer also provides formal document custody services, those services are segregated from the servicing function, and the original notes are maintained separately from the loan files, under the control of different personnel. With respect to BB&T for example, the origination and servicing departments are separate from the document custody department and maintain separate employees and independent computer systems. Specifically, the servicing department for BB&T is located in Greenville South Carolina while the Document Custody Department is located in Charlotte, North Carolina. In any event, industry standards do not require (or, in my experience, even permit) the servicer to maintain the original note in the loan servicing file. In fact, in the mortgage industry there are only three primary reasons for the owner of an original note to provide the original note to a third-party: (1) to deliver the notes to the loan servicer on a loan that is in foreclosure or has been paid off, so that the servicer can complete the satisfaction process, (2) to give the note to a formal custodian of documents for storage and safekeeping, or (3) to deliver the original notes to a purchaser in connection with a sale.

### B. Opinions Relating to Fannie Mae's Document Certification Practices

Fannie Mae's document certification policies and procedures are generally consistent with Freddie Mac's and Ginnie Mae's document certification policies and procedures. I am

aware of this because BB&T's Document Custody Department is an approved Fannie Mae, Freddie Mac and Ginnie Mae custodian. The Agencies are the largest purchasers of mortgage loans in the United States. Consequently, as a practical matter, their document certification policies and procedures set the standard for custom and practice in the industry.

### 1. Industry Custom and Practice Relating to Mortgage Note Certification

BB&T's Document Custody Department employs nine people (including myself) and maintains approximately 450,000 loan files for twelve clients, including BB&T. 64% of the loan files are owned by Freddie Mac, 16% are owned by Ginnie Mae, 11% are private loans, and the remaining 9% are owned by Fannie Mae.

BB&T's Document Custody Department maintains departmental and certification procedures that are intended to encapsulate all the requirements of the Agencies. Procedures are reviewed quarterly by me, as supervisor, and updated as needed. In addition to loan certification, the BB&T Document Custody Department provides services such as loan inventory, loan tracking and loan safekeeping to private investors and to issuers selling mortgage loans to the Agencies.[1]

In the course of its business as a document custodian, BB&T regularly reviews mortgage notes for purposes of certification. BB&T performs mortgage note certification on approximately 9,000 mortgage notes monthly. BB&T's certification procedures, which are based on the Agencies' certification procedures, are consistent with accepted procedures in the industry. In my four years of service on the Freddie Mac Custodian Advisory Committee, I have not become aware of any document custodian with certification procedures that differ significantly with those of the Agencies or BB&T.

When BB&T certifies notes for purchase, regardless of whether the notes are being sold to Fannie Mae, Freddie Mac, or Ginnie Mae, BB&T reviews the notes to confirm that it (1) is an original signed note; and (2) includes the complete endorsement chain (meaning there is no open gap in the chain of title) on the original note or on allonges appended to the note. In general, the Document Custody Department reviews the notes for the following:

- Tag lines (the line at the bottom of the note which indicates that the form is an approved Fannie Mae, Freddie Mac, or Ginnie Mae form);
- Borrower initials;
- Borrower signature - does not contradict printed name underneath;
- Intervening endorsement (if required) is original, endorsed from original lender to the next, signed, contains the printed name and title of the signer, and the printed name of the company endorsing the note;

---

[1] Loan inventory is the verification of documentation maintained within the note file. Loan tracking is the electronic tracking of the receipt and/or release of documents or files, the tracking of the physical location of documents or files and the ability to provide reporting. Loan safekeeping is ensuring the safety and security of loan documents by storing note files in a secure, fire-resistant storage facility.

4

- Final endorsement is original, endorsed to "blank," signed, contains the printed name and title of the signer, and the printed name of the company endorsing the note.

As the mortgage note certifier BB&T is not responsible for verifying whether the signatory who executed the intervening endorsement is authorized to do so. Pursuant to industry custom and practice, a mortgage note certifier is only required to confirm that the signature(s) appearing on the note and any endorsements are present and are original (i.e., not photocopied). In my eighteen years of practice in the industry and in my four years of service on the Freddie Mac Document Custody Review Board, I have never heard or learned of any entity that requires a mortgage note certifier to verify whether the signatory of an intervening endorsement had the authority to do so. BB&T's Document Custody Department does not maintain a list of authorized signatories for correspondent lenders. Maintaining a list or calling each correspondent to verify signatories is not possible because BB&T does business with several hundred correspondent lenders.

It is my understanding that Picatinny has claimed that Fannie Mae should have known that certain Picatinny notes were not authorized to be sold because they were signed by Michael McGrath as AVP of Picatinny and not by a Picatinny employee. Picatinny contends that Fannie Mae should have verified whether Michael McGrath had the authority to execute certain endorsements on behalf of Picatinny. Fannie Mae is not unique in the fact that it does not require verification of a signatory's authority to execute an intervening endorsement. Neither Freddie Mac nor Ginnie Mae have such a requirement. I am not aware of any entity providing mortgage note certification services that verifies whether a signatory to an intervening endorsement has authority to do so.

Once the note is verified BB&T reviews it to ensure the characteristics of the note match the electronic data that was submitted as part of the sale. The electronic data is compared with the note to confirm that the following items are consistent:

- Note date
- Property Address
- Original Loan amount
- Original Lender
- Interest rate
- Principal & Interest
- First and final payment dates

### 2. Opinion Concerning Disputed Notes

I have reviewed several notes[2] provided to me by Latham & Watkins that I understand

---

[2] Latham & Watkins also informed me that I was free to review, and that it would make available to me upon request, all of Picatinny's disputed loans. Based on my review of the sample provided to me and my understanding that the remaining notes did not bear any distinct differences, I determined that there was no benefit in my reviewing the remainder of the disputed loans.

5

are "disputed loans." *See* Section II, p. 2. These loans were sold by U.S. Mortgage, on behalf of Picatinny and various other credit unions, to Fannie Mae. Each note contained an intervening endorsement signed by Michael McGrath as AVP of Picatinny or as AVP of one of the various other credit unions and an endorsement to "blank," signed by an officer of U.S. Mortgage. Using the certification procedures that BB&T employs, BB&T would have certified each of the loans shown, regardless of the Agency purchasing the loan. The fact that Mr. McGrath signed on behalf of multiple credit unions would not have raised a red flag. Because of the large number of loans that BB&T certifies, BB&T checks only for the existence of a name and signature on an intervening endorsement. BB&T does not scrutinize or question the name appearing on an intervening endorsement. Furthermore, I would not have found it troubling even if I had noticed that Mr. McGrath had signed multiple endorsements as AVP of Picatinny (or any other credit union). In my experience, it is not uncommon that an agent of a mortgage lender would be designated in order to sign intervening endorsements.

The opinions provided within this report are based on my experience in the industry, knowledge of industry standards and of the written guidelines of Freddie Mac, Fannie Mae, and Ginnie Mae.

I reserve the right to modify, amend or supplement this report in the event that new or additional information becomes available to me.

_____

Susan E. Tittl

Dated: November 8, 2010

## *Exhibit A*

# *SUSAN E. TITTL*

6345 Royal Pines Drive

Clover, SC 29710

## WORK EXPERIENCE:

### *BRANCH BANKING & TRUST COMPANY* - (January 2007 - Present)

Document Custodian Supervisor/Vice President - Responsible for the everyday operation of the Document Custodian Department. Coordinate with multiple Issuers to ensure they conform to Agency guidelines. Coordinate the work flow to ensure the proper completion within the set time frame. Attend seminars and workshops, as able, to stay up to date on the latest changes in the Document Custodial field. The on-site supervisor who supervises the Document Custodian Department is familiar with all GNMA, FNMA, FHLMC, and FHLB guidelines as well as the guidelines established by BB&T, and any guidelines submitted by an issuer of private mortgages. The on-site supervisor is responsible for the hiring and letting go of employees, scheduling and verification of work hours, and preparing a personal development plan on a six and twelve month basis.

### *BRANCH BANKING & TRUST COMPANY* - (April 2004 – January 2007)

Document Custodian Supervisor/Assistant Vice President - Responsible for the everyday operation of the Document Custodian Department. Coordinate with multiple Issuers to ensure they conform to Agency guidelines. Coordinate the work flow to ensure the proper completion within the set time frame. Attend seminars and workshops, as able, to stay up to date on the latest changes in the Document Custodial field. The on-site supervisor who supervises the Document Custodian Department is familiar with all GNMA, FNMA, FHLMC, and FHLB guidelines as well as the guidelines established by BB&T, and any guidelines submitted by an issuer of private mortgages. The on-site supervisor is responsible for the hiring and letting go of employees, scheduling and verification of work hours, and preparing a personal development plan on a six and twelve month basis.

7

*BRANCH BANKING & TRUST COMPANY* - (September 1998 – April 2004)

Document Custodian Supervisor/Trust Officer - Responsible for the everyday operation of the Document Custodian Department. Coordinate with multiple Issuers to ensure they conform to Agency guidelines. Coordinate the work flow to ensure the proper completion within the set time frame. Attend seminars and workshops, as able, to stay up to date on the latest changes in the Document Custodial field. The on-site supervisor who supervises the Document Custodian Department is familiar with all GNMA, FNMA, and FHLMC guidelines as well as the guidelines established by BB&T, and any guidelines submitted by an issuer of private mortgages.

*BRANCH BANKING & TRUST COMPANY* - (November 1996 - September 1998)

Administrative Assistant for the Vice President/Manager of the Mortgage Custody Department - Administrative Assistant provided support to the Manager of the department by performing general administrative duties with minimal guidance such as billing, answering the phones, and distributing to internal and external clients reports and memos on a timely basis. Aside from the duties of Administrative Assistant, I was also responsible for completing the duties of a Document Custodian.

*BRANCH BANKING & TRUST COMPANY* - (November 1992 - November 1996)

Document Custodian - Receives original documents pertaining to GNMA, FNMA, FMAC, and Private pooled loans. Determines and certifies that all documents satisfy GNMA, FNMA, FHLMC, and Private Loan guidelines. Completes initial, final, and re-certifications in a timely manner. Releases documents in accordance with regulations. Maintains a thorough knowledge of GNMA, FNMA, FHLMC, and Private Loan guidelines.

*BUSINESS CARDS TOMORROW* - (October 1988 - February 1992)

Paste Up Artist - responsible for proof reading and adding any required artwork to layout being prepared for printing. Also responsible for various office duties such as filing, answering the phone, and inventory.

*FRANKLIN'S PRINTING & OFFICE SUPPLIES* - (October 1987 - October 1988)

Part time Paste Up Artist - responsible for proof reading and adding any required artwork to a layout being prepared for printing. Also responsible for various office duties such as filing, answering the phone, and annual inventory.

8

## EDUCATION:

Basic Telephone Skills, Beginning Windows, Interim Excel 4.0, Intro. to Excel, Intro. to Word, Kaset Training, Leadership 1, Leadership 2, Managing Diversity, Managing Interpersonal Relationships, Personal Perception & Productivity, Power Point 3.0, TQM, Time Management, and Windows 95 - all were classes offered through BB&T University

Central Piedmont Community College - 1 year of a 2 year Graphic Arts Management course

West Mecklenburg High School

## REFERENCES:

Available upon request

## CONTACT INFORMATION:

I can be reached by phone at the numbers listed below.

704-747-1118 (cell)

803-831-1315 (home)

704-954-1852 (office)

Or by e-mail at the e-mail address listed below.

susanetittl@yahoo.com (home)

susan.tittl@bbandt.com (work)

# EXHIBIT 15

```
1            UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
2    PICATINNY FEDERAL        )
     CREDIT UNION             )
3          Plaintiff,    )
              vs          ) cv 01295 GEB
4                         )
     FEDERAL NATIONAL         )
5    MORTGAGE ASSOCIATION,       ) CORRECTED TRANSCRIPT
                          ) July 2, 2010
6          Defendant.       )
     ----------------------------
7    SPERRY ASSOCIATES FEDERAL    )
     CREDIT UNION             )
8          Plaintiff,    )
              vs          ) cv 04782 GEB
9    FEDERAL NATIONAL         )
     MORTGAGE ASSOCIATION,      )
10         Defendant.       )
     ----------------------------
11   FEDERAL NATIONAL MORTAGE    )
     ASSOCIATION             )
12         Plaintiff,    )
              vs          ) cv 00473 GEB
13   PROPONENT FEDERAL        )
     CREDIT UNION,            )
14         Defendant.       )
     ----------------------------
15        DEPOSITION OF  DEBRA THOMPSON
                WASHINGTON, D C
16            JUNE 8, 2010
     (Per protective order section 9., this
17   transcript has a temporary "Confidential"
     designation for a period of 15 days after the
18   deposition is received)
     ATKINSON-BAKER, INC.
19   COURT REPORTERS
     (800) 288-3376
20   www.depo.com
     REPORTED BY:  DONNA M. LEWIS, RPR
21   FILE NO.: A4053C3
```

