# EXHIBIT kk

# Dean McGee, CPA, CFE

2650 Provencial Ln.
Richardson, TX 75080
(972) 979-4811
rockpilellc@me.com

November 8, 2010

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
18 Columbia Turnpike, Suite 200
Newark, New Jersey 07102

Re:    Picatinny Federal Credit Union v. Federal National Mortgage Association
         Civil Action No. 09-01295 GEB)

Gentlemen:

I have been engaged on behalf of Picatinny Federal Credit Union ("Picatinny") to evaluate whether Federal National Mortgage Association ("Fannie Mae") acted with the degree of care, skill, knowledge and judgment usually possessed and exercised by other investors in the secondary market with regard to investigating potential improper and/or fraudulent activity of U.S. Mortgage Corp. ("U.S. Mortgage") after discovering various violations of its own Selling and Servicing Guides.   In the event that Fannie Mae's conduct fell below the accepted normal and customary standards of conduct in the secondary mortgage market, I was asked to evaluate whether Fannie Mae's actions or inactions substantially contributed to the loss that Picatinny has sustained.  This letter summarizes my qualifications, evaluation, analysis and opinions with respect to my assignment.

## Summary of Opinion

Based upon my review of the discovery in this action and my experience in the field of fraud prevention and investigation by investors of mortgage loans in the secondary market and otherwise, I can state to a reasonable degree of professional certainty that, as early as 2005, Fannie Mae failed to

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 2

exercise the degree of care, skill, knowledge and judgment possessed and exercised by investors in the secondary market, that Fannie Mae deviated from the standards applicable to this industry and failed to exercise ordinary care by not properly investigating inherently suspicious circumstances involving U.S. Mortgage, and by continuing to purchase mortgage loans when it knew or should have known that U.S. Mortgage was engaged in conduct that was consistent with, if not, mortgage fraud. I also can state to a reasonable degree of professional certainty in the field of fraud prevention and investigation by investors in the secondary market that Fannie Mae's deviation from, and failure to adhere to, the proper standard of care substantially contributed to the loss that Picatinny subsequently sustained between 2007 and 2009.

**Qualifications**

I am a certified public accountant and certified fraud examiner. I have over twenty years experience in the areas of mortgage and accounting fraud, including conducting fraud audits and investigations. I have participated as an expert regarding mortgage frauds and accounting records evidencing those frauds in more than twenty different judicial proceedings.

After working for three years as a staff accountant for an accounting firm, in 1983 I became an Examiner and Instructor with the Federal Home Loan Bank System's supervisory and examination function which provided regulatory oversight to the saving and loan industry. As an Examiner, I conducted examinations of federally insured financial institutions to determine their financial viability and their compliance with federal laws and requirements. In addition, as an instructor, I developed and

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 3

implemented the training of the credit analysis curriculum for the Federal Home Loan Bank System

Office of Education.

In 1989, I joined the Federal Home Loan Mortgage Corp. ("Freddie Mac"), which is a

federally sponsored enterprise that buys residential mortgages on the secondary market from lenders,

packages them into new securities, provides for certain guarantees in the event the mortgages

underlying the securities default, and resells those securities on the open market. Freddie Mac's main

competitor for the purchase of these mortgages is Fannie Mae, the defendant in this action. When I

joined Freddie Mac, I was a financial investigator. In that role, I was responsible for ensuring that sellers

and servicers of Freddie Mac complied with Freddie Mac's policies and procedures which were similar to

the Selling and Servicing Guides of Fannie Mae.

I also conducted over 100 audits of those sellers and servicers, and investigated

suspicious activity by Freddie Mac's sellers and servicers. I later became Project Manager where I

developed a methodology for determining inconsistencies in custodial account activities of Freddie

Mac's sellers/servicers. In 1995, I left Freddie Mac and formed a company, Financial Institution

Technologies, which provided consulting services to mortgage bankers, banks and other financial

entities and persons.

In 1997, I became Vice President of First Horizon Home Loans, and later promoted to

Senior Vice president, managing its Asset Recovery area. First Horizon Home Loans was a mortgage

banker that sold mortgages and serviced mortgages for, among others, Fannie Mae. My primary

responsibilities at First Horizon were to investigate and resolve matters involving fraudulent activity. In

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 4

2009, I returned to Freddie Mac and became its Director of Risk Assessment for the "Making Home Affordable Program - Compliance" program. In that capacity, I developed a risk assessment model of loan servicers.

