**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PICATINNY FEDERAL CREDIT UNION,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>Defendant. | Civil Action No. 09-1295 (GEB)<br><br>**MEMORANDUM OPINION** |

**BROWN, Chief Judge**

This matter comes before the Court upon a Motion for Partial Summary Judgment on Liability (Doc. No. 90) by the plaintiff Picatinny Federal Credit Union ("Picatinny"), and upon the Motion for Summary Judgment (Doc. No. 91) by the defendant Federal National Mortgage Association ("Fannie Mae"). The parties respectively oppose these motions. This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332. The Court has reviewed the parties' submissions and has decided the motions without oral argument pursuant to Federal Rule of Civil Procedure 78. For the following reasons, the Court will deny both motions.

**I.   BACKGROUND**

The matter presented before this Court involves mortgages and their underlying notes that were initially issued by Picatinny to its members, but were then stolen by a third party and sold to Fannie Mae. "Picatinny is a federally chartered credit union" whose "members consist of

1

military and other personnel stationed and/or working at the Picatinny Arsenal, other residents of the Morris County area, and local businesses." (Fannie Mae's Resp. 56.1 Statement at ¶¶ 1, 2; Doc. No. 101-4.) "Picatinny is governed by a Board of Directors solely consisting of its members . . . who are volunteers" and are "elected to the Board by other members of the credit union." (Id. at ¶ 5.) "In 1995, Picatinny began making first mortgage loans to its members." (Id. at ¶ 6.) "At that time, Picatinny did not have employees with expertise in making or servicing first mortgage loans, and did not wish to incur the substantial cost of hiring employees to staff a first mortgage department and purchasing the requisite hardware and software." (Id. at ¶ 7.) "As of April 7, 1995, Picatinny retained CUMAnet to originate, process, underwrite and close first mortgage loans for Picatinny's members and service those loans for Picatinny." (Id. at ¶ 8.) In addition to maintaining Picatinny's mortgage loan files, "Picatinny also allowed CUMAnet to hold its original promissory notes." (Id. at ¶ 9.)

At some point in the late 1990's, the Chief Operating Officer ("CEO") of CUMAnet announced to Picatinny that he was forming a new company, CU National, and "[b]ecause Picatinny was satisfied with the services CUMAnet provided . . . and [because] CU National offered reduced pricing for the same services, Picatinny selected CU National as its new mortgage loan originator and servicer." (Id. at ¶¶ 13, 14.) On July 1, 1999, Picatinny and CU National entered into the Credit Union Support Services and Correspondent Lending Agreement ("the Agreement")." (Id. at ¶ 15.) Specifically, "CU National agreed to provide Picatinny with loan services that were integral to Picatinny's residential mortgage lending program, including the performance of all duties necessary or incidental to the servicing of all first mortgage loans on behalf of Picatinny" including "the collection of payments from Picatinny loan customers and

the remittance of those payments to Picatinny." (Id.) It also provided that "CU National would assist Picatinny in selling its loans to the secondary market." (Picatinny's Resp. 56.1 Stmt. at ¶ 15.) Further, "[t]he Agreement provided that it was 'critical that CU National provide its services to the Credit Union members in such a manner that highlights the Credit Union's involvement and reduces CU National's involvement in the eyes of the member." (Id. at ¶ 17.)

CU National is a wholly owned subsidiary of U.S. Mortgage. (Fannie Mae's Resp. 56.1 Statement at ¶ 16.) Mark McGrath was the CEO of U.S. Mortgage, and he was also an officer of CU National. (Id.) However, "U.S. Mortgage was not a party to the . . . Agreement between CU National and Picatinny." (Id.) "Fannie Mae is a federally chartered entity that purchases mortgage loans originated by lenders in the primary mortgage market in order to provide liquidity and stability to the mortgage markets." (Picatinny's Resp. 56.1 Stmt. at ¶ 3; Doc. No. 99-3.) U.S. Mortgage was "one of Fannie Mae's approximately 1,800 active approved Sellers/Servicers" and was approved in 1996. (Id. at ¶ 4.) "As a Seller/Servicer, U.S. Mortgage could both sell mortgage loans to Fannie Mae and continue to service those loans post-sale by collecting monthly principal and interest payments from the borrowers and remitting those payments to Fannie Mae." (Id. at ¶ 5.)