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
 2                   - - -
        PICATINNY FEDERAL          )
 3      CREDIT UNION              )
              Plaintiff,          )
 4              vs           ) cv 01295 GEB
                                  )
 5      FEDERAL NATIONAL          )
        MORTGAGE ASSOCIATION,      )
 6                                )
              Defendant.   )
 7      -----------------------------
        SPERRY ASSOCIATES FEDERAL    )
 8      CREDIT UNION              )
              Plaintiff,          )
 9              vs           ) cv 04782 GEB
        FEDERAL NATIONAL          )
10      MORTGAGE ASSOCIATION,      )
              Defendant.       )
11      -----------------------------
        FEDERAL NATIONAL MORTAGE    )
12      ASSOCIATION              )
              Plaintiff,          )
13              vs           ) cv 00473 GEB
        PROPONENT FEDERAL          )
14      CREDIT UNION,              )
              Defendant.       )
15      -----------------------------
16
17          Deposition of DEBRA THOMPSON, taken on
18      behalf of the Plaintiff at Latham & Watkins,
19      LLP, 555 11th Street, NW, Suite 1000,
20      Washington, DC at 9:11 a.m. before Donna M.
21      Lewis, RPR.
```

1    certified by either Fannie Mae or a third-party

2    custodian.

3        A.   Yes.

4        Q.   Now, when Fannie Mae purchased loans

5    from sellers -- I would like to focus these

6    questions from the time period January 1, 2007

7    to December 31, 2008, that 2-year time frame --

8    what documents would the sellers deliver in

9    connection with purchases of loans?  And I

10   understand it may be different for MBS or cash,

11   but tell me generally --

12       A.   Generally speaking, the lender is

13   required to deliver the original note endorsed

14   in blank and any document that modifies the

15   original note, and an agency assignment to

16   Fannie Mae in recordable form but unrecorded.

17   However, we allow the lenders to deliver them

18   without the recording information, which

19   actually makes them not recordable, but --

20       Q.   We are going to get to that.

21       A.   Okay.  And okay --

1      Q.   What else?

2      A.   That is it.  I mean, typically that

3   is it.

4      Q.   How about are you familiar with

5   intervening assignments?

6      A.   I am.

7      Q.   And are you familiar with intervening

8   endorsements?

9      A.   I am.

10      Q.   Do they also have to be delivered to

11   Fannie Mae?

12      A.   No.  The endorsement -- the chain of

13   endorsement has to work, but the intervening

14   assignments are not delivered to Fannie Mae.

15      Q.   We know in this -- in the case of my

16   client, of 51 of the 52 loans at issue, all of

17   the intervening assignments were delivered --

18   assignments of mortgage were delivered to

19   Fannie Mae.  Are you telling me they did not

20   need to be?

21      A.   That is correct, they did not need to

1      Q.   Where did you get that understanding

2      from?

3      A.   Just based on my experience.

4      Q.   Okay.  Now, we talked earlier about

5      an intervening endorsement.  Can you explain

6      what that is?

7      A.   Sure.  An intervening endorsement

8      would an endorsement from someone who was the

9      holder of the note to a subsequent holder of

10     the note.

11     Q.   Okay.  In a situation where my

12     client, Picatinny, was the lender and the

13     originating lender, there would need to be an

14     endorsement from my client to the seller of the

15     note and the seller to Fannie Mae; correct?

16     A.   Correct.

17     Q.   And the intervening endorsement is

18     the endorsement from my client to the seller of

19     the note; correct?  Is that your understanding?

20     A.   That's correct.

21     Q.   And was that one of the items that

1    was reviewed by Fannie Mae's loan processors or

2    loan certifiers?

3       A.   The certifier had to make sure that

4    someone in the chain at some point endorsed the

5    note to blank.

6       Q.   Not to blank, we are talking about an

7    intervening endorsement.  How about did the

8    sell -- did the loan processors actually review

9    the intervening endorsement in the case of my

10   client from Picatinny to U.S. Mortgage?

11      A.   Well, the endorsement that was most

12   important to us was the endorsement from our

13   seller to blank.  But they would they would

14   look at an intervening endorsement, yes.

15      Q.   Okay.  So they would review it;

16   correct?

17      A.   Yes.

18      Q.   You know what an allonge is?

19      A.   I do.

20      Q.   What is it?

21      A.   And allonge is an attachment to a

1    note typically to provide an endorsement.

2        Q.   Would it also be used for an

3    intervening endorsement?

4        A.   It could be.

5        Q.   Now, what would the Fannie Mae loan

6    processor -- again staying in the same time

7    frame 2007, 2008 -- review on an allonge or an

8    intervening endorsement, what specifically

9    would he or she look at?

10       A.   They would make sure that it was --

11   so, in the case that you talked about, if

12   Picatinny was the originator, they would look

13   at the endorsement to make sure that somehow

14   there was a chain of intervening endorsements

15   that got the loan from Picatinny to U.S.

16   Mortgage, since U.S. Mortgage was the seller,

17   and then from U.S. Mortgage to blank.  And they

18   would make sure that they were original

19   endorsements.

20       Q.   And there were policies and

21   procedures that Fannie Mae had governing what

1    it paid for it, was it your understanding

2    Fannie Mae had the right to enforce its rights

3    to the notes?

4         MR. KRAUS:  Objection to the form of

5    the question.

6         THE WITNESS:  If the seller had the

7    original note it was my belief that the seller

8    had the right to have the original note.

9    BY MR. FORTE:

10      Q.  Okay.

11      A.  I don't know how you steal notes.

12      Q.  Okay.  We talked about the Bonte loan

13   earlier that is missing.  How do you know that

14   loan just wasn't stolen from Fannie Mae's

15   vault?

16      A.  Who would steal it?

17      Q.  I'm not asking you who.  How do you

18   know it wasn't done?

19      A.  Because as I said earlier when you

20   ask me, I don't believe that anyone has the

21   right -- I don't believe if I stole it that I

1    and the loan; correct?

2            MR. KRAUS:  Objection.  That is not

3    what she said.

4            MR. FORTE:  That is how I heard it.

5    But if I am wrong, let her correct me.

6            THE WITNESS:  What -- what I was

7    trying to say I believe if the seller was in

8    possession of the original document and

9    endorsed the document to me, and met my

10   criteria of endorsing it with his title and

11   name under it, that it is my belief that he or

12   she or the entity had the legal right to do

13   that.  And I'm taking possession of the

14   document.

15   BY MR. FORTE:

16       Q.   Okay.  You told me that basically 89

17   percent -- what we had seen earlier from the

18   February 6th letter, 89 percent of the loans of

19   Fannie Mae were held with other custodians and

20   certified by third parties; correct?

21       A.   Correct.

1    from -- in all of 2007 and the rest of 2008?

2        A.   Yes.

3            MS. GIGL:  That is all I have at this

4    point.

5            MR. KRAUS:  I have a copy of

6    questions.

7            MR. FORTE:  I have a few, too, but go

8    ahead.

9            MR. KRAUS:  I'm not sure you get to

10   ask any more but that's all right.

11       EXAMINATION BY COUNSEL FOR THE DEFENDANT

12   BY MR. KRAUS:

13       Q.   What is the significance of the fact

14   that U.S. Mortgage as seller/servicer delivers

15   an original note to the document delivery

16   facility?

17           MR. FORTE:  Object to the form.

18   BY MR. KRAUS:

19       Q.   You can answer.

20       A.   The significance is that the fact

21   that they had the original note would lead me

1    to believe that they had the authority to

2    deliver the note to me.

3         Q.   Why is that?

4         A.   Because typically notes are held by

5    custodians or their own owners and not just

6    anyone.

7         Q.   Okay.  Are you aware of any reason

8    why an originator of a note, the credit union

9    in this case, would, consistent with customer

10   practice in the industry, allow a

11   seller/servicer not a document custodian, to

12   hold original notes other than in order to sell

13   them to the secondary market?

14        MS. GIGL:  Objection to form.

15        MR. FORTE:  Objection to the form of

16   the question.

17        MS. GIGL:  She is not an expert

18   witness.

19        MR. KRAUS:  You can answer.

20        She has been in the business for 29

21   years.

1          MS. GIGL:  I don't think that makes

2     her an expert.

3          THE WITNESS:  No.

4     BY MR. KRAUS:

5          Q.   Separate and apart from whether or

6     not there was an independent communication from

7     a credit union that Mr. McGrath was authorized

8     to sign on their behalf, what conclusion did

9     the certifiers in your department draw from the

10    fact that -- let me rephrase that?

11         MR. FORTE:  I would think so.

12         MR. KRAUS:  Jim, I don't need --

13    stop.

14         MR. FORTE:  I know.  But don't ask

15    her what conclusions some other person would

16    draw.  You know better than that.

17         MR. KRAUS:  Jim, I don't need it.

18    Make objections when it's appropriate for you

19    to make objections.

20         MR. FORTE:  That is why you withdrew

21    it.  Go ahead.

1    BY MR. KRAUS:

2        Q.   Separate and apart from any

3    independent communication from a credit union

4    as to Mr. McGrath's authority to sign an AVP of

5    the credit union, what conclusions did you draw

6    from the fact that he delivered an original

7    note about his authority to sign intervening

8    endorsement?

9            MS. GIGL:  Objection.

10           MR. FORTE:  Objection.  What is time

11   frame?

12           MR. KRAUS:  During the period between

13   2005 and January 29, 2009.

14           MR. FORTE:  Objection.  Lacks

15   foundation.  I don't even know if she knew that

16   at that time.

17           THE WITNESS:  Well, the fact that he

18   had the original and that he -- and that it was

19   endorsed, that he had the authority to endorse

20   and to sell the original note to Fannie Mae.

21           MR. KRAUS:  I have no further

# EXHIBIT 16