During my career, I have supervised Freddie Mac fraud investigation teams, managed the direct investigation of many cases of suspected mortgage loan seller/servicer financial fraud, and assisted in supporting civil and criminal law enforcement prosecutions regarding mortgage fraud based upon my fraud investigations. I have recommended and helped draft policies and procedures to help detect and prevent fraud, and recommended changes to existing policies. I have given lectures and seminars regarding mortgage banking, the detection and investigation of fraud-related schemes and the proper handling and reconciliation of mortgage servicer custodial accounts. I was tasked with sharing fraud prevention and investigation strategies with HUD, the United States Department of Justice, mortgage seller/services and mortgage insurance companies. I have had the opportunity to confer on a professional basis and work with mortgage fraud investigators at Freddie Mac, Fannie Mae, and other secondary market mortgage investors on the subject of fraud detection and investigation. I have taught the subjects of fraud detection and investigation for mortgage bankers and secondary market investors. I have reviewed papers and training materials on this subject, and I have become familiar with various official guidelines, policies and procedures on this subject.

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 5


**My Compensation**

I am being compensated on an hourly basis for my work on this case.  My compensation is not

contingent on the outcome of my opinion or the outcome of the lawsuit.


**Documents Reviewed**

In connection with my undertaking in this case, I have reviewed, among other things, the

following documents or materials:

- Picatinny's Amended Complaint
- Fannie Mae's Answer to the Amended Complaint
- Fannie Mae's recent Complaint in the related insurance coverage lawsuit against Lloyd's and other insurers;
- Answers to Interrogatories by Fannie Mae and by Picatinny
- Deposition of John Gang, dated December 4, 2009, with Exhibits P-1 to P-22
- Deposition of Jozsef Lajtai, dated December 17, 2009, with Exhibits P-23 to P-60 and DX-1 and DX-2;

- Deposition of Bob Lis, dated January 15, 2010, with Exhibits P-61 to P-89;
- Deposition of Alexandre Saphos, dated February 25, 2010, with Exhibits P-90 to P-120;

- Deposition of Conor Thies, dated March 11, 2010, with Exhibits P-121 to P-141;
- Deposition of Thomas Snavely, dated April 9, 2010, with Exhibits P-142 to P-150;
- Deposition of Karen McBarnett, dated May 5, 2010, with Exhibits P-151 to P-189;
- Deposition of Lori Tavana, dated May 11, 2010, with Exhibits P-190 to P-199;
- Deposition of Barbara Cushman, dated May 12, 2010, with Exhibits P-200 to P-203 and DP-1, DP-2;

- Deposition of Bill Brewster, dated May 27, 2010, with Exhibits P-203 to P-212;
- Deposition of Deborah Thompson, dated June 8, 2010, with Exhibits P-213 to
- P-217;
- Deposition of Vivian Pitts, dated June 15, 2010, with Exhibits P-218 to P-253;
- Deposition of Joan Kane, dated July 28, 2010, with Exhibits P-254 to P-272;
- Deposition of John Davis, dated October 7, 2010, and Exhibits P-273 to P-284;
- Deposition of Nicholas Figlo, dated October 12, 2010, with Exhibits P-285 to P-292;
- Documents identified as GMAC-PICO and GMAC-SDT;

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 6

- U.S. Mortgage Annual Financial Reports; and
- OFHEO, Policy Guidance, Document No. PG-05-003, dated July 25, 2005.

**Background Facts**

U.S. Mortgage was a mortgage banker with its principal place of business in Pine Brook, New Jersey. By virtue of a series of agreements, Fannie Mae established U.S. Mortgage as an approved seller of mortgage loans to Fannie Mae and an approved servicer of mortgage loans held by Fannie Mae from 1996 through February 2009. I have been advised that U.S. Mortgage's subsidiary, CU National Mortgage, LLC ("CU National"), originated and serviced first mortgage loans on Picatinny's behalf. For loans that Picatinny did not wish to maintain in its portfolio, Picatinny would direct CU National to sell those loans on the secondary market.

Beginning in or about November 2007, CU National and its principal, Michael McGrath, took original promissory notes belonging to Picatinny, indorsed those notes in Picatinny's name and without its authority, delivered them to Fannie Mae along with unauthorized mortgage assignments, and purported to sell these mortgage loans to Fannie Mae. CU National and McGrath kept the sale proceeds of the fraudulent and unauthorized loan sales to Fannie Mae.