"In or around 2004, U.S. Mortgage experienced financial troubles and began making authorized sales of credit union loans to Fannie Mae but then delayed remittance of the proceeds to credit unions." (Picatinny's Resp. 56.1 Stmt. at ¶ 27.) Thereafter, from November 2007 through December 2008, U.S. Mortgage's CEO McGrath stole notes that were in the custody of CU National and which belonged to Picatinny and sold them to Fannie Mae for his own personal gain. (Id. at ¶ 30.) In order to make these sales appear legitimate to Fannie Mae, "McGrath

3

signed an allonge to the underlying promissory note[s] and an assignment of mortgage . . . as an "AVP" (Assistant Vice President) of Picatinny." (Fannie Mae's Resp. 56.1 Statement at ¶ 33.) McGrath, however, "never was an 'AVP' or other officer of Picatinny." (Id. at ¶ 34.)

"In January 2009, Picatinny learned from sources other than CU National that CU National had sold certain Picatinny loans to Fannie Mae without Picatinny's knowledge or authorization, and did not remit the loan proceeds to Picatinny." (Id. at ¶ 23.) "In February 2009, Picatinny undertook its own investigation to determine the number of loans U.S. Mortgage had sold without Picatinny's knowledge or authorization, and discovered U.S. Mortgage may have unlawfully sold as many as 58 Picatinny mortgage loans." (Id. at ¶ 25.) However, in this action, Picatinny seeks to recover with respect to only 52[1] of the loans that were identified during the investigation. (Id. at ¶ 27.) McGrath, U.S. Mortgage's CEO, pled guilty on June 11, 2009, to charges of conspiracy to commit mail and wire fraud and conspiracy to commit money laundering, admitting that he stole the notes related to these mortgages from Picatinny and through U.S. Mortgage sold the notes to Fannie Mae without Picatinny's knowledge or consent and without giving Picatinny the proceeds of these sales. (Id. at ¶ 31.)

Fannie Mae admits that it is in possession of these disputed notes, but denies liability, asserting a number of affirmative defenses. It may be that it is relevant to these defenses the details of the process by which Fannie Mae's employees review the paperwork that is submitted in connection with the sale of notes to Fannie Mae. With respect to the evaluation process of these documents, "Fannie Mae required its loan sellers, including U.S. Mortgage, to deliver

---

[1] With respect to one note, the parties disagree about whether it should or should not be included or whether they have reached a settlement with respect to its unauthorized sale to Fannie Mae. (Picatinny Resp. 56.1 Stmt. at ¶ 2.) The parties refer to it as "the Bonte loan." (Id.)

documents to be purchased to Fannie Mae's Document Delivery Facility" ("DDF").  (Fannie Mae's Resp. 56.1 Stmt. at ¶ 36.)  "After delivery of the loan documents to the DDF, Fannie Mae would review the promissory notes, indorsements or allonges to ensure that they were in proper form, a process Fannie Mae referred to as certification."  (Id. at ¶ 37.)  "If DDF did not certify the loan, Fannie Mae would not purchase it."  (Id.)  Fannie Mae required that "the original promissory note . . . be delivered to it or its custodian in connection with a loan sale."  (Picatinny's Resp. 56.1 Stmt at ¶ 35.)

Picatinny originally filed this action in the Superior Court of New Jersey, Law Division, on February 27, 2009.  (Compl.; Doc. No. 1-1.)  Fannie Mae filed its Notice of Removal thereafter on March 20, 2009.  (Doc. No. 1.)  Picatinny filed its Amended Complaint on May 26, 2009. (Doc. No. 11.)  The instant cross-motions for summary judgment were filed on December 15, 2010.  (Doc. Nos. 90, 91.)  The parties respectively oppose these motions.

## II. DISCUSSION

### A. Standard of Review

A party seeking summary judgment must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); Healy v. New York Life Ins. Co., 860 F.2d 1209, 1219, n.3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 (1989); Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in

favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); Hancock Indus. v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987).