```
 1          UNITED STATES DISTRICT COURT
            DISTRICT OF NEW JERSEY
 2          CIVIL ACTION NO. 09-01295 (JAG)
 3    PICATINNY FEDERAL CREDIT   :
      UNION,                     :
 4                               :
                                 :  DEPOSITION UPON
 5          Plaintiff,  :  ORAL EXAMINATION
                        :       OF
 6                      :  BERTRAM M. COHEN
         vs.            :
 7                      :
                        :
 8    FEDERAL NATIONAL MORTGAGE  :
      ASSOCIATION,              :
 9                             :
            Defendant.  :
10
11        T R A N S C R I P T of the stenographic notes
12   of MARY G. VAN DINA, CCR, CLR and Notary Public,
13   taken at the offices of Saiber LLC, 18 Columbia
14   Turnpike, Suite 200, Florham Park, New Jersey,
15   07932-2266, on Wednesday, February 17,
16   2010, commencing at 10:00 a.m.
17
18
19
20
21
22          ROSENBERG & ASSOCIATES, INC.
            Certified Court Reporters & Videographers
23    425 Eagle Rock Ave., Suite 201      575 Madison Ave.
      Roseland, NJ 07068           New York, NY 10022
24    (973) 228-9100  1-800-662-6878      (212) 868-1936
            www.rosenbergandassociates.com
25
```

1        Q.    Did you check the collateral file in the

2    vault?

3        A.    No.

4        Q.    Did she ask anything else about the

5    title insurance?

6        A.    Not that I recall.

7        Q.    Would you agree with me that -- strike

8    that.

9            Is it correct, Mr. Cohen, that the only

10   audits that you remember at CU National are the audit

11   that you conducted in May and June in 2008 and the

12   loans that you reviewed on behalf of Nisivoccia in

13   December of 2008 or January of 2009?

14       A.    The ones that I definitely remember,

15   yes.

16            (Exhibit 28, Document, PICA000011520

17   through 21, is received and marked for

18   identification.)

19       Q.    Do you recognize this document?

20       A.    Yes.  It's an audit plan for 2008.

21       Q.    Did you draft this audit plan?

22       A.    I don't recall if I drafted this.

23       Q.    Who would have drafted it?

24       A.    I don't know.

25            MR. FORTE:  Just let me note my

1    objection to the form of the question.

2         You may answer.

3    A.    I don't know who would have drafted it.

4    Q.    If you look under February, number two

5    says, "First mortgage report is due."

6         Did you provide a first mortgage report

7    in February 2008?

8    A.    I don't recall.

9    Q.    Do you recall whether the audit of CU

10   National was initially scheduled for earlier, early

11   2008?

12        MR. FORTE:  Objection to the form.

13   Which audit?

14   Q.    The audit that you performed on behalf

15   of CU --

16   A.    I don't recall.

17   Q.    We've talked generally about the audit

18   that you conducted on CU National in May/June of

19   2008.

20        When exactly did you begin the audit?

21        MR. FORTE:  Once again, just note my

22   objection.  It's not an audit of CU National.  It's

23   of the mortgage files.

24        As long as we have that understanding, I

25   don't mind you referring it to it as an audit of CU

1    National.

2            MS. BROWN:  Okay.  Understood.

3        A.    I'd have to check my datebook, but I

4    believe it was around June 13.

5            MR. FORTE:  Rebecca, did you get the

6    pages?

7            MS. BROWN:  I did.  I'll use those in

8    just a minute.

9        Q.    Can you explain to me the scope and the

10   purpose of the audit?

11       A.    The purpose is to determine, again, if

12   procedures are being followed, if the proper

13   documentation is in the file, the proper approvals

14   have been made, and that the loans were approved.

15       Q.    Did your audit include confirming the

16   existence of the original notes?

17       A.    No.

18       Q.    The first purpose you listed was whether

19   procedures were being followed.  Which procedures?

20       A.    If -- to determine if credit searches

21   were done, if there was an approval from the loan

22   officer or credit committee, if documents were signed

23   properly, if closing papers were in the file.

24       Q.    Does Picatinny have written procedures

25   that relate to the mortgages?

1    connection with your review of these 62 mortgages

2    that's not listed here?

3        A.    No.  Just below it, you'll see that I

4    also noted that proper riders were included.

5        Q.    And "The packages for condominiums,

6    planned unit developments, second homes, one-to-four

7    families and adjustable rate mortgages"?

8        A.    Yes.

9        Q.    Other than what we've just gone over, is

10   there anything else that you did --

11       A.    No.

12       Q.    -- in connection with these loan files?

13       A.    At the last paragraph, it says, "In

14   addition, I reviewed the history files for three

15   mortgages for anything unusual."

16       Q.    You reviewed the history files for three

17   of the 62 mortgages?

18       A.    Yes.

19       Q.    And what would the history files have

20   included?

21       A.    Payments into the file and payments out

22   of the file, such as escrow payments.

23       Q.    So you would have reviewed loan activity

24   reports for about how long of a period of time?

25            MR. FORTE:  Objection to the form.  I

1    think you're suggesting that he reviewed certain

2    documents.

3        Q.    Did you review loan activity reports?

4        A.    Yes.

5        Q.    For how long a period did you review for

6    these three mortgages?

7        A.    I asked CU National to provide me with a

8    history of the file.

9        Q.    So from the time the mortgage was

10   originated until --

11       A.    Yes.

12       Q.    -- late May 2008?

13       A.    Yes.

14       Q.    Where it says, "I reviewed the mortgages

15   for the following promissory notes with appropriate

16   signatures," what were you looking for?

17       A.    To see that there was a note in the

18   file, a signed note.

19       Q.    Did you look at the original note?

20       A.    No.

21       Q.    Was it your understanding that the notes

22   in the files were not originals?

23       A.    Yes.

24       Q.    What is your understanding about where

25   original notes were kept?

1         Did you visit CU National on Friday,

2    June 20?

3         A.    Yes.

4         Q.    There's the same notation on the next

5    page, on Monday, June 23.

6         Did you visit CU National on June 23?

7         A.    Yes.

8         Q.    And similar notations on both Wednesday,

9    June 25 and Friday, June 27.

10         Did you visit CU National on both of

11    those days?

12         A.    Yes.

13         Q.    Do you have any specific recollections

14    as to what you did on any of the days we just listed?

15         A.    I reviewed the mortgage files.

16         Q.    Let me explain.

17         What I'm asking is, to prevent me from

18    going day by day and asking what you specifically

19    remember about those visits, do you remember

20    generally, or do you have specific recollections of

21    what you did on each particular day?

22         A.    No, I do not have specific recollections

23    per day.

24         Q.    So tell me, generally, during that --

25    what is it a two-week time period?  Sorry.

1          I counted a total of seven times that

2     you visited CU National in connection with your

3     audit.  Is that correct?

4       A.    Correct.

5       Q.    So tell me what you did during those

6     visits.

7          MR. FORTE:  Just note my objection.  You

8     can obviously testify, but he's already testified on

9     some of that issue already.

10         MS. BROWN:  That's fine.  I don't mind

11    hearing it again.

12      A.    I was taken down by Mr. Mathews on the

13    first day to introduce me to Phil Scialabba, who was

14    the contact at CU National, and they provided me with

15    workspace in a conference room and the files, and I

16    went through the files day by day.

17         If I had any questions, I would ask

18    Mr. Scialabba, and I prepared my work papers, which

19    you have copies of.

20      Q.    Did you ever ask to see the original

21    notes that were located in the collateral file?

22         MR. FORTE:  Just note that this is the

23    fourth --

24         MS. BROWN:  It's a different question.

25         MR. FORTE:  I don't see it as a

1    different question, but you can answer.

2        A.    I asked where the originals were, and

3    they told me they were in the collateral file.

4        Q.    Did they indicate or show you where in

5    the offices the collateral file was located?

6        A.    No.

7        Q.    Did you ask them where the collateral

8    file was located?

9        A.    No.

10       Q.    Was it your understanding that it was

11   on-site, meaning in the same office space?

12       A.    Yes.

13            (Exhibit 31, Document, Bates No.

14   PICA000011185, is received and marked for

15   identification.)

16       Q.    Do you recognize this document?

17       A.    Yes.

18       Q.    Can you tell me what it is?

19       A.    It's a checklist for the examination of

20   a Picatinny loan file.

21       Q.    Did you complete one of these -- is it

22   accurate to refer to this as a work paper?

23       A.    Yes.

24       Q.    Did you complete one of these work

25   papers for each of the 62 notes that you reviewed in

1       A.      Yes.

2       Q.      Is this your handwriting?

3       A.      Yes.

4       Q.      Can you tell me what it is?

5       A.      It's a comment on a particular loan

6    regarding the fact that the mortgage is in the name

7    of a husband and wife and a third party, that the

8    mortgage is not signed by her, nor is the

9    authorization to release the information and the

10   affidavit of occupancy.

11      Q.      Other than notations made on the work

12   papers, these were the only notes produced?

13      A.      This is essentially an exception to the

14   norm on a file.

15      Q.      Is that why you had --

16      A.      That's why I made the notes.

17      Q.      -- made the additional notes?

18      A.      Yes.

19      Q.      I'll represent to you that there were no

20   other handwritten notes produced.

21              Do you recall whether additional

22   handwritten notes exist?

23      A.      I do not.

24              MR. FORTE:  I assume excluding the Ts

25   and the Is?

Cohen, B. Mark - Vol. I  2/17/2010  10:00:00 AM

1          MS. BROWN:  Yes, I said other than noted

2    on his work papers.

3          MR. FORTE:  Okay.

4      Q.    Is there anything else that you did in

5    connection with your 2008 audit, other than what

6    we've already discussed?

7      A.    No, not that I can recall, but any work

8    that I do would be noted.

9      Q.    What were your conclusions?

10     A.    Other than the exceptions that I've

11   noted, the conclusions were that the documentation

12   was there, and that the procedures at Picatinny were

13   being followed.

14     Q.    Did you have any specific

15   recommendations?

16     A.    At that time, no.

17     Q.    At any tame?

18     A.    Since the discovery, yes, since the

19   discovery of the fraud, yes.

20     Q.    What were those recommendations?

21     A.    My recommendation today would be that

22   original documentations, original notes and original

23   recorded mortgages, be kept in fireproof, secured

24   files on our property.

25     Q.    Are your original notes and original

1    mortgages kept at Picatinny today?

2        A.    They are not.

3        Q.    Have you made this recommendation to

4    anybody at Picatinny?

5        A.    Yes, I have.

6        Q.    Who have you made this recommendation

7    to?

8        A.    The CEO.

9        Q.    Would that be Mr. Darling?

10       A.    Yes.

11       Q.    What was his response?

12       A.    His response was that it would be looked

13   into.

14       Q.    Do you know whether he or anybody at

15   Picatinny has taken any steps to have the original

16   notes be kept at Picatinny?

17       A.    To my knowledge, they are not being kept

18   at Picatinny.  I was told that the current servicer

19   will not permit it.

20       Q.    What was your response?

21       A.    I had no response.

22       Q.    Why do you think the original notes

23   should be kept at Picatinny?

24           MR. FORTE:  Note my objection, but you

25   may answer.

1        A.    I think that they should be kept under

2   lock and key and secured in safe files in our

3   possession to prevent any fraud such as the one that

4   has occurred.

5        Q.    Is it your opinion that had the files

6   been kept at Picatinny, this fraud would not have

7   occurred?

8            MR. FORTE:  Objection to the form of the

9   question.

10           You may answer.

11       Q.    You can answer.

12       A.    If they had been on our premises, then

13   McGrath would not have had access to them without the

14   knowledge of someone at Picatinny.

15       Q.    Let's look back at D-29 there.  I'm

16   sorry, one other question.

17           You said that you spoke with Bill

18   Darling about it.

19           Did you speak with anybody else at

20   Picatinny about your recommendation?

21       A.    The supervisor.

22       Q.    Did you provide this recommendation in

23   writing?

24       A.    Yes.

25           MS. BROWN:  I'm going to ask that that

1    be produced.

2         MR. FORTE:  I'll take it under

3    advisement.  I'm not sure how an after-the-fact

4    recommendation is relevant to the case.

5         It's not admissible as a matter of law,

6    but put it in writing, and we'll respond to it.

7         MS. BROWN:  So do you want us to write a

8    formal letter?

9         MR. FORTE:  Yes, I do because --

10        MS. BROWN:  Not a problem.  I can do it.

11        Q.    When did you provide this recommendation

12   to the supervisory committee, if you can approximate?

13        A.    It would have to be after February of

14   2009.

15        Q.    Other than the supervisory committee and

16   Mr. Darling, did you make this recommendation to

17   anybody else at Picatinny?

18        A.    No.

19        Q.    Were you present at any meetings,

20   supervisory committee meetings where this

21   recommendation was discussed?

22        A.    No.

23        Q.    Can you just tell me how it was provided

24   to the committee, how it was provided to the

25   supervisory committee?

1      A.    They were the actual loan files.

2      Q.    And after you were finished with your

3    review, what did you do with the loan files?

4      A.    They were returned to Mr. Mathews.  If

5    Nisivoccia needed them, they were available, and they

6    would have been returned to CUN.

7          MR. FORTE:  Don't guess, if you don't

8    know, Mr. Cohen, what happened to the loan files.

9      Q.    But you gave them to Mr. Mathews.

10   Correct?

11     A.    Yes.

12     Q.    Do you remember when you gave them to

13   Mr. Mathews?

14     A.    No.

15     Q.    Do you remember about when you completed

16   your review of these 41 loans?

17     A.    No, I do not.

18          (Exhibit 45, Document entitled,

19   "Plaintiff's Answers and Objections to Defendant's

20   First Set of Interrogatories, is received and marked

21   for identification.)

22     Q.    Have you seen this document before,

23   Mr. Cohen?

24     A.    No, I have not.

25     Q.    I'll represent to you that these are

1    Picatinny's Interrogatory responses.  Do you know

2    what Interrogatory responses are?

3        A.    Answers to questions.

4        Q.    If you'll turn to page 15, Interrogatory

5    No. 14, it states: "Set forth and describe with

6    particularity all institutional policies, procedures,

7    protocols, security initiatives, procedural

8    safeguards and internal controls, if any, established

9    by or on behalf of Picatinny's original promissory

10   notes against any alteration, theft, forgery,

11   counterfeiting, unauthorized writing, copying or

12   mishandling by third parties, including but not

13   limited to the persons or entities that service

14   Picatinny's loans," and the answer, if you skip the

15   whole first paragraph, which are objections, and go

16   to the second paragraph, it states: "Picatinny states

17   that between January 1, 2006 and February 5, 2009,

18   its promissory notes were maintained in a fireproof

19   vault on the premises of CU National, which protected

20   them against any alteration, theft, forgery,

21   counterfeiting, unauthorized writing, copying or

22   mishandling from third parties other than CU National

23   Mortgage, LLC.  With respect to CU National Mortgage,

24   LLC, Picatinny performed random audits of random

25   mortgage files to ensure, among other things, that CU

1    National Mortgage, LLC had in its possession

2    Picatinny's promissory notes, underlying first

3    mortgage loans."

4           Did I read that correctly?

5    A.    Yes.

6    Q.    Other than the audits that we already

7    discussed, did you perform any random audits of

8    random mortgage files?

9    A.    Are you talking about the original file,

10   the original document files or the loan files?

11   Q.    The original document files.

12   A.    No.

13   Q.    Other than the audits we've already

14   discussed, did you audit the loan files?

15   A.    The original documents or the loan files

16   themselves?

17   Q.    My first question was with respect to

18   the original documents.

19   A.    Only the ones that I have selected for

20   audit.

21   Q.    Meaning the audit that we discussed that

22   you performed in July of 2008.  There may have been

23   some work that you did in 2007, but you can't

24   remember it, and you also did some work for

25   Nisivoccia in January of 2009?

1        A.    Yes.

2        Q.    And with all of those audits, you

3    reviewed the copies of the notes in the files and not

4    the original notes?

5        A.    Correct.

6        Q.    It says, "In addition, the National

7    Credit Union Administration performed annual external

8    audits in accordance with the rules and regulations

9    of the Credit Union Membership Act and conducted

10   annual risk assessment reviews."

11           Do you know whether the NCUA ever

12   performed any audit of CU National?

13       A.    No, I do not.

14       Q.    Are you familiar with the audits that

15   Picatinny conducted to ensure that Picatinny had the

16   original notes -- to ensure that CU National had the

17   original promissory notes in its files?

18           MR. FORTE:  Let me just object.  Where

19   does the answer say it ensures that it had the

20   original notes in its files?

21           MS. BROWN:  It says, "Picatinny

22   performed random audits of random mortgage files to

23   ensure, among other things, that CU National had in

24   its possession Picatinny's promissory notes."

25       A.    Promissory notes.

1          MR. FORTE:  Where does it say original

2     notes?  I mean, you added that in.

3          MS. BROWN:  My question is the same.

4          MR. FORTE:  I want to make sure --

5          MS. BROWN:  I can read that one of two

6     ways.  I can say original promissory notes or copies

7     of original promissory notes.

8          MR. FORTE:  Correct.

9          MS. BROWN:  I'm interested in the

10    original promissory notes.

11         MR. FORTE:  Okay.

12    A.    Would you repeat your question?

13    Q.    Are you familiar or are you aware of any

14    audits that Picatinny conducted to ensure that CU

15    National had the original promissory notes in its

16    files?

17    A.    Other than asking where the files -- the

18    original files were, no.

19    Q.    Other than you asking where the original

20    files were?

21    A.    Yes.

22    Q.    And you were told that the original

23    files were in a collateral file in a vault?