Fannie Mae itself describes the U.S. Mortgage/CU National fraud as follows [paraphrased from paragraphs 21-23 of the Fannie Mae complaint against Lloyds]:

> From 1996 until February 4, 2009, US Mortgage was an approved Seller/Servicer by Fannie Mae. As a Seller/Servicer, US Mortgage could both sell mortgage loans to Fannie Mae and continue to service those loans post-sale by, among other things, collecting monthly principal and interest payments from the borrowers and remitting such payments to Fannie Mae.

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 7

As part of its business, US Mortgage, through its subsidiary CU National, served as the *de facto* mortgage department for various credit unions.  In this role, credit unions used US Mortgage/CU National to sell mortgage loans that the credit unions decided not to keep in their own portfolios.  From 1999 through January 2009, U.S. Mortgage sold Fannie Mae 2,549 mortgage loans from 91 credit unions.

It was discovered that Michael J. McGrath, Jr., the President of US Mortgage/CU National, had perpetrated a fraud involving 544 mortgage loans originated on behalf of 25 credit union clients.  With respect to most of the 544 loans, US Mortgage - specifically Mr. McGrath and certain others - stole mortgages from the credit unions and sold them to Fannie Mae without the credit unions' knowledge or authorization and without remitting the sale proceeds obtained from Fannie Mae to the credit unions.

As discussed in detail below, long before November 2007, Fannie Mae was presented with a large number of "red flags" that Fannie Mae itself acknowledged were signs of suspicious and potentially fraudulent conduct by U.S. Mortgage/CU National and/or conduct which otherwise violated or disregarded Fannie Mae guidelines and policies.  The cumulative effect of these many "red flags" should have resulted in a heightened level of skepticism and suspicion of U.S. Mortgage and triggered a more thorough, comprehensive and better planned investigation of U.S. Mortgage's activities.  That investigation would have uncovered the fraudulent conduct and should have resulted in a termination of business relations with U.S. Mortgage, thereby precluding the loss which Picatinny suffered years later.

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 8

**Discussion and Opinions:**

### Concerns Before 2005 Red Audit

In early 2004 and well before the March 2005 Desk Review Audit Report ("Red Audit Report"),

Fannie Mae's Harriet Wolff expressed concerns about U.S. Mortgage's violations of Fannie Mae's

Servicing Guide and U.S. Mortgage's complete inability to produce cash reconciliations. (P-155). In

August 2004, U.S. Mortgage was on Fannie Mae's "watch list." (P-231). It was evident that, as early as

the Fall of 2004, U.S. Mortgage was in the practice of commingling funds in a single clearing account

rather than placing Fannie Mae P/I and T/I receipts into a separately designated and maintained

custodial clearing account for Fannie Mae's benefit. The inability to produce cash reconciliations and

the various excuses offered by U.S. Mortgage as to why it had not done so (P-155, 156) did raise Fannie

Mae's level of suspicion and scrutiny at that time.

### March 2005 Red Audit

In March 2005, Fannie Mae conducted a desk review audit of, among other things, U.S.

Mortgage's activity in its Fannie Mae custodial accounts, _i.e._, accounts that U.S. Mortgage maintained

for the benefit of Fannie Mae. The desk review of U.S. Mortgage's custodial account activity uncovered

serious discrepancies. This resulted in Fannie Mae visiting U.S. Mortgage to attempt to understand its

cash processing functions and reconciliation of its custodial accounts. As a result of the desk review and

Fannie Mae's subsequent onsite visit, Fannie Mae had substantial concerns that U.S. Mortgage was, as

of March 2005, engaging in mortgage fraud.

James H. Forte, Esq.
~~Jeffrey W. Lorell, Esq.~~
Saiber LLC
November 8, 2010
Page 9

In the Red Audit Report dated March 30, 2005, Fannie Mae characterized U.S. Mortgage as "high risk," which was the worst rating a Fannie Mae seller/servicer could receive from a Fannie Mae audit.   According to Nicholas Figlo, a former servicing manager of Fannie Mae, the reference to "high risk" meant that "there were concerns with this servicer's practices that could highly represent potential risk to Fannie Mae." (Figlo Dep. P. 54).  These concerns are discussed in greater detail in various work papers of the audit department.  (P-162, 164, 165, 166, 167, 168, 169, 170 and 171.)