Under the Rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the nonmoving party has provided evidence to show that a question of material fact remains. See Celotex, 477 U.S. at 324. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented . . . by depositions, answers to interrogatories, or further affidavits," id. at 322 n.3, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted); see also Anderson, 477 U.S. at 247-48 (stating that "[b]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact").

What the nonmoving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; see also

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (stating that "[t]he object of [the Rule] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); Anderson, 477 U.S. at 249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (stating that "[t]o raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant," but must "exceed[] the 'mere scintilla' threshold and . . . offer[] a genuine issue of material fact"). The Local Civil Rules supplement the Federal Rules of Civil Procedure and provide that "the movant shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue." L. Civ. R. 56.1. Likewise, in opposition, "[t]he opponent of summary judgment shall furnish . . . a responsive statement of material facts." Id.

### B.     The Parties' Arguments

In support of its motion, Fannie Mae asserts a number of arguments. First, it asserts that it is the holder in due course of the notes, and therefore, should not be divested of them. (Fannie Mae's Br. at 13-15; Doc. No. 91-1.) To this end, it avers that it meets the standard required to be a "holder" and that it purchased the notes for value in good faith without notice of any defect. (Id. at 15-29.) In opposition, Picatinny argues that notes at issue are not negotiable instruments, and therefore, the "holder in due course" affirmative defense is inapplicable. (Picatinny's Opp. Br. at 21-22; Doc. No. 99.) However, even if the Court determines that the notes at issue are indeed negotiable instruments, Picatinny argues that Fannie Mae is not a "holder" of these notes. (Id. at 22.) To this end, should the Court determine that Fannie Mae is not a "holder", Picatinny

suggests that whether or not McGrath had the apparent authority to sell these notes is irrelevant. (Id. at 22-30.) In addition, Picatinny argues that Fannie Mae cannot be found to be a "holder in due course" because it had notice that the signatures on the allonges were unauthorized, and they did not take the notes in good faith. (Id. at 34-40.) In reply, Fannie Mae maintains that these mortgages are negotiable instruments, citing a recent, unpublished New Jersey Superior Court, Appellate Division case. (Fannie Mae's Reply Br. at 2-3; Doc. No. 108.) With respect to its apparent authority defense, Fannie Mae asserts that Picatinny mischaracterizes the law and that an inquiry into whether individual employees relied upon McGrath's apparent authority is not the issue, but rather, the issue the Court should examine is the reasonable belief and reliance of the corporation of McGrath's apparent authority. (Id. at 5-11.) Finally, Fannie Mae maintains that it is a holder in due course of the notes because it did not have notice that the signatures were unauthorized, and as a matter of law, it acquired the notes in good faith. (Id. at 11-15.)

Similar issues were raised in the briefing with respect to Picatinny's Partial Motion for Summary Judgment. In addition to the arguments outlined previously, Picatinny also argues in support of its motion that the Court should conclude as a matter of law that Fannie Mae converted the notes because U.S. Mortgage was not a person entitled to enforce them. (Picatinny's Br. at 13-15; Doc. No. 90-2.) Further, Picatinny asserts that Fannie Mae did not take the notes by negotiation. (Id. at 15-16.) Picatinny therefore asserts that Article 3 of the Uniform Commercial Code ("U.C.C.") does not apply and rather, the Court should apply common law principles to Picatinny's conversion claim. (Id. at 16.) Picatinny also argues that Fannie Mae's estoppel and waiver defenses lack merit. (Id. at 33-35.) Picatinny maintains that the defenses asserted pursuant to provisions in the UCC are in applicable as well. (Id. at 36-40.) In