24    A.    Yes.

25    Q.    But you never saw the vault?

# EXHIBIT 17

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF NEW JERSEY

3        HONORABLE JOSEPH A. GREENAWAY

4        CIVIL ACTION NO. 09-01295 (JAG)

5

6     PICATINNY FEDERAL CREDIT UNION,  :

7            Plaintiff,              :

8        vs.                    :

9     FEDERAL NATIONAL MORTGAGE        :

10    CORPORATION,                :

11           Defendant.         :

12    --------------------------------

13

14

15        VIDEOTAPED DEPOSITION OF:

16          ROBERT BAUMANN

17        FRIDAY, MAY 21, 2010

18

19

20        ROSENBERG & ASSOCIATES, INC.

21      Certified Court Reporters & Videographers

22    425 Eagle Rock Ave., Suite 201     575 Madison Ave.

23    Roseland, NJ 07068          New York, NY 10022

24    (973) 228-9100   1-800-662-6878   (212) 868-1936

25        www.rosenbergandassociates.com

1      A.    No.

2      Q.    What did you do in June or July

3    of 2003 that related to the first mortgage

4    operations of Picatinny?

5      A.    Could you repeat that.

6      Q.    What, if anything, did you do in

7    the way of internal --

8      A.    No, the prior question.

9      Q.    The prior question was in June or

10   July of 2003, did you do an internal audit on

11   behalf of Picatinny of its first mortgage

12   operations conducted with CU National.

13     A.    I will try to go back to the

14   previous question.  The question that you

15   asked was did I do any other audits, other

16   than the one of July of 2003?

17     Q.    Right?

18     A.    Is that correct?

19     Q.    That was.

20     A.    No, I only did the one in July of

21   2003.

22          THE VIDEOGRAPHER:  We are going

23   off the video record.  The time is 11:03.

24          (Whereupon, there was a brief

25   recess.)

1          THE VIDEOGRAPHER:  We are back on

2     the video record.  The time is 11:07.

3          Q.    Is it fair to call what you did

4     in June and July of 2003 an internal audit of

5     Picatinny's first mortgage operations?

6          A.    Yes.

7          Q.    Is it also fair to call it an

8     internal audit of the operations of CU

9     National on behalf of Picatinny?

10         A.    No.

11         Q.    Why not?

12         A.    Because it is limited.  I am only

13    interested in what Picatinny had at CU

14    National.

15         Q.    That is why I said for Picatinny.

16         A.    But I don't know how CU National

17    reacts to other credit unions that they deal

18    with.

19         Q.    Okay.  I am not asking you about

20    that.  What I am asking you is is it fair to

21    call what you did an internal audit of CU

22    National's operations on behalf of Picatinny?

23         A.    Yes.

24         Q.    That is all I wanted to know.

25    Other than the internal audit of CU

Baumann, Robert - Vol. 1  5/21/2010  10:10:00 PM

1        A.     I don't -- I don't know.

2        Q.     Do you know whether or not the

3    loan files that you reviewed at CU National

4    had original mortgage notes or copies of

5    mortgage notes?

6        A.     I don't know.

7        Q.     Do you -- did you ever see

8    anyplace within CU National or US Mortgage's

9    operations where there were fireproof

10   cabinets for maintaining original documents?

11       A.     I don't know.  I requested files

12   from them and they were available when I

13   arrived, in boxes.

14       Q.     Would it be fair to say that you

15   did not do any audit to determine whether the

16   original notes were still in the possession

17   of CU National?

18       A.     Yes.

19       Q.     That's fair to say?

20       A.     Yes.

21       Q.     And, of course, if you didn't

22   know CU National was holding original notes,

23   you didn't know to in look for them, also

24   true?

25       A.     Yes.

# EXHIBIT 18

## Bill Darling

**From:**         Mark Cohen
**Sent:**         Friday, September 18, 2009 11:14 AM
**To:**           Bill Darling
**Subject:**      CUMAnet
**Attachments:**  Cumanet2009.doc

Attached is a copy of what I will be reporting to the Supervisory Committee about CUMAnet. I will separately review the other loans we discussed.

Mark Cohen
Internal Auditor
Picatinny Federal Credit Union
(973)-361-5225 x210
(973)-361-8850 - fax
www.picacreditunion.com



picatinny
*federal credit union

This message and any attachments are solely for the intended recipient. If you are not the intended recipient, disclosure, copying, use, or distribution of the information included in this message is prohibited--please immediately and permanently delete this message.

I went to CUMAnet in Basking Ridge, NJ to review mortgage files they are servicing for us. CUMAnet has taken over mortgage servicing from CU National as a result of the fraud perpetrated on PFCU and other credit unions by Michael McGrath of US Mortgage, parent of CU National.

At CUMAnet, I dealt primarily with Joan Mahon, VP-Mortgage operations and Wendy Ciecwisz, Servicing Manager.

I reviewed the portfolio of 20 mortgages serviced by CUMAnet and 27 mortgages processed by them and sold for us to Fannie Mae. The review took me the better part of four days. Each file was reviewed for applications, credit checks, appraisals, original signed notes, recorded original mortgages, approvals by PFCU loan officer, whether to sell or hold the mortgage signed by PFCU loan officer, terms, right to cancel and truth in lending disclosures.

Of the mortgages sold, the following mortgages did not have original recorded mortgages in the files at CUMAnet:

| Mortgage File # | Name | Date | Amount |
|---|---|---|---|
| 9000390 | James W. Owings | 6/12/09 | $ 90,000 |
| 9000661 | Janice Colon & Van A. Nazario | 8/13/09 | 111,000 |
| 9000376 | Daniel E. & Debra D. Crnarich | 5/14/09 | 231,000 |
| 9000673 | Steven E. Barrieres & Runqing Li | 7/24/09 | 200,000 |
| 9000707 | Ronald J. Gemeinhardt | 7/27/09 | 190,000 |
| 9000365 | Anthon F. & Kimberly M. Astrologo | 7/1/09 | 192,000 |
| 9000706 | Richard Ciekus | 8/4/09 | 272,000 |

Of the mortgages held in the portfolio, the following mortgages do not have original recorded mortgages in the files at CUMAnet:

| Mortgage File # | Name | Date | Amount |
|---|---|---|---|
| 9000386 | Roland L. Ryder | 5/8/09 | $ 268,000 |
| 9000644 | Patricia R. Lyon | 2/2/09 | 132,000 |
| 9000647 | Cheryl Cryan | 1/13/09 | 170,000 |
| 9000646 | Rocco G. LoPrete | 1/14/09 | 285,000 |
| 9000648 | Karin D. & John W. Gruber | 1/2/09 | 350,000 |
| 9000649 | Steven J. Pittenger | 1/6/09 | 170,000 |

Some of the recorded mortgages may not have yet been processed by the recording governmental authority because of the recent dates and some of the paperwork may not have yet been filed because of the transitioning from US Mortgage to CUMAnet.

A copy of the listing above has been provided to CUMAnet.

As a result of the revised PFCU First Mortgage Policy, certain paper work of first mortgages is also kept on file in the PFCU Loan Department. A check list has been

CONFIDENTIAL

developed for use in the Loan Department, which is also revised as determined by the Loan Department.

I reviewed the files here to see if the policy is being followed and that the check lists are used. No discrepancies were noted.

Currently, original signed notes and recorded mortgages are kept on file at CUMAnet in the individual mortgage files.  It is my recommendation that once the mortgages are recorded, copies of the notes and recorded mortgages are retained by CUMAnet and the originals be retained in the files at PFCU. Until the originals are returned, copies should be kept here and a follow up time be established to check on the status of the recording process.

PICA000025896

# EXHIBIT 19

SAIBER LLC
One Gateway Center, 13th Floor
Newark, New Jersey 07102
(973) 622-3333
Attorneys for Plaintiff
Picatinny Federal Credit Union

| | |
|---|---|
| PICATINNY FEDERAL CREDIT UNION,<br><br>                    Plaintiff,<br><br>          v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>                    Defendant. | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY<br><br>Hon. Joseph A. Greenaway<br><br>Civil Action No. 09-01295 (JAG)<br><br>          Civil Action<br><br>PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES |

TO:   ALAN E. KRAUS, ESQ.
      Latham & Watkins, LLP
      One Newark Center, 16th Floor
      Newark, New Jersey 07101-3174
      Attorneys for Defendant
      Federal National Mortgage Association

SIR:

        Plaintiff Picatinny Federal Credit Union ("Picatinny")
hereby answers and objects to the First Set of Interrogatories of
defendant Federal National Mortgage Association ("Fannie Mae") as
follows:

### GENERAL OBJECTIONS AND LIMITATIONS

        Picatinny objects to the "Definitions" and
"Instructions" in Fannie Mae's First Set of Interrogatories to
the extent that they seek to impose obligations upon Picatinny in
excess of those obligations contained in Rule 33 of the Federal
Rules of Civil Procedure and Local Civil Rule 33.1.

Picatinny specifically objects to Instruction No. 1 stating that "[u]nless requested otherwise, the time period which applies to each Interrogatory is July 1, 1999 to the present" because this time period is, on its face, overly broad, unduly burdensome and oppressive, and seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence.

Picatinny further objects to Instruction Nos. 6 and 7 because they, coupled with each interrogatory, ask more than 25 single questions in violation of Rule 33 of the Federal Rules of Civil Procedure and Magistrate Judge Arleo's letter order dated April 14, 2009 (hereinafter "Letter Order").

Picatinny states that its answers are the result of the information known and available to it without the benefit of document and deposition discovery from Fannie Mae or third-parties such as U.S. Mortgage Corp. and CU National Mortgage, LLC and, upon completion of discovery, reserve the right to supplement and amend its responses prior to trial.

### SPECIFIC ANSWERS AND OBJECTIONS

1.    Identify all persons with knowledge of any relevant fact or circumstance relating to any claim, alleged fact or defense in this litigation, and for each such person set forth the complete substance of their relevant knowledge.

**ANSWER:** Picatinny objects to this interrogatory because it is unduly burdensome and oppressive in that it

requires Picatinny to identify each person with knowledge "of any relevant fact or circumstance" and to set forth the "complete substance of their relevant knowledge."  Picatinny further objects to this interrogatory because it seeks information protected from disclosure by the work product doctrine in that it asks Picatinny to identify each person with knowledge of any "relevant" fact or circumstance and the complete substance of each such person's "relevant" knowledge.  Picatinny also objects to this interrogatory because it asks more than a single part question in violation of Rule 33 of the Federal Rules of Civil Procedure and the Letter Order.

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, Picatinny refers Fannie Mae to the persons identified and information contained in its Initial Disclosures.

2.  Identify all persons who, between July 1, 1999 and February 5, 2009, were authorized at any time to indorse promissory notes on behalf of Picatinny.

**ANSWER:**  Picatinny objects to this interrogatory because it is overly broad in that it seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence because the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was

3

2006.  Picatinny further objects to this interrogatory because it is unduly vague and ambiguous in its use of the undefined phrase "indorse promissory notes."

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, and interpreting the term "indorse promissory notes" to mean sign on behalf of Picatinny for the purpose of negotiating promissory notes underlying first mortgage loans that Picatinny funded, Picatinny responds as follows:  Stephen J. Lardiere, former General Manager of Picatinny; Daniel J. Mathews, Loan Manager and Vice President of Lending for Picatinny; and Bill Darling, Chief Executive Officer of Picatinny.

In addition, Picatinny states that, on one occasion on or about August 26, 2003 in connection with the authorized sale of certain specifically identified loans to Fannie Mae, it issued a resolution authorizing U.S. Mortgage Corporation to execute an allonge to the promissory notes underlying these loans, which were set forth in a list attached to the resolution.  A copy of this resolution and the attached list has been provided to Fannie Mae.

3.   Identify all persons who, between July 1, 1999 and February 5, 2009, were authorized to indorse checks payable to the order of Picatinny, including but not limited to all such persons employed by U.S. Mortgage.

**ANSWER:** Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence because (1) Fannie Mae does not contend that it relied upon Picatinny's alleged authorization of any third-parties to indorse checks when Fannie Mae wrongfully took the disputed loans without Picatinny's knowledge or authorization; and (2) the year in which the first disputed loan, as the phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, Picatinny states that, from January 1, 2006 through February 5, 2009, its Chief Executive Officer was authorized to sign checks issued to the order of Picatinny.  In addition, Picatinny states that, with respect to checks issued by its members to the order of Picatinny in payment of monies due and owing under their first mortgage loans, from January 1, 2006 through late January 2009 or early February 2009, CU National Mortgage, LLC was authorized to indorse such checks in connection with its Loan Servicing responsibilities under the Credit Union Support Services and Correspondent Mortgage Lending Agreement, which is in accordance with the same practices that prudent mortgage servicers follow, including, but not limited to, Fannie Mae's own loan servicers.

5

4.   State with particularity Picatinny's policies, procedures, and protocols for retaining, storing, warehousing, maintaining, locating, tracking, transferring or handling its original promissory notes.

**ANSWER**:  Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence because (1) it appears designed to determine whether Picatinny allegedly failed to exercise ordinary care substantially contributing to the making of a forged signature on the allonges to the disputed notes and assignments of the mortgages securing the disputed loans, and the disputed notes and assignments of mortgages did not contain a forged signature under the New Jersey version of the Uniform Commercial Code; and (2) the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.

Picatinny further objects to this interrogatory because it is, on its face, unduly burdensome and oppressive and asks more than a single part question in violation of Rule 33 of the Federal Rules of Civil Procedure and the Letter Order.  Picatinny also objects to this interrogatory because it is unduly vague and ambiguous in its use of the undefined terms "protocols,"

"warehousing," "locating," "tracking," "handling" and "promissory notes."

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, and interpreting the term "promissory notes" to refer to promissory notes underlying first mortgage loans that Picatinny funded, Picatinny states that, between January 1, 2006 and February 5, 2009, CU National Mortgage, LLC maintained the original promissory notes underlying Picatinny's first mortgage loans. The promissory notes were maintained in a fireproof vault that CU National Mortgage, LLC possessed in Pine Brook, New Jersey. Periodically, audits of random mortgage files were performed to ensure, among other things, that CU National Mortgage, LLC had in its possession Picatinny's promissory notes underlying first mortgage loans.

5. State with particularity where Picatinny's original promissory notes were kept, and how there were stored between July 1, 1999 and February 5, 2009.

**ANSWER:** Picatinny refers Fannie Mae to its answer to Interrogatory No. 4.

6. Identify all persons with access to Picatinny's original promissory notes between July 1, 1999 and February 5, 2009.

**ANSWER:** Picatinny objects to this interrogatory because it seeks information that is neither relevant to any

7

party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence because (1) it appears designed to determine whether Picatinny allegedly failed to exercise ordinary care substantially contributing to the making of a forged signature on the allonges to the disputed notes and assignments of the mortgages securing the disputed loans, and the disputed notes and assignments of mortgages did not contain a forged signature under the New Jersey version of the Uniform Commercial Code; and (2) the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006. Picatinny further objects to this interrogatory because it is unduly vague and ambiguous in its use of the undefined terms "access" and "promissory notes."

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, and interpreting the phrase "promissory notes" to refer to promissory notes underlying first mortgage loans that Picatinny funds, Picatinny states that, between January 1, 2006 and February 5, 2009, its authorized representatives, including auditors, had access to original promissory notes underlying Picatinny's first mortgage loans, if they needed such access for any reason. Picatinny does not have knowledge which authorized representatives of CU National Mortgage, LLC had access to those original promissory notes.

8

7.    Identify and describe all persons or entities Picatinny has hired, commissioned, or otherwise requested to service, originate or sell its mortgage loans, setting forth the extend of the servicing relationship including, but not limited to, all of the servicer's duties and responsibilities.

**ANSWER:** Picatinny objects to this interrogatory because it is overly broad and seeks information that is neither relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence because the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006. Picatinny further objects to this interrogatory because it is unduly vague and ambiguous in its use of the undefined term "commissioned."

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, Picatinny states that, between January 1, 2006 and February 5, 2009, CU National Mortgage, LLC originated and serviced Picatinny's first mortgage loans under the "Credit Union Support Services And Correspondent Mortgage Lending Agreement," a copy of which has been produced in connection with Picatinny's initial disclosures.

In addition, during that same time frame, Picatinny authorized CU National Mortgage, LLC to sell five first mortgage

9

loans that Picatinny funded, but did not authorize CU National Mortgage, LLC or any other person or entity to execute any documents on its behalf in connection with those sales.

8.   If the answer to Interrogatory No. 7 includes persons or entities other than U.S. Mortgage, state whether these other persons or entities were granted authority to facilitate, support or otherwise assist Picatinny with sale of notes to the secondary market.

**ANSWER:**  Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence because the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly assigned to Fannie Mae without Picatinny's knowledge or authorization was 2006.

Without waiving the foregoing objection and subject thereto, and subject to the General Objections and Limitations, Picatinny refers Fannie Mae to its response to Interrogatory No. 7.

9.   State with particularity the process by which Picatinny received payments for the notes originated by Picatinny or on its behalf.

**ANSWER:**  Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the

10

discovery of admissible evidence because (1) the process by which Picatinny received payment for promissory notes underlying first mortgage loans that Picatinny originated or were originated on its behalf does not make the existence of any fact that is of consequence to the determination of the action more or less probable; and (2) the year in which the first disputed loan, as the phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.  Picatinny further objects to this interrogatory because it is unduly vague and ambiguous in its use of the undefined term "notes."