The Red Audit Report confirms Mr. Figlo's testimony in this regard.  Specifically, under the heading "Conclusion," the Red Audit Report states: "U.S. Mortgage poses significant risk to Fannie Mae due to misuse of custodial funds and commingling of Fannie Mae and other investor custodial funds." The Red Audit Report further noted that U.S. Mortgage did not maintain records that supported U.S. Mortgage's movement of custodial funds in and out of Fannie Mae accounts.

It was expected that Fannie Mae's auditors would be concerned with the findings in the Red Audit Report.  Most financial frauds involving mortgage servicers generally begin with the abuse of the funds held in the custodial bank accounts.  The money is readily available and easily moved from account to account.  Common indicators, or "red flags," of fraud include commingling of funds, even dollar transfers between bank accounts, and large transfers just prior to the required monthly remittance.

Fannie Mae clearly deemed the audit findings cited in the Red Audit Report as significant.  The Fannie Mae Director of the U.S. Mortgage audit, Karen McBarnette, had serious concerns about the commingling and improper use of Fannie Mae custodial funds.  In an email dated March 28, 2005 to numerous high level Fannie Mae personnel, Ms. McBarnette "recommend[s] that NSO and NBC ...

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 10

determine whether Fannie Mae accounts were involved in fraudulent activity." (P-172). McBarnette

correctly notes that: "In addition to violating Fannie Mae's guidelines, the frequent and unnecessary

movement of funds between accounts is a strong indicator of fraud." In an email dated March 29, 2005,

Mercy Jimenez, Senior Vice President of Fannie Mae's National Business Center, referred to the U.S.

Mortgage custodial account process as "a potential hot bed for fraud." (P-174) As further recognition of

the seriousness of the 2005 Red Audit, I note that this particular audit was the only servicer concern

specifically cited as an issue during the meeting of the Fannie Mae Audit Committee of Fannie Mae's

Board of Directors held on April 18, 2005. The Committee members were assured that a "large team

was working with U.S. Mortgage." (P-187)

Despite the seriousness of the March 2005 Red Audit and the fact that it was a "strong"

indicator of fraud (which was later confirmed), there is no evidence that Fannie Mae actually did any

additional analysis of the clearing and custodial account activity until years after the March 2005 audit.

A normal and customary investigation of suspected fraud involving the custodial accounts requires that

an accountant trace the sources of each deposit and the corresponding disbursement to its recipient. As

the transactions are matched, the timing of the transactions is used to determine the lowest common

balance. If the custodial account balance is less than the amounts collected for all recipients, there is

evidence that the funds are being used for other purposes. Rather than identifying the reason for the

custodial account abuse, Fannie Mae used its staff to train U.S Mortgage to ensure that,

notwithstanding evidence of U.S. Mortgage's apparent participation in substantial prior misconduct, U.S.

Mortgage would, for a limited period of time in the future, comply with Fannie Mae's servicing

guidelines. By failing to determine whether U.S. Mortgage was using funds from Fannie Mae's custodial

James H. Forte, Esq.
~~Jeffrey W. Lorell, Esq.~~
Saiber LLC
November 8, 2010
Page 11

accounts for fraudulent activity, Fannie Mae deviated from the standards applicable to fraud prevention

and investigation by investors in the secondary market.

### Concern Raised by Cross Valley Federal Credit Union on April 8, 2005  (P-145)

Fannie Mae's deviation from the applicable standard of care is made worse because it then

possessed additional information that it obtained shortly after the March Red Audit Report was finalized

which strongly indicated that U.S. Mortgage may have been engaging in mortgage fraud.  On April 8,

2005, McBarnette was contacted by Tom Snavely, an auditor with Padden, Guerrini & Associates, PC,

about an issue with Cross Valley Federal Credit Union ("Cross Valley") and U.S. Mortgage.  Mr. Snavely

explained that U.S. Mortgage serviced and, on occasion, sold mortgages for his client, Cross Valley.