opposition to Picatinny's motion, Fannie Mae reiterates its arguments related to McGrath's apparent authority, that Picatinny's argument that the notes at issue are not negotiable instruments is belied by New Jersey law, and that its affirmative defense of estoppel pursuant to N.J.S.A. §§ 12A:3-405 and 406 is viable. (Fannie Mae's Opp. Br. at 30-39; Doc. No. 101-1.) In reply, Picatinny asserts that there is no genuine dispute of material fact with respect to whether McGrath had apparent authority, and therefore, the Court should conclude that he did not. (Picatinny's Reply Br. at 6; Doc. No. 107.) In addition, Picatinny argues that Fannie Mae cannot establish the "reliance" prong of its apparent authority defense, and that while Fannie Mae argues that New Jersey law has changed and that it no longer requires consideration of "reliance," Picatinny asserts that Fannie Mae purchased 45 of the 52 notes at issue before the purported change in the law, and therefore, this affirmative defense cannot apply to at least those 45 notes. (Id. at 7.) Picatinny also reiterates that U.S. Mortgage cannot be considered Picatinny's agent and that Picatinny's relationship was with CU National, not with U.S. Mortgage. (Id. at 9.) Picatinny also points out that Fannie Mae "did not conduct any diligence concerning the authority of Mr. McGrath to indorse the Stolen Notes or the authority of U.S. Mortgage to sell them." (Id. at 10.)

      **C.**    **Analysis**

The parties agree that McGrath stole the notes at issue and, without authorization from Picatinny, sold these notes to Fannie Mae. The issue before the Court is whether as a matter of law any or all of Fannie Mae's affirmative defenses can be decided or alternatively, whether summary judgment should be denied due to ambiguities in the material facts or genuine disputes

9

of material fact.

                1.        Whether McGrath had Apparent Authority to Indorse the Notes

One of the issues central to all arguments is whether or not as a matter of law U.S. Mortgage had the apparent authority to sell the notes to Fannie Mae. Here, the parties agree that U.S. Mortgage did not have actual authority to sell the notes in the secondary market to Fannie Mae. "Apparent authority is relevant where the agent purports to exercise a power which he or she does not have." Burlington Indus. v. Ellerth, 524 U.S. 742, 759 (1998). "[U]nder general rules of agency law, principals are liable when their agents act with apparent authority and commit torts." Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp., 456 U.S. 556, 565-66 (1982) (explaining that "a principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority").

In New Jersey, to prevail on a claim of apparent authority, a plaintiff must establish the following elements:

> (1) that the principal has manifested his consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority; (2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) that the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.

Licette Music Corp. v. Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A., 2009 N.J. Super. Unpub. LEXIS 1861 (App. Div. July 16, 2009) (quoting Staron v. Weinstein, 305 N.J. Super. 236, 240 (App. Div. 1997)). When faced with an issue involving whether apparent authority should be legally recognized, "[t]he factual question is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence,

conversant with business uses . . . is justified in presuming that such agent has the authority to perform the particular act in question." Alicea v. New Brunswick Theological Seminary, 244 N.J. Super. 119, 129 (App. Div.1990), aff'd, 128 N.J. 303 (1992) (citations omitted).  See also Rodriguez v. Hudson County Collision Co., 296 N.J. Super. 213, 220-21 (App. Div. 1997). "Apparent authority is typically a question of fact for a jury to determine." Kim v. Marina Dist. Dev. Co., LLC, 2010 U.S. Dist. LEXIS 71090, *20-*21 (D.N.J. July 14, 2010) (citing Gizzi v. Texaco, Inc., 437 F.2d 308, 310 (3d Cir.1971)).

There are disputes of fact with respect to whether or not Picatinny voluntarily acted to place U.S. Mortgage in a situation where it would appear to a person of ordinary prudence that U.S. Mortgage was Picatinny's agent with authority to sell these notes in the secondary market. On the one hand, it can be reasonably inferred from the facts presented by the parties that Picatinny entered into a contractual agreement with CU National, and CU National was its own separate corporate entity and subsidiary of U.S. Mortgage.  It would therefore be reasonable to infer that U.S. Mortgage did not have Picatinny's permission to act on its behalf, and thus, the first required prong to establish agency would not be met.  In addition, there are questions here with respect to whether or not Fannie Mae operated in good faith.  Picatinny specifically asserts that evidence of Fannie Mae's failure to operate in good faith can be inferred because Fannie Mae "continued to purchase loans from U.S. Mortgage" despite its knowledge that:

> (1) U.S. Mortgage had misappropriated funds that belonged to Fannie Mae . . .;
> (2) U.S. Mortgage had misappropriated over $2.1 million from Cross Valley . . .;
> (3) U.S. Mortgage's head of servicing actively participated in a $45 million fraud upon Fannie Mae when he was previously employed at Olympia Mortgage . . . ;
> (4) U.S. Mortgage's owners and officers were under criminal investigation and named in a[n] indictment as conspirators in a multi-million dollar mortgage fraud . . . ; and (5) U.S. Mortgage's sales of mortgage loans to Fannie Mae increased in

> 2007 and 2008 by approximately 200% even though the sales of mortgage loans throughout the country had fallen substantially.