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, and interpreting the term "notes" to refer to promissory notes underlying first mortgage loans that Picatinny funded, Picatinny states that, between January 1, 2006 and February 5, 2009, CU National Mortgage, LLC provided Picatinny at the end of each month a detailed letter and a check representing the payments that CU National Mortgage, LLC had received that month in payment of loans that it was servicing on behalf of Picatinny. Enclosed with the letter and check was a monthly remittance report that would be reconciled with the amount of the check.  The report would reflect, among other things, the amount of principal payments, curtailments, and interest minus service fees.

10.   Identify all persons who communicated in Picatinny's name with Picatinny members about their mortgage loans between July 1, 1999 and February 5, 2009.

**ANSWER**:  Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence because (1) Fannie Mae does not contend that it relied upon Picatinny's communications with Picatinny's members when Fannie Mae wrongfully took the disputed loans without Picatinny's knowledge or authorization; and (2) the year in which the first disputed loan, as the phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, Picatinny states that, from January 1, 2006 through February 5, 2009, Steve Lardiere, former General Manager and Chief Executive Officer of Picatinny, Kenneth A. Miner, Collections Manager for Picatinny, Bill Darling, Chief Executive Officer of Picatinny, and Dan Mathews, Loan Manager and Vice President of Lending of Picatinny, communicated with Picatinny members about their first mortgage loans.

11.   State with particularity the process Picatinny used to sell its loans on the secondary market.

12

**ANSWER:** Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence because the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006. Picatinny further objects to this interrogatory because it is unduly vague and ambiguous in its use of the undefined term "its loans."

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, and interpreting the phrase "its loans" to refer to promissory notes underlying first mortgage loans that Picatinny funded, Picatinny refers Fannie Mae to its response to Interrogatory No. 7.

12. Identify all facts, witnesses and documents supporting Picatinny's contention that "[a]t no time was Mr. McGrath an Assistant Vice President of Picatinny or authorized to execute allonges or assignments on behalf of Picatinny," as alleged in Paragraph 3 of the Complaint.

**ANSWER:** Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence in that, before Fannie Mae served its First Set of Interrogatories, Picatinny requested and

13

received leave to file an Amended Complaint in which Picatinny amended this allegation to state "[a]t no time was McGrath an Assistant Vice President of Picatinny.  Nor was he authorized to execute allonges, assignments or other agreements on behalf of Picatinny in connection with these loans."  Picatinny further objects to this interrogatory because it seeks information protected from disclosure by the work product doctrine in that it asks Picatinny to identify the witnesses that it will rely upon at trial to prove allegations made in its pleading.  Picatinny also objects to this interrogatory because it asks more than a single part question in violation of Rule 33 of the Federal Rules of Civil Procedure and the Letter Order.

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, Picatinny states that Mr. McGrath was never an officer or employee of Picatinny in any capacity and was not authorized to execute allonges, assignments or other agreements on behalf of Picatinny in connection with the disputed loans.  The persons with knowledge of these facts include, but are not limited to, Steve Lardiere, Bill Darling, and Dan Mathews.  Moreover, Mr. McGrath has admitted under oath during his June 11, 2009 criminal plea allocution that he did not possess such authorization.

13.  State with particularity what Picatinny interpreted the responsibilities of the parties to be under the Credit Union Support Services and Correspondent Mortgage Lending

Agreement, including what specific roles and authorities were granted to Picatinny and U.S. Mortgage under the terms of the agreement.

        **ANSWER**: Subject to the General Objections and Limitations, Picatinny objects to this interrogatory because it is unduly vague and ambiguous in its use of the undefined "interpreted." Without waiving the foregoing objection and subject thereto, Picatinny refers Fannie Mae to the language of the Agreement, which set forth the roles and authorities granted to Picatinny. By its clear terms, the Agreement did not grant any roles or authorities to U.S. Mortgage Corp, which was not a party to the Agreement. In addition, Picatinny states that Picatinny did not provide CU National Mortgage, LLC with any home equity loans business and, as such, the section entitled "Home Equity Loans" was not applicable to the relationship between Picatinny and CU National Mortgage, LLC.

        14. Set forth and describe with particularity all institutional polices, procedures, protocols, security initiatives, procedural safeguards and internal controls, if any, established by or on behalf of Picatinny's original promissory notes against any alteration, theft, forgery, counterfeiting, unauthorized writing, copy or mishandling by third parties, including, but not limited to, the person or entities that service Picatinny's loans.

**ANSWER:**  Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence because (1) it appears designed to determine whether Picatinny allegedly failed to exercise ordinary care substantially contributing to the making of a forged signature on the allonges to the disputed notes and assignments of the mortgages securing the disputed loans, and the disputed notes and assignments of mortgages did not contain a forged signature under the New Jersey version of the Uniform Commercial Code; and (2) the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.  Picatinny further objects to this interrogatory because it is unduly vague and ambiguous in its use of the undefined term "promissory notes."

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, and interpreting the phrase "promissory notes" to refer to promissory notes underlying first mortgage loans that Picatinny funded, Picatinny states that, between January 1, 2006 and February 5, 2009, its promissory notes were maintained in a fireproof vault on the premises of CU National Mortgage, LLC, which protected them against any alteration, theft, forgery, counterfeiting unauthorized writing, copying or mishandling from

third parties other than CU National Mortgage, LLC.  With respect to CU National Mortgage, LLC, Picatinny performed random audits of random mortgage files to ensure, among other things, that CU National Mortgage, LLC had in its possession Picatinny's promissory notes underlying first mortgage loans.  In addition, the National Credit Union Administration performed annual external audits in accordance with the rules and regulations of the Credit Union Membership Access Act and conducted annual risk assessment reviews.

15.   Identify each person with knowledge of the policies, procedures, protocols, security initiatives or internal controls described in response to the immediately preceding interrogatory.

**ANSWER:**  Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence because (1) it appears designed to determine whether Picatinny allegedly failed to exercise ordinary care substantially contributing to the making of a forged signature on the allonges to the disputed notes and assignments of the mortgages securing the disputed loans, and the disputed notes and assignments of mortgages did not contain a forged signature under the New Jersey version of the Uniform Commercial Code; and (2) the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery

17

requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.  Picatinny further objects to this interrogatory because it is unduly vague and ambiguous in its use of the undefined term "promissory notes."

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, and interpreting the phrase "promissory notes" to refer to promissory notes underlying first mortgage loans that Picatinny funded, Picatinny states that, between January 1, 2006 and February 5, 2009, the persons with knowledge of the policies, procedures, protocols, security initiatives or internal controls described in response to the immediately preceding interrogatory are Steve Lardiere, Dan Mathews, Bill Darling, Mark Cohen, and representatives of Picatinny's external auditors which included, among others, Nisivoccia & Company, Wiss & Company, LLP, and Reinsel Kuntz Leshner, LLP.

16.  Set forth and describe with particularity any steps Picatinny to limit its losses resulting from a fraud perpetrated by one of its own employees or agents including, but not limited to, the purchase of fidelity bonds or any other insurance policies by Picatinny or any third-party, such as U.S. Mortgage.

**ANSWER**:  Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the

18

discovery of admissible evidence because (1) under the common law collateral source rule, any recovery that Picatinny receives from its fidelity insurer does not reduce Fannie Mae's liability to Picatinny for damages arising from Fannie Mae's conversion of Picatinny loans; (2) the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.

Without waiving the foregoing objections and subject thereto, and subject to the General Objections and Limitations, Picatinny shall produce a copy of the bonds that it has in its possession relating to its purchase of fidelity coverage between January 1, 2006 and the present.

17.  Identify all persons or entities that have purchased loans originated by or on behalf of Picatinny on the secondary market since July 1, 1999, and set forth the dates that Picatinny first learned of the identity of these purchasers with respect to each such purchase.

**ANSWER**:  Picatinny objects to this interrogatory because it is overly broad and seeks information that is neither relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence because the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.

Without waiving the foregoing objection and subject thereto, and subject to the General Objections and Limitations, Picatinny states that, between January 1, 2006 and February 5, 2009, it authorized CU National Mortgage, LLC to sell only five first mortgage loans that it funded on the secondary market and does not know to whom those loans were sold.  With respect to loans that were originated on behalf of Picatinny but Picatinny chose not to fund, Picatinny does not have knowledge if such loans were sold on the secondary market and, if they were sold, to whom they were sold.

18.   State with particularity when Picatinny first learned that Fannie Mae was a purchaser of mortgage loans originated by or on behalf of Picatinny.

**ANSWER:**   Picatinny objects to this interrogatory because it is overly broad and seeks information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence because the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.

Without waiving the foregoing objection and subject thereto, and subject to the General Objections and Limitations, Picatinny states that, between January 1, 2006 and February 5, 2009, it was unaware to whom the five first mortgage loans that

20

it funded and authorized CU National Mortgage, LLC to sell were sold.   The only first mortgage loans that Picatinny knew Fannie Mae purchased that were originated on behalf of Picatinny were those loans that were the subject of the 2003 Board resolution described in Picatinny's answer to Interrogatory No. 2.

With respect to loans that were originated on behalf of Picatinny but Picatinny chose not to fund, Picatinny does not have knowledge if such loans were sold on the secondary market and, if they were sold, to whom they were sold.  Picatinny first learned that the disputed loans, as that phrase is defined in Fannie Mae's discovery requests, were sold to Fannie Mae in February 2009.

19.  Describe all efforts that Picatinny made, at any time, to alert, instruct, inform, or otherwise notify Fannie Mae of the scope or extent of U.S. Mortgage's authority to bind Picatinny in its dealings on the secondary market.

**ANSWER:**  Picatinny objects to this interrogatory because it is overly broad and seek information that is neither relevant to any party's claim or defense nor reasonably calculated to lead to the discovery of admissible evidence because the year in which the first disputed loan, as that phrase is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.

21

Without waiving the foregoing objection and subject thereto, and subject to the General Objections and Limitations, Picatinny states that, between January 1, 2006 and February 5, 2009, it did not know who purchased the five first mortgage loans that it funded and authorized CU National Mortgage, LLC to sell. The only loans that Picatinny knew Fannie Mae purchased that were originated on behalf of Picatinny were those loans that were the subject of a specific Board resolution in August 2003.  Picatinny passed a Board resolution that was designed, in part, to alert, instruct, inform or otherwise notify Fannie Mae that U.S. Mortgage Corporation had Picatinny's authority to sell those loans specifically identified in an attachment to the resolution. Because Fannie Mae did not contact Picatinny concerning U.S. Mortgage's authority to sell Picatinny's loans, Picatinny assumes that Fannie Mae requested and received from U.S. Mortgage Corporation a copy of that authorization.

20.  State with particularity the circumstances surrounding the 2003 sale of notes from Picatinny to Fannie Mae that is not disputed in this action, including all facts, witnesses and documents that refer or relate to that sale.

**ANSWER:**  Picatinny objects to this interrogatory because it is overly broad and seeks information that is neither relevant to any party's claim nor defense or reasonably calculated to lead to the discovery of admissible evidence because the year in which the first disputed loan, as that phrase

is defined in Fannie Mae's discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.

Without waiving the foregoing objection and subject thereto, and subject to the General Objections and Limitations, Picatinny states that, in 2003, it opted to sell certain 30 year fixed rate mortgages to Fannie Mae because interest rates were low and long term fixed rate mortgages then made up 66% of Picatinny's first mortgage loans. Because Picatinny was concerned that interest rates would rise, Picatinny made the decision to sell certain 30 year fixed rate loans to enable it to re-invest its assets more quickly to take advantage of the increase in interest rates. A copy of documents that refer or relate to that sale have been produced and additional documents relating to that sale also will be produced. The persons involved in the sale are identified in those documents.

21. Set forth with particularity all communications between Picatinny and Fannie Mae concerning or relating to the 2003 sale of notes from Picatinny to Fannie Mae.

**ANSWER**: Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence because the year in which the first disputed loan, as that phrase is defined in Fannie Mae's

23

discovery requests, was allegedly sold to Fannie Mae without Picatinny's knowledge or authorization was 2006.

Without waiving the foregoing objection and subject thereto, and subject to the General Objections and Limitations, Picatinny states that it is unaware of any communications responsive to this interrogatory other than the resolution authorizing the sale of these loans, assuming Fannie Mae requested verification of U.S. Mortgage Corporation's authority to sell the loans specifically identified in the resolution.

22.  State with particularity all facts and circumstances supporting Picatinny's contention that Fannie Mae lacked good faith or acted in a commercially unreasonable manner in purchasing the disputed notes.

**ANSWER:**  Without the benefit of any discovery, and subject to its right to supplement its response upon the conclusion of discovery, the facts demonstrating Fannie Mae's failure to observe reasonable commercial standards of fair dealing and to act in a commercial reasonably manner include: (1) Fannie Mae's purchase of 52 mortgage loans from U.S. Mortgage Corp. without making any efforts to determine from Picatinny what authority U.S. Mortgage possessed to sell mortgage loans on Picatinny's behalf; (2) Fannie Mae's purchase of 52 Picatinny mortgage loans from U.S. Mortgage when the allonge to the note and assignment of mortgage from Picatinny to U.S. Mortgage was executed by Michael J. McGrath, Jr., purportedly as an Assistant

Vice President of Picatinny, when Fannie Mae knew that Mr. McGrath was employed by U.S. Mortgage; (3) Fannie Mae's purchase of several hundred mortgage loans made by approximately 20 other credit unions when the allonge to the note and assignment of mortgage from each of those 20 or so other credit unions was executed by Michael J. McGrath, Jr., purportedly as an officer of those credit unions, when Fannie Mae knew that Mr. McGrath was employed by U.S. Mortgage; (4) Fannie Mae's failure to follow its own policies and procedures that required it to ensure that Mr. McGrath was specifically authorized to execute allonges and assignments of mortgage on behalf of Picatinny in connection with the disputed loans; (5) Fannie Mae's failure to follow its own polices and procedures that required it to obtain from U.S. Mortgage a recorded copy of the assignments of mortgage from Picatinny to U.S. Mortgage with respect to each of the disputed loans; (6) Fannie Mae's failure to record, or ensure the recording of, the assignments of mortgages that U.S. Mortgage had provided to Fannie Mae; (7) Fannie Mae's failure to follow its own policies and procedures that required Fannie Mae's National Underwriting Center to conduct a Quality Control review of the files underlying the loans that U.S. Mortgage sold to Fannie Mae; and (8) Fannie Mae's failure to terminate its relationship with U.S. Mortgage when it learned in or around 2005 that U.S. Mortgage and/or one or more of U.S. Mortgage's officers was or may have been involved in mortgage fraud.

25

23.  Set forth with particularity all money damages claimed by Picatinny in this action and the basis for their calculation loan by loan.

**ANSWER:**  Picatinny shall provide to Fannie Mae a chart reflecting the principal amount of its loss with respect to each of the 52 disputed loans, which totals $13,167,786.69.  In addition, Picatinny is entitled to the interest that it did not receive on the outstanding principal balance.  Picatinny also has sustained consequential damages arising from Fannie Mae's conversion of Picatinny's 52 first mortgage loans, including, but not limited to, attorneys' fees and litigation costs, expenses and disbursements that it has incurred in attempting to recover its loss from third parties, including, but not limited to, its fidelity insurer and the participants in the fraudulent actions of CU National Mortgage, LLC and U.S. Mortgage Corp.  An approximation of such fees, litigation costs, expenses and disbursements, which cannot be accurately broken down with respect to each of the 52 disputed loans, is $100,000.

24.  Set forth with particularity all amounts received from U.S. Mortgage that were attributed to payments relating to the disputed loans.

**ANSWER:**  Picatinny objects to this interrogatory because it seeks information that is neither relevant to any party's claim or defense or reasonably calculated to lead to the discovery of admissible evidence in that Picatinny has agreed to

provide in response to the Interrogatory No. 23 the current principal balance outstanding on each of the disputed loans.