While Mr. Snavely was conducting an annual financial audit of Cross Valley, he became concerned that

Cross Valley had authorized U.S. Mortgage to sell loans to the secondary mortgage market because,

after more than six months, U.S. Mortgage had not sent any payments to Cross Valley.  When he made

an inquiry to U.S. Mortgage about the payments, U.S. Mortgaged informed Cross Valley that it had sold

the Cross Valley loans to Fannie Mae.  Mr. Snavely then contacted Ms. McBarnette at Fannie Mae and

shared his concern that U.S. Mortgage was not remitting Fannie Mae sales proceeds to his client.  Mr.

Snavely stated that Ms. McBarnette did not know why the funding by Fannie Mae was taking so long

and agreed to have someone else from Fannie Mae contact him.  Snavely was contacted shortly

afterwards by another person from Fannie Mae who advised that Mr. Snavely's *client must be awfully

stupid*."  (Snavely Deposition – pages 69 - 80)

On April 11, 2005, Ed Carlin, Deputy Director of the Northeastern and Central Pennsylvania

Partnership office, notified Bruce Garrett ("Garrett") of Fannie Mae about Cross Valley's concerns.

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 12

Garrett was informed that Cross Valley believed that U.S. Mortgage had $2.1 million of proceeds from loan sales to Fannie Mae which were outstanding for six to ten months, and that payment was due Cross Valley. (An unpaid balance of $2.1 million likely involved 8 to 10 mortgage loans or more.) Cross Valley was trying to find someone from Fannie Mae who could verify that the loans had been sold. Garrett then forwarded the email to Alex Saphos, the Fannie Mae account representative assigned to U.S. Mortgage. On April 14, 2005, Mr. Saphos responded back to Garrett that he was waiting to hear from Fannie Mae's legal department and senior management to get approval to discuss Cross Valley's concern with U.S. Mortgage. (P-185). Mr. Saphos does not recall ever responding to Cross Valley's concerns.

### Fannie Mae April 2005 ORC Audit (P-92)

In response to Cross Valley's concerns, Fannie Mae's Operational Review and Compliance ("ORC") area in Dallas tasked Nick Figlo to review six loans to examine the funding processes at U.S. Mortgage. Specifically, Mr. Figlo was directed to review U.S. Mortgage's March 2005 bank statements in order to trace Fannie Mae's payment of the sales proceeds to U.S. Mortgage, the account(s) at U.S. Mortgage to which these proceeds were credited, and then U.S. Mortgage's payment of the sales proceeds to the source originally funding the loan. (Figlo Dep. p. 75-76, 117-118). Fannie Mae's ORC group selected the six loans for Figlo to investigate prior to the onsite audit but Fannie Mae selected six loans entirely unrelated to Cross Valley. The failure to identify and include Cross Valley loans, particularly the specific loans where payment was reportedly delayed, was a serious shortcoming of this investigation.

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 13

The purpose of the on-site funding review by Mr. Figlo, as stated by Joseph Sakole, V.P. of

Fannie Mae ("Sakole"), was "to determine if the delay in funding [i.e., to Cross Valley] was systematic or

a one time error by U.S. Mortgage . . . ." (P-186). However, the audit conducted by Mr. Figlo on the six

unrelated loans was neither designed nor carried out to answer this fundamental question. Fannie Mae

essentially made no effort whatsoever to determine whether the delay in funding to Cross Valley was

"systematic" or whether the excuse given by U.S. Mortgage (i.e., mistake in coding) had any factual

support. ORC did not ask Mr. Figlo to review any of the loans originated by Cross Valley. They also did

not explain to Mr. Figlo who originated the six loans given to him. When Mr. Figlo was asked if he knew

who originated the loans, he indicated that he "had no idea." (Figlo Dep. p. 75 -77). In addition, Mr.

Figlo stated that the first time he was aware that U.S. Mortgage was selling loans originated in the name

of credit unions was sometime in February 2009. (Figlo Dep. p. 80 – 81). This testimony reflects that

Mr. Figlo did not verify the originating source of funds on any loans funded by a credit union.

Normal audit procedures for the secondary mortgage industry would have been to verify the

timing of funding between origination and sale to the investor and to determine the funding activity

related to the loans funded by credit unions, other funding sources, and particularly by Cross Valley. All,

or part, of this information could have been obtained from the warehouse inventory report as described

in Fannie Mae's operational report dated April 11, 2005 on pages 11 and 12. This report and other loan

inventory related reports would have indicated the date the loan was originated, the date sold to an

investor and the date the warehouse lender or other funding source was repaid. A specific inquiry

about, and analysis of, the Cross Valley loans sold to Fannie Mae was necessary to determine when the

payments for the Cross Valley-originated loans were made by Fannie Mae to U.S. Mortgage, and when

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 14

U.S. Mortgage then paid Cross Valley. The auditor would have then traced the transactions through the bank account activity to provide further assurance that fraud was not committed.