(Picatinny's Opp. Br. at 38.)  In addition, there is evidence that suggests that Fannie Mae knew or should have known that McGrath was never an "AVP" of Picatinny.  On the other hand, U.S. Mortgage had been authorized by Picatinny in other instances to sell its notes in the secondary market and was actually in possession of the original notes, and therefore, it may be inferred that Fannie Mae reasonably determined that U.S. Mortgage had Picatinny's authorization to sell the notes and that Fannie Mae acted in good faith in buying the notes.  Therefore, the Court cannot conclude as a matter of law that U.S. Mortgage acted with apparent authority.  Accordingly, both of the parties' motions for summary judgment are denied with respect to this issue.

      2.     Whether the Notes are Negotiable Instruments

Picatinny asserts that the notes in question are not negotiable instruments.  (Picatinny's Br. at 15.)  Picatinny lodges two arguments on this point.  First, Picatinny states that U.S. Mortgage was not a person entitled to enforce the promissory notes, citing N.J.S.A. § 12A:3-301, which defines "a person entitled to enforce" an instrument as "the holder of the instrument, a nonholder in possession of the instrument who has the rights of a holder, or a person not in possession of the instrument who is entitled to enforce the instrument pursuant to 12A:3-309 or subsection d. of 12A:3-418."  (Picatinny's Br. at 14.)  Second, Picatinny cites N.J.S.A. § 12A:3-201(b), which provides that "if an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder."  (Id.) Picatinny argues that because U.S. Mortgage cannot be considered a "holder", the notes are not

negotiable. (Picatinny's Br. at 15-16.) Therefore, the Court notes that both arguments hinge on whether or not U.S. Mortgage should be considered a "holder." Fannie Mae asserts that U.S. Mortgage should be considered a holder because it had "apparent authority." (Fannie Mae's Opp. Br. at 17-29.)

As this Court previously stated, there are genuine disputes of fact and differing yet reasonable inferences that may be drawn from the facts presented to this Court. It is reasonable to infer or not to infer from the facts set forth that U.S. Mortgage acted with apparent authority. Indeed, if it had apparent authority, it may be concluded that it was a "holder," and if it did not have apparent authority, it may not be concluded that it was a "holder." For this reason, the Court will deny summary judgment on this issue.

Picatinny also asserts that the notes at issue are not "negotiable instruments" pursuant to Article 3 of the U.C.C. because "Section 4 of the notes impose[s] the additional obligation on the borrower to notify the note holder in writing whenever a borrower makes a prepayment." (Picatinny's Br. at 21.) Fannie Mae directed this Court's attention to a recent unpublished Appellate Division case, HSBC Bank USA v. Gouda, 2010 N.J. Super. Unpub. LEXIS 3029 (App. Div. Dec. 17, 2010) in which the Appellate Division addressed this precise issue. While the Court notes that the case is not precedential, the Court concurs with its outcome and will follow its holding. The type of "additional undertaking or instruction" that is presented here, is the exact same as that examined in HSBC Bank USA v. Gouda. The Appellate Division explained:

> the right of [a party] . . . to prepay part of the principal does not constitute an "additional undertaking or instruction" that adversely affects the negotiability of the note. Quite the opposite, the right of prepayment is a voluntary option

> that defendants may elect to exercise solely at their discretion. Indeed, such an allowance confers a benefit, not a burden, upon defendants, who can freely choose to decline the opportunity. The fact that defendants must notify the lender in the event they opt for prepayment imposes no additional liability on them and is not a condition placed on defendants' promise to pay. Rather, notification is simply a requirement of the exercise of the right of prepayment which, as noted, defendants are free to reject. This requirement does not render the note in issue non-negotiable.