Without waiving the foregoing objection and subject thereto, and subject to the General Objections and Limitations, Picatinny states that it has not received any amounts from U.S. Mortgage.  It has, however, received payments from CU National Mortgage, LLC, which are reflected on the monthly trial balances that CU National Mortgage, LLC delivered to Picatinny.  The monthly trial balances during the period from January 1, 2006 through February 5, 2009 in Picatinny's possession, custody and control will be produced.

AS TO OBJECTIONS:

SAIBER LLC
Attorneys for Plaintiff
Picatinny Federal Credit Union

By: _____

JAMES H. FORTE
A Member of the Firm

Dated:  June 18, 2009

27

STATE OF NEW JERSEY )
                    )   ss.:
COUNTY OF MORRIS    )

      BILL DARLING, of full age, being duly sworn according to law, upon his oath, deposes and says:

      1.  I am the Chief Executive Officer of Picatinny Federal Credit Union and am authorized to execute this corporate verification on its behalf.

      2.  Based upon my own personal knowledge, I have personal knowledge of some of the matters set forth herein. As for those matters of which I do not have personal knowledge, I believe them to be true based upon, among other things, documents that Picatinny Federal Credit Union maintains in the course of its regularly conducted business activities.

                            _____
                                  BILL DARLING

Sworn and subscribed to
before me on this _18_th
day of June, 2009

_____
NOTARY PUBLIC

ROBYN ELIZABETH PAIVA
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires March 7, 2012

# EXHIBIT 20



Credit Union Mortgage Alliance Network

September 10, 2010

Mr. Dan Mathews , VP of Lending
Picatinny Federal Credit Union
100 Mineral Springs Drive
Dover, NJ 07801

Re: Mortgage Notes

Dear Mr. Mathews,

In compliance with the requests of NCUA and CUMIS, on October 1, 2010, we will begin sending the original Notes to your credit union upon completion of Post Closing of the mortgage file. It is important for your credit union to prepare secure and appropriate accommodations for these documents

In reference to files and Notes now being held by CUMAnet, we are offering the following options to meet the standards set by NCUA and CUMIS. You can:

1.  Have all files recalled from storage and the original notes removed, copied for file and the original Note sent via secure delivery service to your designated office. An inventory of contents will be included in the package. The inventory will be verified by CUMAnet and must be verified upon receipt by your Credit Union. Original files will then be returned to Archive Systems for storage. All expenses incurred to recall the files, remove the Notes and return the files to Archive Systems will be the responsibility of the credit union.

Or, you can choose to:

2.  Have the loan files retrieved and the complete files (with Notes inside) delivered to your credit union. Please note that all files closed prior to July 2007 must be scanned prior to releasing the files to your facility. The files will be shipped in boxes, with contents inventoried and verified by CUMAnet. You will verify the contents upon receipt. The credit union will be responsible for all direct costs incurred for this process.

Or, you can:

3.  Have the Notes retrieved from your loan files and returned to your credit union as set forth in Option #1. Have all files closed prior to July 2007 scanned. These files would then be viewable along with all files closed after July 2007 by the credit union

through a secure password. These files will be maintained in storage at Archive Systems. The credit union will be responsible for the costs incurred for this process.

Unless you would prefer another carrier, CUMAnet will be using UPS to deliver all Notes and files. If you have a preferred carrier, please notify us of your choice and provide us with billing information.

As NCUA and CUMIS have asked that all credit unions hold the Notes to the loans in their possession, we ask that you let us know by September 30 how you would like us to proceed with your existing loan documents. If none of the alternatives offered meet your needs, please let us know how you would like to handle the return of your documents and we will do everything possible to accommodate your request.

We welcome the opportunity to discuss alternatives with you or provide more information on this important process. Please contact Dirck Van Deusen, Daniel von Schaumburg, Cris Tiberi or me at any time.

Sincere regards,

Diane Johnson
President
CUMAnet, LLC
908.860.7101
dianej@mortgagedept.com


jsh

# EXHIBIT 21

1        SUPERIOR COURT OF NEW JERSEY

              CIVIL ACTION

2                - - -

   PICATINNY FEDERAL          )

3                    )

   CREDIT UNION            )

4          Plaintiff,      )

                    )

5          vs         ) MRS-L-713-09

                    ) CIVIL ACTION

6   FEDERAL NATIONAL          )

   MORTGAGE ASSOCIATION,      )

7                    )

          Defendant.      )

8                    )

   ----------------------------

9

10           DEPOSITION OF

              JOHN GANG

11           WASHINGTON, D C

           FRIDAY, DECEMBER 4, 2009

12

13

   ATKINSON-BAKER, INC.

14   COURT REPORTERS

   (800) 288-3376

15   www.depo.com

16

17   REPORTED BY:   DONNA M. LEWIS, RPR

18

19   FILE NO.: A30AFA1

20

21

1    loaned, what would be required to be sent by the

2    seller?

3        A    Those same documents.

4        Q    Okay.  Would you also require -- or

5    would Fannie Mae also require an allonge or an

6    endorsement on the note?

7        A    The endorsement, yes, would be part of

8    that document stream or in some cases included as

9    allonge, as an allonge on that document stream.

10       Q    And the allonge would be from who to

11   whom?

12       A    It really allows us to track, to trail a

13   title.

14       Q    By allonge we are referring to a

15   document that is affixed to the note that reflects

16   the transfer of the note from one party to

17   another; is that your understanding?

18       A    I don't know if that is the only reason

19   we would get an allonge.  But in some cases that

20   endorsement is included on the allonge.

21       Q    I wasn't asking for that.  I think you

1    answered a different question.  I was asking for

2    your understanding of an allonge.  What do you

3    understand an allonge is?

4        A   An allonge is an attachment to the note.

5        Q   For what purpose?

6        A   My understanding is that a variety of

7    purposes in the one that we have talked about is

8    to provide an endorsement.

9        Q   So if the note is made out to my client,

10   Picatinny Federal Credit Union and the loan is

11   being sold by US Mortgage, would an allonge be

12   required by US Mortgage to deliver to the document

13   delivery facility?

14       A   To be clear, what it is made out to

15   Picatinny, what does it mean?

16       Q   The note is issued to the order of

17   Picatinny Federal Credit Union?

18       A   If that language is in the note, but if

19   they are the originator.

20       Q   Yes.

21       A   That Is listed on the note, is that what

1    you are referring to?

2        Q    Yes.  We will use your term originator.

3        A    Is there -- there is not always an

4    allonge required if, in fact, that endorsement can

5    be fit on the note.

6        Q    Okay.  So either if the note is to be

7    sold by US Mortgage to Fannie Mae, US Mortgage was

8    required to either have an endorsement from

9    Picatinny on the note or an allonge from Picatinny

10   attached to the note, correct?

11       A    The requirement is that the endorsement

12   needs to be in the collateral we get.  And there

13   is a couple different ways to fulfill that

14   requirement?

15       Q    Well, tell me what other ways are there

16   than an endorsement on the note or an allonge

17   attached to the note?

18       A    That is exactly what I said.

19       Q    Okay.  So those are the only two ways

20   that you know that the requirement can be filled?

21       A    To my knowledge, yes.

1      Q    So going back to my initial question,

2    when US Mortgage delivers a loan to be sold to

3    Fannie Mae where it was originated by Picatinny,

4    US Mortgage would either have to deliver an

5    endorsement -- the note with an endorsement from

6    Picatinny on it or an allonge from Picatinny

7    attached to the note, correct?

8      A    Yes.

9      Q    What else would it deliver other than

10   the note and the allonge?  You said an assignment

11   of mortgage?

12     A    (Witness nods)

13     Q    You have to answer verbally.  We can't

14   have nods of the head.

15     A    I mentioned a rider.

16     Q    Okay.  Were there any riders to --

17     A    A rider to the note could be there.

18   There could be for the borrowers could include a

19   power of attorney, a borrower, co-borrower, but

20   only one signs the physical notes.  There needs to

21   be some type of power of attorney present for us

1    endorsement.  And then it says, the blank

2    endorsement must contain the following.  And then

3    there were six bullet points.  Do you see where I

4    am referring to?

5        A    Yes.

6        Q    The fourth bullet point says, authorized

7    signature.  Do you see what I am referring to?

8        A    Yes.

9        Q    Can you tell me what efforts, if any,

10    the certifiers in the loan certification group

11    made certain that, in fact, an authorized

12    signature was contained on the endorsement?

13        A    Okay.  So the requirements would be that

14    the signature was an original signature.  It

15    represented the organization and a title of the

16    person who was signing and a printed out name.

17    And Fannie Mae's definition was that is what our

18    authorized signature was on the endorsement.

19        Q    So if any person represented they had

20    the authority to do so, that would satisfy

21    Fannie Mae's policy that an authorized signature

1    documents that are sent to it as part of a

2    document submission package?

3        A    Once the processing of that package of

4    loans or documents was completed, it would be

5    stored in a vault in the Herndon facility.

6        Q    Is that in hard copy form?

7        A    Yes.

8        Q    So a copy of each of the documents

9    submitted to Fannie Mae is made by Fannie Mae as

10    matter of course?

11        A    No, no.  The collateral that we see that

12    we use to certify is, including the bar code, is

13    stored into the vault.

14        Q    I see, the original?

15        A    Correct, or whatever documents come

16    through.

17        Q    That is fair enough.  So all of -- and

18    for how long a period of time are those documents

19    stored?

20        A    As long as the loan is an active loan on

21    our books.

1    with a whole bunch of shelves and files that are

2    stored up in the shelves.

3        Q    So rather than a vault, it is a room

4    with limited access, is that fair?

5        A    We call it a vault because it is

6    controlled access, you know, I'm don't know if a

7    vault has to have a big metal door on it with a

8    big -- you know, so we call it a vault.  And our

9    definition is it is controlled access, you know,

10   fire insured facility that we have.

11       Q    Now, we have talked about the documents

12   that would be delivered in the normal course of

13   Fannie Mae to the document delivery facility.  Can

14   you tell me which of those documents that we have

15   talked about need to be originals?

16       A    I think some of these, there might be

17   some the exceptions, the note has to be an

18   original, clearly.  And, you know, clearly power

19   of attorney, it can be an original or a photocopy

20   is acceptable.  There are some cases where we will

21   take, you know, a photocopy of the power of

1    me that the intervening assignment must be

2    provided to the loan certification group?  In

3    other words, in a situation where Picatinny is the

4    originating lender, it would have to assign its

5    loan to US Mortgage, and US Mortgage would have to

6    assign the mortgage to Fannie Mae; correct?

7        A   The only -- the difference that I know

8    about is if that initial assignment is in blank.

9        Q   Correct.

10       A   So it might not be multiple assignments

11   if the initial one is in blank.

12       Q   Okay.  So, if the initial assignment is

13   in blank from Picatinny, then you would not need

14   another assignment; correct?

15       A   Correct.  Multiple, yeah.

16       Q   Well, in this case there are no blank

17   assignments of mortgages.  So, knowing that

18   Picatinny did not either authorize or even on an

19   unauthorized basis have an assignment in blank of

20   its mortgage, two assignments would have to be

21   provided to the loan certification group; correct?

1       A    In order to pass our certification, yes.

2       Q    Now, do you know why two assignments

3    were required and instead of two assignments, an

4    assignment directly from Picatinny to Fannie Mae

5    was not asked for?

6       A    In most cases, the relationship between

7    that originator and the seller might not ever

8    contemplate -- in the industry wide not

9    specifically to Picatinny -- a secondary

10   execution.  And if it does, it might not have an

11   execution to Fannie direct.

12       So, in terms of process when I am buying

13   a loan, if I didn't know what I was going to do

14   with it, why would I have Picatinny do an

15   assignment to directly to Fannie.

16      Q    Well, let's look at that.

17      MR. FORTE:  Can you pull P -- I think it

18   is maybe 11.  It is the ones in question.  Right

19   there.

20   BY MR. FORTE:

21      Q    Is that P11 or 12?

# EXHIBIT 22

# ORIGINAL

MiN: 100059733300035239   **NOTE**

# NOTE

**March 18, 2008**
[Date]

[City]

**New Jersey**
[State]

[Property Address]

# REDACTED

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$191,350.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **8.1250%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **May 01, 2008**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **April 01, 2038**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **PO Box 682, Pine Brook, NJ 07058**

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$1,420.77**

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1846L1 (0609)

Form 3200 1/01
GreatDocs™
(Page 1 of 3)

**MFCD3002**

3330003523

CONFIDENTIAL

FNMA-USM000029870

## ALLONGE TO PROMISSORY NOTE

### LOAN INFORMATION

Loan Number: 3330003523

Borrower(s)        **REDACTED**

Property Address:

Note Amount: 191,350.00

Note Date:   March 18, 2008

Pay to the order of:

U.S. MORTGAGE CORPORATION

Without Recourse

Picatinny Federal Credit Union

Name *Bill Darlies*

Title *PRESIDENT*

US4057

CONFIDENTIAL                                    FNMA-USM000029873

MIN: 100059733300038720 **NOTE** ORIGINAL

**February 01, 2008**
[Date]

[City]

**New Jersery**
[State]

[Property Address]     **REDACTED**

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$258,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **4.6250%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **March 01, 2008**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **February 01, 2038**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **PO Box 682, Pine Brook, NJ 07058**

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$1,326.48**.

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1846L1 (0609)

Form 3200 1/01
GreatDocs™
(Page 1 of 3)

**MFCD3002**

**3330003872**

CONFIDENTIAL

FNMA-USM000018663

## ALLONGE TO PROMISSORY NOTE

**LOAN INFORMATION**

**Loan Number:** 3330003872

**Borrower(s)**          REDACTED

**Property Address:**

**Note Amount:** 258,000.00

**Note Date:**    February 1, 2008

Pay to the order of:

U.S. MORTGAGE CORPORATION

_____

Without Recourse

Picatinny Federal Credit Union

Name  Bill Darling

Title  CEO

US4057

**ORIGINAL**

# NOTE

*1000597333000372 43*

| | | |
|---|---|---|
| **November 19, 2007** | | **New Jersery** |
| [Date] | [City] | [State] |

[Property Address]                    **REDACTED**

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $357,900.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **8.3750%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **January 01, 2008**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **December 01, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **PO Box 682, Pine Brook, NJ 07058**

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **$2,720.30**.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1846L1 (0609)

Form 3200 1/01
GreatDocs™
(Page 1 of 3)

**MFCD3002**                                              **3330003724**

# ALLONGE TO PROMISSORY NOTE

**LOAN INFORMATION**

**Loan Number:** 3330003724

**Borrower(s)**                                                    :

## REDACTED

**Property Address:**

**Note Amount:** 357,900.00

**Note Date:**    November 19, 2007

Pay to the order of:

U.S. MORTGAGE CORPORATION

_____

Without Recourse

Picatinny Federal Credit Union

_____

Name Bill Darling

Title

US4057

# \#1000597333000   NOTE   ORIGINAL
## 38142

January 04, 2008
[Date]

[City]

Pennsy Ivania
[State]

[Property Address]

## REDACTED

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $245,000.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Picatinny Federal Credit Union, A Federal Credit Union

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          6.1250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the          1st          day of each month beginning on          March 01, 2008          I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on February 01, 2038          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at PO Box 682, P ine Brook, NJ  07058

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,488.65

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family— Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM 1646L1 (0609)

Form 3200 1/01
GreatDocs™
(Page 1 of 3)

MFCD3002

3330003814

# ALLONGE TO PROMISSORY NOTE

**LOAN INFORMATION**

**Loan Number:** 3330003814

**Borrower(s)** : 

# REDACTED

**Property Address:**

**Note Amount:** 245,000.00

**Note Date:**    January  4, 2008

Pay to the order of:

U.S. MORTGAGE CORPORATION

_____

Without Recourse

Picatinny Federal Credit Union

Name *Bill Darling*

Title    *CEO*

US4057

ORIGINAL

MIN: 100059733300038472

**NOTE**

December 26, 2007                                     [City]                              Pennnsylvania
[Date]                                                                                    [State]

**REDACTED**

[Property Address]

1.  **BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. **$400,000.00**                        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**
I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.  **INTEREST**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        **5.7500%**.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

3.  **PAYMENTS**
    **(A)  Time and Place of Payments**
    I will pay principal and interest by making a payment every month.
    I will make my monthly payment on the     **1st**     day of each month beginning on     **February 01, 2008**           .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **January 01, 2038**          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at **PO Box 682, Pine Brook, NJ  07058**

                                                            or at a different place if required by the Note Holder.

    **(B)  Amount of Monthly Payments**
    My monthly payment will be in the amount of U.S. **$2,334.30**

4.  **BORROWER'S RIGHT TO PREPAY**
    I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
    I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

**MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                 Form 3200 1/01

ITEM 1646L1 (0609)                                                                                     GreatDocs™
                                                                                                      (Page 1 of 3)

**MFCD3002**                                                                              3330003847

CONFIDENTIAL                                                                     FNMA-USM000018693