The third paragraph on page 12 of the April ORC Audit Report addresses the Cross Valley concern about delayed funding but incorrectly reflects the magnitude of the issues. The report reflects that the Cross Valley concern is about "two loans" rather than indicating the $2.1 million amount stated by Cross Valley. The paragraph goes on to state that Michael McGrath ("McGrath"), president of U.S Mortgage, indicated that the problem was caused by a coding error. The report further states that the situation "was immediately corrected." The conclusions contained in paragraphs two and three of page 12 of the report indicate that "US Mortgage/CU National have policies and procedures that represent sound business practices" and that the Cross Valley situation "does not reflect a systemic error but rather an isolated incident."

When Ms. Kane was asked in her deposition about the third paragraph on page 12, she stated that she received the information from Figlo. (Kane deposition, pp. 210 – 216). But when he was asked about the information provided in that paragraph, Mr. Figlo indicated he was unaware of any of the information contained in that paragraph. (Figlo Dep, p. 93-95).

In reality, no audit work was done at all to determine what happened with the delayed payment for the Cross Valley loans and why it occurred. No one has adequately explained why or how those statements came to be included in the report, and there is no factual support for them. The report's conclusions are not supported by the evidence collected in the supplemental audit. A review of six loans cannot provide a basis for determining sound business practices and there is no evidence of any review of the Cross Valley transactions by the Fannie Mae auditors at all.

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 15

### US Mortgage Audited Financial Statements dated December 31, 2004

A review of the audited financial statements of U.S. Mortgage Corporation dated December 31, 2004, indicate that US Mortgage held cash and cash equivalence ($33,898,297) and related liabilities consisting of funds due to credit unions ($32,156,535) and mortgage escrows payable ($5,934,066) on its balance sheet. Assuming that the liability accounts are custodial in nature, U.S. Mortgage had approximately $4.2 million less in cash than what would be required to be held in custodial accounts. In addition, the amount of cash and cash equivalents ($33,898,297) is abnormally high for a typical mortgage banker. It would have been customary for an auditor familiar with the secondary market and who is investigating a suspicion of fraud to review any available financial data. The items mentioned in the above paragraph are red flags of fraud and support the concern raised by Cross Valley.

### US Mortgage Continues to Commingle Custodial Funds

As noted above, Fannie Mae's efforts in 2005 were designed principally to secure U.S. Mortgage's compliance with its Selling and Servicing Guides, as opposed to investigating and understanding the reason why U.S. Mortgage commingled custodial funds. Not surprisingly, once Fannie Mae was no longer monitoring U.S. Mortgage's custodial accounts through on-site visits, U.S. Mortgage returned to its improper use of Fannie Mae and other investor funds. In the summer of 2008, Fannie Mae's review of U.S. Mortgage's bank statements revealed that US Mortgage was once again commingling custodial funds and apparently using the custodial funds for its own purposes, leaving the custodial accounts seriously underfunded. (P-133). The pattern of misuse and custodial account abuse was clear. As stated by John Nelson to Conor Theis on October 30, 2008, "this in effect, is like robbing Peter to pay Paul." (P-133).

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 16

## Conclusion

After the review of the circumstances surrounding the Fannie Mae investigatory activities in 2005 and the related Fannie Mae audits of U.S. Mortgage, it is my opinion that Fannie Mae failed to perform an adequate investigation of the suspected fraud within US Mortgage. As a result of Fannie Mae's failure to perform audit procedures that are normal and customary for the secondary mortgage market, Fannie Mae did not terminate the business relationship with U.S. Mortgage. This allowed U.S. Mortgage to continue to engage in fraudulent activity and to use Fannie Mae to facilitate the fraud scheme.

Fannie Mae's own auditors initially raised a concern of fraudulent activity in its Red Audit Report. Once this concern was raised, it would be normal and customary to escalate the review of its customer and intensify the audit process. Although Fannie Mae raised its level of activity with U.S. Mortgage by ensuring that U.S. Mortgage complied with its guidelines, Fannie Mae failed properly to investigate the many red flags of fraudulent activity.