HSBC Bank USA, 2010 N.J. Super. Unpub. LEXIS 3029, at *7-*8.  Therefore, the Court rejects Picatinny's argument and concludes that the requirement set forth in N.J.S.A. § 12A:3-104(a)(3) is not violated.  Accordingly, the Court denies Picatinny's Motion for Summary Judgment on this point.

        3.      <u>Whether Fannie Mae can be Determined to be a Holder in Due Course as a Matter of Law</u>

Fannie Mae asserts that as a matter of law the Court should determine that it is a holder in due course of the notes at issue. (Fannie Mae's Br. at 13-15.)  Picatinny opposes this argument, stating that Fannie Mae had notice that the signatures on the allonges were unauthorized and they did not take the notes in good faith. (Picatinny's Opp. Br. at 34-40.)  The Court previously addressed these issues with respect to its discussion regarding U.S. Mortgage's alleged apparent authority and in relation to the Court's discussion about whether the notes, under the law, are negotiable instruments.  The Court concludes, as it previously stated, that there are disputes of material fact regarding whether Fannie Mae operated in good faith. (Picatinny's Opp. Br. at 38).  For these same reasons that were previously outlined, the Court denies summary judgment on this issue.

      4.      <u>Whether as Fannie Mae's Affirmative Defenses of Waiver and Estoppel are Meritorious</u>

Picatinny asserts that Fannie Mae's waiver and estoppel defenses lack merit. (Picatinny's Br. at 33-35.) While Fannie Mae does not address Picatinny's assertion regarding a waiver defense in its opposition brief, Fannie Mae makes clear that its Fifth Affirmative Defense relies on the Restatement (Third) of Agency § 2.05, which has been adopted by the New Jersey courts, <u>see</u> <u>Estate of Cordero ex rel. Cordero v. Christ Hospital</u>, 403 N.J. Super. 306, 315 n.3 (App. Div. 2008). (Fannie Mae's Opp. Br. at 31-32.) Section 2.05 of the Restatement (Third) of Agency provides:

> A person who has not made a manifestation that an actor has authority as an agent and who is not otherwise liable as a party to a transaction purportedly done by the actor on that person's account is subject to liability to a third party who justifiably is induced to make a detrimental change in position because the transaction is believed to be on the person's account, if
>
> (1) the person intentionally or carelessly caused such belief, or
>
> (2) having notice of such belief and that it might induce others to change their positions, the person did not take reasonable steps to notify them of the facts.

Restatement (Third) of Agency § 2.05. Having thus clarified the scope of its Fifth Affirmative Defense, the Court concludes that Picatinny's motion for summary judgment on this issue should be denied. Again, this defense largely relies and turns on facts that Fannie Mae describes as "Picatinny's carelessness". (Fannie Mae's Opp. Br. at 32.) The Court cannot conclude as a matter of law that Picatinny was careless, and concludes that this requires a finding of fact rather than a conclusion of law. Whether or not this defense is meritorious turns on facts that are in dispute, and therefore, summary judgment is denied on this ground.

        5.       <u>Whether the U.C.C.'s provisions outlined in N.J.S.A. §§ 12A:3-405 and 406 are viable</u>

Picatinny also argues that Fannie Mae's Sixth and Seventh Affirmative Defenses should be dismissed. (Picatinny's Br. at 36.) Picatinny asserts that they should be dismissed because McGrath's signature on the notes at issue are not fraudulent as it is defined in the U.C.C. and because Picatinny asserts its agreement was with CU National, and not with U.S. Mortgage. (<u>Id.</u> at 38.) Again, this argument relies on dispute of fact with respect to the alleged agency relationship between Picatinny and U.S. Mortgage. For the reasons previously expressed at length, the Court will deny summary judgment on this issue.

### III. CONCLUSION

For the foregoing reasons, the Court denies Picatinny's Partial Motion for Summary Judgment and denies Fannie Mae's Motion for Summary Judgment. An appropriate form of order accompanies this opinion.

Dated: April 7, 2011

                                                   s/ Garrett E. Brown, Jr.
                                                   GARRETT E. BROWN, JR., U.S.D.J.