# ALLONGE TO PROMISSORY NOTE

**LOAN INFORMATION**

Loan Number: 3330003847

Borrower(s)                                          :

**REDACTED**

Property Address:

Note Amount: 400,000.00

Note Date:   December 26, 2007

Pay to the order of:

U.S. MORTGAGE CORPORATION

_____

Without Recourse

Picatinny Federal Credit Union

_____

Name  *Bill Donley*

Title  *CEO*

US4057

MIN: 1000597333000 3883 7 **NOTE**

# ORIGINAL

**January 09, 2008**
[Date]

[City]

**Pennnsylvania**
[State]

[Property Address]

**REDACTED**

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $**165,300.00**                      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Picatinny Federal Credit Union, A Federal Credit Union**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of         **6.2500%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     **1st**     day of each month beginning on          **March 01, 2008**          . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **February 01, 2038**          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **PO Box 682, Pine Brook, NJ 07058**

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $**1,017.79**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

**MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM 1646L1 (0609)

Form 3200 1/01
GreatDocs™
(Page 1 of 3)

**MFCD3002**

3330003883

CONFIDENTIAL

# ALLONGE TO PROMISSORY NOTE

**LOAN INFORMATION**

**Loan Number:** 3330003883

**Borrower(s)**                                                      :

## REDACTED

**Property Address:**

**Note Amount:** 165,300.00

**Note Date:**    January  9, 2008

Pay to the order of:

U.S. MORTGAGE CORPORATION

_____

Without Recourse

Picatinny Federal Credit Union

Name   Bill Darling

Title   CEO

US4057

CONFIDENTIAL

FNMA-USM000018660

# EXHIBIT 23

www.rileywelch.com

# RILEY WELCH LAPORTE
## & Associates
### Forensic Laboratories

Thomas P. Riley, BS
Forensic Document Examiner *, **

Gregoire P. Michaud, BA
Latent Print Examiner

P.O. Box 80225, Lansing, Michigan 48908-0225
Telephone (517) 394-1512   Fax (517) 882-2767

Gerald M. LaPorte***, ****, M.S.F.S.
Forensic Chemist &
Document Specialist

Todd W. Welch, BA
Forensic Document Examiner *

Felix Adatsi, Ph.D.
Toxicologist

September 10, 2010

Re:   ***Picatinny Federal Credit Union v. Federal National Mortgage Association; Civil Action No. 09-1295 (JAG)***
   **Riley Welch LaPorte & Associates Forensic Laboratories (RWLA) Case#09-351006**

My name is Gerald M. LaPorte, M.S.F.S. and I am a Forensic Chemist and Document Dating Specialist with Riley Welch LaPorte & Associates Forensic Laboratories. I have been retained by Latham & Watkins, LLC and I am being compensated at a rate of $400/hour. I have 17 years of experience in the field of forensic science and over 9 years of experience performing physical and chemical examinations on a variety of documents to determine how they were produced, where they may have originated from, and if they are authentic. I trained with the United States Secret Service in the field of questioned document examination with specialization in the area of ink and paper analysis. For over 6 years, I was responsible for maintaining the largest international collection of writing ink standards in the world – a collection of nearly 10,000 inks that date back to the 1920s. I served as the Chief Research Forensic Chemist of the United States Secret Service until March of 2009 and I am currently employed with another U.S. government agency as a Forensic Policy Program Manager.

I am a member of several organizations including the American Academy of Forensic Sciences (AAFS), American Society of Questioned Document Examiners (ASQDE), American Society of Testing and Materials (ASTM) International, Mid-Atlantic Association of Forensic Scientists (MAAFS), and the Mid-Western Association of Forensic Scientists (MAFS). I am also a contributing member in the Scientific Working Group for Questioned Documents (SWGDOC) and the European Document Examiners Working Group (EDEWG). I have conducted over 50 lectures, seminars, and training events in 13 different countries for law enforcement agencies, professional organizations, and technical experts. As well, I have organized and personally conducted workshop training in the areas of document authentication and ink analysis. I have published several scientific papers in the area of forensic document examination and authored a chapter on document fraud and forgery. A copy of my curriculum vitae (Attachment 1) and a list of trials and depositions (Attachment 2) are included for your consideration.

## REQUEST

I was asked by Latham & Watkins to examine and review fifty-one (51) Picatinny Federal Credit Union promissory notes on March 21, 2009 that were located in a secured vault at Fannie Mae in Herndon, Virginia to determine if the signatures on the notes were original ink signatures.

**QUESTIONED EXHIBITS**

The following is a summary of the fifty-one (51) promissory notes that were examined.

| FNMA Loan Number | Lender Loan Number | Customer Name |
|---|---|---|
| 4005648151 | 3330002928 | |
| 4005648153 | 3330003095 | |
| 4005648154 | 3330003136 | |
| 4005648155 | 3330003506 | |
| 4005648156 | 3330003597 | |
| 4005648157 | 3330002764 | |
| 4005648158 | 3330003243 | |
| 4005648159 | 3330003592 | |
| 4005661270 | 3330002101 | |
| 4005661271 | 3330002175 | |
| 4005661272 | 3330002274 | |
| 4005661273 | 3330002295 | |
| 4005661274 | 3330002345 | |
| 4005661275 | 3330002216 | |
| 4005661276 | 3330002030 | **REDACTED** |
| 4005756471 | 3330001700 | |
| 4005756472 | 3330001410 | |
| 4005756771 | 3330000431 | |
| 4005756772 | 3330000819 | |
| 4005756773 | 3330000877 | |
| 4005756774 | 3330000887 | |
| 4005756775 | 3330000898 | |
| 4005756776 | 3330001233 | |
| 4005756777 | 301308649 | |
| 4005756778 | 301310876 | |
| 4005756780 | 3330000341 | |
| 4005757011 | 3330002748 | |
| 4005757012 | 3330003642 | |
| 4005757014 | 3330003754 | |
| 4006016265 | 3330001896 | |
| 4006016266 | 3330002397 | |
| 4006016267 | 3330004404 | |
| 4006016268 | 3330004513 | |
| 4006016269 | 3330004602 | |
| 4006016270 | 3330004650 | |
| 4006016271 | 3330004771 | |

| | |
|---|---|
| 4006016272 | 3330004845 |
| 4006016273 | 3330004895 |
| 4006016274 | 3330000992 |
| 4006016275 | 3330001919 |
| 4006016276 | 3330004529 |
| 4006016277 | 3330004959 |
| 4006016454 | 3330004359 |
| 4006113174 | 3330005103 |
| 4006152757 | 3330005404 |
| 4006152759 | 3330005439 |
| 4006153590 | 3330005254 |
| 4006188123 | 3330005273 |
| 4006188124 | 3330005369 |
| 4006188125 | 3330005457 |
| 4006197950 | 3330005226 |

**REDACTED**

## EXAMINATIONS

Visual and microscopic examinations were conducted on the promissory notes to determine if the borrower signatures were original (i.e., created with a writing instrument) or reproductions (e.g., photocopied or scanned). Writing inks can typically be classified into ballpoint, non-ballpoint (e.g., roller ball, felt tip, gel), and fountain pen inks based on their unique microscopic characteristics that result from the combination of their differential chemical composition and interactions with paper. Determining the type and color of a writing ink is commonly reported following a microscopic examination and is further described in the American Society for Testing and Materials (ASTM) International Standard Guide E 1422–05[1]. In this case, the objective of the analysis was to determine whether the signatures were original, thus, the type of ink used is not reported.

A brief description of the technique and the instruments utilized are as follows:

Visual – This type of examination uses the unaided human eye to examine the physical appearance of a document.

Microscopic – Stereomicroscopes are used to examine the features of a document at varying degrees of magnification. A stereomicroscope is a binocular microscope capable of blending both eyepiece images, allowing the examiner to discern depth of field.

Digital Photography –High resolution digital photographs of the signatures were captured and used for verification if needed.

---

[1] Conducted per E1422-05 "Standard Guide for Test Methods for Forensic Writing Ink Comparison," ASTM International. For Annual Book of ASTM Standards volume information, refer to the standard's Document Summary page on the ASTM website.
For referenced ASTM International standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org.
Conducted per E1422-05 "Standard Guide for Test Methods for Forensic Writing Ink Comparison," ASTM International. For Annual Book of ASTM Standards volume information, refer to the standard's Document Summary page on the ASTM website.

## RESULTS

It was determined that all of the signatures on the fifty-one (51) Picatinny Federal Credit Union promissory notes were original ink signatures.

## DISPOSITION OF THE EVIDENCE

No promissory notes were removed from the Fannie Mae vault in Herndon, VA and remained in the possession of a Fannie Mae representative at all times.

_____
Gerald M. LaPorte, M.S.F.S.
Forensic Chemist and Document Dating Specialist

# ATTACHMENT 1

## GERALD M. LAPORTE, M.S.F.S.
## Curriculum Vitae

**Positions:**     *Forensic Policy Program Manager*
United States Government
Washington, DC USA

*Forensic Chemist & Document Specialist*
Riley Welch LaPorte & Associates Forensic Laboratories
Lansing, Michigan  USA

**Education:**     University of Alabama at Birmingham (1994)
Birmingham, Alabama  USA
Master of Science in Forensic Science (M.S.F.S.)

University of Windsor (1992)
Windsor, Ontario Canada
Bachelor of Commerce in Business Administration

University of Windsor (1990)
Windsor, Ontario Canada
Bachelor of Science in Biology (B.Sc.)

**Professional**
**Experience:**     United States Government
Washington, DC (03/09 – Present)
*Forensic Policy Program Manager*
Duties: Provide expert analysis and advice on agency-wide programs or issues of national impact relating to forensic science; provide expert advice to top management officials; identify reasons for the nature and/or extent of program-related problems that arise and investigate area in need of improvement; write comprehensive resolution recommendations; formally present findings before large and diverse audiences, such as Federal, state, and local government representatives, special interest groups, the scientific community, and the media.

United States Secret Service, Washington, DC (04/01 – 03/09)
*Chief Forensic Chemist*
Duties: Serve as the technical liaison and research chemist for the United States Secret Service pertaining to issues related to the chemistry of documents and fingerprints; coordinating clandestine tagging programs; direct all research projects within the Forensic Services Division.
Laboratory Duties: perform physical and chemical examinations on a variety of documents to determine how they were produced, where they may have originated from, and if they are authentic. These types of documents include anonymous letters (e.g., threatening, kidnapping, and extortion), suspected counterfeit identifications and financial documents (e.g. travelers checks, credit cards), contracts, and other miscellaneous written materials.  Chemical examinations are conducted using thin layer chromatography (TLC), gas chromatography/mass spectrometry (GC/MS), liquid chromatography-mass spectrometry (LC/MS), infrared spectroscopy (IR), scanning electron microscopy/energy dispersive x-ray analysis (SEM/EDXA); perform chemical tests on unknown (e.g. miscellaneous powders) and controlled substances; testify in court as an expert witness.
Administrative Duties: responsible for the overall activities of the instrumental analysis laboratory including supervising interns and contractors, establishing fiscal year budgets for laboratory supplies, maintaining and purchasing all laboratory equipment, and the overseeing of two of the world's largest

databases for writing and printer inks; participate in the hiring of new employees and the training of new forensic document examiners within the instrumental laboratory.

Virginia Division of Forensic Science, Richmond, VA (11/99 – 04/01)
*Forensic Scientist*
Duties: analyze evidence for the presence or absence of controlled substances using a variety of chemical and instrumental tests; utilize sophisticated instrumentation such as gas chromatography/mass spectrometry and Fourier transform infrared spectroscopy; testify in court as an expert witness

Anne Arundel County Police Department Crime Lab, Millersville, MD (01/99 -11/99)
*Forensic Chemist*
Duties: similar to the aforementioned duties for Virginia Division of Forensic Science
Accu-Chem Laboratories, Richardson, TX (07/96 – 09/98)
*Forensic and Clinical Toxicology Specialist*
Duties: supervisor of toxicology department; sales and marketing of drug testing and occupational and environmental toxicology testing; serve as a liaison to physicians and personnel responsible for forensic urine drug testing; testify in court as an expert witness in the area of forensic urine drug testing

Jefferson County Coroner/Medical Examiner Office, Birmingham, AL (09/93 - 07/96)
**Autopsy Assistant/Forensic Technician**
Duties: identify, collect, preserve, and document any potential evidentiary material; eviscerate all human organs and document any relevant findings; perform histological examinations

University of Alabama at Birmingham, Birmingham, AL (01/94 – 07/96)
**Guest Forensic Science Lecturer**
Duties: lecture on areas related to forensic pathology and death investigation to undergraduate and graduate students

**Honors/Professional Affiliations:**

American Academy of Forensic Sciences (AAFS)
Mid-Atlantic Association of Forensic Scientists (MAAFS)
American Standards for Testing and Materials (ASTM)
American Society of Questioned Document Examiners (ASQDE)
Guest Reviewer for the Journal of Forensic Sciences
Guest Reviewer for the Journal for the American Society of Questioned Document Examiners
Contributing member in the Scientific Working Group for Questioned Document Examiners (SWGDOC)
Contributing member in the European Document Examiners Working Group (EDEWG) and the International Collaboration for Ink Dating (INCID)
Co-Chair on the Standards, Practices, and Protocols Interagency Working Group (IWG) under the Office of Science and Technology Policy (Executive Office of the President)
Recipient of the "2005 Forensic Scientist of the Year" by the Mid-Atlantic Association of Forensic Scientists
Recipient of the United States Attorney's Office Eastern District of Virginia "Law Enforcement Public Service Award"

# LECTURES AND INSTRUCTIONAL COURSES CONDUCTED

1. **Workshop Instructor.** "Inkjet Technology and Forensic Examinations" at the Annual Meeting for the American Society of Questioned Document Examiners (ASQDE). Dearborn, MI, August 2009.
2. **Workshop Instructor**. "Inkjet Technology and Forensic Examinations" at the Annual Meeting for the Southern Association of Forensic Document Examiners (SAFDE). Peach Tree City, GA, April 8, 2009.
3. **Workshop Instructor.** "Inkjet Technology and Forensic Examinations" at the Skill-Task Training Assessment & Research (ST2AR) Fall Workshop. Las Vegas, NV, October 22-23, 2008.
4. **Workshop Instructor.** "Applications of Light and Color Theory in Forensic Document Examinations" at the American Academy of Forensic Sciences Annual Meeting, Washington, DC, February 18, 2008.
5. **Workshop Instructor.** "Methods Used for Authenticating Questioned Documents" at the Mid-Western Association of Forensic Scientists (MAFS) Annual Meeting, Traverse City, MI, September 25, 2007.
6. **Workshop Instructor.** "Methods Used for Authenticating Questioned Documents" at the American Society of Questioned Document Examiners (ASQDE) Annual Meeting, Boulder, CO August 13-14, 2007.
7. **Instructor for the Midwest Forensic Resource Center (MFRC)** – Recorded Training. Questioned Documents and the Crime Scene, Ames, IA, July 18, 2007.
8. **Instructor at the Federal Bureau of Investigation (FBI) Academy** - Forensic Document Examiner Training Seminar, Quantico, VA. "An Analytical Approach to Forensic Document Examination." April 17, 2007.
9. **Instructor at the George Washington University**, Washington, DC. "An Analytical Approach to Forensic Document Examination." February 28, 2007.
10. **Instructor at Marymount University**, Arlington, VA. An Analytical Approach to Forensic Document Examination." November 14, 2006.
11. **Workshop Instructor**. "Authenticating Documents "American Board of Forensic Document Examiners (ABFDE). Las Vegas, NV, November 6-7, 2006.
12. **Instructor at the George Washington University**, Washington, DC. "An Analytical Approach to Forensic Document Examination." October 18, 2006.
13. **Workshop Instructor.** "The Forensic Examination of Documents Produced with Office Machine Systems Utilizing Inkjet Technology." The International Association for Identification (IAI) 91st International Education Conference, Boston, MA, July 3, 2006.
14. **Workshop Instructor.** "Security Features in Documents. " Mid-Atlantic Association of Forensic Scientists Annual Meeting, May 3, 2006.
15. **Instructor at the Federal Bureau of Investigation (FBI) Academy** - Forensic Document Examiner Training Seminar, Quantico, VA. "The Forensic Examination of Inks." April 5, 2006.
16. **International Instructor in Doha, Qatar.** "The Examination of Counterfeit Documents." March 27-28, 2006.
17. **Instructor at Marshall University**, Huntington, WV. "Forensic Science at the United States Secret Service." March 15, 2006.
18. I**nstructor at Indiana University-Purdue University at Indianapolis.** "Forensic Science at the United States Secret Service." December 12, 2005.
19. **Workshop Instructor.** "The Forensic Examination of Printing Processes." American Board of Forensic Document Examiners (ABFDE). Las Vegas, NV, November 7-8, 2005.
20. **Instructor at the George Washington University**, Washington, DC. "The Forensic Examination of Printers and Copiers." December 1, 2004.
21. **Instructor at the University of Windsor**, Windsor, Ontario Canada. "Questioned Document Examinations." November 10, 2004.
22. **Instructor at the University of Windsor**, Windsor, Ontario Canada. "Forensic Science at the United States Secret Service." November 9, 2004.
23. **Instructor at the University of Windsor**, Windsor, Ontario Canada. "Forensic Drug Chemistry and Toxicology." November 8, 2004.
24. **Instructor at George Washington University**. "The Forensic Examinations of Inks and Paper." George Washington University, October 27, 2004.
25. **Workshop Instructor.** "The Forensic Examination of Documents Produced By Office Machine Systems Utilizing Inkjet Technology." Northeastern Association of Forensic Sciences, September 30, 2004.
26. **Instructor at Federal Law Enforcement Training Center.** "The Forensic Examination of Printers and Copiers" and "The Forensic Analysis of Inks and Paper." Brunswick, GA. June 21, 2004.
27. **Guest Speaker at the Federal Bureau of Investigation Laboratory.** "Forensic Chemistry and Questioned Document Examinations." Quantico, VA. May 5, 2004.

28. **Instructor at Forest Park High School.** "Applications of Forensic Chemistry." Woodbridge, VA. May 18, 2004.
29. **Workshop Instructor.** "The Forensic Examination of Documents Produced By Office Machine Systems Utilizing Inkjet Technology." Mid-Atlantic Association of Forensic Sciences, April 20, 2004.
30. **Instructor at George Washington University.** "The Forensic Examination of Printers and Copiers." George Washington University, November 20, 2003.
31. **Instructor at George Washington University.** "Ink and Paper Chemistry." George Washington University, October 30, 2003.
32. **Instructor at Marshall University.** "Ink and Paper Chemistry" and "Counterfeit Identification Examinations." Huntington, WV. September 23, 2003.
33. **International Instructor. International Law Enforcement Academy (ILEA).** "Ink and Paper Chemistry" and Counterfeit Document Examinations." Pretoria, South Africa. May 19-20, 2003.
34. **Instructor at Federal Law Enforcement Training Center.** "Printing Processes" and "Physical and Chemical Analysis of Inks and Paper." Brunswick, GA. June 22, 2003.
35. **International Instructor. International Law Enforcement Academy (ILEA).** "Ink and Paper Chemistry" and "Counterfeit Document Examinations." Pretoria, South Africa. May 19-20, 2003