1. Both Fannie Mae audits were limited in scope – neither expanded their scope to isolate the intent of transactions, but only tested business processes and compliance to Fannie Mae guidelines. This was superficial, at best.

2. Fannie Mae assumed that the risk to Fannie Mae was the use of Fannie Mae funds to operate U.S. Mortgage and therefore disregarded indications that a different but equally important type of fraud was occurring.

3. Fannie Mae failed to determine the nature of the fraud in spite of specific details provided by Cross Valley. In Fannie Mae's response to Cross Valley's concerns, it chose not to review any Cross Valley transactions.

4. Fannie Mae did not properly use or consider all the data available at the time of the audit (audited financial statements).

James H. Forte, Esq.
Jeffrey W. Lorell, Esq.
Saiber LLC
November 8, 2010
Page 17

5.   The Fannie Mae auditors failed to properly follow the audit instructions provided by their own oversight group (ORC) in carrying out the supplemental audit.

6.   Fannie Mae failed to obtain satisfactory evidence in order to resolve the serious issues raised by Cross Valley's concerns of delayed funding.

7.   Fannie Mae reached a conclusion to the effect that the delayed funding to Cross Valley was not systematic, which conclusion was not adequately supported by any meaningful investigation or by the evidence at hand.

Consequently, I can say to a reasonable degree of professional certainty that Fannie Mae failed to exercise the degree of care, skill and judgment customarily and normally used in the secondary mortgage market, and that had Fannie Mae done so, the information uncovered would likely have revealed the nature of U.S. Mortgage's improper and unlawful activities.  This discovery would have caused Fannie Mae to cease doing "business as usual" with U.S. Mortgage and, as a result, the fraud later perpetuated involving the theft of Picatinny's loans would likely have been averted altogether.

Sincerely,

Dean McGee, CPA, CFE

**Dean McGee, CPA, CFE**

2650 Provencial Lane
Richardson, Texas  75080

rockpilellc@me.com

(972) 889-1074 (H)
(972) 979-4811 (W/C)

## SUMMARY

Accounting professional with over twenty years of experience in the real estate industry. Extensive experience in fraud audits and investigations, loss mitigation and training. Analytical thinker with creative problem-solving skills, excellent verbal and written communication skills.

## SIGNIFICANT ACCOMPLISHMENTS

**Audits and Controls:**  Conducted over a hundred onsite audits of financial institutions and mortgage companies to determine financial viability and compliance with Federal laws and investor requirements. Identified a significant control weakness in the management of $1.0 trillion trust fund system and then developed a desktop audit process used to remotely identify the fraudulent use of these funds. Reconstructed the books and records of companies to identify methods of fraud and to support recovery. Extensive use of the internet and online data services to evaluate personal and financial information.

**Management and Training:**  Developed and implemented the training of the credit analysis curriculum for the Federal Home Loan Bank System. Developed a methodology for the reconciliation of trust accounts and then provided training to hundreds of lenders. Supervised a staff of 10 investigators and analysts and managed a $1.5 million departmental budget. Controlled litigation costs to a $200,000 annual budget while recovering over $2.0 million each year for five consecutive years

**Creative Problem Solving:**  Disposed of over $35 million in fraudulent transactions annually at no loss to the company. Negotiated settlements with MI companies that saved over $1.0 million annually. Reconciled the interests of numerous parties to include the US Department of Justice, the Office of Housing and Urban Development (HUD), defrauded borrowers and others to resolve complex litigation matters.

## PROFESSIONAL WORK EXPERIENCE

**Rockpile Resolution LLC**                                                     2008 & 2010
*Owner*
Conduct fraud audits; provide litigation support and expert witness testimony, assist local nonprofits with accounting issues

**Freddie Mac (Making Home Affordable – Compliance)**                          2009
*Director*, Risk Assessment
Development of servicer risk assessment, fraud detection, and data analytics

**First Horizon Home Loan Corporation**                                        1997 – 2008
*Senior Vice President*, Asset Recovery
Oversight of repurchases, litigation and recovery; investigation of complex fraud cases

Dean McGee

**Financial Institution Technologies**                                                   1995-1997
*Consultant*                                                                             1988-1989
Consulting services to mortgage banking entities, banks and bankruptcy trustees