36. **International Instructor. International Criminal Investigative Training Program (ICITAP)**, U.S. Department of Justice, "Counterfeit Document Examinations" and "Ink and Paper Chemistry." Sophia, Bulgaria. January 16-17, 2003.

# PROFESSIONAL PRESENTATIONS

1. **LaPorte, G.** The Importance of Validating and Verifying a Standardized Method: Envelope Examinations and the Anthrax Investigation. Presented at the Mid-Atlantic Association of Forensic Scientists Annual Meeting. Hunt Valley, MD, May 8, 2009.
2. **LaPorte, G.** Questioned Documents and Homicide Investigations. Presented at the Annual Meeting for the Virginia Homicide Investigators Association. Norfolk, VA, October 6, 2008.
3. **LaPorte, G.** Questioned Documents and the Sub-Disciplines. Presented at the Symposium on Special Topics in Questioned Document Analysis. Ankeny, IA, September 30, 2008.
4. **LaPorte, G.** An Overview of the Forensic Examinations on Documents Produced Using Inkjet and Thermal Printing Devices and the Increasing Need for Security. 31st Annual Global Inkjet Printing Conference, Budapest, Hungary, March 12, 2008.
5. **LaPorte, G**, Beuchel, A, and Stepehns, J. The Examination of Commercial Printing Defects to Assess Common Origin and Batch Variation. Presented at the American Academy of Forensic Sciences Annual Meeting, Washington, DC, February 22, 2008.
6. **LaPorte, G.** Exonerations and Incarcerations: The Key Role of the Forensic Sciences – Questioned Documents. Presented at the American Academy of Forensic Sciences Annual Meeting, Washington, DC, February 19, 2008.
7. **LaPorte, G**, Holifield, A, and Stephens, J. The Black Money Scam. Presented at the Mid-Atlantic Association of Forensic Scientists Annual Meeting, Washington, DC, May 24, 2007.
8. Schwartz, R. and **LaPorte, G.** The Effects of Common Environmental Variables on the Infrared Luminescence Properties of Writing Inks. Presented at the Mid-Atlantic Association of Forensic Scientists Annual Meeting, Washington, DC, May 25, 2007.
9. Holifield, A and **LaPorte, G**. Artificially Aged Documents. Presented at the Mid-Atlantic Association of Forensic Scientists Annual Meeting, Washington, DC, May 25, 2007.
10. Voiles, R., Stephens, J., and **LaPorte, G.** The Forensic Examination of Documents Using Print Quality Analysis Software. Presented at the Mid-Atlantic Association of Forensic Scientists Annual Meeting, Washington, DC, May 25, 2007.
11. **LaPorte, G.** Forensic Applications of Chromatography at the United States Secret Service. Presented for the Minnesota Chromatography Forum. Minneapolis, MN, March 27, 2007.
12. **LaPorte, G**. The Necessity of Security Printing for the Forensic Scientist. Presented at the 30th Annual Global Inkjet and Thermal Conference. Prague, Czech Republic, March 2, 2007.
13. **LaPorte, G.,** Stoker, D**.,** Thomas, Y, Stephens, J, and Shaffer, D**.** The Analysis of 2-Phenoxyethanol for the Dating of Documents. Presented at the 59th Annual Meeting of the American Academy of Forensic Sciences, San Antonio, TX, February 22, 2007.

14. Shaffer, D., Stephens, J. **LaPorte**, G. A Comparison of the Physical and Chemical Characterization of Conventional Toners vs. Chemically Prepared Toners. Presented at the 59th Annual Meeting of the American Academy of Forensic Sciences, San Antonio, TX, February 23, 2007.

15. Nelis, E., LaPorte, G., and Thomas, Y. The Use of Electrospray Ionization – Mass Spectrometry for the Identification of Controlled Substances. Presented at the 59th Annual Meeting of the American Academy of Forensic Sciences, San Antonio, TX, February 23, 2007.

16. **LaPorte, G.** The Forensic Examination of Documents Produced on Office Machine Systems Utilizing Inkjet Technology. Presented at the California Association of Criminalistics Fall Workshop Meeting, October 12, 2006.

17. **LaPorte, G**. The Physical and Chemical Examinations of Documents Produced Using Inkjet Technology. Presented at the 4th Meeting of the European Document Experts Working Group, The Hague, Netherlands, September 28, 2006.

18. Schuler, R., Treado, P.J., Gardner, C., **LaPorte, G**., Stephens, J. Chemical Imaging for Questioned Document Examination. Presented at the 4th Meeting of the European Document Experts Working Group, The Hague, Netherlands, September 29, 2006.

19. **LaPorte, G**. The Forensic Examination of Documents Produced Using Inkjet Technology. Presented at the Imaging Materials Seminar: Inkjet Ink, Rochester, NY, May2, 2006.

20. Layman, M. and **LaPorte, G.** Questioned Documents and the Crime Scene. Presented at the 58th Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 23, 2006.

21. Shaffer, D, Stephens, J., and **LaPorte, G**. The Characterization of Envelopes for Questioned Document Examinations. Presented at the 58th Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 23, 2006.

22. Stephens, J. and **LaPorte, G**. The Use of Hyperspectral Contrast Imaging for the Examination of Writing Inks. Presented at the 58th Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 23, 2006.

23. **LaPorte, G**. and Layman, M. The Use of Supplementary Testing in Forensic Document Examinations. Presented at the Annual Meeting for the American Society of Questioned Document Examiners, Montreal, Quebec, August 15, 2005.

24. **LaPorte, G.,** Arredondo, M, McConnell, Cantu, A. The Static Method of Dating Writing Inks – A Preliminary Assessment of the United States International Ink Library. Presented at the Mid-Atlantic Association of Forensic Scientists Annual Meeting, Pittsburgh, PA, May 19, 2005.

25. **LaPorte, G**. The Forensic Examination of Documents Produced Using Inkjet and Thermal Technology. Presented at the 28th Global Inkjet and Thermal Printing Conference, Barcelona, Spain, March 16, 2005.

26. **LaPorte, G**. The Examination of Inkjet Printed Documents – What's on the Frontier? Presented at the 57th Annual Meeting of the American Academy of Forensic Sciences, New Orleans, LA, February 24, 2005.

27. Shaffer, D. and **LaPorte, G.** Applications of Scanning Electron Microscopy/Energy Dispersive X-Ray Analysis at the United States Secret Service. Scanning: The Journal of Scanning Microscopies, Volume 26(2), March/April, 2004.

28. Arredondo, M and **LaPorte, G.** The Forensic Examination of Paper. Presented at the Mid-Atlantic Association of Forensic Scientists Annual Meeting, Wilmington, DE, April 23, 2004.

29. **LaPorte, G**. The Forensic Examination of Documents and Counterfeit Identifications Related to Terrorism and Financial Crimes. International Conference on Asian Organized Crime and Terrorism. Honolulu, HI, April 10-16, 2004.

30. Cochran, J., Glisson, F., and **LaPorte, G**. Characterization of Inks by Solid Phase Microextraction – Gas Chromatography/Time-of-Flight Mass Spectrometry. Pittconn 2004, Chicago, IL.

31. **LaPorte, G**. Analyzing Bar Soaps by Utilizing a Variety of Optical and Chemical Techniques. Presented at the 56th Annual Meeting of the American Academy of Forensic Sciences, Dallas, TX, February 20, 2004.

32. **LaPorte, G**. The Analysis of Volatile Organic Compounds in Ballpoint Inks Using Gas Chromatography/Mass Spectrometery. Presented at the 56th Annual Meeting of the American Academy of Forensic Sciences, Dallas, TX, February 19, 2004.

33. **LaPorte, G.** Inkjet Technology: The Need for Security and Forensic Traceability. Presented at the 11th Annual European Inkjet Printing Conference, Lisbon, Portugal, November 10, 2003.

34. **LaPorte. G.** Cold Cases in Forensic Science. Presented to the Virginia Homicide Investigators Association (VHIA). October 6, 2003.

35. **LaPorte, G.** The Use of an Electrostatic Detection Device (EDD) to Identify Class Characteristics on Documents Produced by Printers and Copiers. Presented at the American Society of Questioned Document Examiners Annual Meeting. August, 2003.

36. Wilson, J & **LaPorte, G**.   The Differentiation of Gel Inks using Various Optical and Chemical Techniques. Presented at the Mid-Atlantic Association of Forensic Scientists Annual Meeting, Annapolis, MD, May 8, 2003.

37. **LaPorte, G**.  The Analysis of 2-Phenoxyethanol in Ballpoint Inks Using Gas Chromatography/Mass Spectrometry.  Presented at the Mid-Atlantic Association of Forensic Scientists Annual Meeting, Annapolis, MD, May 8, 2003.

38. **LaPorte, G**.  The Forensic Examination of Thermal Transfer Printing.  Presented for Information Management Institute: The 14th Annual Thermal Printing Conference, Scottsdale, AZ, April 28-30, 2003.

39. **LaPorte, G**.  The Use of an Electrostatic Detection Device (EDD) to Identify Class Characteristics on Documents Produced by Printers and Copiers.  Presented at the American Academy of Forensic Sciences Annual Meeting, Chicago, IL, February, 2003.

40. **LaPorte, G**.  The Forensic Examination of Office Machine Systems Utilizing Inkjet and Toner Technology.  Presented for Information Management Institute: The 10th Annual European Ink Jet Printing Conference, Lisbon, Portugal, October 28-30, 2002.

41. Payne, J & **LaPorte, G**.  The Forensic Examination of Thermal Transfer Printers.  Presented at the Mid-Atlantic Association of Forensic Scientists, Frederick Maryland, April 25, 2002.

42. **LaPorte, G** & Ramotowski, R.   The Effects of Latent Print Processing on Questioned Documents Produced by Office Machine Systems Utilizing Inkjet Technology and Toner.  Presented at the Mid-Atlantic Association of Forensic Scientists, Frederick Maryland, April 25, 2002.

43. **LaPorte, GM** & Davis, G.G. (1995).  A Retrospective Study of the Incidence of Drugs in Decomposed Remains in Jefferson County, Alabama.  Presented as an oral presentation at the  American Academy of Forensic Sciences Annual Meeting, Seattle, WA.

44. Gruszecki, A, Davis, GG, **LaPorte, GM** & Robinson, CA (1995).  The Incidence of Corresponding Presence of Cocaine and Cocaethylene in Both Hair and Routine Postmortem Biological Samples.  Presented as a poster at the American Academy of Forensic Sciences Annual Meeting, Seattle, WA.

# PROFESSIONAL PUBLICATIONS

1. Houlgrave, S., **LaPorte, G**., and Stephens, J.  The Use of Filtered Light for the Evaluation of Writing Inks Analyzed Using Thin Layer Chromatography.  Journal of Forensic Sciences.  Accepted for Publication in May, 2010.

2. **LaPorte, G**., Stephens, J, and Beuchel, A.  The Examination of Commercial Printing Defects to Assess Common Origin, Batch Variation, and Error Rate.  Journal of Forensic Sciences, Volume 55(1), January, 2010.

3. Bicknell, D and **LaPorte, G**.  "Documents, Forgeries and Counterfeits" in The Encyclopedia of Forensic Sciences.  Accepted for publication in November 2008 with pending date for print.

4. Arredondo, M., **LaPorte, G**., Wilson, J., McConnell, T., Shaffer, D., and Stam, M.  Analytical Methods Used for the Discrimination of Substances Suspected to be Bar Soap: A Preliminary Study.  Journal of Forensic Sciences, Volume 51 (6), November, 2006.

5. **LaPorte, G.**, Arredondo, M., McConnell, T., Stephens, J., Cantu, A., Shaffer, D.   An Evaluation of Matching Unknown Writing Inks with the United States International Ink Library.  Journal of Forensic Sciences, Volume 51 (3), May, 2006.

6. **LaPorte, G**.  Modern Approaches to the Forensic Analysis of Inkjet Printing – Physical and Chemical Examinations.  Journal of the American Society of Questioned Document Examiners, Volume 7, Number 1, June 2004.

7. **LaPorte, G**. The Use of an Electrostatic Detection Device to Identify Individual and Class Characteristics on Documents Produced by Printers and Copiers – A Preliminary Study.  Journal of Forensic Sciences, Volume 49 (3), May, 2004.

8. **LaPorte, G.**, Wilson, J, Cantu, A.  The Identification of 2-Phenoxyethanol in Ballpoint Inks Using Gas Chromatography/Mass Spectrometry.  Journal of Forensic Sciences, Volume 49 (1), January 2004.

9. Wilson, J, **LaPorte, G**, Cantu, A.  Differentiation of Black Gel Inks Using Optical and Chemical Techniques.  Journal of Forensic Sciences, Volume 49 (2), March  2004.

10. **LaPorte, G**. Published Book Review, "Advances in the Forensic Analysis and Dating of Writing Ink."  Journal of Forensic Identification Volume 53(6), 2003\735.

11. **LaPorte, G**, Wilson, J, Mancke, S. Amanda, Payne, J, Ramotowski, R, & Fortunato, S.  The Forensic Analysis of Thermal Transfer Printers, Journal of Forensic Sciences, Volume 48 (5), September 2003.

12. **LaPorte, G** & Ramotowski, R.  The Effects of Latent Print Processing on Questioned Documents Produced by Office Machine Systems Utilizing Inkjet Technology and Toner,  Journal of Forensic Sciences, Volume 48 (3), May, 2003.

13. Lovett Doust, J & **LaPorte, G** (1991).  Population Sex Ratios, Population Mixtures and Fecundity in a Clonal Dioecious Macrophyte, *Vallisneria Americana*.  Journal of Ecology.  79: 477-489.

# ATTACHMENT 2

### Trial List
### for
### Gerald M. LaPorte, M.S.F.S.

I have testified approximately 35-40 times in the Commonwealth of Virginia and the States of Texas and Maryland on issues related to forensic urine drug testing and controlled substance analysis.

The following is a list of court appearances related to the examination of questioned documents/ink analysis/ink dating:

**Criminal Cases**

1. Tax Court of Canada vs L.D.G. 2000 Incorporated
   Montreal, Quebec Canada                                      April 9, 2002
2. USA v William Bartmann
   United States District Court – Northern District of Oklahoma   October 17, 2003
3. USA v Clayton Lee Waagner
   United States District Court – Eastern District of Pennsylvania   December 2, 2003
4. Matter of Singh, Atvar (A76-676-494)
   U.S. Department of Homeland Security –
   Immigration and Customs Enforcement                          July 16, 2004
5. USA vs Paul Ihle, Jr.
   United States District Court – Northern Indiana              September 9, 2004
6. State v Matthew C. Owens, Case # 2NO-SO3-821 CR
   Nome, Alaska                                                 January 27, 2005
7. USA v Sylvester Richards Gayekpar
   United States District Court – District of Minnesota         October 12, 2005
8. State v Matthew Owens, Case # 2NO-S03-821 CR
   Kotzebue, Alaska                                             November 2, 2005
9. USA v Robert Sterling Miller – Western District of Texas
   Austin, Texas, Case#A-05-CR-247 SS                           April 26, 2006
10. USA v Hector R. Lugo-Rios – United States District Court,
    Judicial District of Puerto Rico
    San Juan, Puerto Rico, Case#05-354 (JAF)                    May 24, 2006
11. USA v Nancy Harlow – Northern District of Texas
    Dallas, Texas, Case#3:06-CR-011-D                           July 18, 2006
12. USA v Hector R. Lugo-Rios et al – United States District Court,
    Judicial District of Puerto Rico
    San Juan, Puerto Rico, Case#05-354 (JAF)                    August 25, 2006
13. State of New Jersey v Alfred Smith
    Superior Court of New Jersey, County of Burlington
    Mt. Holly, NJ, Case#05-1988                                 August 31, 2006
14. USA v Cleveland Kilgore – U.S. District Court For the
    District of Maryland
    Baltimore, MD, Case#RDB-06-0115                             September 21, 2006
15. USA v Isidore Nouthong et al – U.S. District Court For the
    Eastern District of Virginia
    Alexandria, VA, Case#:1:06cr305                             October 26, 2006
16. USA v Isidore Nouthong et al – U.S. District Court For the
    Eastern District of Virginia
    Alexandria, VA, Case#:1:06cr305                             February 7, 2007
17. USA v Clyde Cook – U.S. District Court For the
    Eastern District of Tennessee
    Memphis, TN                                                 April 10, 2007
18. USA v Jermain Betea

|  | | |
|---|---|---|
| | Eastern District of Virginia | |
| | Alexandria, VA, Case#1:06cr305 | May 3, 2007 |
| 19. | USA v Crist Dauberman | |
| | Eastern District of Virginia | |
| | Richmond, VA , Case#3:07CR040 | May 8, 2007 |
| 20. | USA v Jose Padilla et al – U.S. District Court For the | |
| | Southern District of Florida | |
| | Miami, FL, Case#04-60001-CR-Cooke | July 12, 2007 |
| 21. | Commonwealth of Kentucky v Quincy Omar Cross | |
| | Hickman Circuit | |
| | Clinton, KY, Case#08-CR-00001 | April 2, 2008 |
| 22. | People of the State of NY v Stacey Castor | |
| | County of Onondaga | |
| | Syracuse, NY, DR#05-359834/07-402152 | January 21, 2009 |
| 23. | USA v Mark A. O'Hair, Et AL | |
| | Northern District of Florida | |
| | Pensacola, FL, Case #3:08cr75/LAC | July 28, 2009 |

## Civil Cases

1. International Arbitration. Bank Julius Baer Co. Ltd v Waxfield Ltd Llc Bbcfd Sa G 04-6668-Cv 424 F.3d 278. New York, NY; June 11, 2009. (UNRESOLVED)
2. International Center for Settlement of Disputes (ICSID); Libananco Holdings Co. Limited v. Republic of Turkey (ICSID Case No. ARB/06/8).  Washington, DC; November 3, 2009 (UNRESOLVED)
3. Lake Forest Homeowner's Association v. Orlando Lake Forest Joint Venture, et al Seminole County Case No. 07-CA-1867-16-L.  Seminole County, FL; April 20, 2010. (RULING ISSUED)

## Depositions

1. Blau v Schaefer, MD (Docket MID-L-3015-05), New Jersey; July 25, 2008.
2. Giorgio v. Gibbens, M.D., et al (File No. 2392/S), New Jersey; August 26, 2009 (Trial Pending)
3. Lake Forest Homeowner's Association v. Orlando Lake Forest Joint Venture, et al Seminole County Case No. 07-CA-1867-16-L,  March 19, 2010.

# EXHIBIT 24

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW JERSEY

3          CIVIL ACTION NO:  09-01295 (JAG)

4

5    PICATINNY FEDERAL CREDIT UNION,      )

6                             )

7          Plaintiff,            )

8                             )

9          -against-              )

10                            )

11   FEDERAL NATIONAL MORTGAGE CORP.,     )

12                            )

13         Defendant.            )

14                            )

15                            )

16

17         VIDEOTAPED DEPOSITION OF: DANIEL J. MATHEWS

18              WEDNESDAY, JUNE 30, 2010

19

20            ROSENBERG & ASSOCIATES, INC.

21         Certified Court Reporters & Videographers

22      425 Eagle Rock Ave., Suite 201      575 Madison Ave.

23      Roseland, NJ 07068           New York, NY 10022

24      (973) 228-9100    1-800-662-6878    (212) 868-1936

25            www.rosenbergandassociates.com

1    aware of that specifically identifies you by name or

2    by title as a person who had authority to sign

3    allonges?

4            MR. FORTE:  Note my objection, but you

5    may answer.

6            A.    Not that I'm aware of.

7            Q.    Are you aware of any document that

8    specifically identified Mr. Lardiere by name or by

9    title as a person with authority to sign allonges?

10           A.    Not that I'm aware of.

11           Q.    Are you aware of any document that

12   specifically identified Mr. Darling by name or by

13   title as a person with authority to sign allonges?

14           MR. FORTE:  Same objection.  You may

15   answer.

16           A.    Not that I'm aware of.

17           Q.    Are you aware of any document that

18   specifically states that only you, Mr. Lardiere or

19   Mr. Darling could sign allonges on behalf of

20   Picatinny?

21           A.    Not that I'm aware of.

22           Q.    By your understanding, is there anyone

23   besides you, Mr. Lardiere and Mr. Darling that was

24   authorized to sign allonges on behalf of Picatinny

25   between 2002 and February 1, 2009?

1      A.    No.

2      Q.    Let's go back to the bulk sale in

3   2003.  What is your understanding as to how that sale

4   was to be accomplished?  What was the process?

5           MR. FORTE:  Note my objection.  You

6   asked and answered -- that's been asked and answered

7   already, as well.  A number of repetitive questions

8   today, Alan.

9           MR. KRAUS:  I don't think that one was

10  asked and answered.

11     Q.    I understand how they were selected.

12  I'm talking about once loans were selected to be

13  sold, what is your understanding as to how that was

14  going to happen?

15     A.    I wasn't involved in that.

16     Q.    Were you the person who signed the

17  1008s?

18     A.    For those particular --

19     Q.    Right.

20     A.    Those were loans that were -- those

21  loans we were holding on our books initially, so they

22  would have been loans that we held.

23     Q.    Okay.

24     A.    At the point in time where we booked

25  it, and then we had it on our books and then we