**Federal Home Loan Mortgage Corporation**                                               1989-1995
*Project Manager*
*Financial Investigator*
Training for seller/servicers; conducted financial investigations and audits

**Federal Home Loan Bank System**                                                        1983-1988
*Program Manager, Office of Education*
*Instructor, Office of Education*
*Examiner*
Bank examinations, management of training budget and staff; course development and instruction

**Whitaker, Lipp and Healea, CPA's**                                                     1980-1983
Preparation of tax returns, compilations and audits

## COMMUNITY ACTIVITES

Board Member, North Texas 3-Share
Volunteer, The Classics, Theatre and Art for Children
Volunteer, Strategies to Elevate People
Ambassador, Wildflower! Richardson's Arts and Music Festival
Volunteer, City House
Member, Watermark Community Church

## REFERENCES

Available upon request

**Dean McGee, CPA, CFE**

2650 Provencial Lane                rockpilellc@me.com                (972) 889-1074 (H)
Richardson, Texas  75080                                             (972) 979-4811 (W/C)

## SUMMARY

Accounting professional with o ver twenty years of experience in the real estate industry.  Extensive experience in fraud audits and investigations, loss mitigation and training.  Analytical thinker with creative problem-solving skills, excellent verbal and written communication skills.

## SIGNIFICANT ACCOMPLISHMENTS

**Audits and Controls:**  Conducted over a hundred onsite audits of financial institutions and mortgage companies to determine financial viability and compliance with Federal laws and investor requirements. Identified a significant control weakness in the management of $1.0 trillion trust fund system and then developed a desktop audit process used to remotely identify the fraudulent use of these funds. Reconstructed the books and records of companies to identify methods of fraud and to support recovery. Extensive use of the internet and online data services to evaluate personal and financial information.

**Management and Training:**  Developed and implemented the training of the credit analysis curriculum for the Federal Home Loan Bank System.  Developed a methodology for the reconciliation of trust accounts and then provided training to hundreds of lenders.  Supervised a staff of 10 investigators and analysts and managed a $1.5 million departmental budget.  Controlled litigation costs to a $200,000 annual budget while recovering over $2.0 million each year for five consecutive years

**Creative Problem Solving:**  Disposed of over $35 million in fraudulent transactions annually at no loss to the company.  Negotiated settlements with MI companies that saved over $1.0 million annually.  Reconciled the interests of numerous parties to include the US Department of Justice, the Office of Housing and Urban Development (HUD), defrauded borrowers and others to resolve complex litigation matters.

## PROFESSIONAL WORK EXPERIENCE

**Rockpile Resolution LLC**                                                2008 & 2010
*Owner*
Conduct fraud audits; provide litigation support and expert witness testimony, assist local nonprofits with accounting issues

**Freddie Mac (Making Home Affordable – Compliance)**                       2009
*Director,* Risk Assessment
Development of servicer risk assessment, fraud detection, and data analytics

**First Horizon Home Loan Corporation**                                   1997 – 2008
*Senior Vice President*, Asset Recovery
Oversight of repurchases, litigation and recovery; investigation of complex fraud cases

**Dean McGee**

| | |
|---|---|
| **Financial Institution Technologies** | 1995-1997 |
| *Consultant* | 1988-1989 |
| Consulting services to mortgage banking entities, banks and bankruptcy trustees | |

| | |
|---|---|
| **Federal Home Loan Mortgage Corporation** | 1989-1995 |
| *Project Manager* | |
| *Financial Investigator* | |
| Training for seller/servicers; conducted financial investigations and audits | |

| | |
|---|---|
| **Federal Home Loan Bank System** | 1983-1988 |
| *Program Manager, Office of Education* | |
| *Instructor, Office of Education* | |
| *Examiner* | |
| Bank examinations, management of training budget and staff; course development and instruction | |

| | |
|---|---|
| **Whitaker, Lipp and Healea, CPA's** | 1980-1983 |
| Preparation of tax returns, compilations and audits | |

## COMMUNITY ACTIVITES

Board Member, North Texas 3-Share
Volunteer, The Classics, Theatre and Art for Children
Volunteer, Strategies to Elevate People
Ambassador, Wildflower! Richardson's Arts and Music Festival
Volunteer, City House
Member, Watermark Community Church

## REFERENCES

Available upon request

{00630235.DOC}